UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re

HFAH CLEAR LAKE LLC,[1]
a Florida limited liability company,

Debtor.

_____

Chapter 11

Case No. 14-

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER
(A) APPROVING BIDDING PROCEDURES, (B) APPROVING
THE FORM AND MANNER OF NOTICE, (C) APPROVING FORM
OF PURCHASE AND SALE AGREEMENT (D) SCHEDULING
AN AUCTION, AND (E) APPROVING THE SALE OF
SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS**

The above captioned debtor (the "**Debtor**"), pursuant to this motion (the "**Sale Procedures Motion**"), seeks entry of an order (the "**Sale Procedures Order**"), substantially in the form attached hereto as **Exhibit A**, (a) approving bidding procedures (the "**Bidding Procedures**") and bid protections in connection with the sale (the "**Sale**") of the Debtor's real property located at 719 Executive Center Drive, in the City of West Palm Beach, Palm Beach County, Florida 33401 [Tax Parcel Identification Nos. 74-43-43-20-01-007-0000 and 74-43-43-20-01-007-0010], comprising approximately 10.92 acres of land (the "**Property**"); (b) approving the form and manner of notice of the Sale; (c) scheduling an auction (the "**Auction**") and (d) approving the form of that certain Purchase and Sale Agreement between the Debtor as seller and Revenue Properties (US) Inc. as purchaser ("**Revenue Properties**"), as amended by the First Amendment (collectively the "**PSA**"), a copy of which is attached hereto as composite **Exhibit**

_____

[1]    The last four digits of the Debtor's federal tax identification number are 6161.  The Debtor's address is c/o Keldar Advisors, LLC, 245 Saw Mill River Road, Suite 106, Hawthorne, NY 10532.

**B**.  The Debtor also requests that the Court schedule a sale hearing (the "**Sale Hearing**") to consider approving the Sale to Revenue Properties pursuant to the **PSA** or to the highest or otherwise best bidder at the Auction (the "**Successful Bidder**").

The Debtor further requests that, at the conclusion of the Sale Hearing the Court enter an order (the "**Sale Order**"), authorizing the Debtor to sell the Property free and clear of all liens, claims, encumbrances and other interests to Revenue Properties or any other Successful Bidder, on substantially similar terms as those set forth in the PSA or as further modified by the Successful Bidder.  In support of this Motion, the Debtor respectfully states as follows:

Local Bankruptcy Rule 6004-1 Concise Statement[2]

| Provision | Description | Location (in PSA unless otherwise noted) |
|---|---|---|
| Seller | HFAH Clear Lake, LLC | Page 1 |
| Buyer | Revenue Properties (US) Inc. or such other Successful Bidder at the Auction | Page 2, and para. 3 |
| Sale Price | $4,225,000.00 | Para. 2(a) |
| Deposit | $500,000.00 | Para 2(b) &(c) |
| Assumed Liabilities | None | |
| Cure Amounts | None | |
| Closing Date | The Closing Date shall occur within 5 business days of the sale order becoming a final, non appealable order | Para. 5(a) |
| Break-up Fee and Expense | $301,750.00 | Para. 2(i) &(j) |
| Potential Lien Holders | The Direct lender group consists of a group of individuals with fractionalized beneficial interests in the HFAH Clear Lake 1st in the principal amount of $146,050,000.00, and a group of individuals with | Page 1, Preliminary Statement |

---

[2]    The following summary of the PSA is provided for the convenience of the Court and parties in interest.  To the extent that there are any discrepancies between this summary and the PSA, the terms and language of the PSA shall govern.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the PSA, attached hereto as Exhibit B.

|  |  |  |
|---|---|---|
|  | fractionalized beneficial interests in the HFAH Clear Lake 2nd in the principal amount of $2,750,000.00. In addition the City of West Palm Beach may have rights for past due taxes and code violations |  |
| Personal Identifiable information | The Debtor does not have personal identifiable information for any third parties |  |
| Initial Overbid Amount | $4,651,750.00 | Para3(a)(viii) |
| Minimum Incremented Amounts | $100,000.00 | Para 3(a)(viii) |
| Minimum Deposit | $500,000.00 | Para 3(a)(iii) |
| Preliminary Bid Documents | Potential Bidders must, on or before December 1, 2014, deliver: a non-binding indication of interest with respect to the Sale; and preliminary proof by the Potential Bidder of its financial capacity to close a transaction. | Bidding Procedures Para 2 |
| Due Diligence | A Potential Bidder who delivers acceptable Preliminary Bid Documents as determined by the Debtor may conduct a due diligence review. The Debtor shall provide Acceptable Bidders reasonable due diligence information as soon as reasonably practicable after submission of the Preliminary Bid Documents. | Bidding Procedures Para 4 |
| Bid Deadline | Binding bids must be received by the Debtor by 5:00 p.m. (Eastern Standard Time) on December 5, 2014 | Bidding Procedures Para 4 & 9 |
| Qualified Bid Requirements | Only Potential Bidders who submit "Qualified Bids" by the Bid Deadline may participate in the Auction. A Qualified Bid is an irrevocable offer that must:<br>(a)     be in writing;<br>(b)     authorize the Debtor to provide the bid to Revenue Properties;<br>(c)     equal or exceed $4,651,750, which is comprised of the Purchase Price ($4,225,000), the Break-Up Fee ($126,750), the Expense Reimbursement ($175,000) and the Minimum Bid Increment ($100,000) (the "**Minimum Bid Amount**");<br>(d)     constitute a good faith, bona fide offer to purchase the Property;<br>(e)     be accompanied by a clean and a duly executed copy of the PSA and the documents set forth as exhibits thereto, along with marked copies that reflect the amendments and modifications to the PSA, which may not be materially more burdensome | Bidding Procedures Para 5 |

3

| | | |
|---|---|---|
| | to the Debtor or inconsistent with the Bidding Procedures;<br><br>(f)      identify with particularity each and every condition to closing;<br><br>(g)      not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, and/or (iii) the outcome or completion of a due diligence review; and<br><br>(h)      must remain irrevocable until 48 hours after the Auction.<br><br>In addition, to participate in the Auction, each Acceptable Bidder must by the Bid Deadline:<br><br>(a)      demonstrate to the Debtor's satisfaction that such Potential Bidder has the financial wherewithal and ability to consummate the Sale;<br><br>(b)      disclose the identity of each entity that will be participating in the Auction and the terms of such participation, with evidence that the Potential Bidder is legally empowered to complete the Sale;<br><br>(c)      submit a Good Faith Deposit in cash equal to $500,000 by wire transfer of immediately available funds to an Berger Singerman LLP; and<br><br>(d)      not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or similar payment or reimbursement. | |
| Proposed     Auction Date | If one or more Qualified Bids are received by the Bid Deadline, then Debtor's counsel shall conduct the Auction at their offices located at **2650 North Military Trail, Suite 240, Boca Raton, Florida**. The Auction shall be held on or before December 8, 2014<br><br>The Auction will be conducted in accordance with the following procedures:<br><br>(a)      the Auction will be conducted openly;<br><br>(b)      only the Qualified Bidders, including Revenue Properties, shall be entitled to bid at the Auction; | Bidding Procedures Para 12, 13, & Notice |

|  |  |  |
|---|---|---|
|  | (c)      the Qualified Bidders, including Revenue Properties, shall appear in person at the Auction, or through duly-authorized representatives; <br><br>(d)      only such authorized representatives of each of the Qualified Bidders, Revenue Properties, the Debtor, any Direct Lender, and their respective advisors shall be permitted to attend the Auction; <br><br>(e)      bidding at the Auction shall begin at the Minimum Bid Amount; <br><br>(f)      subsequent bids at the Auction shall be made in minimum increments of $100,000; <br><br>(g)      Revenue Properties shall receive a credit equal to the amount of the Break- up Fee and the Expense Reimbursement when bidding; <br><br>(h)      each bidder will be informed of the terms of the previous bids; <br><br>(i)      the bidding will be transcribed; <br><br>(j)      each bidder must confirm on the record that it has not engaged in any collusion with respect to the bidding or the Sale; <br><br>(k)      absent irregularities in the conduct of the Auction, bids made after the Auction is closed shall not be considered; and <br><br>(l)      the Auction is cash only and no credit bids will be allowed. |  |
| Procedures Acceptance of the Successful Bid | At the end of the Auction, the Debtor, in the exercise of its reasonable, good-faith business judgment, shall identify the highest or otherwise best bid (the "**Successful Bid**").  The Successful Bidder and the Debtor shall, as soon as commercially reasonable and practicable, complete and sign all documentation evidencing and containing the terms of the Successful Bid. <br><br>At the Sale Hearing, the Debtor will seek certain findings from the Court, including that (a) the Auction was conducted and the Successful Bidder was selected in accordance with the Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Property and is in the best interests of the Debtor and its estate. | Bidding Procedures Para 14 |
| Designation of Back- | At the conclusion of the Auction the Debtor will | Bidding |

5

5940361-2

| up Bidder | identify and announce the identity of the Qualified Bidder with the second highest or otherwise best bid (the "**Back-up Bidder**").  If the Successful Bidder fails to consummate the Sale, then the Debtor and the Back-up Bidder will automatically be authorized, but not required, to consummate the Sale with the Back-up Bidder as soon as is commercially reasonable without further order of the Court. | Procedures Para 18 |
| --- | --- | --- |
| Return of Good Faith Deposit and Refund of the Initial Deposit to Revenue Properties | The Good Faith Deposit of the Successful Bidder shall be credited to the price paid for the Property, with $200,000 of such deposit refunded to Revenue Properties.  If the Successful Bidder fails to consummate the Sale (other than as a result of a material breach by the Debtor), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by the Debtor.  The Good Faith Deposit of any unsuccessful Qualified Bidders (except for Revenue Properties) will be returned within fifteen (15) days after consummation of the Sale or upon the permanent withdrawal of the proposed Sale of the Property.  Revenue Properties' Good Faith Deposit shall be returned in accordance with the PSA. | Para 3(a)(ix) & (x) and Bidding Procedures Para 20 & 21 |
| Reservation of Rights | The Debtor reserves its rights (subject to the rights and remedies of Revenue Properties under the PSA and Bidding Procedures) to modify the Bidding Procedures in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the Sale. | Bidding Procedures Para 8 |

## **Preliminary Statement**

1.      As detailed in the Declaration of Daniel G. Hayes, filed contemporaneously

herewith, in support of the Debtor's First Day Motions (the "**Hayes Declaration**"), the Property

has been mired in bankruptcy proceedings initially filed on April 13, 2006, by USA Commercial

Mortgage Company and its affiliates (collectively, "**USACM**"), the entities that originally

brokered, syndicated and originated the loan on the property.  The USACM bankruptcy

proceedings were followed by the bankruptcy case of Asset Resolution, LLC ("**ARC**") , who had

acquired assets from the USACM bankruptcy estate, including, the loan on the Property, which case remains pending before the United States District Court for the District of Nevada; Case No. 09-32824 (the "**ARC Bankruptcy Case**").  The connection between the Debtor and the Nevada bankruptcy cases arises from a first loan and a second loan originated by USACM and funded by certain individuals, trusts, estates, and other lenders, including USACM (collectively, the "**Direct Lenders**").  The chapter 7 Trustee appointed in the ARC Bankruptcy Case purportedly holds an interest in one or both mortgages on the Property as a result of USACM's participation in the loans.

2.      The Debtor entered into the PSA, which provides for a purchase price of $4,225,000 for the Property.  The PSA is the result of extensive marketing and negotiation efforts by the Debtor and its advisors, and will be used by the Debtor to establish the floor price at the Auction for the Property.  At the Auction, the Debtor will market test the consideration it has negotiated with Revenue Properties in an effort to maximize the value of its Estate for the benefit of all parties in interest.

3.      Accordingly, by this Motion, the Debtor seeks approval of Bidding Procedures that will govern both the solicitation of competing bids by other potential purchasers and the Auction process, and bid protections (including a break-up fee and expense reimbursement) for Revenue Properties in recognition of the value the Debtor obtains by having a stalking horse bid set a floor at the Auction.  By this Motion, the Debtor also requests that the Court authorize the Debtor to conduct the Auction, and schedule the Sale Hearing for the Court to approve the Sale of the Property to Revenue Properties or the Successful Bidder.

## Jurisdiction

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004 and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 6004-1.

## Background

7.     The Debtor was formed for the purpose of acquiring and converting an existing 180-unit apartment complex into condominium units.  In connection with the acquisition of the property the Debtor obtained secured financing totaling in excess of $19 million from USACM.

8.     On September 30, 2014 (the "**Petition Date**"), the Debtor filed a voluntary petition for reorganization under the Bankruptcy Code.  The Debtor continues in possession of its property and is managing its business as debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## The Proposed Sale to Revenue Properties

9.     The PSA sets forth the terms of the Sale of the Debtor to Revenue Properties, subject to higher or otherwise better offers at the Auction, free and clear of all liens, claims and interests), pursuant to sections 105(a) and 363 of the Bankruptcy Code all as summarized in the Concise Statement, above.

5940361-2

## Sale Notice and Objection Deadline

10.     The Debtor believes that it will obtain the maximum recovery for parties in interest if the Property is sold through a well-advertised Auction.   Under Bankruptcy Rules 2002(a) and (c), the Debtor must notify creditors of (a) the proposed sale of the Property; (b) the time and place of the Auction; (c) the terms and conditions of the Sale; and (d) the deadline for filing any objections.   The Debtor requests that notice of the Sale, the Auction, and the Sale Procedures Order be deemed adequate and sufficient if:

> Within five business days of the entry of the Sales Procedures Order, the Debtor (or its agent) shall serve by first class mail, postage prepaid, copies of (a) the Sales Procedures Order, (b) the Bidding Procedures, and (c) a notice regarding the proposed Sale (the "**Sale Notice**"), substantially in the form attached hereto as **Exhibit C**.  The Sales Procedures Order, the Bidding Procedures, and the Sale Notice will be served upon the following entities (collectively, the "**Notice Parties**"):
>
> > a.  the U.S. Trustee;
> >
> > b.  all known creditors of the Debtor as identified on the Debtor's schedules of assets and liabilities;
> >
> > c.  all taxing authorities having jurisdiction over any of the Property, including the Internal Revenue Service;
> >
> > d.  all parties that have requested notice pursuant to Bankruptcy Rule 2002;
> >
> > e.  all persons or entities known or reasonably believed to have asserted a lien in any of the Property;
> >
> > f.  all persons or entities known or reasonably believed to have expressed an interest in purchasing the Property;
> >
> > g.  the Direct Lenders; and

9

h.   Revenue Properties and its counsel.

11.     Finally, the Debtor proposes that the Court establish the deadline for objecting to the Sale as seven days before the Sale Hearing (the "**Sale Objection Deadline**").

<u>**Legal Authority for the Requested Relief**</u>

12.     As noted in the above summaries of the PSA and the Bidding Procedures, the PSA requires that the Debtor provide Revenue Properties with bid protections in the form of the Break-up Fee and the Expense Reimbursement.   These bid protections were a material inducement for, and a condition of Revenue Properties' agreement to enter into the PSA.   As described more fully herein, the Debtor believes that these bid are appropriate because, among other things, Revenue Properties' willingness to serve as a stalking horse bidder and establish a minimum bid for other bidders increases the chances that the Debtor will receive the highest or otherwise best offer for the Property and will serve as a catalyst for other potential bidders.

A.      <u>**The Bid Protections are Appropriate**</u>

13.     In summary, the Sale Procedures serve the interests of the Debtor's Estate in several ways.  The procedures themselves are fair and reasonable, as they will permit the Debtor to conduct an orderly sale and obtain the best possible price on the best possible terms for the Property.  Additionally, the procedures require that potential bidders demonstrate their capacity to complete the transaction.  Accordingly, the proposed Sales Procedures are appropriate under the circumstances and should be approved as a valid exercise of the Debtor's sound business judgment.

14.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate.  *Official Comm.*

*of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *see also In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are therefore appropriate in the context of bankruptcy sales.  *See, Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

15.     The Debtor is also requesting approval of the provisions of the PSA regarding the payment to Revenue Properties of (a) the Break-up Fee of $126,750 (*i.e.*, three percent of the Sales Proceeds), payable in most instances only upon closing of a Court-approved sale of the Property to an entity other than Revenue Properties who outbids Revenue Properties at the Auction, and (b) the Expense Reimbursement of up to $175,000, payable under certain termination events.  Revenue Properties required the inclusion of these provisions in the PSA to be willing to serve as a stalking horse bidder.

16.     Approval of break-up fees and other forms of bidding protections in connection with a sale of significant assets are an established practice in chapter 11 cases. *See In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of approximately 3% of the purchase price and expense reimbursement up to $5,000,000); *In*

11

*re Silicon Graphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving break-up fee of approximately 2.8% of the purchase price and expense reimbursement up to $750,000); *In re Steve & Barry's Manhattan LLC*, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee of 2% of the purchase price and expense reimbursement up to $2 million).

17. The bid protections have encouraged Revenue Properties to bid for the Property and perform diligence with respect thereto, which will allow the Debtor to maximize the value of the Property at the Auction. Bankruptcy courts generally approve bidding procedures under a business judgment standard pursuant to which courts defer to the actions of a corporation's board of directors taken in good faith and in the exercise of honest business judgment. Specifically, courts have approved bidding protections upon considering the following three factors: (a) whether the relationship of the parties who negotiated the fee is tainted by self-dealing or manipulation; (b) whether the fee hampers, rather than encourages, bidding; and (c) whether the amount of the fee is unreasonable relative to the proposed purchase price. *See Integrated Res.*, 147 B.R. at 657. Here, each of these three factors supports approval of the Bid Protections.

18. The PSA, including the provisions for the bid protections, is the product of extensive, good faith arm's-length negotiations between the Debtor and Revenue Properties. Moreover, the bid protections are not significant when compared with the advantages provided by Revenue Properties of ensuring a floor price for the Property and are appropriately priced so as not to deter active bidding from potential bidders. Additionally, the proposed bid protections are "reasonably related to the bidder's efforts and the transaction's magnitude," *Integrated Res.*, 147 B.R. at 662-63, and are reasonable in relation to the Sales Proceeds. Finally, Revenue Properties has stated that it would not be willing to commit to hold open its offer to purchase the

Property under the terms of the PSA unless the bid protections and assistance covenants are approved and any payments related thereto in accordance with the PSA are authorized. Accordingly, this Court should approve the bid protections and assistance covenants as set forth in the PSA.

### B.     The Minimum and Subsequent Overbid Amounts Are Appropriate

19.     Another important component of the Bidding Procedures is the "overbid" provision.  As set forth therein, for a bid to be considered a Qualified Bid, it must exceed the Minimum Bid Amount of $4,651,750, which is comprised of the Purchase Price ($4,225,000), the Break-Up Fee ($126,750), the Expense Reimbursement ($175,000) and the Minimum Bid Increment ($100,000).  Each overbid increment thereafter must be at least $100,000 higher than the previous bid.

20.     The Minimum Bid Amount is necessary not only to compensate the Debtor for the risk that it assumes in foregoing a known, willing and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by the estate after deducting the Bid Protections to be paid to Revenue Properties in the event of a prevailing overbid at the Auction.  *In re Colony Hill Assocs.*, 111 F.3d 269, 270 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 or 8.6%); *Financial News Network*, 980 F.2d at 165, 166-67 (requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million or 9.5%); *In re Tempo Technology Com.*,202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities); *In re Wintex, Inc.*, 158 B.R. 540,543 (D. Mass. 1992) ("Debtor may avoid the increased costs and complexity associated with considering

additional bids for sale of debtor's property unless the additional bids are high enough to justify their pursuit.  The 10% increase requirement is one example of a reasonable litmus test.").

21.    Here, the Minimum Bid Amount is necessary to fund the Bid Protections payable to Revenue Properties in the event Revenue Properties is outbid at the Auction.  The Debtor believes that such an initial overbid is reasonable under the circumstances, and will enable the Debtor to maximize the value for the Property while limiting any chilling effect on the sale process.  In fact, the subsequent overbid increment of $100,000 amount is not significant when compared to the Sales Proceeds.  Thus, this Court should approve the Minimum Bid Amount and subsequent overbid amounts set forth in the Bidding Procedures.

## C.    The Bidding Procedures Facilitate Maximum Recovery for the Estate

22.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Applying Bankruptcy Code section 363, bankruptcy courts frequently have considered and approved auction and sale procedures in advance of a proposed sale of property of the estate.  *See, e.g., Doehring v. Crown Corp. (In re Crown Corp.)*, 679 F.2d 774, 775 (9th Cir. 1982) (noting that the district court had required specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N. Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits); *In re Table Talk, Inc.*, 53 B.R. 937, 943 (Bankr. D. Mass. 1985) (noting that

Bankruptcy Code section 363 requires notice and a hearing prior to the establishment of bidding procedures for the sale of property of the estate).

23.     To that end, courts have uniformly recognized that establishing sale procedures in advance of an auction facilitates a debtor's efforts to increase the value ultimately realized by the estate by, among other things: (a) creating a well-defined and orderly forum in which potential bidders are provided a fair opportunity to submit competing offers; (b) ensuring fair comparability among competing bids; and (c) helping to ensure that only serious bidders with the intention of and ability to consummate the transaction are involved in the process. *See generally In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991).

24.     As set forth above, the Bidding Procedures are designed to maximize value by establishing "ground rules" for the Auction, including rules governing: the process by which a potential buyer may become a Qualified Bidder and submit a Qualified Bid; the deadline for the submission of bids; the time and place of, and procedures governing the Auction, if Qualified Bids are received; the procedures for the Debtor's selection of the Successful Bidder; and the Bid Protections that induced Revenue Properties to act as the stalking horse bidder.

25.     Additionally, given the incredible complexity surrounding the mortgages, the Direct Lenders and the Nevada bankruptcy cases, and the estimated $3 million dollars of property taxes, fines and penalties levied against the Property, cause exists to deny credit bids pursuant to section 363(k) of the Bankruptcy Code.  Under protocols established in the Nevada bankruptcy cases, for the Direct Lenders to take any action, such action must be approved by 51% of the Direct Lenders.  In these circumstances, however, it seems inequitable to allow a faction of Direct Lenders to bind all other Direct Lenders to an additional $3 million in expenses. Moreover, because the Direct Lenders are an extremely disparate group, without any form of

5940361-2

organization or structure, allowing a credit bid would impose an unacceptable burden on the Debtor as it is virtually impossible to determine whether a 51% majority has approved assumption of liabilities under a credit bid.

26.     The Debtor believes that the Bidding Procedures described above establish appropriate parameters under which the value of the Property may be tested at the Auction. These Bidding Procedures, which were designed to ensure a competitive and fair bidding process, will increase the likelihood that the Debtor receives the highest or otherwise best value for the Property.

27.     Moreover, the Debtor believes that the Auction and proposed Bidding Procedures will promote active bidding from seriously interested parties and, in the event Revenue Properties is the ultimate purchaser of the Property, these procedures will confirm that the highest or otherwise best value is obtained for the Property by "market-testing" the purchase price.  Significantly, the Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to consummate a transaction.

### D.     The Sale is a Sound Exercise of the Debtor's Business Judgment

28.     Courts have made clear that a debtor's business judgment is entitled to great deference with respect to the procedures to be used in selling estate assets.  *See, e.g., In re Moore*, 110 B.R. 924 (Bankr. C.D. Cal. 1990); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such

procedures and arrangements are "presumptively valid"), *appeal dismissed*, 3 F.3d 49 (2d Cir.
1993); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

29.     The Debtor submits that sufficient cause exists to approve the proposed Bidding
Procedures.  The Auction and proposed Bidding Procedures will enable the Debtor to have the
best chance and opportunity to procure the highest and best bids for the purchase of the Property,
and implement a controlled and fair process whereby the value received by the Estate will be
maximized to the fullest extent possible.  The Bidding Procedures will facilitate a competitive
and fair bidding process in several respects, including ensuring that (a) all Potential Bidders are
given sufficient notice and an opportunity to participate in the Sale process; (b) competing bids
are readily comparable by requiring that all parties agree to the terms and conditions contained in
the PSA; and (c) only serious, committed entities will participate in the process by requiring both
a deposit and the provision of information regarding the ability of the Potential Bidder to meet its
obligations under the PSA.

30.     Therefore, the proposed Bidding Procedures are reasonable and appropriate and
within the Debtor's sound business judgment because they will serve to maximize the value that
the Debtor will recover on account of the Sale of the Property.

### E.     The Proposed Notice Procedures are Appropriate

31.     As set forth above, no later than five days Business Days following entry of the
Sale Procedures Order, the Debtor will serve the Sale Procedures Order, the Bidding Procedures
and the Sale Notice on the Notice Parties, who encompass all parties likely to be affected by the
Sale.  The Debtor submits that such notice complies fully with Bankruptcy Rule 2002, and is
reasonably calculated to provide timely and adequate notice of the Sale and the Auction to the
Debtor's creditors and other parties in interest, and also to those who have expressed an interest,

or may express an interest, in bidding on the Property.  Based upon the foregoing, the Debtor respectfully requests that the Court approve the proposed notice procedures.

## <u>Conclusion</u>

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as **Exhibit A**, (a) approving the Bidding Procedures and bid protections in connection with the Sale; (b) approving the form and manner of notice of the Sale; (c) scheduling the Auction; (d) approving the form of PSA; and (e) granting such other and further relief as is fair and equitable.

Dated: September 30, 2014

BERGER SINGERMAN LLP
Proposed Attorneys for HFAH Clear Lake LLC
1450 Brickell Avenue, Suite 1900
Miami, Florida  33131
(305) 755-9500
(305) 714-4340 (Facsimile)

By____/s/  Debi Evans Galler_____
    Paul Steven Singerman
    Florida Bar Number 378860
    Singerman@bergersingerman.com
    Debi Evans Galler
    Florida Bar Number 985236
    dgaller@bergersingerman.com

18

**EXHIBIT A**
**SALE PROCEDURE ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re                                             /          Chapter 11

HFAH CLEAR LAKE LLC,
a Florida limited liability company,                        Case No. 14-

_____ Debtor. _____

**ORDER ON DEBTOR'S MOTION FOR ENTRY OF AN ORDER**
**(A) APPROVING BIDDING PROCEDURES, (B) APPROVING THE FORM**
**AND MANNER OF NOTICE, (C) APPROVING FORM OF PURCHASE AND**
**SALE AGREEMENT (D) SCHEDULING AN AUCTION, AND (E) APPROVING THE**
**SALE OF SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE**
**AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS**

Upon the motion (the "**Motion**") [ECF No.____ ], dated September 30, 2014, filed by the

above captioned debtor (the "**Debtor**") for entry of an order, pursuant to sections 105(a) and 363

of title 11 of the United States Code (the "**Bankruptcy Code**"), and rules 2002, 6004, and 9007

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 6004-

1 (a) authorizing the Debtor to enter into a purchase and sale agreement (the "**PSA**") with

Revenue Properties (US) Inc., (b) approving bidding procedures and overbid protections in

5940364-3

connection with the Sale[1] of the Property, (c) approving the form and manner of notice, (d) approving form of purchase and sale agreement and (e) scheduling the Auction; the Court having reviewed the Motion, and conducted a hearing to consider the relief requested therein (the "**Hearing**"); and having heard statements of counsel and any evidence presented in support of the relief requested in the Motion at the Hearing; and it appearing that due notice of the Motion was provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**Findings of Fact and Conclusions of Law:**

A.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.       The Debtor has articulated good and sufficient reasons for (a) the sale of substantially all of its Property as provided in the PSA, (b) the approval of the Bidding Procedures, attached hereto as **Exhibit A** and incorporated herein by reference, and (c) the granting of a break-up fee (the "**Break-Up Fee**") and expense reimbursement (the "**Expense Reimbursement**") to Revenue Properties in its role as stalking horse bidder, as provided herein, in the PSA, and in the Bidding Procedures.

---

[1]         Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Motion, the Bidding Procedures or the PSA.

C.     Notice of the Motion was good and sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures or any other form of relief granted herein is or shall be required.

D.     All amounts, if any, to be paid by the Debtor to Revenue Properties pursuant to the PSA, including the Break-up Fee and Expense Reimbursement, shall be paid in accordance with the terms and conditions of the PSA, and (a) are reasonable and appropriate in light of the size and nature of the proposed Sale, the commitments that have been made and the efforts that have been and will be expended by Revenue Properties, (b) are necessary to induce Revenue Properties to continue to pursue the Sale and to continue to be bound by the PSA, (c) are fair, reasonable and equitable in all respects under the circumstances, (d) were negotiated by the parties at arm's length and in good faith, and (e) represent an exercise of the Debtor's sound business judgment.  Further, all such amounts to be paid to Revenue Properties, including the Break-up Fee and Expense Reimbursement, are actual and necessary costs and expenses of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code.

E.     The Break-up Fee and Expense Reimbursement induced Revenue Properties to submit a bid that will serve as a minimum floor bid on which the Debtor, its creditors and other bidders may rely.  Revenue Properties has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible price for the Property will be received.

F.     The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Property.

G.     The transaction contemplated by the PSA are undertaken by Revenue Properties without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the transaction, unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

H.     Neither the Debtor nor Revenue Properties have engaged in any action or inaction that would cause or permit the transactions contemplated by the PSA to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.   The consideration provided by Revenue Properties for the Property under the PSA is fair and reasonable and the sale may not be avoided under section 363(n) of the Bankruptcy Code.

**It Is Ordered:**

1.     The Motion is GRANTED.

2.     The form of the PSA is approved.

3.     The Debtor is authorized to enter into the PSA.

4.     The Sale of the Property as provided in the PSA is approved, subject to the receipt of higher and better bids at the Auction.

5.     The form and manner of notice of the Auction and Sale attached hereto as **Exhibit B** and incorporated herein by reference (the "**Sale Notice**"), is approved.

6.     The Debtor is authorized to conduct to Auction on December 8, 2014 at the offices of Berger Singerman LLP located at **2650 North Military Trail, Suite 240, Boca Raton, Florida**.

7.     The Bidding Procedures are hereby approved and shall govern the sale process. Bids that do not conform to the Bid Procedures will not be considered for participation in the

Auction.  The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

8.      The deadline to submit Preliminary Bid Documents (as defined in the Bidding Procedures) shall be December 1, 2014.

9.      The deadline to submit a Qualified Bid (as defined in the Bidding Procedures) shall be December 5, 2014 (the "**Bid Deadline**").

10.     As further described in the Bidding Procedures, the Debtor shall conduct the Auction if a Qualified Bid, other than the Revenue Properties bid under the PSA, is received prior to the Bid Deadline.  Reasonable notice of the time and place for the Auction will be given to all Qualified Bidders, including Revenue Properties.  If no timely, conforming Qualified Bids other than the Revenue Properties bid under the PSA, are submitted by the Bid Deadline, the Auction will not be held, Revenue Properties will be the Successful Bidder, and the Debtor will seek authority to consummate the transactions contemplated by the PSA with Revenue Properties at the Sale Hearing.

11.     Any obligations of the Debtor contained in the PSA that are intended to be performed prior to entry of an order by this Court approving the sale, are hereby authorized and are fully enforceable as of the date of entry of this Order.

12.     Objections, if any, to the Sale of the Property must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Bankruptcy Rules, (d) be filed with the Court electronically by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, so as to be actually received no later than 4:00 p.m. (Eastern Time) seven (7) days before the Sale Hearing (the "**Sale Objection Deadline**").

13.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion of any objection to the Motion and the consummation and performance of the Sale, and shall be deemed to constitute such party's consent to the Sale and the transactions and documents related thereto.

14.     The Break-up Fee, Expense Reimbursement and other bid protections as set forth in the PSA are hereby approved, and any and all objections to the bid protections that were not consensually resolved at or before the Hearing are hereby overruled.

15.     The Debtor is authorized and directed to pay any and all amounts owing to Revenue Properties in accordance with the terms of the PSA, including the Break-up Fee and Expense Reimbursement, without further order of the Court.

16.     If Revenue Properties becomes entitled to payment from the Debtor under the PSA for, among other things, the Break-up Fee or the Expense Reimbursement, then Revenue Properties shall be, and hereby is, granted an allowed administrative claim in the Debtor's Chapter 11 case in an amount equal to such amounts, under sections 503(b) and 507(a)(2) of the Bankruptcy Code and, if applicable, the Break-up Fee and Expense Reimbursement shall be paid upon consummation, and from the proceeds, of the transaction with a purchaser other than Revenue Properties.

17.     Notice of (a) the Motion, constitutes good, sufficient and timely notice, and no other or further notice shall be required, other than service of a copy of this Order by first class mail postage prepaid upon the Notice Parties.

18.     Notwithstanding Rules 6004(h), 6006(d), 7062, or 9014 of the Federal Rules of Bankruptcy Procedure or Rule 62(a) of the Federal Rules of Civil Procedure, this order shall be

immediately effective and enforceable upon its entry and there shall be no stay of execution of this Order.

19.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order

# # #

Submitted by:
Debi Evans Galler, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone:  (305) 755-9500
Facsimile:  (305) 714-4340
Email:  dgaller@bergersingerman.com

Copy furnished to:
Debi Evans Galler, Esq.
*(Attorney Galler is directed to serve a conformed copy of this Order upon all interested parties, and to file a Certificate of Service with the Court).*

5940364-3

- 7 -

**Exhibit A – Bidding Procedures**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re                                                    Chapter 11

HFAH CLEAR LAKE LLC                                       Case No. 14
a Florida limited liability company,

                          Debtor.

_____

## BIDDING PROCEDURES

These Bidding Procedures (the "**Bidding Procedures**") set forth the process by which HFAH Clear Lake, LLC ("**Clear Lake**") is authorized to conduct the sale (the "**Sale**") by auction (the "**Auction**") of substantially all of Clear Lake's assets, defined as the "Property" in the Purchase and Sale Agreement dated April 8, 2014 (as may be amended) between the Debtor, as seller, and Revenue Properties (US), Inc. ("**Revenue Properties**"), as purchaser (the "**PSA**"), or such other Purchase and Sale Agreement submitted at or prior to the Auction and subsequently determined by the Debtor to be the highest offer for the Property and approved by the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "**Bankruptcy Court**").  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the PSA.

**Assets to be Sold**

1.      These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest offer for the Property, as identified in further detail and defined in the PSA.

**Participation Requirements**

2.     To participate in the bidding process or otherwise be considered for any purpose hereunder, an entity (other than Revenue Properties) interested in the Property (a "**Potential Bidder**") must, on or before December 1**,** 2014, deliver the following documents (the "**Preliminary Bid Documents**") to participate in the bidding process:

(a)     a non-binding indication of interest with respect to the purchase of the Property; and

(b)     preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which Clear Lake and its advisors will determine.

3.     Within two (2) business days after a Potential Bidder delivers the Preliminary Bid Documents, Clear Lake shall notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct a due diligence review.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "**Acceptable Bidder**") may submit bids to purchase the Property.  Revenue Properties shall at all times be deemed an Acceptable Bidder.

**Obtaining Due Diligence Access**

4.     After notification of Acceptable Bidder status, Clear Lake shall provide each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request.  The due diligence period will end on December 5**,** 2014 (the "**Bid Deadline**").

- 2 -

5.     Clear Lake shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

**Bid Requirements**

6.     To participate in the Auction, an Acceptable Bidder (other than Revenue Properties) must deliver to Clear Lake a written irrevocable offer that must:

(a)     be in writing;

(b)     equal or exceed $4,651,750 (the "**Minimum Bid Amount**"), which is comprised of the Purchase Price ($4,225,000), the Break-Up Fee ($126,750), the Expense Reimbursement ($175,000) and the Minimum Bid Increment ($100,000);

(c)     constitute a good faith, bona fide offer to purchase the Property;

(d)     be accompanied by a clean and a duly executed copy of the PSA with copies that are marked to reflect the amendments and modifications from the PSA executed with Revenue Properties, which may not be materially more burdensome to Clear Lake or inconsistent with these Bidding Procedures;

(e)     identify with particularity each and every condition to closing, if any;

(f)     not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, and/or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

(g)     must remain irrevocable until 48 hours after the Auction.

7.   In addition to the above, each Acceptable Bidder must:

(a)     fully disclose the identity of each entity that will be bidding for or purchasing the Property, or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

(b)     on or before the Bid Deadline, submit a cash deposit equal to $500,000 by wire transfer of immediately available funds to Berger Singerman LLP (the "**Good Faith Deposit**");

(c)     acknowledge and agree if the respective Acceptable Bidder is the Successful Bidder (as defined herein), that $200,000 of the Good Faith Deposit will be remitted to Revenue Properties as the Initial Deposit Refund as defined and provided in Section 3(a)ix of the PSA; and

(d)     not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

8.     Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."  Notwithstanding anything in these Bidding Procedures to the contrary, Clear Lake may not alter the definition of Qualified Bid or Qualified Bidder without the express consent of Revenue Properties.  Within two (2) Business Days after the Bid Deadline, Clear Lake, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders and Revenue Properties whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  The PSA submitted by Revenue Properties and any additional bids timely submitted by Revenue Properties (to the extent such bids are generally consistent with the terms of the PSA) shall be deemed Qualified Bids, qualifying Revenue Properties to participate in the Auction.

The Debtor reserves its rights (subject to the rights and remedies of Revenue Properties under the PSA and Bidding Procedures) to modify the Bidding Procedures in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the Sale.

**Bid Deadline**

9.      Binding bids must be received by Clear Lake so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on the Bid Deadline.

**Evaluation of Qualified Bids**

10.      Prior to the Auction, Clear Lake shall evaluate Qualified Bids and identify the highest Qualified Bid (the "**Starting Bid**").  Within 24 hours of such determination, Clear Lake shall notify Revenue Properties as to which Qualified Bid is the Starting Bid.  Clear Lake shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**No Qualified Bids**

11.      If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the PSA will be deemed the Successful Bid (as defined herein), and Clear Lake will pursue entry of an order by the Bankruptcy Court approving the PSA and authorizing the sale of the Property to Revenue Properties.

**Auction**

12.      If one or more Qualified Bids are received by the Bid Deadline, then Clear Lake shall conduct the Auction with respect to the Property.  The Auction shall be conducted by Berger Singerman, if one or more Qualified Bids are received by the Bid Deadline.  The Auction shall be held on or before December 8**,** 2014.

13.      The Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

- 5 -

(a)    the Auction will be conducted openly;

(b)    only the Qualified Bidders, including Revenue Properties, shall be entitled to bid at the Auction;

(c)    credit bids shall not be permitted by any direct lender;

(d)    the Qualified Bidders, including Revenue Properties, shall appear in person at the Auction, or through duly-authorized representatives;

(e)    only such authorized representatives of each of the Qualified Bidders, Revenue Properties, Clear Lake, and any direct lender, and their respective advisors shall be permitted to attend the Auction;

(f)    bidding at the Auction shall begin at the Starting Bid;

(g)    subsequent bids at the Auction, including any bids by Revenue Properties, shall be made in minimum increments of $100,000;

(h)    Revenue Properties shall receive a credit equal to the amount of the Break-up Fee and the Expense Reimbursement when bidding at the Auction;

(i)    each participating bidder will be informed of the terms of the previous bids;

(j)    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(k)    each bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale; and

(l)    absent irregularities in the conduct of the Auction, bids made after the Auction is closed shall not be considered.

**Acceptance of the Successful Bid**

14.    Upon the conclusion of the Auction (if the Auction is conducted), Clear Lake shall identify the highest bid (the "**Successful Bid**").  The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder".  The Successful Bidder and Clear Lake shall, as soon as commercially reasonable and practicable, complete and sign all

agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

15.     The Bankruptcy Court will conduct a hearing to approve the Sale to the Successful Bidder as soon as practicable after the Auction.  Clear Lake will request the Bankruptcy Court make certain findings regarding the Auction, including, among other things, that (a) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Property, and is in the best interests of Clear Lake.

16.     If an Auction is held, Clear Lake shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

17.     If Revenue Properties is not the Successful Bidder, then Berger Singerman, LLP shall be authorized and directed to remit $200,000 of the Good Faith Deposit to Revenue Properties as the Initial Deposit Refund as defined and provided in Section 3(a)ix of the PSA.

**Designation of Back-Up Bidder**

18.     If for any reason the Successful Bidder fails to consummate the purchase of the Property within the time permitted after the entry of the order approving the Sale to the

- 7 -

Successful Bidder, then the Qualified Bidder with the second highest or otherwise best bid for the Property (the "Back-Up Bidder"), will automatically be deemed to have submitted the highest or otherwise best bid, and Clear Lake and the Back-Up Bidder will be authorized, but not required, to consummate the Sale with the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

**Break-Up Fee and Expense Reimbursement**

19.     If the sale closes with an entity other than Revenue Properties, Clear Lake shall be obligated to pay to Revenue Properties, by wire transfer in immediately available funds to an account designated by Revenue Properties, all amounts due to Revenue Properties, including the Break-up Fee and the Expense Reimbursement, in each instance in accordance with the applicable provisions of the PSA.

**Return of Good Faith Deposit**

20.     The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of the Property, be credited to the purchase price paid for the Property.  If the Successful Bidder fails to consummate the purchase of the Property (other than as a result of a material breach of the PSA by Clear Lake), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, Clear Lake.

21.     The Good Faith Deposit of any unsuccessful Qualified Bidders (except for Revenue Properties) will be returned within 15 days after consummation of the Sale or upon the permanent withdrawal of the proposed Sale of the Property.  The Good Faith Deposit of Revenue Properties shall be returned in accordance with the terms of the PSA.

**Exhibit B- Form of Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re                                                                                    Chapter 11

HFAH CLEAR LAKE LLC,
a Florida limited liability company,                               Case No. 14-

                                              Debtor.

_____/

## NOTICE OF AUCTION OF DEBTOR'S PROPERTY

     **PLEASE TAKE NOTICE THAT** the above-captioned debtor (the "**Debtor**") filed a

voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy**

**Code**") in the United States Bankruptcy Court for the Southern District of Florida, West Palm

Beach Division (the "**Bankruptcy Court**") on September 30, 2014.

     **PLEASE TAKE FURTHER NOTICE THAT** on September 30, 2014, in connection

with the proposed sale (the "**Sale**") of substantially all of the Debtor's (the "**Property**") to

Revenue Properties (US) Inc. ("**Revenue Properties**") or any other Successful Bidder for the

Purchased Assets at an auction for the Property (the "**Auction**"), the Debtor filed a motion [ECF

No. ___] seeking, among other things, the entry of an order approving (a) bidding procedures

governing the Sale, (b) the form of purchase and sale agreement, (c) payment of a break-up fee

and expense reimbursement to Revenue Properties in certain instances, including if Revenue

Properties is not the Successful Bidder at the Auction, and (d) the form and manner of notice.

     **PLEASE TAKE FURTHER NOTICE THAT** on _____ __, 2014, the

Bankruptcy Court entered an order [ECF No. ___] (the "**Sale Procedure Order**") (a) approving

the bidding procedures for the Sale of the Purchased Assets and (b) approving the form of purchase and sale agreement, (c) approving the form of notice, and (d) scheduling the Auction.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline to submit a Qualified Bid is **December 1, 2014.**

**PLEASE TAKE FURTHER NOTICE THAT** as provided in the Sale Procedures Motion, the Debtor shall conduct the Auction on **December 8, 2014** beginning at 10:00 a.m. at the offices of Berger Singerman LLP located at **2650 North Military Trail, Suite 240, Boca Raton, Florida**.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale is _____ ___, **2014.**

**PLEASE TAKE FURTHER NOTICE THAT** a hearing to consider the proposed Sale will be held as soon as practicable after the Auction.

Dated:    _____ ___, 2014

> **BERGER SINGERMAN LLP**
> Proposed Attorneys for HFAH Clear Lake LLC
> 1450 Brickell Avenue, Suite 1900
> Miami, Florida    33131
> (305) 755-9500
> (305) 714-4340 (Facsimile)
>
>
> By: s/ Debi Evans Galler
>    Paul Steven Singerman
>    Florida Bar Number 378860
>    Singerman@bergersingerman.com
>    Debi Evans Galler
>    Florida Bar Number 985236
>    dgaller@bergersingerman.com

**COMPOSITE EXHIBIT B**
**PSA, AS AMENDED**

20

**FIRST AMENDMENT**
**TO PURCHASE AND SALE AGREEMENT**

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "First Amendment") dated the 29th day of September, 2014 (the "Effective Date") is made by and between **HFAH CLEAR LAKE LLC**, a limited liability company organized under the laws of the State of Florida (the "Seller"), and **REVENUE PROPERTIES (US) INC.**, a corporation organized under the laws of the State of Delaware, and its successors and assigns (the "Purchaser").

R E C I T A L S

A.    Purchaser and Seller are parties to that certain Purchase and Sale Agreement dated April 8, 2014 (the "**Agreement**") relating to certain real property located at 719 Executive Center Drive, West Palm Beach, Palm Beach County, Florida 33401, as more particularly described in the Agreement (the "**Property**").

B.    Purchaser and Seller have agreed to extend certain dates under the Agreement and amend the Purchase Agreement, as more fully set forth below.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged by the parties, Purchaser and Seller hereby agree as follows:

1.    Recitals.  The above Recitals are true and correct, and by reference are incorporated herein.

2.    Capitalized Terms.  All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Agreement.

3.    Closing.  Subsection 5(a) of the Agreement is hereby deleted and replaced by the following:

> (a) The consummation of the transactions contemplated herein (the "Closing") shall be held on a business day designated by Purchaser within five (5) business days after the Sale Order becomes a final, non-appealable order, provided that all of the conditions to Purchase set forth herein, including specifically the Conditions to Purchaser's Obligations in Section 15, have been satisfied. Purchaser shall have the right to terminate this Agreement upon ten (10) business days' written notice to Seller if either (i) the Bankruptcy Case has not been filed by October 15, 2014, or (ii) the Closing has not occurred by January 31, 2015 (the "Termination Right").  If Purchaser does not exercise the Termination Right and if the Closing has not occurred by February 28, 2015 this Agreement shall terminate (the "Termination Date").  If Purchaser exercises the Termination Right or if the Termination Date occurs, Purchaser shall be entitled to have the Escrow Agent refund the Additional Deposit and have Berger Singerman LLP refund any unused portion of the Initial Deposit.  The Closing shall be held at the offices of the Escrow Agent, or other mutually agreed upon location, and may be done by "mail away".

4.    Bidding Procedures. The Bidding Procedures attached to the Agreement as Exhibit "B" (the "Procedures") are hereby deleted in its entirety and replaced with Exhibit "B" attached to this First Amendment.

5.      <u>Deposits</u>.  Seller acknowledges that the Initial Deposit and Additional Deposit have been deposited by the Purchaser as required under Sections 2(a) and 2(b) of the Agreement and that the Initial Deposit has been disbursed to Berger Singerman LLP pursuant to Section 2(e) of the Agreement.

6.      <u>Counterparts, Electronic Original Versions</u>.  This First Amendment may be executed in any number of counterparts, which, when taken together, shall constitute one complete instrument. Electronic counterpart signature pages, including facsimile and scanned and e-mailed versions of this executed document shall be considered original versions for all purposes.

7.      <u>Full Force and Effect; Conflicts.</u>  The Agreement as amended by this First Amendment remains in full force and effect, and contains all of the terms and conditions of the parties with respect to the transactions described in the Agreement. In the event of a conflict between the terms of this First Amendment and the Agreement, the terms of this First Amendment shall control.

*{The remainder of this page is intentionally left blank}*

**IN WITNESS WHEREOF**, intending to be legally bound, the parties have caused this First Amendment to be duly executed as of the Effective Date.

**SELLER**:

**HFAH CLEAR LAKE LLC**,
a Florida limited liability company

By:     Term Management LLC,
        a Florida limited liability company
Its:     Manager

By: _____
      Daniel G. Hayes
  Its:    Manager

**PURCHASER**:

**REVENUE PROPERTIES (US) INC.**, a Delaware corporation

By: _____
Name:
Its:

**AMENDED BIDDING PROCEDURES**

## BIDDING PROCEDURES

These Bidding Procedures (the "**Bidding Procedures**") set forth the process by which HFAH Clear Lake, LLC ("**Clear Lake**") is authorized to conduct the sale (the "**Sale**") by auction (the "**Auction**") of substantially all of Clear Lake's assets, defined as the "Property" in the Purchase and Sale Agreement dated April 8, 2014 (as may be amended) between the Debtor (the "**PSA**"), as seller, and Revenue Properties (US), Inc. ("**Revenue Properties**"), as purchaser, or such other Purchase and Sale Agreement submitted at or prior to the Auction and subsequently determined by the Debtor to be the highest offer for the Property and approved by the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "**Bankruptcy Court**").  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the PSA.

**Assets to be Sold**

1.      These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest offer for the Property, as identified in further detail and defined in the PSA.

**Participation Requirements**

2.      To participate in the bidding process or otherwise be considered for any purpose hereunder, an entity (other than Revenue Properties) interested in the Property (a "**Potential Bidder**") must, on or before December 1, 2014, deliver the following documents (the "**Preliminary Bid Documents**") to participate in the bidding process:

       (a)     a non-binding indication of interest with respect to the purchase of the Property; and

       (b)     preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which Clear Lake and its advisors will determine.

3.     Within two (2) business days after a Potential Bidder delivers the Preliminary Bid Documents, Clear Lake shall notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct a due diligence review.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "**Acceptable Bidder**") may submit bids to purchase the Property.  Revenue Properties shall at all times be deemed an Acceptable Bidder.

**Obtaining Due Diligence Access**

4.     After notification of Acceptable Bidder status, Clear Lake shall provide each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request.  The due diligence period will end on December 5, 2014 (the "**Bid Deadline**").

5.     Clear Lake shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

**Bid Requirements**

6.    To participate in the Auction, an Acceptable Bidder (other than Revenue Properties) must deliver to Clear Lake a written irrevocable offer that must:

    (a)    be in writing;

    (b)    equal or exceed $4,651,750 (the "**Minimum Bid Amount**"), which is comprised of the Purchase Price ($4,225,000), the Break-Up Fee ($126,750), the Expense Reimbursement ($175,000) and the Minimum Bid Increment ($100,000);

    (c)    constitute a good faith, bona fide offer to purchase the Property;

    (d)    be accompanied by a clean and a duly executed copy of the PSA with copies that are marked to reflect the amendments and modifications from the PSA executed with Revenue Properties, which may not be materially more burdensome to Clear Lake or inconsistent with these Bidding Procedures;

    (e)    identify with particularity each and every condition to closing, if any;

    (f)    not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, and/or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

    (g)    must remain irrevocable until 48 hours after the Auction.

7.    In addition to the above, each Acceptable Bidder must:

    (a)    fully disclose the identity of each entity that will be bidding for or purchasing the Property, or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

    (b)    on or before the Bid Deadline, submit a cash deposit equal to $500,000 by wire transfer of immediately available funds to Berger Singerman LLP (the "**Good Faith Deposit**");

    (c)    acknowledge and agree if the respective Acceptable Bidder is the Successful Bidder (as defined herein), that $200,000 of the Good Faith

Deposit will be remitted to Revenue Properties as the Initial Deposit Refund as defined and provided in Section 3(a)ix of the PSA; and

(d)     not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

8.     Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."  Notwithstanding anything in these Bidding Procedures to the contrary, Clear Lake may not alter the definition of Qualified Bid or Qualified Bidder without the express consent of Revenue Properties.   Within two (2) Business Days after the Bid Deadline, Clear Lake, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders and Revenue Properties whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  The PSA submitted by Revenue Properties and any additional bids timely submitted by Revenue Properties (to the extent such bids are generally consistent with the terms of the PSA) shall be deemed Qualified Bids, qualifying Revenue Properties to participate in the Auction.

**Bid Deadline**

9.     Binding bids must be received by Clear Lake so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on the Bid Deadline.

**Evaluation of Qualified Bids**

10.     Prior to the Auction, Clear Lake shall evaluate Qualified Bids and identify the highest Qualified Bid (the "**Starting Bid**").  Within 24 hours of such determination, Clear Lake shall notify Revenue Properties as to which Qualified Bid is the Starting Bid.  Clear

Lake shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**No Qualified Bids**

11.     If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the PSA will be deemed the Successful Bid (as defined herein), and Clear Lake will pursue entry of an order by the Bankruptcy Court approving the PSA and authorizing the sale of the Property to Revenue Properties.

**Auction**

12.     If one or more Qualified Bids are received by the Bid Deadline, then Clear Lake shall conduct the Auction with respect to the Property.  The Auction shall be conducted by Berger Singerman, if one or more Qualified Bids are received by the Bid Deadline.  The Auction shall be held on or before December 8, 2014.

13.     The Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

> (a)     the Auction will be conducted openly;
>
> (b)     only the Qualified Bidders, including Revenue Properties, shall be entitled to bid at the Auction;
>
> (c)     credit bids shall not be permitted by any direct lender;
>
> (d)     the Qualified Bidders, including Revenue Properties, shall appear in person at the Auction, or through duly-authorized representatives;
>
> (e)     only such authorized representatives of each of the Qualified Bidders, Revenue Properties, Clear Lake, and any direct lender, and their respective advisors shall be permitted to attend the Auction;
>
> (f)     bidding at the Auction shall begin at the Starting Bid;

5

(g)     subsequent bids at the Auction, including any bids by Revenue Properties, shall be made in minimum increments of $100,000;

(h)     Revenue Properties shall receive a credit equal to the amount of the Break-up Fee and the Expense Reimbursement when bidding at the Auction;

(i)     each participating bidder will be informed of the terms of the previous bids;

(j)     the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(k)     each bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale; and

(l)     absent irregularities in the conduct of the Auction, bids made after the Auction is closed shall not be considered.

**Acceptance of the Successful Bid**

14.     Upon the conclusion of the Auction (if the Auction is conducted), Clear Lake shall identify the highest bid (the "**Successful Bid**").  The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder".  The Successful Bidder and Clear Lake shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

15.     The Bankruptcy Court will conduct a hearing to approve the Sale to the Successful Bidder as soon as practicable after the Auction.  Clear Lake will request the Bankruptcy Court make certain findings regarding the Auction, including, among other things, that (a) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding

6

Procedures, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Property, and is in the best interests of Clear Lake.

16.     If an Auction is held, Clear Lake shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

17.     If Revenue Properties is not the Successful Bidder, then Berger Singerman, LLP shall be authorized and directed to remit $200,000 of the Good Faith Deposit to Revenue Properties as the Initial Deposit Refund as defined and provided in Section 3(a)ix of the PSA.

**Designation of Back-Up Bidder**

18.     If for any reason the Successful Bidder fails to consummate the purchase of the Property within the time permitted after the entry of the order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best bid for the Property (the "Back-Up Bidder"), will automatically be deemed to have submitted the highest or otherwise best bid, and Clear Lake and the Back-Up Bidder will be authorized, but not required, to consummate the Sale with the Back-Up Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

**Break-Up Fee and Expense Reimbursement**

19.     If the sale closes with an entity other than Revenue Properties, Clear Lake shall be obligated to pay to Revenue Properties, by wire transfer in immediately available funds to an account designated by Revenue Properties, all amounts due to Revenue Properties, including the Break-up Fee and the Expense Reimbursement, in each instance in accordance with the applicable provisions of the PSA.

**Return of Good Faith Deposit**

20.     The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of the Property, be credited to the purchase price paid for the Property.  If the Successful Bidder fails to consummate the purchase of the Property (other than as a result of a material breach of the PSA by Clear Lake), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, Clear Lake.

21.     The Good Faith Deposit of any unsuccessful Qualified Bidders (except for Revenue Properties) will be returned within 15 days after consummation of the Sale or upon the permanent withdrawal of the proposed Sale of the Property.  The Good Faith Deposit of Revenue Properties shall be returned in accordance with the terms of the PSA.

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") dated as of the 8th day of April, 2014 (the "Effective Date"), is made by and between **HFAH CLEAR LAKE LLC**, a limited liability company organized under the laws of the State of Florida (the "Seller"), and **REVENUE PROPERTIES (US) INC.**, a corporation organized under the laws of the State of Delaware, and its successors and assigns (the "Purchaser").

**Preliminary Statement.**

Seller owns two (2) land parcels located at 719 Executive Center Drive, in the City of West Palm Beach, Palm Beach County, Florida 33401 [Tax Parcel Identification Nos. 74-43-43-20-01-007-0000 & 74-43-43-20-01-007-0010], comprising approximately 10.92 acres more or less, as more fully described in the legal description attached hereto as **Exhibit A** and hereby incorporated, together with all and singular, all properties appurtenant thereto and the rights, air rights, easements, rights-of-way, tenements, and hereditaments appertaining thereto (the "Property"). The Property is encumbered by (a) statutory liens for delinquent property taxes, (b) statutory liens arising in connection with numerous fines and penalties levied against the Property, (c) a first mortgage that secures a promissory note dated January 6, 2005, in the original amount of $14,800,000 (the "First Mortgage"), and (d) a second mortgage that secures a promissory note dated June 24, 2005, in the original amount of $2,750,000 (the "Second Mortgage").

Purchaser desires to purchase the Property along with certain General Intangibles (as hereinafter defined), and the Seller desires to sell the Property to Purchaser and convey the General Intangibles to Purchaser. Seller and Purchaser have negotiated and agreed upon the terms and provisions herein, and propose to facilitate a sale in connection with Seller filing a voluntary petition for relief under Chapter 11 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Florida, (the "Court"). The sale of the Property will be subject to competitive bidding and potentially higher and better offers at a Court approved auction (the "Auction"), all on the terms and conditions set forth in this Agreement and in accordance with §§ 105, 363, 503 and other applicable provisions of the Bankruptcy Code. Except for the Permitted Exceptions (as hereinafter defined), the Property will be sold pursuant to an order of the Court approving such sale under § 363 of the Bankruptcy Code, free and clear of any and all (a) liens, claims, encumbrances, interests, mortgages, taxes, charges, restrictions, pledges, assessments, security interests, options, leases or subleases, judgments, demands, and rights of any third party (collectively "Liens"), with such Liens attaching to the proceeds of sale and (b) fines, penalties, fees, assessments or any other charge (collectively, "Fines") imposed under resolutions or citations issued by the City of West Palm Beach (the "City") and/or any other governmental agency, authority, or body exercising jurisdiction over the Property, citing the Property for non-compliance with existing codes, ordinances, and orders relating to zoning, building, construction, police and public safety, or utilities (collectively, the "Citations"). Purchaser acknowledges that it will be required to comply with all applicable codes, ordinances and regulations relating to zoning, building, construction, police and public safety, or utilities following the Closing (described in Section 5(a) below).

In consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

1.     **Purchase and Sale of Property.**

Seller agrees to sell and Purchaser agrees to purchase the Property free and clear of all Liens pursuant to §§ 363(f) and 363(h) of the Bankruptcy Code. Seller shall also convey to Purchaser all of Seller's right, title and interest, if any, in all intangible property used or useful in connection with the foregoing, including, without limitation, all contract rights, warranties, guaranties, licenses, permits, governmental approvals, associated development rights, licenses, entitlements, development and building plans, rights to associations, declaration rights, memberships and/or affiliations, municipal offsite credits, prepaid building permits, impact and/or concurrency fees, and water/sewer or other utility fees and credits which benefit the Property, together with all contractual rights,

warranties and other intangible assets in connection with the Real Property that the Seller owns or has in its possession, including, without limitation, all of Seller's rights, if any, to the trade name "Sail Club at Clear Lake" (collectively, the "General Intangibles"), free and clear of all Liens and Fines pursuant to §§ 363(f) and 363(h) of the Bankruptcy Code.

2.      **Purchase Price and Terms of Payment.**

(a)      The total purchase price of the Property (the "Purchase Price") is Four Million Two Hundred Twenty-five Thousand Dollars ($4,225,000); with Five Hundred Thousand Dollars ($500,000) of the Purchase Price paid in accordance with paragraphs (b)-(h), and the remaining Three Million Seven Hundred Twenty Five Thousand Dollars ($3,725,000) being paid at the Closing (described in Section 5(a) below).  The Property is sold collectively and not at a price per unit.  This is an ALL CASH transaction without contingency for financing.

(b)      Purchaser shall deposit the sum of Two Hundred Thousand Dollars ($200,000) (the "Initial Deposit") with Driver, McAfee, Peek & Hawthorne, P.L., 1 Independent Drive, Suite 1200, Jacksonville, Florida 32202 [(904) 301-1269, Fax (904) 301-1279] (the "Escrow Agent") on or before 4:00 p.m. West Palm Beach, Florida time on the date which is two (2) business days after the Effective Date.  The Escrow Agent shall also act as the title agent for either First American Title Insurance Company or Fidelity National Title Insurance Company (either, the "Title Company").  The Escrow Agent shall act as escrow agent for the Deposit and settlement company for the Closing.  Failure to timely make the Initial Deposit shall be a default under this Agreement.

(c)      Purchaser shall deposit an additional sum of Three Hundred Thousand Dollars ($300,000) (the "Additional Deposit", and together with the Initial Deposit, the "Deposit") with the Escrow Agent within two (2) business days after Purchaser sends notice to Seller of completion of all Due Diligence.

(d)      Seller and Purchaser agree that satisfaction of Section 2(c) is a condition precedent to filing the Bankruptcy Case and Purchaser's obligations under this Agreement shall be contingent until such is satisfied.  Failure of the foregoing condition of Section 2(c) is grounds for Purchaser to provide Seller with written notice of termination of this Agreement and receive a return of the Initial Deposit until such condition is satisfied.

(e)      Within two (2) business days after expiration of the Due Diligence Period, Purchaser acknowledges and agrees that the Escrow Agent shall disburse the Initial Deposit to Berger Singerman LLP acting in its capacity as bankruptcy counsel for Seller to help fund administrative expenses, including professional fees and costs, associated with the Bankruptcy Case (each an "Administrative Expense" and collectively, the "Administrative Expenses").

(f)      Notwithstanding use of the Initial Deposit for Administrative Expenses, if a bid from another purchaser (the "Successful Bidder") is accepted at the Auction as the highest and best bid (the "Successful Bid"), Seller agrees that Purchaser is entitled to a refund of the entire $500,000 Deposit, which shall be refunded in accordance with Section 3 herein.

(g)      At the Closing (described in Section 5 (a)), (i) the Deposit shall be applied toward the Purchase Price, and (ii) Purchaser shall pay, or cause to be paid, the balance of the Purchase Price, subject to prorations and adjustments required herein, by wire transfer of the required sum in currently available funds to the Escrow Agent.

(h)      Purchaser acknowledges and agrees that after the expiration of the Due Diligence Period, the Deposit shall be non-refundable to Purchaser except in the event of (a) Seller's default of its obligations under this Agreement, (b) failure to satisfy all Conditions to Purchaser's Obligations to Purchase as set forth in Section 15 herein, (c) the Purchaser is not the Successful Bidder at the Auction, (d) failure to close by the

Termination Date (as such term is defined in Section 5(a) below), or (e) a termination of this Agreement as a result of casualty or condemnation as provided in Sections 7 and 12 herein.

(i)  Seller agrees that if a bid received from another purchaser is accepted at the Auction as the Successful Bid then Seller will pay Purchaser, in cash, an amount equal to three percent (3%) of the Purchase Price (the "Break-Up Fee") from the cash proceeds of such transaction.

(j)  If Purchaser becomes entitled to the Break-Up Fee, Seller shall also reimburse Purchaser for reasonable out-of-pocket expenses actually incurred by Purchaser in connection with this Agreement and the transactions contemplated herein, including without limitation, Purchaser's legal fees and third party consulting fees, in cash in an aggregate amount not to exceed One Hundred Seventy-Five Thousand Dollars ($175,000) (the "Expense Reimbursement").

**3.    Sale Process, Bidding Procedures, Sale Motion.**

(a)  Procedures for the Auction of the Property shall be as provided in the form attached hereto as **Exhibit B** (the "Bidding Procedures"), and shall, among other items:

i.    Permit Seller to accept competitive bids on the Property at the Auction.

ii.    Require Marcus & Millichap Real Estate Investment Services of Florida, Inc., or such other broker approved by the Court, to market the Property and solicit bids from qualified bidders by providing a copy of the Bidding Procedures and notice of the Auction to all prospective purchasers who were previously contacted regarding the sale of the Property and as otherwise required by the Court.

iii.    Require deposits of Five Hundred Thousand Dollars ($500,000) from potential bidders be submitted to Berger Singerman LLP.

iv.    Provide for the qualification of potential bidders to assure the ability of bidders to close.

v.    If one or more qualified bids are received, require an "open cry" auction to be conducted by Berger Singerman LLP.

vi.    Provide that Purchaser is a qualified bidder entitled to bid at the Auction.

vii.    Require minimum bid increments of One Hundred Thousand Dollars ($100,000) (the "Minimum Bid Increment").

viii.    Require that qualified bids equal or exceed $4,651,750 (the "Minimum Bid Amount"), which is comprised of the Purchase Price ($4,225,000), the Break-Up Fee ($126,750), the Expense Reimbursement ($175,000) and the Minimum Bid Increment ($100,000).

ix.    Provide that if the Purchaser does not submit the Successful Bid at the Auction but submits the second-highest bid and elects to be the back-up bidder and close on the transaction if the Successful Bidder fails to close (the "Back-up Bidder"), then the Additional Deposit shall be held by the Escrow Agent pending the closing and Berger Singerman LLP shall be authorized and directed to remit, within two (2) days of the Sale Hearing, Two Hundred Thousand Dollars ($200,000) of the Successful Bidder's deposit to Purchaser in respect of the Initial Deposit (the "Initial Deposit Refund").

x.    Provide that if Purchaser does not submit the Successful Bid at the Auction and **IS NOT** the Back-up Bidder, the entire $500,000 Deposit shall be returned to Purchaser as follows:

A. Berger Singerman LLP shall be authorized and directed to remit the Initial Deposit Refund within two (2) days of the Sale Hearing;

B. the Escrow Agent shall be authorized and directed to refund the Additional Deposit to Purchaser within two (2) days of the Sale Hearing; and

C. Purchaser shall assign any right, title or interest in the Initial Deposit to the Successful Bidder upon Purchaser's receipt of the Initial Deposit Refund.

xi. Provide that the Break-Up Fee, Expense Reimbursement, and any portion of the Deposit not yet refunded be disbursed to Purchaser in immediately available funds at the Closing.

xii. Provide that Driver, McAfee, Peek & Hawthorne, P.L. shall serve as Escrow Agent, in accordance with the terms hereof, for any sale of the Property if Purchaser submits the Successful Bid.

xiii. Provide for an ALL CASH sale, with no contingency for financing.

xiv. Provide for no due diligence contingency.

(b) Within seven (7) days after the Petition Date, Seller shall file a motion with the Court, in a form reasonably satisfactory to Purchaser, requesting the Court issue an order (the "Sale Procedure Order") in accordance with §§ 105 and 363 of the Bankruptcy Code, which shall include the Court's (i) approval of: (a) this Agreement, (b) Seller's execution thereof, (c) Purchaser as the "stalking horse" bidder, (d) payment of the Break-Up Fee and the Expense Reimbursement, (e) the Minimum Bid Amount, (f) the Bidding Procedures, and (g) the form of notice for the Auction and the hearing to approve the sale of the Property (the "Sale Hearing"); (ii) finding that cause exists to prohibit credit bids in accordance with § 363(k) of the Bankruptcy Code; and (iii), the scheduling of the (x) Auction and (y) Sale Hearing, with the Sale Hearing to be conducted as soon as practicable after the Auction.

(c) At, or shortly thereafter, the Sale Hearing the Court shall enter the "Sale Order", in a form satisfactory to Purchaser, which (a) approves the sale of the Property and conveyance of the General Intangibles to Purchaser on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with the transaction, (b) includes a specific finding that Purchaser is the good faith purchaser of the Property and acted in "good faith" within the meaning of § 363(m) of the Bankruptcy Code, (c) states that, pursuant to Bankruptcy Code §§ 363(f) and 363(h), the sale of the Property to Purchaser shall be free and clear of all Liens, Fines, Citations, or defects in title or interests of third parties, excepting only Permitted Exceptions, (d) states that this Agreement may be specifically enforced against and be binding upon and not subject to avoidance or rejection by Seller, (e) provides that the Court shall retain jurisdiction to resolve any dispute, claim or controversy arising out of or related to this Agreement or any breach thereof, (f) states that this Agreement was negotiated, proposed and entered into by the parties in good faith without collusion, and from an arm's length bargaining position for fair value, (g) contains a waiver of the automatic stay following entry of the Sale Order, and (h) includes findings or orders that would allow for the mooting of any appeal made during the fourteen (14) day period set forth in Rule 8002(a) and 6004(h) of the Federal Rules of Bankruptcy Procedure so long as the Sale Order has not been stayed prior to the consummation of the transaction contemplated by this Agreement.

(d) If there is any conflict between the terms of Section 3 and the Sale Procedure Order or the Sale Order, such Orders shall govern with respect to any conflicting terms.

4.      **Title.**

(a)      Title to the Property shall be fee simple, marketable and good of record and in fact and insurable by the Title Company (or a nationally recognized ALTA title insurance company licensed to do business in Florida of Purchaser's choice) at normal rates.  At the Closing, Title to the Property shall vest in the Purchaser in fee simple, free and clear of any and all Liens and Fines, except for the following permitted exceptions (the "Permitted Exceptions"): (a) real estate taxes not yet due and payable; (b) zoning and building restrictions and other laws, ordinances, and regulations of governmental bodies having jurisdiction over the Property, (c) the Citations (but not any liens issued in connection therewith), and (d) matters of record affecting title to the Property, as reviewed and approved by Purchaser pursuant to this Section 4.

(b)      On or before seven (7) days after entry of the Sale Procedures Order, Purchaser agrees to obtain and furnish to Seller a commitment of title insurance for the Property (the "Commitment").  Purchaser shall have five (5) business days to review the Commitment and provide Seller with notice of objection of any matter or exception to title shown on the Title Commitment that will not be cured by virtue of entry of the Sale Order.  Purchaser shall have the right to either (i) waive such exceptions or other matters and proceed to the Closing on the terms set forth herein (in which event the exceptions to which Purchaser objected shall be deemed to be Permitted Exceptions, or (ii) terminate this Agreement by written notice to Seller and obtain the return of the Deposit, in which event neither party shall have any further liability or obligation to the other (except for liabilities which expressly survive termination).

(c)      Purchaser shall have the right to re-examine the title to the Property at the Closing and to object to any defects or encumbrances that have been placed of record on the Property subsequent to the date of Purchaser's initial Title Commitment (except for encumbrances which have been caused by or approved in writing by Purchaser, which shall be Permitted Exceptions) (the "Subsequent Objections").  If (i) Seller cannot cure the Subsequent Objections, and (i) the Subsequent Objections will not be cured by virtue of entry of the Sale Order, then Purchaser may (i) waive the Subsequent Objections and proceed to Closing; or (ii) terminate this Agreement and receive a refund of the Additional Deposit and any unused portion of the Initial Deposit, if any.

5.      **The Closing.**

(a)      The consummation of the transactions contemplated herein (the "Closing") shall be held on a business day designated by Purchaser within five (5) business days after the Sale Order becomes a final, non-appealable order, provided that all of the conditions to Purchase set forth herein, including specifically the Conditions to Purchaser's Obligations in Section 15, have been satisfied.  If the Closing has not occurred by September 30, 2014, Purchaser shall have the right to terminate this Agreement upon ten (10) business days' written notice to Seller (the "Termination Right").  If Purchaser does not exercise the Termination Right and if the Closing has not occurred by March 2, 2015 this Agreement shall terminate (the "Termination Date").  If Purchaser exercises the Termination Right or if the Termination Date occurs, Purchaser shall be entitled to have the Escrow Agent refund the Additional Deposit and have Berger Singerman LLP refund any unused portion of the Initial Deposit.  The Closing shall be held at the offices of the Escrow Agent, or other mutually agreed upon location, and may be done by "mail away".

(b)      At the Closing, Seller shall deliver to Purchaser (i) a special warranty deed in form and content reasonably acceptable to the Purchaser (the "Deed") conveying good and marketable, fee simple, title for the Property to Purchaser free and clear of all Liens, Fines, Citations and clouds and defects, subject only to the Permitted Exceptions; (ii) an assignment of the General Intangibles in form and content reasonably acceptable to the Purchaser; (iii) a properly executed no-lien affidavit in a form satisfactory to allow deletion of the standard exceptions from the title insurance policy; (iv) a properly executed non-foreign affidavit that complies with the requirements of § 1445 of the Internal Revenue Code; (v) a closing statement; and (vi) any documents necessary to transfer any permits, impact fee credits, concurrency, development rights or similar development entitlements. Seller and Purchaser shall each execute any and all state law disclosures, affidavits, and declarations as are required

by applicable law for the conveyance of real property.  Seller shall also execute such affidavits and other instruments as reasonably required by Purchaser's counsel or the Title Company, at any time within the three (3) months after the Closing or until Seller is dissolved or no longer in existence, and for the better conveying, transferring, assuring, and confirming the conveyance of title to the Property to the Purchaser in accordance with Section 4 hereof.

(c)        All documentary stamps required to be affixed to the deed, the brokerage commission set forth in Section 9 herein, all taxes due and owing as of the date of the Closing, including special assessments against the Property for public improvements authorized, pending or completed prior to the Closing, whether assessment for such has been levied or not, and any expenses to clear title of any Liens, Fines and Citations other than the Permitted Exceptions shall be paid from the proceeds of sale.  Each party shall pay the legal fees of its own counsel.  Purchaser shall pay all costs incurred for title examination, title insurance premiums, land surveys, all of the costs and fees for recording the Deed and any mortgage financing it places on the Property and all of escrow fees charged by the Title Company, if any.  Any and all other closing costs imposed at the Closing shall be paid by the party incurring same.

(d)        Taxes, assessments, income and expenses of the Property shall be prorated through the day of closing.  Taxes and assessments shall be prorated based on the current year's tax and assessments.  If the Closing occurs at a date when the current year's millage is not fixed, and the current year's assessment is available, taxes will be prorated based upon the prior year's millage.  If the Closing occurs when neither the current year's millage nor assessment is available, then taxes shall be prorated based on the prior year's tax.  Any tax proration based on an estimate shall not be subject to readjustment.

6.        **Access before Closing.**

Purchaser and its identified agents and representatives ("Purchaser's Agents") shall have the right to enter onto the Property at all reasonable times after the Effective Date for purposes of  conducting surveys, soil tests, engineering tests, and such other tests, investigations, studies, and inspections as Purchaser deems necessary or desirable, or provided that (i) pursuant to Section 10 the Purchaser nevertheless accepts the Property in its present condition on the Effective Date except to the extent set forth in this Agreement or the Deed delivered at the Closing, and (ii) all such tests, investigations, studies, and inspections shall be conducted at Purchaser's sole risk and expense, and with advance notice to Seller, and (iii) Purchaser shall indemnify, defend, and hold Seller harmless from and against any losses, liabilities, costs, or expenses (including reasonable attorney's fees) arising solely and directly out of Purchaser's entry onto the Property; *provided however*, Purchaser's indemnity shall not cover any damages, losses or claims to the Property or to any Seller related (i) to any conditions or environmental issues which existed prior to Purchaser's inspection or to the existence of any hazardous materials or substances which is discovered during Purchaser's inspection or (ii) resulting from Seller's acts, failure to act or negligence.  In the event Purchaser fails to close as required hereunder, at Seller's request, Purchaser at its sole expense shall return the Property to the condition it was in prior to the entry or improvements or modifications.  The foregoing indemnity obligation set forth in this Section 6 shall survive any termination of this Agreement and shall not be limited by the liquidated damages provision of Section 8(b) hereof.

7.        **Risk of Loss; Casualty.**

Prior to the Closing, Seller shall bear all risk of loss to the Property from any casualty resulting in an environmental contamination and all liabilities arising from the Property before the Closing.

8.        **Breach.**

(a)        If Seller shall default under any of the provisions of this Agreement and such default is not cured by Seller within five (5) days after receipt of written notice from Purchaser of such default, Purchaser may, at its option, either: (i) terminate this Agreement and have the Additional Deposit returned by the Escrow Agent and have any unused portion of the Initial Deposit returned by Berger Singerman LLP, in which event the parties shall have no further rights or liabilities one to the other hereunder; or (ii) to seek the equitable remedy of

specific performance (provided that if Seller's breach or default makes specific performance unavailable Purchaser shall have any and all remedies available at law or equity).

(b)     Purchaser and Seller agree that if Purchaser defaults in its obligations under this Agreement for any reason whatsoever, Seller shall be entitled to receive and retain, as fixed and agreed upon liquidated damages, the Deposit.  The foregoing shall constitute the sole and exclusive remedy of Seller for any breach by Purchaser hereunder, and Purchaser shall have no other liability hereunder or in connection herewith, whether for damages or otherwise, except for the indemnity provision of Section 6 hereof.  The parties agree that the Deposit is a reasonable estimate of Seller's damages in the event of Purchaser's default and that Seller's receipt of the Deposit is not intended as a penalty, but as full and final liquidated damages.

**9.        Commissions.**

(a)     Seller has agreed to pay Marcus & Millichap Real Estate Investment Services of Florida, Inc., a commission subject to the sale, transfer, and closing of the Property (the "Commission").  The Commission shall be paid from the sale proceeds, as approved by the Court.

(b)     Except for those identified brokers, Seller and Purchaser each represent and warrant to the other that they have not dealt with or engaged any other broker, finder, or other person in connection with the transactions contemplated herein.  Each party agrees to indemnify and hold the other harmless on account of any loss, damage, liability, or expenses, including attorney's fees, incurred by reason of a breach of such representation and warranty.  The foregoing indemnity obligations set forth in this Section 9 shall survive the conveyance of the Property to Purchaser and any termination of this Agreement.

**10.        Due Diligence Period; As-Is Condition.**

(a)     During the period beginning on the Effective Date and ending at 5:00 p.m. Eastern Standard Time on the date which is thirty days after the Effective Date (the "Due Diligence Period"), Purchaser and Purchaser's Agents will be given the right to (i) examine Seller's documents and records for the Property, contained within the virtual work-room established on-line care/of Seller's agent Keldar Advisors LLC, and (ii) perform non-destructive physical tests and conduct any and all necessary engineering, environmental and other inspections at the Property and examine the other documents and records referred to herein, or attached as, the Exhibits and Schedules, if any, annexed hereto (the "Review Materials").  With respect to Purchaser's right to inspect the Property, Purchaser agrees that Seller shall receive not less than one day's prior notice for each inspection.

(b)     Except as otherwise provided herein, Purchaser's obligations under this Agreement shall be contingent, only during the Due Diligence Period, upon Purchaser being satisfied in its sole discretion with the results of its investigation and evaluation of the Premises (the "Due Diligence Condition").  In the event that the Due Diligence Condition is not so satisfied, Purchaser shall notify Seller in writing (the "Termination Notice") prior to the expiration of the Due Diligence Period.  If Purchaser shall give the Termination Notice to Seller prior to the expiration of the Due Diligence Period, the Initial Deposit and all interest earned thereon shall be promptly returned to Purchaser and the parties hereto shall be released from all further obligations and liabilities hereunder, except with respect to the covenants, representations, warranties, and indemnities that survive this Agreement.  In the event that Purchaser does not give the Termination Notice to Seller prior to the expiration of the Due Diligence Period, Purchaser shall be deemed to have waived the Due Diligence Condition and Purchaser's right to terminate this Agreement pursuant to this Section 10(b) shall be deemed deleted from this Agreement, Purchaser shall make the Additional Deposit to the Escrow Agent in accordance with page 2 of this Agreement, and this Agreement shall continue in effect subject to the other provisions hereof.

(c)     Purchaser shall have the right, but not the obligation, to obtain at Purchaser's sole cost and expense a Phase I environmental site assessment (the "Phase I Report"), a Phase II environmental report in scope recommended by the Phase I Report, if any, and an asbestos survey (collectively, the Environmental Tests").

If Purchaser does not approve of the results of the Environmental Tests in its sole and absolute discretion, Purchaser may elect to terminate the Agreement and receive a return of the Initial Deposit from Escrow Agent (the "Environmental Condition").

(d)         Notwithstanding anything to the contrary contained in this Agreement, any investigation or examination of the Premises, the Review Materials or other materials with respect to the Premises performed by Purchaser of Purchaser's Agents prior to the Closing shall be performed at the sole expense of Purchaser.

(e)         As a material inducement to Seller to execute this Agreement, Purchaser acknowledges, represents and warrants that, upon the satisfaction or waiver of the Due Diligence Condition, (i) Purchaser will have fully examined and inspected the Premises, together with the Review Materials and other documents and materials with respect to the Premises which Purchaser deems necessary or appropriate in connection with its investigation and examination of the Premises, (ii) Purchaser will have accepted and will be fully satisfied in all respects with the foregoing and with the physical condition, value, use, operation, and tax status, of the Property (other than its continued review of the Environmental Condition), (iii) except as expressly set forth in this Agreement and the documents delivered by Seller at Closing, the Premises will be purchased by Purchaser "as is" and, upon Closing, Purchaser shall assume responsibility for the physical condition of the Premises, and (iv) except as expressly set forth in this Agreement and the documents delivered by Seller at Closing, Purchaser will have decided to purchase the Premises solely on the basis of its own independent investigation.  **PURCHASER AGREES TO ACCEPT THE PROPERTY ON AN "AS IS" AND "WHERE IS" BASIS, WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATION OR WARRANTY EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE DOCUMENTS DELIVERED BY SELLER AT CLOSING**.  Without limiting the foregoing, except as set forth in this Agreement and the documents delivered at Closing, Seller has not made, does not make, and no person acting for or claiming to act for Seller makes, and has not authorized anyone else to make any representation, as to the present or future physical condition, value, financing status, leasing, operation, use, tax status, income and expenses, absence of defects or toxic or hazardous substances, fitness for a particular purpose, compliance with laws or regulations, or any other matter or thing pertaining to the Premises, and Purchaser acknowledges that no such representation has been made, but subject to the express provisions of this Agreement to the contrary, as of the closing the physical condition of the Premises shall be substantially the same condition as that existing on the date hereof, reasonable wear, tear and deterioration excepted.  **EXCEPT AS EXPRESSLY SET FORTH HEREIN AND IN THE DOCUMENTS DELIVERED BY SELLER AT CLOSING, SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY.**  Seller shall not be liable for or bound by any verbal or written statements, representations, real estate broker's "set-ups", or information pertaining to the Premises furnished by any real estate broker, agent, employee, servant, or any other person unless the same are specifically set forth herein.  Notwithstanding any other term or provision of this Agreement, the provisions of this subsection 10(d) shall survive any expiration, termination, or consummation of this Agreement and shall not be merged into the closing documents.

**11.        Obligations Pending Closing.**

(a)         Except as may be necessary to cure any title objections of Purchaser, or to comply with Section 4(a), from the Effective Date hereof to the Closing, Seller: (i) shall not cause any change in the status of title to the Property or the physical condition of the Property; (ii) shall not remove or disturb physical improvements, trees, shrubbery, and plants, and all sand, gravel, dirt, minerals, oil and natural gas in, on, or under the Property; (iii) shall not enter into any leases or other occupancy agreements with respect to all or any portion of the Property; and (iv) shall promptly notify Purchaser in the event of occurrence of title or condition change, casualty, violation, or any breach of the foregoing provisions.  Seller hereby covenants and agrees that it will not further market the Property or enter into a sale contract for the Property except as provided herein

(b)     In the event any governmental agency should notify Seller, or Seller should become aware, of any permanent or temporary actual or threatened taking of all or any portion of the Property, Seller shall promptly notify Purchaser of that event.  If judicial, administrative or other proceedings are instituted, prior to Closing, that may result in the taking of any material portion of the Property by eminent domain, Purchaser shall have the option to terminate this Agreement by giving Seller written notice to that effect within thirty (30) days after receiving written notice of the proceedings from Seller.  Should Purchaser fail to timely notify Seller of such termination, then Purchaser shall be deemed to have waived its right to terminate the Agreement pursuant to this Section 11(b). Should Purchaser terminate this Agreement pursuant to this provision, the Escrow Agent and Berger Singerman LLP shall each return the Deposit funds in their respective possession to Purchaser, and the parties shall be released of all further obligations and liability under this Agreement.  If Purchaser elects not to terminate this Agreement because of a taking or a threatened taking through eminent domain, then at the Closing, Seller shall assign to Purchaser all right, title and interest in any award made or pending in connection with the taking.

## 12.     Representations and Warranties of Seller.

Seller represents and warrants to Purchaser as follows, all of which representations and warranties are true and correct as of the date hereof and shall be true and correct as of Closing hereunder:

(a)     The persons executing this Agreement on behalf of Seller warrant and represent to Purchaser in their individual capacities that they have the authority to enter into this Agreement and to bind Seller in accordance with its terms without obtaining any further approvals or consents (other than Court approval) and that Seller will fully comply with all applicable statutes, rules, and regulations governing the sale and transfer of the Property to Purchaser.  Seller is not a "foreign person" as that term is defined in § 1445 of the Internal Revenue Code, no withholding of sale proceeds is required with respect to Seller's interest in the Property under § 1445(a) of the Internal Revenue Code, and Seller shall execute an affidavit to such effect in the form to be provided by Purchaser.  Seller shall indemnify Purchaser and its agents against any liability or cost, including reasonable attorneys' fees, in the event that this representation is false or Seller fails to execute such affidavit at Closing hereunder.

(b)     Seller:  (i) is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida; (ii) has full power and authority to sell the Property to Purchaser without the consent of any other person or entity (other than Court approval and obtaining removal of the Citations); (iii) has authorized the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby; and (iv) is the sole legal and equitable owner of record and in fact of good and marketable fee simple title to the Property.

(c)     Seller has given no person, firm or other legal entity other than Purchaser, any right or option whatsoever to acquire the Property or any portion thereof or any interest therein.

(d)     To the best of Seller's knowledge, except for municipal lien proceedings for unpaid utilities and assessed fines, penalties, and charges by the City of West Palm Beach, there is no pending or threatened litigation, proceeding or investigation relating to the Property or Seller's ownership thereof, nor does Seller have reasonable grounds to know of any basis for such litigation, proceedings, or investigations; and to the best of Seller's knowledge, there are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under any applicable debtor relief laws contemplated by or pending or threatened against the Seller or the Property.

(e)     To Seller's best knowledge, except for municipal lien proceedings for unpaid utilities and assessed fines, penalties, and charges by the City of West Palm Beach, there exists no violation of any law, regulation, orders, or requirements issued by any governmental agency or authority, or action in any court on account thereof, against or affecting the Property.

(f)     To Seller's best knowledge, there are no Hazardous Materials located in, on, or under the Property, and Seller is not a generator of any such Hazardous Materials and has conducted its activities on and from the Property in full compliance with all hazardous waste, emission, reporting, and removal requirements imposed by applicable law.  Seller has received no notice of any violation of any applicable federal, state or local environmental laws, regulations, ordinances, rules, standards, criteria, limitations and requirements related to or connected with the disposal, storage, treatment, processing, emission or discharge of any Hazardous Materials with regard to the Property.  "Hazardous Materials" means and refers to all hazardous, toxic, and radioactive substances, wastes or materials, pollutants or contaminants (including by way of illustration only, asbestos, materials containing asbestos, polychlorinated biphenyls (PCB), pesticides, petroleum products, ammonia, chlorine, and derivatives of petroleum products) and other similar substances or materials, which are included under or regulated under any local, state or federal law pertaining to environmental regulation of hazardous substances, contamination or cleanup of hazardous substances (either by definition, determination or identification in such laws or by judicial or administrative interpretation of such laws), including the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Florida Pollution Spill Prevention and Control Act, Florida Statutes, Chapter 376, and other similar state, federal or local laws.

(g)     To the best of Seller's knowledge, no taking by power or eminent domain or condemnation proceedings have been instituted or threatened for the permanent or temporary taking or condemnation of all or any portion of the Property.

(h)     The Seller has not made, and prior to Closing hereunder will not make, without prior written notice to Purchaser, any commitments to any governmental authority or agency, utility company, school board, church or other religious body, or to any other organization, group, or individual, relating to the Property which would impose on Purchaser the obligation to make any contributions of money, dedication of land, or grants of easements or rights-of-way, or to construct, install, or maintain any improvements, public or private, on or off the Property except as currently installed at the Property.

(i)     Seller has not previously transferred, conveyed, allocated, encumbered or pledged (except pursuant to any secured debt that will be terminated at Closing) any development rights, impact fee credits, development entitlements or the General Intangibles to any third party.

(j)     To the best of Seller's knowledge all Review Material, documents and other information provided by Seller to Purchaser pursuant to this Agreement shall be true and complete copies of the documents and information in Seller's possession or control. Seller is not aware of any inaccuracies or errors set forth in the Review Material.  To the extent that Seller prepared the Review Material, the Review Materials are true and correct in all material aspects.

(k)     Seller has no knowledge of any change contemplated in any applicable laws, ordinances, or regulations, any judicial or administrative action, proceeding, or investigation, any action by owners of land adjoining the Property, or natural or artificial conditions upon the Property, which would restrict or prohibit Purchaser's use and development of the Property.

(l)     There are no unrecorded leases, options, rights of first refusal, service contracts, management agreements, or other agreements or instruments in force or effect that grant to any person or entity any right, title, interest, or benefit in or to all or any part of the Property or which will be binding on the Property or Purchaser after the Closing, nor are there any parties in possession of any portion of the Property as lessees.

(m)     The representations and warranties contained in this Section 12 shall survive the Closing for six (6) months after the date of Closing.

13.    **Representations and Warranties of Purchaser.**

(a)    Purchaser represents and warrants to Seller that Purchaser has full power and authority to enter into and perform under the terms of this Agreement without the consent of any third party (or has obtained such consent to the extent required) and each party Purchaser has authorized the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby and persons executing this Agreement on behalf of Purchaser warrant and represent to Seller in their individual capacities that they have the authority to enter into this Agreement and to bind Purchaser in accordance with its terms without obtaining any further approvals or consents.

(b)    Purchaser: (i) is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Delaware; (ii) has full power and authority to purchase the Property from Seller without the consent of any person or entity, other than approval of its board of directors to consummate the transaction contemplated by this Agreement; and (iii) has authorized the execution, delivery, and performance of this Agreement.

14.    **Escrow.**

(a)    Escrow Agent shall invest any Deposit funds in its possession in an interest-bearing account with a banking institution with an office in Jacksonville, Florida.  Purchaser and Seller acknowledge that any amount over $250,000.00 shall not be insured, and both parties release and hold harmless Escrow Agent from all losses, costs and liabilities which may accrue or be incurred related to such lack of insurance.  If the Closing under this Agreement occurs, the Escrow Agent shall apply the Deposit against the Purchase Price due Seller at Closing.  Any interest earned on the Deposit shall be credited and delivered to the party receiving the Deposit, provided, however, that if the transaction closes, at Closing any interest earned on the Deposit shall be credited to Purchaser by applying the same against the Purchase Price.

(b)    Escrow Agent shall not be bound in any way by any other agreement or contract between Seller and Purchaser, whether or not Escrow Agent has knowledge thereof.  Escrow Agent's only duties and responsibilities with respect to any Deposit funds in its possession shall be to hold the Deposit and other documents delivered to it as agent and to dispose of the Deposit and such documents in accordance with the terms of this Agreement.  Without limiting the generality of the foregoing, Escrow Agent shall have no responsibility to protect the Deposit and shall not be responsible for any failure to demand, collect or enforce any obligation with respect to the Deposit or for any diminution in value of the Deposit from any cause, other than Escrow Agent's gross negligence or willful misconduct.  Escrow Agent may, at the expense of Seller and Purchaser, consult with counsel and accountants in connection with its duties under this Agreement.  Escrow Agent shall not be liable to the parties hereto for any act taken, suffered or permitted by it in good faith in accordance with the advice of counsel and accountants.  Escrow Agent shall not be obligated to take any action hereunder that may, in its reasonable judgment, result in any liability to it unless Escrow Agent shall have been furnished with reasonable indemnity satisfactory in amount, form and substance to Escrow Agent.

(c)    Escrow Agent is acting as a stakeholder only with respect to the Deposit.  If there is any dispute as to whether Escrow Agent is obligated to deliver the Deposit or as to whom the Deposit is to be delivered, Escrow Agent shall not make any delivery, but shall hold the Deposit until receipt by Escrow Agent of an authorization in writing, signed by all the parties having an interest in the dispute, directing the disposition of the Deposit, or, in the absence of authorization, Escrow Agent shall hold the Deposit until the final determination of the rights of the parties in an appropriate proceeding.  Escrow Agent shall have no responsibility to determine the authenticity or validity of any notice, instruction, instrument, document or other item delivered to it, and it shall be fully protected in acting in accordance with any written notice, direction or instruction given to it under this Agreement and believed by it to be authentic.  If written authorization is not given, or proceedings for a determination are not begun, within thirty (30) days after the date scheduled for the Closing of title and diligently continued, Escrow Agent may, but is not required to, bring an appropriate action or proceeding for leave to deposit

the Deposit with a court of the State in which the Property is located pending a determination. Escrow Agent shall be reimbursed for all costs and expenses of any action or proceeding, including, without limitation, attorneys' fees and disbursements incurred in its capacity as Escrow Agent, by the party determined not to be entitled to the Deposit. Upon making delivery of the Deposit in the manner provided in this Agreement, Escrow Agent shall have no further liability hereunder. In no event shall Escrow Agent be under any duty to institute, defend or participate in any proceeding that may arise between Seller and Purchaser in connection with the Deposit. The parties acknowledge that Escrow Agent also represents Purchaser and in the event of any dispute between Seller and Purchaser, Seller acknowledges and agrees that Escrow Agent may represent Purchaser with respect to any disputes with respect to this Agreement or other matters, and Seller agrees that Escrow Agent shall not be disqualified or prevented from representing Purchaser by virtue of its capacity as Escrow Agent. The provisions of this Section 14 shall survive Closing.

15.    **Purchaser's Conditions to Closing.**

Purchaser's obligation to close under this Agreement shall be subject to and conditioned upon the fulfillment of the following conditions precedent (collectively, "Conditions to Purchaser's Obligations to Purchase"):

(a)    All of the documents required to be delivered by Seller to Purchaser at the Closing pursuant to the terms and conditions hereof shall have been delivered;

(b)    Each of Seller's representations, warranties, covenants and conditions in Section 12 shall be true in all material respects as of the Closing;

(c)    Seller shall have complied with, fulfilled and performed in all material respects each of the covenants, terms and conditions to be complied with, fulfilled or performed by Seller hereunder and there shall be no default by Seller under this Agreement;

(d)    There shall not be any pending litigation or, to the knowledge of either Purchaser or Seller, any litigation threatened in writing, which, if adversely determined, would restrain the consummation of any of the transactions contemplated by this Agreement or declare illegal, invalid or nonbinding any of the covenants or obligations of the Seller;

(e)    The Title Company shall have issued the Commitment, with liability in the amount of the Purchase Price, with extended coverage, if available, insuring Purchaser's fee estate in the Property, and the Commitment shall be dated as of the Closing and modified as of the Closing to show fee simple title to the Property to be vested in Purchaser without any changes to the Commitment that individually or in the aggregate reasonably would be expected to result in a Material Adverse Effect (the Commitment as modified on the Closing Date as required herein shall be referred to as the "Marked Commitment");

(f)    During the Due Diligence Period, the Environmental Condition shall be satisfied to Purchaser's sole satisfaction;

(g)    The Court shall have entered the Sale Order in form and substance acceptable to Purchaser and such Order shall not have been rescinded, reversed, modified or stayed and the time period allowing for such action has expired; and

(h)    If any Conditions to Purchaser's Obligations to Purchase set forth in this Section 15 is not met, Purchaser may (i) waive any of the foregoing conditions and proceed to Closing on the scheduled date of Closing, (ii) terminate this Agreement and receive a return of the Deposit from the Escrow Agent, or (iii) if such failure constitutes a default by Seller of its covenants hereunder, exercise any of its remedies pursuant to Section 8.

16.     **General Provisions.**

(a)     Purchaser shall have the right to assign any of its rights and obligations under this Agreement in whole or in part at any time to a related entity; provided that no assignment shall release Purchaser from any of its obligations hereunder.  Any proposed assignment of Purchaser's rights and obligations under this Agreement to any person other than an entity under common control and ownership with Purchaser shall require prior written notice to Seller.

(b)     Purchaser reserves the right to waive any of the terms and conditions of this Agreement for its benefit, including, without limitation, the contingency, conditions precedent, title, and warranty provisions, and to purchase the Property in accordance with the terms and conditions of this Agreement which have not been so waived.  Any such waiver must be in writing signed by Purchaser.

(c)     Seller and Purchaser acknowledge that each has relied exclusively on its own independent tax and legal counsel in connection with the review of this contract and the determination of any tax consequences and/or benefits that may result from this transaction.

(d)     The terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, successors, assigns, and legal representatives.

(e)     All representations, warranties, and indemnities contained in this Agreement shall not survive the transfer and conveyance of the Property to Purchaser unless otherwise expressly set forth herein.  For purposes of survival, all representations and warranties of Purchaser and Seller made herein shall be deemed to date from the Effective Date hereof and to have been restated and reaffirmed on the date of the Closing.

(f)     All notices required or permitted by this Agreement shall be given in writing and delivered personally or sent by a nationally recognized overnight delivery service or by United States mail, registered or certified, return receipt requested, postage prepaid, or by facsimile transmission during regular business hours followed immediately by a confirmation copy by a nationally recognized overnight delivery service, or by email with PDF-Format attachment during regular business hours followed immediately by a confirmation copy by a nationally recognized overnight delivery service, to the following addresses:

As to Seller:          HFAH Clear Lake LLC
                       Attn.: Daniel G. Hayes, Authorized Representative
                       c/o Keldar Advisors LLC
                       245 Saw Mill River Road, Suite 106
                       Hawthorne, New York 10532-1547
                       (914) 372-1983 │ Fax (914) 801-4667
                       │ Email dhayes@keldaradviors.com

With copy to:          Berger Singerman LLP
                       Attn.: Paul Steven Singerman, Esq. and Debi Evans Galler, Esq.
                       1450 Brickell Avenue, Suite 1900
                       Miami, Florida  33131
                       (305) 755-9500 │ Fax (305) 714-4340
                       │ Email: Singerman@bergersingerman.com
                       │ Email dgaller@bergersingerman.com

As to Purchaser:       Revenue Properties (US) Inc.
                       Attn.: General Counsel

55 City Centre Drive, Suite 1000
Mississauga, Ontario
L5B 1M3
(905) 281-3800 │Fax (905) 281-5890
│ Email bflynn@morguard.com

With copy to:                    Revenue Properties (US) Inc.
                                 c/o Revenue Properties Management Company, Inc.
                                 2542 Williams Boulevard
                                 Kenner, Louisiana 70062
                                 Attention:  Mr. John Talano
                                 504-904-8522 │ Fax (504) 904-8525
                                 │ Email:  jtalano@morguard.com

With further copy to:            Driver, McAfee, Peek & Hawthorne, P.L.
                                 1 Independent Drive, Suite 1200
                                 Jacksonville, Florida 32202
                                 Attn:  Matthew S. McAfee
                                 (904) 301-1269 │Fax (904) 301-1279
                                 │Email  mmcafee@northfloridalaw.com

With further copy to:            Eric N. McKay, Esq.
                                 3946 3rd Street South, Ste. 297
                                 Jacksonville Beach, Florida 32250-5847
                                 (904) 651-6256 │Fax (904) 273-2661
                                 │Email eric@ericmckaylaw.com

As to Escrow Agent:              Driver, McAfee, Peek & Hawthorne, P.L.
                                 1 Independent Drive, Suite 1200
                                 Jacksonville, Florida 32202
                                 Attn:  Sara McGraw
                                 (904) 301-1269 │Fax (904) 301-1279
                                 │Email  slm@northfloridalaw.com

Any notice served upon either party as provided above shall be deemed to have been given at the time such notice is received, if sent by hand or overnight delivery or facsimile transmission or by email with PDF-Format attachment.  Either party shall have the right from time to time to change its address for the receipt of notices by giving written notice of the new address in the manner set forth above.

(g)      This Agreement contains the entire understanding between the parties hereto with respect to the Property and is intended to be an integration of all prior or contemporaneous agreements, conditions, or undertakings between the parties hereto and there are no promises, agreements, conditions, undertakings, warranties, or representations, oral or written, express or implied, between and among the parties hereto with respect to the Property other than as set forth herein.  No change or modification of this Agreement shall be valid unless the same is in writing and signed by Seller and Purchaser.

(h)      The date on which this Agreement has been executed and ratified by both parties being the last date subscribed below, and such date shall be referred to as and shall constitute the "Effective Date" of this Agreement.

Purchase and Sale Agreement
April 2014) ◆ Page 15

HFAH Clear Lake LLC
Revenue Properties (US) Inc.

(i)      In the event any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

(j)      Each party covenants that it will upon request of the other party do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged, or delivered, all such further acts, conveyances, and assurances as may reasonably be required for the better conveying, transferring, assuring, and confirming the transfer of the Property to the Purchaser.

(k)      This Agreement and all transactions hereunder shall be governed by the laws of the State of Florida without reference to its conflict of laws provisions.  In the event that either party hereto is required to resort to litigation to enforce its rights hereunder, the parties agree that any judgment awarded to the prevailing party shall include all reasonable litigation expenses, including without limitation reasonable actual attorneys' fees, incurred by the prevailing party.

(l)      This Agreement may be executed in multiple counterparts, but all of such copies shall be deemed an original.  Amendments and modifications to this Agreement may be made effective upon the exchange of counterparts by facsimile transmission or electronic transfer of PDF-format facsimiles, which the parties may rely upon as deemed original documents.

(m)      No waiver of the manner of performance, time of performance, or fulfillment of any obligation or condition hereunder shall be effective unless set forth in a written instrument authorized and executed with the same formality as this Agreement.

(n)      Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement.  As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to the effect that any ambiguities herein should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto.

(o)      If either party initiates or is made a party to legal proceedings (whether judicial, administrative, declaratory, in arbitration, or otherwise) in connection with this Agreement, then the non-prevailing party in those proceedings will pay the costs and attorney's fees, including the costs and attorney's fees of appellate proceedings, incurred by the prevailing party.

(p)      Any reference in this Agreement to time periods of less than six (6) days shall exclude Saturdays, Sundays and legal holidays in its computation. Any time period provided for in this Agreement that expires on a Saturday, Sunday, or legal holiday shall extend to 5:00 p.m. of the next full business day.

(q)      As required by Florida law, the following disclosure is included in this Agreement:

"Radon is a naturally occurring radioactive gas, that when it has accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

[Signatures pages commence on succeeding pages.]

▪

Purchase and Sale Agreement
April 2014) • Page 16

HFAH Clear Lake LLC
Revenue Properties (US) Inc.

IN WITNESS WHEREOF, **HFAH CLEAR LAKE LLC** has caused this Agreement to be duly executed under seal by its authorized representative on the date set forth below.

SELLER:

**HFAH CLEAR LAKE LLC**,
a Florida limited liability company

By:     Term Management LLC,
         a Florida limited liability company
Its:    Manager


By: _Daniel G. Hayes_
        Daniel G. Hayes
Its:    Manager

Date:   April 8, 2014

Purchase and Sale Agreement
April 2014) ◆ Page 17

HFAH Clear Lake LLC
Revenue Properties (US) Inc.

IN WITNESS WHEREOF, **REVENUE PROPERTIES (US) INC.** has caused this Agreement to be duly executed under seal by its authorized representative on the date set forth below.

PURCHASER:

**REVENUE PROPERTIES (US) INC.**, a Delaware corporation

By: _____

Name:       Paul Miatello           Beverley G. Flynn
            Vice President          Vice President

Its:

Date:    April 8 , 2014

Purchase and Sale Agreement
April 2014) ◆ Page 18

HFAH Clear Lake LLC
Revenue Properties (US) Inc.

## ACKNOWLEDGMENT OF ESCROW AGENT

Escrow Agent has executed a counterpart of this Agreement to confirm that Escrow Agent shall act as escrowee with respect to and hold in escrow the Deposit and any interest earned thereon, pursuant to the provisions of Section 14.

ESCROW AGENT:

**DRIVER, McAFEE, PEEK & HAWTHORNE, P.L.**

By: _____

Matthew S. McAfee

Its:    Executive Vice President

Date:    April 15, 2014

Purchase and Sale Agreement
April 2014 ◆ Page 19

HFAH Clear Lake LLC
Revenue Properties (US) Inc.

## Exhibit A
## Legal Description

Parcel 1:

A certain portion of Parcel No. 7, Executive Center Park, according to the map or plat thereof as recorded in Plat Book 28, Page 229, Public Records of Palm Beach County, Florida, said portion being more particularly described as follows:

Beginning at the Northwest corner of said Parcel No. 7, run South 7° 15' 40" West (bearings mentioned herein are related to the plat of said Executive Center Park whose bearings are based on assumed data) along the West line of Parcel No. 7; 594.36 feet to the Southwest corner of said Parcel No. 7; thence South 58° 53' 26" East 295.51 feet; thence South 35° 29' 06" East 109.75 feet to a point on a curve concave to the Northwest having a radius of 1400.00 feet and whose tangent passing thru said point bears North 45° 27' 57" East; thence Northeasterly along the arc of said curve subtending an angle of 20° 46' 13" a distance of 507.51 feet; thence North 58° 53' 26" West 40.00 feet thence South 31° 06' 34" West 78.00 feet; thence North 58° 53' 26" West 348.81 feet; thence North 31° 06' 34" East 194.25 feet; thence North 58° 53' 26" West 193.50 feet; thence North 34° 27' 18" West along a line radial to the Right of Way line of the cul-de-sac at the end of Executive Center Drive a distance of 42.37 feet to a point on said Right of Way line, said point being on the arc of a curve concave to the North having a radius of 100.00 feet; thence Westerly along the arc of said 100.00 foot radius curve subtending an angle of 41° 42' 58" a distance of 72.81 feet, to the Point of Beginning, together with an easement for drainage purposes only, over and under the following described land 12 feet in width lying in Parcel 6 of said Plat, the centerline of which is more particularly described as follows: From the Northeast corner of the above described Parcel 6 run (for convenience the Easterly line of said Parcel 6 run is assumed to bear South 7° 15' 40" West and all other bearings mentioned herein are relative thereto) South 7° 15' 40" West along the Easterly line of said Parcel 6 a distance of 6 feet to the Point of Beginning; thence run Westerly and Northerly parallel to and 6 feet as measured at right angles to the Northerly line of Parcel 6 to a point, said point being the end of described easement centerline and 448.45 feet Easterly of the Northwest corner of Parcel 6 as measured along its Northerly line.

Parcel 2:

Parcel No. 7, Executive Center Park, according to the map or plat thereof as recorded in Plat Book 28, Page 229, Public Records of Palm Beach County, Florida.  LESS and EXCEPT therefrom: A certain portion of Parcel No. 7, Executive Center Park, recorded in Plat Book 28, Page 229, Public Records of Palm Beach County, Florida, said portion being more particularly described s follows: Beginning at the Northwest corner of said Parcel No: 7, run South 07° 15' 40" West (bearings mentioned herein are related to the plat of said Executive Center Park whose bearings are based on assumed data along the West line of Parcel No. 7; 594.36 feet to the Southwest corner of said Parcel No. 7; thence South 58° 53' 26" East 295.51 feet; thence South 35° 29' 06" East 109.75 feet to a point on a curve concave to the Northwest having a radius of 1400.00 feet and whose tangent passing thru said point bears North 45° 27' 57" East; thence Northeasterly along the arc of said curve subtending an angle of 20° 46' 13" a distance of 507.51 feet; thence North 58° 53' 26" West 40.00 feet; thence South 31° 06' 34"  West 78.00 feet; thence North 58° 53' 26" West 348.81 feet; thence North 31° 06' 34" East 194.25 feet; thence North 58° 53' 26" West 193.50 feet; thence North 34° 27' 18" West along a line radial to the Right of Way line of the cul-de-sac at the end of Executive Center Drive a distance of 42.37 feet to a point on said Right of Way line, said point being on the arc of a curve concave to the North having a radius of 100.00 feet; thence Westerly along the arc of said 100.00 foot radius curve subtending an angle of 41° 42' 58" a distance of 72.81 feet, to the Point of Beginning, together with an easement for drainage purposes only, over and under the following described land 12 feet in width lying in Parcel 6 of said Plat, the centerline of which is more particularly described as follows: From the Northeast corner of the above described Parcel 6 run (for convenience the Easterly line of said Parcel 6 run is assumed to bear South 7° 15' 40" West and all other bearings mentioned herein are relative thereto) South 7° 15' 40" West along the Easterly line of said Parcel 6 a distance of 6 feet to the Point of Beginning; thence run Westerly and Northerly parallel to and 6 feet as measured at right angles to the Northerly line of Parcel 6 to a point, said point being the end of described easement centerline and 448.45 feet Easterly of the Northwest corner of Parcel 6 as measured along its Northerly line.

Purchase and Sale Agreement
April 2014) ◆ Page 20

HFAH Clear Lake LLC
Revenue Properties (US) Inc.

**Exhibit B**
**Bidding Procedures**

**BIDDING PROCEDURES**

These Bidding Procedures (the "Bidding Procedures") set forth the process by which HFAH Clear Lake, LLC ("Clear Lake") is authorized to conduct the sale (the "Sale") by auction (the "Auction") of substantially all of Clear Lake's assets, defined as the "Property" in the Purchase and Sale Agreement dated April ___, 2014 (as may be amended) between the Debtor (the "PSA"), as seller, and Revenue Properties (US), Inc. ("RPI"), as purchaser, or such other Purchase and Sale Agreement submitted at or prior to the Auction and subsequently determined by the Debtor to be the highest offer for the Property and approved by the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the PSA.

**Assets to be Sold**

1.      These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest offer for the Property, as identified in further detail and defined in the PSA.

**Participation Requirements**

2.      To participate in the bidding process or otherwise be considered for any purpose hereunder, an entity (other than RPI) interested in the Property (a "Potential Bidder") must, on or before June ___, 2014, deliver the following documents (the "Preliminary Bid Documents") to participate in the bidding process:

    (a)    a non-binding indication of interest with respect to the purchase of the Property; and

    (b)    preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which Clear Lake and its advisors will determine.

3.    Within two (2) business days after a Potential Bidder delivers the Preliminary Bid Documents, Clear Lake shall notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct a due diligence review.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "Acceptable Bidder") may submit bids to purchase the Property.  RPI shall at all times be deemed an Acceptable Bidder.

**Obtaining Due Diligence Access**

4.    After notification of Acceptable Bidder status, Clear Lake shall provide each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request.  The due diligence period will end on July __, 2014 (the "Bid Deadline").

5.    Clear Lake shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

**Bid Requirements**

6.    To participate in the Auction, an Acceptable Bidder (other than RPI) must deliver to Clear Lake a written irrevocable offer that must:

    (a)    be in writing;

    (b)    equal or exceed $4,651,750 (the "Minimum Bid Amount"), which is comprised of the Purchase Price ($4,225,000), the Break-Up Fee ($126,750), the Expense Reimbursement ($175,000) and the Minimum Bid Increment ($100,000);

    (c)    constitute a good faith, bona fide offer to purchase the Property;

    (d)    be accompanied by a clean and a duly executed copy of the PSA with copies that are marked to reflect the amendments and modifications from the PSA executed with RPI, which may not be materially more burdensome to Clear Lake or inconsistent with these Bidding Procedures;

    (e)    identify with particularity each and every condition to closing, if any;

    (f)    not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, and/or (iii) the outcome or completion of a due diligence review by the Potential Bidder; and

    (g)    must remain irrevocable until 48 hours after the Auction.

7.    In addition to the above, each Acceptable Bidder must:

    (a)    fully disclose the identity of each entity that will be bidding for or purchasing the Property, or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

    (b)    on or before the Bid Deadline, submit a cash deposit equal to $500,000 by wire transfer of immediately available funds to to Berger Singerman LLP (the "Good Faith Deposit");

(c)    acknowledge and agree if the respective Acceptable Bidder is the Successful Bidder (as defined herein), that $200,000 of the Good Faith Deposit will be remitted to RPI as the Initial Deposit Refund as defined and provided in Section 3(a)ix of the PSA; and

(d)    not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

8.      Bids fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."  Notwithstanding anything in these Bidding Procedures to the contrary, Clear Lake may not alter the definition of Qualified Bid or Qualified Bidder without the express consent of RPI.  Within two (2) Business Days after the Bid Deadline, Clear Lake, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders and RPI whether their bids constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  The PSA submitted by RPI and any additional bids timely submitted by RPI (to the extent such bids are generally consistent with the terms of the PSA) shall be deemed Qualified Bids, qualifying RPI to participate in the Auction.

**Bid Deadline**

9.      Binding bids must be received by Clear Lake so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on the Bid Deadline.

**Evaluation of Qualified Bids**

10.     Prior to the Auction, Clear Lake shall evaluate Qualified Bids and identify the highest Qualified Bid (the "Starting Bid").  Within 24 hours of such determination, Clear

- 4 -

Lake shall notify RPI as to which Qualified Bid is the Starting Bid.  Clear Lake shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**No Qualified Bids**

11.    If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the PSA will be deemed the Successful Bid (as defined herein), and Clear Lake will pursue entry of an order by the Bankruptcy Court approving the PSA and authorizing the sale of the Property to RPI.

**Auction**

12.    If one or more Qualified Bids are received by the Bid Deadline, then Clear Lake shall conduct the Auction" with respect to the Property.  The Auction shall be conducted by Berger Singerman, if one or more Qualified Bids are received by the Bid Deadline.  The Auction shall be held on or before August __, 2014.

13.    The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

      (a)    the Auction will be conducted openly;

      (b)    only the Qualified Bidders, including RPI, shall be entitled to bid at the Auction;

      (c)    credit bids shall not be permitted by any direct lender;

      (d)    the Qualified Bidders, including RPI, shall appear in person at the Auction, or through duly-authorized representatives;

(e)     only such authorized representatives of each of the Qualified Bidders, RPI, Clear Lake, and any direct lender, and their respective advisors shall be permitted to attend the Auction;

(f)     bidding at the Auction shall begin at the Starting Bid;

(g)     subsequent bids at the Auction, including any bids by RPI, shall be made in minimum increments of $100,000;

(h)     RPI shall receive a credit equal to the amount of the Break-up Fee and the Expense Reimbursement when bidding at the Auction;

(i)     each participating bidder will be informed of the terms of the previous bids;

(j)     the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(k)     each bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale; and

(l)     absent irregularities in the conduct of the Auction, bids made after the Auction is closed shall not be considered.

**Acceptance of the Successful Bid**

14.     Upon the conclusion of the Auction (if the Auction is conducted), Clear Lake shall identify the highest bid (the "Successful Bid").  The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder".  The Successful Bidder and Clear Lake shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

15.     The Bankruptcy Court will conduct a hearing to approve the Sale to the Successful Bidder as soon as practicable after the Auction.  Clear Lake will request the Bankruptcy Court make certain findings regarding the Auction, including, among other

things, that (a) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures, and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Property, and is in the best interests of Clear Lake.

16.     If an Auction is held, Clear Lake shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an order approving such Successful Bid.

17.     If RPI is not the Successful Bidder, then Berger Singerman, LLP shall be authorized and directed to remit $200,000 of the Good Faith Deposit to RPI as the Initial Deposit Refund as defined and provided in Section 3(a)ix of the PSA.

**Designation of Back-Up Bidder**

18.     If for any reason the Successful Bidder fails to consummate the purchase of the Property within the time permitted after the entry of the order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best bid for the Property (the "Back-Up Bidder"), will automatically be deemed to have submitted the highest or otherwise best bid, and Clear Lake and the Back-Up Bidder will be authorized, but not required, to consummate the Sale with the Back-Up Bidder as soon as is commercially

- 7 -

reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

**Break-Up Fee and Expense Reimbursement**

19.     If the sale closes with an entity other than RPI, Clear Lake shall be obligated to pay to RPI, by wire transfer in immediately available funds to an account designated by RPI, all amounts due to RPI, including the Break-up Fee and the Expense Reimbursement, in each instance in accordance with the applicable provisions of the PSA.

**Return of Good Faith Deposit**

20.     The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of the Property, be credited to the purchase price paid for the Property.  If the Successful Bidder fails to consummate the purchase of the Property (other than as a result of a material breach of the PSA by Clear Lake), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, Clear Lake.

21.     The Good Faith Deposit of any unsuccessful Qualified Bidders (except for RPI) will be returned within 15 days after consummation of the Sale or upon the permanent withdrawal of the proposed Sale of the Property.  The Good Faith Deposit of RPI shall be returned in accordance with the terms of the PSA.

**EXHIBIT C**
**NOTICE OF AUCTION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re                                                              Chapter 11

HFAH CLEAR LAKE LLC,
a Florida limited liability company,                 Case No. 14-

                                        Debtor.

_____/

## NOTICE OF AUCTION OF DEBTOR'S PROPERTY

**PLEASE TAKE NOTICE THAT** the above-captioned debtor (the "**Debtor**") filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "**Bankruptcy Court**") on September 30, 2014.

**PLEASE TAKE FURTHER NOTICE THAT** on September 30, 2014, in connection with the proposed sale (the "**Sale**") of substantially all of the Debtor's (the "**Property**") to Revenue Properties (US) Inc. ("**Revenue Properties**") or any other Successful Bidder for the Purchased Assets at an auction for the Property (the "**Auction**"), the Debtor filed a motion [ECF No. ___] seeking, among other things, the entry of an order approving (a) bidding procedures governing the Sale, (b) the form of purchase and sale agreement, (c) payment of a break-up fee and expense reimbursement to Revenue Properties in certain instances, including if Revenue Properties is not the Successful Bidder at the Auction, and (d) the form and manner of notice.

**PLEASE TAKE FURTHER NOTICE THAT** on _____ __, 2014, the Bankruptcy Court entered an order [ECF No. ___] (the "**Sale Procedure Order**") (a) approving

the bidding procedures for the Sale of the Purchased Assets and (b) approving the form of purchase and sale agreement, (c) approving the form of notice, and (d) scheduling the Auction.

PLEASE TAKE FURTHER NOTICE THAT the deadline to submit a Qualified Bid is **December 1, 2014.**

PLEASE TAKE FURTHER NOTICE THAT as provided in the Sale Procedures Motion, the Debtor shall conduct the Auction on **December 8, 2014** beginning at 10:00 a.m. at the offices of Berger Singerman LLP located at **2650 North Military Trail, Suite 240, Boca Raton, Florida**.

PLEASE TAKE FURTHER NOTICE THAT the deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale is _____ ___**, 2014.**

PLEASE TAKE FURTHER NOTICE THAT a hearing to consider the proposed Sale will be held as soon as practicable after the Auction.

Dated:   _____ ___, 2014

> **BERGER SINGERMAN LLP**
> Proposed Attorneys for HFAH Clear Lake LLC
> 1450 Brickell Avenue, Suite 1900
> Miami, Florida    33131
> (305) 755-9500
> (305) 714-4340 (Facsimile)
>
>
> By: s/ Debi Evans Galler
>       Paul Steven Singerman
>       Florida Bar Number 378860
>       Singerman@bergersingerman.com
>       Debi Evans Galler
>       Florida Bar Number 985236
>       dgaller@bergersingerman.com