UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Case

HFAH CLEAR LAKE LLC, [1]                             Case No. 14-31806-EPK

        Debtor.

_____/

**DEBTOR'S RESPONSE IN OPPOSITION TO SECURED CREDITORS DONNA
CANGELOSI AND ADRIAN OOSTHUIZEN'S OBJECTION [ECF NO. 19 and 20]**

      HFAH Clear Lake LLC (the "Debtor"), files its response in opposition to *Secured Creditors*

*Donna Cangelosi and Adrian Oosthuizen's Objection to, and Motion to Continue Hearings on, (I)*

*Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures, (B) Approving the Form*

*and Manner of Notice, (C) Approving Form of Purchase and Sale Agreement (D) Scheduling an*

*Auction, and (E) Approving the Sale of Substantially all the Debtor's Assets Free and Clear of All*

*Liens, Claims, Encumbrances and Interests; (II) Motion to Approve Interim and Final Orders*

*Pursuant to 11 U.S.C. §§ 105, 364, and 507 Approving Post-Petition Financing and Scheduling a*

*Final Hearing; and (III) Debtor's Application for Approval of the Employment of Marcus &*

*Millichap Real Estate Investment Services of Florida, Inc., as Real Estate Broker for the Debtor*

*Nunc Pro Tunc to the Petition Date* [ECF No. 19 and 20] (the "Objection") wherein Donna

Cangelosi ("Cangelosi") and Adrian Oosthuizen ("Oosthuizen")(Cangelosi and Oosthuizen

collectively referred to as the "Objectors") seek a 30-45 days continuance of these motions to allow

the District Court in another bankruptcy case time to appoint a "TDI Representative" to act on behalf

---

[1]    The last four digits of the Debtor's federal tax identification number are 6161.  The Debtor's mailing address is c/o Keldar Advisors, LLC, 245 Saw Mill River Road, Suite 106, Hawthorne, NY 10532.

of the Direct Lenders[2].  The Debtor objects to such a lengthy delay (i) as being unnecessary in that this Court can establish procedures that would protect the Direct Lenders' interests and appoint a representative for the Direct Lenders, and (ii) would risk a delay in the ultimate sale of the Property, possibly causing the Stalking Horse to call a default under the Purchase and Sale Agreement, or causing a termination of the Purchase and Sale Agreement by its terms, and risk the liability insurance expiring, with the Debtor having no ability to pay for continued coverage beyond the end of March 2015.

## I. BACKGROUND

1.      By way of background and history of the loans and this Property, the Debtor incorporates by reference the *Declaration of Daniel G. Hayes in Support of Debtor's First Day Motions* [ECF No. 6].

2.      This case, for the most part, is about and because of the Direct Lenders, and the Debtor and the Direct Lenders are aligned in the goal of maximizing the price for the Property that can be achieved through the proposed auction process.

3.      The Debtor welcomes the involvement of 51% or more of the (243) Direct Lenders, but not a minority faction that does not represent, and may have separate and distinct objectives from, the actual Direct Lenders.

4.      One of the Objectors, Oosthuizen, holds a .0031% beneficial interest in the First Note ($16,050,000)[3] secured by the First Mortgage in his own name as a married man.  *See* the Ballot Report attached hereto as **Exhibit "A"**, and incorporated herein by reference.  Apparently Cangelosi is Oosthuizen's wife but holds no direct beneficial interest in the HFAH Clear Lake 1st (or 2nd), and

---

2   Terms not otherwise defined herein shall have the meaning ascribed to them in the *Declaration of Daniel G. Hayes in Support of Debtor's First Day Motions* [ECF No. 6].

3   The total obligations to the Direct Lenders on account of the 1st Note and the 2nd Note is approximately $19 million, not $40 million as stated in the Objection at para 19.

therefore has no standing in this case.

5.      Cangelosi, however, is very active and familiar to the Nevada District Court in connection with the ARC Bankruptcy Case (the "ARC Court"), and apparently has been appointed in several different loans as a "TDI Representative," which appears to function as a servicer for the loans.  *See*, Objection, para 12.  Cangelisi's interest in another appointment is not a valid basis for her to intervene here.

6.      In its January 29, 2010, *Nunc Pro Tunc Order Converting Chapter 11 Cases to Chapter 7 Cases* in the Asset Resolution LLC, and related cases, the ARC Court ordered that the Chapter 7 Trustee had no authority to operate ARC's loan servicing business, including any loan servicing rights arising under certain Loan Servicing Agreements originally entered into by the direct lenders with USCAM, as those rights had been property terminated by the direct lenders and were not property of the ARC bankruptcy estate.

7.      The ARC Court further ordered that the Chapter 7 Trustee was placed in temporary nominal control to hold the loan servicing rights, subject to:

> (i) the '51% Rule' under Nevada law, pursuant to which 51% or more of the direct lenders in each of the 14 SPE Debtors and in each of the Loans may notify the Chapter 7 Trustee regarding how they want to proceed with the management and direction of each of the 14 SPE Debtors and each of those Loans (*e.g.*, the retention of a new loan servicer, the lack of any loan servicer, the conveyance of title, etc.); and (ii) further order of the Court.  In other words, for example, if 51% or more of the direct lenders in a Loan vote in favor of retaining a new loan servicer pursuant to new loan servicing terms and conditions, the Chapter 7 trustee, upon approval of the Court, shall transfer control of the Loan to that new loan servicer in accordance with the directive from the majority of the direct lenders in that Loan.  In the event that 51% or more of the direct lenders in any of the 14 SPE Debtors or Loans cannot agree on the management and direction of any of the 14 SPE Debtors or Loans, an immediate hearing before the undersigned United States District Judge [Judge Jones] shall be convened to address and resolve the management and direction of any such 14 SPE Debtors or Loans.

*See, Nunc Pro Tunc Order Converting Chapter 11 Cases to Chapter 7 Cases* (the "Conversion Order") attached hereto as **Exhibit "B"** and incorporated herein by reference.

8.      Pursuant to the Conversion Order, Janet L. Chubb, Esq. of Jones Vargas was tasked with identifying how 51% or more of the direct lenders in each of the 14 SPE Debtors and Loans intended to proceed with the management and direction of those 14 SPE Debtors and Loans, and Ms. Chubb was to ensure that such votes were properly undertaken and recorded.

9.      The "51% rule" is again reiterated in the ARC Court's September 6, 2012, *Agreed Order Regarding Settlement and Related Relief*, (the "Settlement Order"), a copy of which is attached hereto as **Exhibit "C"**.  In paragraph 147 the ARC Court found:

> Pursuant to Nev. Rev. Stat. 645B.340, as long as the holders of 51% or more of the DL Interests in a USCAM Loan agree to take actions in connection with the Loan on behalf of all the DL Interests in the Loan (including without limitation, pursuing foreclosure of the collateral for the Loan, retaining terminating, or settling relationships with a loan servicer or authorized agent to take approved actions for the Loan, modifying the terms of the Loan, and/or managing and disposing of the collateral for the loan), a Direct Lender acting under such vote… shall be authorized to undertake the actions contemplated by such vote on behalf of all of the DL Interests in the Loan.

10.     On June 24, 2010, the ARC Court entered its *Order on Trustee's Motion to Approve Transfer of Loan Servicing Agreements and Related Rights (Nineteen Loans)* [ECF No. 989]  (the "Servicing Transfer Order") and approved the transfer of the servicing of the HFAH Clear Lake 1st (among others) to Cross, FLS ("Cross"), noting that "More than 51% of the holders of the direct lender's beneficial interests with respect to each of the loans identified above,… have elected to place the loan servicing rights of each Loan with Cross, FLS."  A copy of the Servicing Transfer Order is attached hereto as **Exhibit "D"** and incorporated herein by reference.

11.     No servicer was appointed for the HFAH Clear Lake 2nd.

4

12.     A copy of the Ballot used for the HFAH Clear Lake 1st is attached hereto as **Exhibit "E"**.  The Ballot indicates that Cross (and the Direct Lenders) will be bound by the terms of a *Majority Administration and Cooperation Agreement* (which presumably sets forth what action Cross can and cannot take without getting further approval).

13.     The Ballot also states that:

> the District Court of Nevada has ordered that the Direct Lenders are responsible for  the management of their assets and that holders of 51% of the Beneficial Interest are responsible to manage the Asset and Direct Lender activities; to seek solutions to pay arrears property taxes, and recover any value in the Asset.  If 51% Beneficial Interest cannot agree to an asset management solution, then the Asset may be lost to tax foreclosure, or the District Court may impose a court appointed receiver to manage the Asset. (Emphasis Added)

14.     Unfortunately, the Direct Lenders have taken no action with respect to the Property to pay the property taxes, which have not been paid since 2006, address the code violations, or otherwise try to recover any value for the Property.

15.     On May 8, 2012, Cross exercised its rights under the Majority Administration and Cooperation Agreement and resigned.   See *Cross FLS, LLC's Status Report and Notice of Termination or Majority Administrative and Cooperative Agreements* filed in the ARC Bankruptcy Case [ECF No 1797] (the "Termination Report") attached hereto as **Exhibit "F"**, and incorporated herein by reference.

16.     In the Termination Report, Cross details the procedures it established to communicate with the various direct lender groups and get 51% consent for certain decisions. On page 8 of 35 of the Termination Report, Cross indicates that the process of communications and conversations with the direct lenders could take weeks if not months, and the balloting process would also take months "including simultaneous reminder vote emails and direct phone calls to lenders advising them to vote." This makes sense when you consider the number of Direct Lenders involved (appx. 243) and

5

the fact that, for the most part, the Direct Lenders are "mom and pop" investors, some of whom are elderly and do not have email.[4]

17.     On page 27 of 35 of the Termination Report, Cross provides an update regarding the HFAH Clear Lake 1st, which reflects that during the time Cross was managing this loan there were several proposals presented to the Direct Lenders, "some of which were turned down and/or some of which did achieve the statutory 51% beneficial interest vote required to approve such a sale." It is the Debtor's understanding through its communications with Cross that it was more of the latter (did not receive the vote) than the former (being turned down).

18.     No servicer was ever approved to replace Cross.

19.     During the period following the resignation of Cross, in 2012, Cangelosi (and two other interested persons) contacted the Debtor directly and represented that they would be able to imminently raise capital, pay taxes, demolish the buildings and negotiate city fines/penalties. At the same time those parties also met with Marcus & Millichap about the market prospects for the Property. This representation appears to have been made for their own account, as they did not purport to represent the class of Direct Lenders.

20.     On May 15, 2013, Cangelosi filed in the ARC Bankruptcy Case a declaration *In Opposition to HFAH Clearlake LLC's Motion for Relief From Stay Pursuant to 11 U.S.C.§ 362(d)(1)* (the "Declaration") in which Cangelosi (who is not even a Direct Lender) states in paragraph 8 :

---

[4]     Undersigned counsel spoke with a Mr. Sinder on October 13th, who is a Direct Lender, is 90 years old, and does not have access to email or fax.

> <u>The direct lenders are moving diligently to be in a position to develop</u> <u>the property</u>. It is intended to set up a TDI representative organization with Arthur Kriss and me as the TDI reps. The organization will then borrow money to foreclose upon the property, demolish the existing structures, negotiate tax and penalty concessions, and obtain entitlements to develop the property. It will then be sold to a buyer as a non-distressed asset versus the current proposed sale. (Emphasis Added)

A copy of the Declaration is attached hereto as **Exhibit "G"** and incorporated by reference.

21.     Cangelosi states in her Declaration, in para 2, that she was involved in earlier negotiations with the Stalking Horse and that the offer was presented to the Direct Lenders for a vote and that it was rejected. Undersigned counsel has requested a copy of any documents memorializing this vote (presumably there would be a Ballot and a tabulation as was the case for the vote on engaging Cross), and as of the filing of this Response, none has been provided.

22.     The Property is not a melting ice cube, it is a basket of rotting fish. The Debtor is not "rushing to sale", as alleged in the Objection. The Debtor, after being unable to get the attention of the Direct Lenders for more than six (6) years, is trying to finally bring the matter to a resolution; sell the Property through a Court approved auction process, which has the dual purpose of generating funds to make a distribution to the Direct Lenders and allow the purchaser to cure the problems of this blighted property.

## II. <u>THE DIP LOAN</u>

23.     The DIP Loan is very limited, capped at $200,000, and was required as a result of zero cash flow and zero cash available from Debtor in order to pay for liability insurance on the property, undersigned counsel's retainer, and to make some funds available to pay administrative expenses in the case, including U.S. Trustee fees, and was done by the Stalking Horse as an accommodation to the Debtor.

24.     Of the $200,000, the Debtor has already paid for 6 months worth of liability insurance

($3,285.82), the filing fees for this case, and the bankruptcy retainer for undersigned counsel ($65,000).

25.     The DIP Motion was not filed on an emergency basis and no funds are sought during the first few weeks of the case.  The Debtor and Stalking Horse did not seek to prime the Direct Lenders, the DIP Loan is non-interest bearing, and the Debtor has no ability to get a loan from conventional sources.

26.     If the Direct Lenders wish to step in as the DIP Lender, the Debtor does not believe that the Stalking Horse would have any objection whatsoever.

### III. BID PROCEDURES

27.     Despite Objectors' statements to the contrary, based upon prior history with the Direct Lenders, and as noted in the Termination Report and based upon the Debtor's prior experience , it is unlikely that the Direct Lenders will be able to get a 51% vote to do or not do anything within the 30-45 days extension requested.

28.     The Bankruptcy Court for the District of Delaware in the *In Re Electroglas, Inc.*, 2009 WL 8503455 (or LEXIS 5527)  held that a group of secured creditors lacked standing to credit bid under their loan documents because only the trustee had the right to credit bid on behalf of all noteholders.  That is similar to the case here.  First, the Objectors themselves have no power to bind the other Direct Lenders, and, assuming that a TDI Representative is appointed, he or she must have received 51% vote to authorize a credit bid on the collective Direct Lender's behalf.

29.     Based upon the Debtor's attempts to get the Direct Lenders to take action with regard to this Property, and their complete inability to do so, and the fact that more than 2 years has past since Cangelosi first approached the Debtor indicating that she could "imminently" raise capital to pay taxes, demolish the building, and then almost 17 months since Cangelosi filed her Declaration

where she stated she would seek to "set up a TDI representative organization" (with herself as the TDI representative) and that the Direct Lenders were "*diligently* moving to be in a position to develop the property,"  the Debtor has no confidence that a vote of 51% of the Direct Lenders directing a course of action can be obtained in 30-45 when nothing has been accomplished in more than 2 years, despite "imminent" prospects, and diligent pursuit.

## IV. <u>RETENTION OF REAL ESTATE BROKER</u>

30.     Marcus & Millichap has extensive experience in dealing with this Property.  They were involved in brokering numerous prior purchases/sales of market properties comparable to the Property as well as the marketing and sale of the Property throughout the years and have a database with historical due diligence information that is being made available to potential bidders.  In addition, Cross in its summary of the status of the HFAH Clear Lake 1st, stated that Marcus & Millichap is "a very reputable brokerage firm in the area."

31.     If the Direct Lenders, when they appear in this case, have additional market avenues that they wish Marcus & Millichap to pursue, Marcus & Millichap would be more than happy to accommodate any reasonable requests.

32.     The fact that Marcus & Millichap has found the Stalking Horse Bidder does not mean their job is done, far from it.  Marcus & Millichap and the Debtor have over the last few years assembled a long list of interested parties and names of persons with active interest in the Property if its title encumbrances could be cleared.  Marcus & Millichap is simply waiting on the approval of its retention and the approval of bidding procedures so that it may aggressively market the Property for the Auction.  It is Marcus & Millichap's belief that there will be a spirited auction and hope that the Purchase Price will be bid up at Auction.

33.     It is a fact that the Property has been marketed as a "distressed" asset, because, in fact

9

it is a distressed asset.  Would the Property be worth more if it was not a distressed asset, most likely; however, Marcus & Millichap has to market the Property as it has been given to them, and sadly, that it as a distressed property.

## V. NO NEED TO GO TO NEVADA

34.     There is simply no need for the Objectors to go to the ARC and seek appointment of a TDI Representative in the ARC Bankruptcy Case.  An appropriate representative could be appointed by this Court.

35.      The ARC Court has made it abundantly clear to the Direct Lenders that it is their responsibility to take action on behalf of their loans, and that, pursuant to Nevada law,  such action must be at the direction of 51% or more of the Direct Lenders; however, one Direct Lender may speak for the collective providing they do so in accordance with the actions contemplated by the vote of 51% or more.  *See* Settlement Order, para 147. It is not sufficient that a representative is appointed, the Direct Lenders must also vote on a course of action.

36.     This Court has jurisdiction over the Debtor and the Property, this Court can enter an order providing for the same or similar procedures that the ARC Court has apparently previously entered, or the Court can establish its own procedures, whatever the Court determines would protect the rights of the Direct Lenders.  There is simply no need to go to another court to direct how this Case should be administered.  That falls squarely within the purview of this Court.

WHEREFORE, the Debtor respectfully requests that the Court (i) overrule the Objection, (ii) enter orders approving the Debtor's bid procedures, DIP Loan and retention of Marcus & Millichap as real estate broker, and (iii) grant such other and further relief as the Court deems appropriate.

5985230-1

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on this 15th day of October, 2014, by first class, U.S. Mail, to Evan P. Kristol, Marcus & Millichap Real Estate Investment Services of Florida, Inc., 5900 N. Andrews Avenue, Suite 100, Fort Lauderdale Florida 33309.  I FURTHER CERTIFY that a true and correct copy of the forgoing was served upon all registered parties, by electronic transmission directly through the Court's CM/ECF system.

Respectfully submitted,

Dated:  October 15, 2014

BERGER SINGERMAN LLP
*Counsel for Debtor in Possession*
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Facsimile:  (305) 714-4340

By:    */s/  Debi Evans Galler*
          Debi Evans Galler
          Florida Bar No. 985236
          dgaller@bergersingerman.com

## EXHIBIT A
## BALLOT REPORT

5985230-1

| | | | | | | CROSS FLS ELECTION BALLOT COUNT |
|---|---|---|---|---|---|---|
| | | | | | | HFA CLEAR LAKE I NOTE PRINCIPAL BALANCE: $16,050,000 |

| LAST NAME | FIRST NAME | NO BALLOT | YES BALLOT | LENDER DOLLARS | Percentage Ownership | VESTING NAME |
|---|---|---|---|---|---|---|
| Au | Michael | | 1 | 50,000 | 0.0031 | Michael K. M. Au, a married man dealing with his sole & |
| Bazzoli-Ferrari | Lidia & Daniela | | 1 | 50,000 | 0.0031 | Lidia Bazzoli & Daniela Bazzoli-Ferrari, JTWROS |
| Becker | Kenneth R & Joanne T | | 1 | 100,000 | 0.0062 | Kenneth R. Becker & Joanne T. Becker, hu sband & wife, |
| Bellan | Joseph C & Verna J | | 1 | 50,000 | 0.0031 | Joseph C. Bellan & Verna J. Bellan Trust ees of the Joseph |
| Betteridge | David P | | 1 | 60,000 | 0.0037 | David P. Betteridge, a single man |
| Bittner Jr | Gerald L | | 1 | 75,000 | 0.0047 | Gerald L. Bittner, Jr. DDS Profit Sharin g Plan |
| Blanchard | Rene C | | 1 | 50,000 | 0.0031 | Rene C. Blanchard Trustee of the Rene C. Blanchard |
| Blanchard | Rene C | | 1 | 100,000 | 0.0062 | Rene C. Blanchard Trustee of the Rene C. Blanchard |
| Bolding | William & Carolyn | | 1 | 50,000 | 0.0031 | William Bolding & Carolyn Bolding, husba nd & wife, As |
| Bonfiglio | James R & Donna M | | 1 | 100,000 | 0.0062 | James R. Bonfigilo & Donna M. Bonfigilo Trustees of the |
| Borkoski | John S & Kathleen K | | 1 | 50,000 | 0.0031 | John S. Borkoski & Kathleen Borkoski, hu sband & wife As |
| Borom | Charles E & Lanna G | | 1 | 50,000 | 0.0031 | Charles E. Borom & Lanna G. Borom, husba nd & wife, As |
| Brahy | Raymond & Rita | | 1 | 100,000 | 0.0062 | Raymond Brahy & Rita Brahy, husband & wi fe As |
| Brooks | Howard D & Doreen C | | 1 | 50,000 | 0.0031 | Howard D. Brooks & Doreen C. Brooks Trus tees of the |
| Burgess | Edward | | 1 | 75,000 | 0.0047 | First Savings Bank Custodian For Edward Burgess IRA |
| Capone | Peter W & Deidre D | | 1 | 100,000 | 0.0062 | Peter W. Capone & Deidre D. Capone, husb and & wife, |
| Cardwell | James B | | 1 | 350,000 | 0.0218 | Cardwell Charitable Trust c/o James B. C ardwell, trustee |
| Cardwell | James B | | 1 | 405,000 | 0.0252 | Cardwell Family Trust c/o James B. Cardw ell & Reba Jo |
| Cauchois | Jacqueline & Maurice | | 1 | 50,000 | 0.0031 | Maurice A. Cauchois & Jacqueline M. Cauc hoisTrustees |
| Cazier | Ronald & Karen | | 1 | 50,000 | 0.0031 | Ronald Norman Cazier & Karen Rae Cazier Family Trust |
| Clark | Donald P | | 1 | 100,000 | 0.0062 | Donald P. Clark Trustee of the Donald P. Clark Family |
| Clark & Reid | Jack R | | 1 | 50,000 | 0.0031 | Jack R. Clark & Linda C. Reid, husband & wife As JTWROS |
| Cranston | Peter C | | 1 | 60,000 | 0.0037 | First Savings Bank Custodian For Peter C . Cranston IRA |
| Daniel | Mark A & Cathy A | | 1 | 50,000 | 0.0031 | Daniel Living Trust As Amended dated 1/9 /98 c/o Mark |
| Dashosh | Laura | | 1 | 50,000 | 0.0031 | Laura Dashosh, an unmarried woman |
| Davis | Patrick M & Susan M | | 1 | 50,000 | 0.0031 | S & P Davis Limited Partnership, a Texas Partnership |
| Deberry | Tracy A | | 1 | 50,000 | 0.0031 | Tracy A. Deberry, an unmarried man |
| Dery | James D & Ann R | | 1 | 75,000 | 0.0047 | James D. Dery & Ann R. Dery, husband & w ife |
| Devito | Dennis A | | 1 | 250,000 | 0.0156 | Dennis A Devito, a married man |
| Disbrow | Eric C | | 1 | 50,000 | 0.0031 | Eric C. Disbrow Trustee of the Eric C. D isbrow M.D., Inc. |
| Donovan | Mieko & Richard | | 1 | 100,000 | 0.0062 | Mieko Donovan & Richard Donovan As JTWRO S |
| Drubin | Daniel T & Laura | | 1 | 100,000 | 0.0062 | Daniel T. Drubin & Laura Drubin husband & wife As |
| Earp | Mary H & Mary Ann | | 1 | 60,000 | 0.0037 | Mary Ann Earp, a single woman & Mary H. Earp, a |

| LAST NAME | FIRST NAME | NO BALLOT | YES BALLOT | LENDER DOLLARS | Percentage Ownership | VESTING NAME |
|---|---|---|---|---|---|---|
| Earp | Robert & Larry Schwartz | | 1 | 57,000 | 0.0036 | Schwartz & Earp Joint Venture |
| Elowitz | Scott J | | 1 | 50,000 | 0.0031 | Scott J. Elowitz, a married man dealing with his sole & |
| Enrico | Dr David R & Dr Bonny K | | 1 | 95,000 | 0.0059 | Dr. David R. Enrico & Dr. Bonny K. Enric o, husband & |
| Escher | Caspar | | 1 | 100,000 | 0.0062 | Caspar H Escher Jr, an unmarried man |
| Favro | William H & Carol M | | 1 | 50,000 | 0.0031 | William H. Favro & Carol M. Favro Truste es of the Favro |
| Fernandez | Larry | | 1 | 100,000 | 0.0062 | Larry Fernandez Trustee of the Fernandez Family Trust |
| Ferrera | R. David | | 1 | 50,000 | 0.0031 | First Savings Bank Custodian For R. Davi d Ferrera IRA |
| Ferrera | R. David | | 1 | 50,000 | 0.0031 | R. David Ferrera Trustee of the Sacramen to Research |
| Fine | Lewis H & Arlene J | | 1 | 80,000 | 0.0050 | Lewis H. Fine & Arlene J. Fine, husband & wife |
| Fix | Daniel K & Barbara J | | 1 | 250,000 | 0.0156 | Daniel K. Fix & Barbara J. Fix, trustees For The Daniel K. |
| Flannery | Anne | | 1 | 50,000 | 0.0031 | Anne Flannery, an unmarried woman |
| Goldstein | Barry J & Patricia B | | 1 | 50,000 | 0.0031 | Barry J. Goldstein & Patricia B. Goldste in As JTWROS |
| Graham | Robin | | 1 | 100,000 | 0.0062 | Robin B. Graham & Celia Allen-Graham, tr ustees of the |
| Greenwald | Clarence J | | 1 | 70,000 | 0.0044 | First Regional Bank Custodian For Claren ce J. Greenwald |
| Hansen | Christian | | 1 | 100,000 | 0.0062 | Christian Hansen, a single man |
| Hansen | Lynn J | | 1 | 100,000 | 0.0062 | MLH Family Investment Limited, A Texas C ompany |
| Hausler Jr | Edwin Lowell | | 1 | 50,000 | 0.0031 | Edwin L. Hausler, Jr., Trustee for the E dwin Lowell |
| Havins | Kimberly | | 1 | 80,000 | 0.0050 | Kimberly Havins Trustee Of The Paepae Es tate Trust |
| Heffner | Mike & Barbara | | 1 | 100,000 | 0.0062 | Michael T. Heffner & Barbara C. Heffner Trustees of the |
| Helms | Terry | | 1 | 100,000 | 0.0062 | Terry Helms, trustee of the Terry Helms Living Trust |
| Helms | Terry | | 1 | 550,000 | 0.0343 | Helms Homes, LLC, A Nevada Limited Liabi lity Company |
| High | Brenda J | | 1 | 71,000 | 0.0044 | First Trust Company of Onaga Custodian F or Brenda High |
| High | Hamilton M | | 1 | 66,000 | 0.0041 | First Trust Company of Onaga Custodian F or Hamilton |
| Johnston Jr | Delbert T & Rebecca J | | 1 | 50,000 | 0.0031 | Delbert T. Johnston, Jr. & Rebecca Johns ton, trustees of |
| Klevay | Gail & Walter | | 1 | 50,000 | 0.0031 | Walter Klevay & Gail Klevay, husband & w ife |
| Knobel | Anna S & David W | | 1 | 50,000 | 0.0031 | David W. Knobel & Anna S. Knobel, truste es of the 1996 |
| Kriss | Arthur L | | 1 | 50,000 | 0.0031 | First Savings Bank Custodian For Arthur l Kriss IRA |
| Latorra | Michael & Joan | | 1 | 75,000 | 0.0047 | Michael Latorra & Joan Latorra, husband & wife, As |
| Lyall | Brant C. & Kathy J. | | 1 | 50,000 | 0.0031 | Brant C. Lyall & Kathy J. Lyall, husband & wife, JTWROS |
| Manuel | Gilbert | | 1 | 50,000 | 0.0031 | Gilbert Manuel, trustee of the Gilbert M anuel Living |
| McGillick | Todd | | 1 | 50,000 | 0.0031 | TK & Associates, A Minnesota Company |
| McMullin | Phillip E & Rosemarie L | | 1 | 50,000 | 0.0031 | Rosemarie L. McMullin, As Her Separate P roperty Under |
| Michaelian | Andre | | 1 | 50,000 | 0.0031 | Michaelian Holdings LLC A Nevada Limited Liability |
| Michelsen | Gary A | | 1 | 50,000 | 0.0031 | Gary A. Michelsen, an unmarried man |
| Molitch | Matthew | | 1 | 50,000 | 0.0031 | Matthew Molitch Trustee of the Molitch 1 997 Trust |
| Monighetti | Pete | | 1 | 50,000 | 0.0031 | Monighetti Inc., A Nevada Corporation |

| LAST NAME | FIRST NAME | NO BALLOT | YES BALLOT | LENDER DOLLARS | Percentage Ownership | VESTING NAME |
|---|---|---|---|---|---|---|
| Montesano | Ronald K | | 1 | 50,000 | 0.0031 | Ronald K. Montesano, trustee for the ben efit of the |
| Moon | Frieda | | 1 | 50,000 | 0.0031 | Frieda Moon, trustee of the Dependent's Trust of the |
| Neufeld | Fred G | | 1 | 50,000 | 0.0031 | Equity Trust Company Custodian for the b enefit of the |
| Newman | Daniel D | | 1 | 70,000 | 0.0044 | Daniel D. Newman Trustee of the Daniel D . Newman |
| Ogren | Robert L | | 1 | 60,000 | 0.0037 | Robert L. Ogren, trustee for the benefit of the Robert L. |
| Oosthuizen | Adrian J R | | 1 | 50,000 | 0.0031 | Adrian J.R. Oosthuizen, a married man de aling with his |
| Ovca Jr | William J | | 1 | 50,000 | 0.0031 | William J. Ovca, Jr., trustee of the Ovc a Associates-Inc |
| Pardee | Cynthia Ann | | 1 | 50,000 | 0.0031 | Cynthia Ann Pardee, trustee of the Cynth ia Ann Pardee |
| Phenix | Betty J | | 1 | 50,000 | 0.0031 | Betty J. Phenix, a married woman dealing with her sole & |
| Pollard | Charles | | 1 | 50,000 | 0.0031 | Charles Pollard Jr, a married man dealin g with his sole & |
| Prescia | Anthony | | 1 | 75,000 | 0.0047 | Anthony Prescia & Nancy Prescia, trustee s of the |
| Rice | Manuel G | | 1 | 50,000 | 0.0031 | First Savings Bank Custodian For Manuel Rice IRA |
| Rineer III | Harvey A. | | 1 | 50,000 | 0.0031 | Harvey Andrew Rineer III Trustee for the Harvey Andrew |
| Robbins | Cassandra J | | 1 | 50,000 | 0.0031 | Cassandra J. Robbins, an unmarried woman |
| Robinson | Alan & Gail | | 1 | 100,000 | 0.0062 | Alan Robinson & Gail Robinson husband & wife As |
| Rogers | Eleanor L | | 1 | 200,000 | 0.0125 | Eleanor L. Rogerts, trustee of the Elean or L. Rogers 1991 |
| Rosenstein | Stuart M & Deborah H | | 1 | 50,000 | 0.0031 | Stuart M. Rosenstein & Deborah H. Rosens ein husband |
| Rotchy | Lee | | 1 | 50,000 | 0.0031 | Lee Rotchy, trustee of the Lee Rotchy Tr ust dated |
| Ryan | Richard J | | 1 | 50,000 | 0.0031 | Richard J. Ryan, trustee of the Ryan 199 9 Revocable |
| Sack | Burton | | 1 | 100,000 | 0.0062 | Scott A Sack Irrevocable Trust, Burton Sack Trustee |
| Sack | Burton | | 1 | 100,000 | 0.0062 | David A Sack Irrevocable Trust, Burton Sack Trustee |
| Samsen | Howard & Vera | | 1 | 50,000 | 0.0031 | Howard Samsen & Vera Samsen, husband & w ife, As |
| Schmidt | Julius | | 1 | 50,000 | 0.0031 | Julius Schmidt, trustee of the Schmidt F amily Trust |
| Schroeder | David W | | 1 | 50,000 | 0.0031 | David W. Schroeder, a single man |
| Schulze | Douglas G & Doreen L | | 1 | 80,000 | 0.0050 | Douglas Gregg Schulze & Doreen L. Schulz , husband & |
| Sexton | David W & Pamela K | | 1 | 50,000 | 0.0031 | David W. Sexton & Pamela K. Sexton, husb and & wife, As |
| Sharpe | Ronald | | 1 | 25,000 | 0.0016 | Ronald Sharpe, a single man |
| Shoup | Donald E & Sharon K | | 1 | 100,000 | 0.0062 | Donald E. Shoup & Sharon K. Shoup, husba nd & wife, As |
| Simmons | Alan R & Judith B | | 1 | 50,000 | 0.0031 | Alan R. Simmons & Judith B. Simmons, hus band & wife, |
| Sindler | Bernard | | 1 | 50,000 | 0.0031 | Benard Sindler, trustee of the B S Livin g Trust |
| Soro | Francesco | | 1 | 50,000 | 0.0031 | Francesco Soro |
| Spindle | Clifton H & Verna R | | 1 | 50,000 | 0.0031 | Clifton H. Spindle & Verna R. Spindle, h usband & wife, As |
| Stevenson | Bert A | | 1 | 100,000 | 0.0062 | Bert A. Stevenson Trustee of the Dalton Trust dated |
| Stewart | Michael D & Mary Jude | | 1 | 100,000 | 0.0062 | Michael D. Stewart & Mary Jude Stewart T rustees of the |
| Taylor | Evalyn C | | 1 | 100,000 | 0.0062 | Evalyn C. Taylor Trustee of the Evalyn C . Taylor Separate |
| Taylor | Kevin | | 1 | 100,000 | 0.0062 | KTaylorGO Investments, LTD, a Texas Comp any |

| LAST NAME | FIRST NAME | NO BALLOT | YES BALLOT | LENDER DOLLARS | Percentage Ownership | VESTING NAME |
|---|---|---|---|---|---|---|
| Thurmond | Jacqueline | | 1 | 50,000 | 0.0031 | First Savings Bank Custodian For Jacquel ine Thurmond |
| Tomczak | Sigmund L & Diana | | 1 | 75,000 | 0.0047 | Sigmund Tomczak & Diana Tomczak Trustees of the |
| Tracy | Richard R | | 1 | 50,000 | 0.0031 | Richard R. Tracy & Ursula W. Tracy, husb and & wife As |
| Tracy | Richard R | | 1 | 75,000 | 0.0047 | Richard R. Tracy, trustee of the Reno Ae ronautical |
| Trujillo | Carlos A | | 1 | 120,000 | 0.0075 | Carlos A. Trujillo |
| Van Sickle | Lloyd F | | 1 | 100,000 | 0.0062 | Lloyd F. Van Sickle, trustee of the Van Sickle Family Trust |
| Violet | Melody J | | 1 | 50,000 | 0.0031 | Melody J. Violet, an unmarried woman |
| Von Tagen | Madeline P | | 1 | 50,000 | 0.0031 | Madeline P. Von Tagen, trustee of the Vo n Tagen Trust |
| Weber | Heinrich R & Brigitte S | | 1 | 150,000 | 0.0093 | Heinrich Richard Weber & Brigitte S. Web er, husband & |
| Weiland | Gerald R & Diana F | | 1 | 60,000 | 0.0037 | Diana F. Weiland, trustee for the benefi t of Gerald R. |
| Westbrook | Connie | | 1 | 50,000 | 0.0031 | Connie Westbrook, an unmarried woman |
| Wilkinson | Dianna J & Barton R | | 1 | 70,000 | 0.0044 | Barton R. Wilkinson & Dianna J. Wilkinso n, husband & |
| Wolfe | Larry & Kathryn | | 1 | 50,000 | 0.0031 | Lk Wolfe Family, Lp, A Nevada Limited Pa rtnership |
| Wyatt | Kenneth H & Phyllis P | | 1 | 50,000 | 0.0031 | Kenneth H. Wyatt & Phyllis P. Wyatt, tru stees of the |
| Zappulla | Joseph G & Carol A | | 1 | 100,000 | 0.0062 | Joseph G. Zappulla & Carol A. Zappulla, husband & wife |
| Zerbo | Anthony J | | 1 | 50,000 | 0.0031 | Anthony J. Zerbo, an unmarried man |
| Lanzas | Jose M & Gladys | 1 | | 20,000 | 0.0012 | Jose M Lanzas & Gladys Lanzas |
| | | TOTALS | 1 | 121 | 9,634,000 | |
| | | | | | | |
| | | TOTAL YES BENEFICIAL INTEREST : | | 9,614,000 | | |
| | | YES BENEFICIAL INTEREST PERCENTAGE: | | 0.5990 | | |

**<u>EXHIBIT B</u>**
**THE CONVERSION ORDER**

5985230-1

**Entered on Docket**
**January 29, 2010**

JANET L. CHUBB, ESQ.
Nevada State Bar No. 176
LOUIS M. BUBALA III, ESQ.
Nevada State Bar No. 8974
JONES VARGAS
100 W. Liberty St, 12th Floor
P.O. Box 281
Reno, NV 89504-0281
Telephone: 775-786-5000
Fax: 775-786-1177
Email: jlc@jonesvargas.com
    and   tbw@jonesvargas.com
    and   lbubala@jonesvargas.com

Attorneys for Certain Direct Lenders

WILLIAM A. BREWER III, ESQ.
Texas State Bar No. 02967035
*Pro Hac Vice to be filed*
MICHAEL J. COLLINS, ESQ.
Texas State Bar No. 00785495
*Pro Hac Vice filed*
KENNETH N. HICKOX, JR., ESQ.
Texas State Bar No. 24045194
*Pro Hac Vice to be filed*
ROBERT M. MILLIMET, ESQ.
Texas State Bar No. 24025538
*Admitted Pro Hac Vice*
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015
Email: wab@bickelbrewer.com
    mjc@bickelbrewer.com
    kzh@bickelbrewer.com
    rrm@bickelbrewer.com

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ASSET RESOLUTION LLC,<br>BUNDY 2.5 MILLION SPE, LLC,<br>BUNDY FIVE MILLION SPE, LLC<br>CFP ANCHOR B SPE, LLC<br>CFP CORNMAN TOLTEC SPE, LLC<br>CFP GESS SPE LLC<br>CFP GRAMERCY SPE, LLC<br>FIESTA STONERIDGE, LLC<br>FOX HILLS SPE, LLC<br>HFAH MONACO SPE, LLC<br>HUNTSVILLE SPE LLC<br>LAKE HELEN PARTNERS SPE LLC<br>OCEAN ATLANTIC SPE LLC<br>SHAMROCK SPE LLC<br>10-90 SPE, LLC<br><br>          Debtors.<br><br>■  Affects All Debtors<br>☐  Affects Only _____ | Chapter 11<br>   (Jointly Administered under)<br>Case No. BK-S-09-32824-RCJ<br>      BK-S-09-32831-RCJ<br>      BK-S-09-32839-RCJ<br>      BK-S-09-32843-RCJ<br>      BK-S-09-32844-RCJ<br>      BK-S-09-32846-RCJ<br>      BK-S-09-32849-RCJ<br>      BK-S-09-32851-RCJ<br>      BK-S-09-32853-RCJ<br>      BK-S-09-32868-RCJ<br>      BK-S-09-32873-RCJ<br>      BK-S-09-32875-RCJ<br>      BK-S-09-32878-RCJ<br>      BK-S-09-32880-RCJ<br>      BK-S-09-32882-RCJ<br><br>NUNC PRO TUNC ORDER CONVERTING<br>CHAPTER 11 CASES TO CHAPTER 7 CASES<br><br>Hearing Time:   January 19, 2010<br>Hearing Time:   3:30 pm |

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000  Fax: (775) 786-1177

For all the reasons set forth on the record at the hearing held on January 19, 2010, including the reasons set forth in the Motion for Order Converting Cases to Chapter 7, or, Alternatively, for the Appointment of a Trustee [Doc. #136] and in Certain Direct Lenders' Reply Brief in Support of Their Motion for Order Converting Cases to Chapter 7, or, Alternatively, for the Appointment of a Trustee [Doc. #275], the Court finds that cause exists under 11 U.S.C § 1112(b) for the above-captioned Chapter 11 cases to be converted into Chapter 7 cases. Accordingly,

IT IS ORDERED THAT the above-captioned Chapter 11 cases are hereby converted into Chapter 7 cases, effective as of January 19, 2010.

IT IS FURTHER ORDERED THAT a Chapter 7 Trustee shall be appointed forthwith by the Office of the United States Trustee, Region 11 to take immediate control over Debtor Asset Resolution LLC's ("Asset Resolution") estate, including any loan servicing rights it purports to hold as well as its role as managing member of each of the 14 special purpose entity Debtors ("14 SPE Debtors"), its fractional beneficial loan interests, its control over funds being held in trust for the direct lenders, and its claims pending before the undersigned United States District Judge in both the action styled *3685 San Fernando Lenders, LLC, et al. v. Compass USA SPE, LLC, et al.*, Case No. 2:07-cv-00892-RCJ-GWF ("892 Case") as well as the adversary complaint styled *Complaint for Declaratory Relief* ("Adversary Case").

IT IS FURTHER ORDERED THAT the Chapter 7 Trustee has no authority to operate Asset Resolution's loan servicing business, including any loan servicing rights arising under those certain Loan Servicing Agreements ("LSAs") originally entered into by the direct lenders with USA Commercial Mortgage Company ("USACM"). Nor does the Chapter 7 Trustee have any authority to operate the 14 SPE Debtors as their managing member.

Instead, pursuant to separate order issued by the undersigned United States District Judge in the 892 Case on January 21, 2010, those loan servicing rights, including the purported right of Asset Resolution to be the managing member of the 14 SPE Debtors, have been properly terminated by the direct lenders and do not constitute property of Asset Resolution's estate. As a result, the Chapter 7 Trustee shall be placed in temporary nominal control of the 14 SPE Debtors as well as each of the outstanding loans originated by USACM for which Asset Resolution purported to hold

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    the loan servicing rights (the "Loans"), subject to:  (i) the "51% Rule" under Nevada law, pursuant

2    to which 51% or more of the direct lenders in each of the 14 SPE Debtors and in each of the Loans

3    may notify the Chapter 7 Trustee regarding how they want to proceed with the management and

4    direction of each of the 14 SPE Debtors and each of those Loans (*e.g.*, the retention of a new loan

5    servicer, the lack of any loan servicer, the conveyance of title, etc.); and (ii) further order of the

6    Court.  In other words, for example, if 51% or more of the direct lenders in a Loan vote in favor of

7    retaining a new loan servicer pursuant to new loan servicing terms and conditions, the Chapter 7

8    Trustee, upon the approval of the Court, shall transfer control of that Loan to that new loan servicer

9    in accordance with the directive from the majority of the direct lenders in that Loan.  In the event

10   that 51% or more of the direct lenders in any of the 14 SPE Debtors or Loans cannot agree on the

11   management and direction of any of the 14 SPE Debtors or Loans, an immediate hearing before the

12   undersigned United States District Judge shall be convened to address and resolve the management

13   and direction of any such 14 SPE Debtors or Loans .

14        Janet L. Chubb, Esq. of Jones Vargas is tasked with identifying how 51% or more of the

15   direct lenders in each of the 14 SPE Debtors and Loans intend to proceed with the management and

16   direction of those 14 SPE Debtors and Loans.  Ms. Chubb is expressly authorized to solicit the vote

17   of 51% or more of the direct lenders in each of the 14 SPE Debtors and Loans.  Pursuant to separate

18   order to be issued by the undersigned United States District Judge in the 892 Case, the Preliminary

19   Injunction entered on November 6, 2007, precluding the direct lenders from communicating with

20   borrowers or otherwise interfering with the loan servicer under the LSAs will be vacated.  In her

21   discretion, Ms. Chubb will ensure that such votes are properly undertaken and recorded, and will

22   communicate the results of those votes to the Chapter 7 Trustee.

23        IT IS FURTHER ORDERED THAT, in connection with the determination of how 51% or

24   more of the direct lenders in each of the 14 SPE Debtors and Loans intend to proceed with the

25   management and direction of those 14 SPE Debtors and Loans, the Chapter 7 Trustee is authorized

26   to vote the fractional beneficial loan interests held by Asset Resolution in those 14 SPE Debtors and

27   Loans.

28

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

1    IT IS FURTHER ORDERED THAT the Chapter 7 Trustee, as a fiduciary for the direct

2    lenders, shall take legal, but not beneficial, title to the funds that were previously being held by

3    Asset Resolution in trust for the direct lenders.  Asset Resolution and the 14 SPE Debtors shall

4    cooperate with the Chapter 7 Trustee to effectuate the immediate transfer of control over such funds

5    to the Chapter 7 Trustee.  Pursuant to further order of the Court, the Chapter 7 Trustee shall disburse

6    those funds that were previously being held by Asset Resolution in trust for the direct lenders in

7    accordance with the summary judgment Order entered by the undersigned United States District

8    Judge in the 892 Case on September 18, 2009,  and without prejudice to the rights of third parties to

9    assert claims (such as for Prepaid Interest) at the time that an order for distribution is sought.  The

10   Chapter 7 Trustee is also authorized to perform an accounting of those funds that were previously

11   being held by Asset Resolution in trust for the direct lenders, and investigate and pursue the

12   recovery of any improper or unwarranted transfers of those funds by Asset Resolution and the 14

13   SPE Debtors.

14       IT IS FURTHER ORDERED THAT the Chapter 7 Trustee shall, in its discretion and subject

15   to the approval of the Court, evaluate, prosecute, resolve, and/or compromise the affirmative claims

16   for relief filed by Asset Resolution in the 892 Case and the Adversary Case.

17       IT IS FURTHER ORDERED THAT the interim order approving $1 million in debtor in

18   possession financing is hereby revoked [Doc. #255].

19       IT IS FURTHER ORDERED THAT Asset Resolution's and the 14 SPE Debtors'

20   Application for Order Extending Debtors' Exclusive Periods to File Plan and Solicit Acceptances

21   Thereto pursuant to 11 U.S.C. § 1121(d) [Doc. #263] is DENIED as moot.

22       IT IS FURTHER ORDERED THAT the Application of the Official Committee of

23   Unsecured Creditors of Asset Resolution LLC, et al. for an Order Authorizing the Retention of

24   NachmanHaysBrownstein, Inc. as its Financial Advisors, *Nunc Pro Tunc*, as of November 25, 2009

25   [Doc. #109] is DENIED as moot.  As a result, no request to compensate NachmanHaysBrownstein,

26   Inc. for any services rendered since November 25, 2009, shall be entertained.

27   _____

28

In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

___ The court has waived the requirement of approval under LR 9021.

✓ This is a Chapter 11 case, and I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

ORDER

I IT IS SO ORDERED, NUNC PRO TUNC 01/19/2010, 3:30 P.M.

DATED: This 27th day of January, 2010.

_____
Robert C. Jones
United States District Judge

r

π π π

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

**<u>EXHIBIT C</u>**
**SETTLEMENT ORDER**

**Entered on Docket**
**September 06, 2012**

SCHWARTZER & McPHERSON, LEWIN, REZ & ENGEL
A Professional Law Corporation
  James P. Hill, CA SBN 90478 (Pro Hac Vice)
  Jonathan S. Dabbieri, CA SBN 91963 (Pro Hac Vice)
  Elizabeth E. Stephens, NV SBN 5788
228 South Fourth Street, First Floor
Las Vegas, NV 89101
Telephone:  (702) 382-6440
Fax Number: (702) 384-9102

Attorneys for Chapter 7 Trustee,
William A. Leonard, Jr.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re | CASE NO. BK-S-09-32824-RCJ (Lead Case) |
| ASSET RESOLUTION, LLC, | Jointly Administered with Case Nos.: |
| | BK-S-09-32831-RCJ; BK-S-09-32839-RCJ; |
| Debtor. | BK-S-09-32843-RCJ; BK-S-09-32844-RCJ; |
| | BK-S-09-32846-RCJ; BK-S-09-32849-RCJ; |
| | BK-S-09-32851-RCJ; BK-S-09-32853-RCJ; |
| | BK-S-09-32868-RCJ; BK-S-09-32873-RCJ; |
| | BK-S-09-32875-RCJ; BK-S-09-32878-RCJ; |
| | BK-S-09-32880-RCJ; BK-S-09-32882-RCJ |
| | Chapter 7 |

Affects:
☒ All Debtors
☐ Asset Resolution, LLC, 09-32824
☐ Bundy 2.5 Million SPE, LLC, 09-32831
☐ Bundy Five Million SPE, LLC, 09-32839
☐ CFP Anchor B SPE, LLC, 09-32843
☐ CFP Cornman Toltec SPE, LLC, 09-32844
☐ CFP Gess SPE LLC, 09-32846
☐ CFP Gramercy SPE, LLC, 09-32849
☐ Fiesta Stoneridge, LLC, 09-32851
☐ Fox Hills SPE, LLC, 09-32853
☐ HFAH Monaco SPE, LLC, 09-32868
☐ Huntsville SPE, LLC, 09-32873
☐ Lake Helen Partners SPE, LLC, 09-32875
☐ Ocean Atlantic SPE, LLC, 09-32878
☐ Shamrock SPE, LLC, 09-32880
☐ 10-90 SPE, LLC, 09-32882

**AGREED ORDER REGARDING**
**SETTLEMENT AND RELATED RELIEF**

Date:  August 22, 2012
Time:  8:30 a.m.
Ctrm:  RCJ-Courtroom 6
      Bruce R. Thompson Federal Building
      400 S. Virginia Street
      Reno, NV 89501
      AND
      RCJ-Courtroom – TBD
      Lloyd D. George Courthouse
      333 Las Vegas Blvd., South
      Las Vegas, NV 89101
Judge:  Hon. Robert C. Jones

On April 12, 2012, the Court held a hearing with respect to the Motion To Approve Settlement (the "Motion") [AR Dkt. No. 1706] filed by William A. Leonard, Jr. (the "Trustee"), the chapter 7 trustee for the bankruptcy estate (the "ARC Estate") of Asset Resolution, LLC ("Asset Resolution") and the other affiliated debtors (the "SPE Debtors") (jointly and severally, the "Estates") in the above-referenced procedurally-consolidated chapter 7 cases (the "Asset Resolution Bankruptcy Cases"). The Court has considered and relied upon the declarations and exhibits which were submitted with or as a supplement to the Motion, the Certificate of Service filed by the Trustee with respect to the Motion, the massive records in the various bankruptcy cases, adversary cases, and civil litigation referred to in this Order, the representations to the Court by the other parties to the proposed settlement, the sole limited objection to the Motion, subsequent objections filed by others, and relevant legal principles. The Court has also relied upon the agreement of the parties as expressed in this Order itself (which is agreed to by the "Settling Parties" (as defined below) as to form and content).

BASED UPON THE FOREGOING AND SUBJECT TO THE LIMITATIONS EXPRESSLY SET FORTH BELOW, THE COURT NOW HEREBY ENTERS THIS ORDER AND MAKES THE FOLLOWING FINDINGS OF FACT, LEGAL CONCLUSIONS, AND DECLARATIONS WITH RESPECT TO THE MOTION, THE SETTLEMENT TO WHICH IT RELATES, AND ALL OBJECTIONS THERETO:

**I.**

**JURISDICTION AND VENUE**

1. The settlement which is the subject of the Motion (the "Settlement") arises out of and substantially resolves numerous intertwined and overlapping issues which have been the subject of protracted, hotly-contested, and extremely expensive bankruptcy proceedings and civil litigation spanning the past seven years in bankruptcy courts, federal district courts, and appellate courts throughout the country.

2. The first set of proceedings were chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court") bearing primary Case No. BK-S-06-10725-LBR (the "USACM Bankruptcy Cases"). The USACM Bankruptcy Cases

were prompted by the liquidity problems created by a massive, interstate ponzi-scheme in which insider managers and brokers of USA Commercial Mortgage Company and its affiliates ("USACM") fraudulently induced thousands of persons across the United States ("Direct Lenders") to invest hundreds of millions of dollars in fractionalized "direct lender" beneficial interests ("DL Interests") in what were falsely represented to be fully-secured, short-term commercial real estate loans to independent borrowers and guarantors (the "USACM Loans").

       3.     The proceedings mushroomed from the Nevada Bankruptcy Court to civil litigation in this Court as a result of the sale to Compass Partners, LLC and Compass USA SPE LLC and their affiliates (jointly and severally, "Compass") of, among other things, loan servicing agreements (the "LSAs") and/or DL Interests held by USACM in sixty-five USACM Loans and/or related collateral properties over the objections of certain other Direct Lenders. The civil litigation involved a series of actions ultimately consolidated in the action styled 3685 San Fernando Lenders, LLC, et al. v. Compass USA SPE, LLC, et al., Case No. 2:07-cv-00892-RCJ-GWF (the "892 Case"), as well as federal and state claims pled in a "follow on" suit pending in this Court styled Leonard C. Adams, et al. v. Silar Advisors, LP, et al., Case No. 3:11-cv-00210-RCJ-VPC (the "210 Case"). Silar Advisors, LP acting for itself and/or as investment manager ("Silar Advisors") and as lead lender for certain investors and participants, including without limitation SMOF-A, LLC, Silar Special Opportunities Fund, LP, Silar Special Opportunities Fund, Ltd. and Silar Managed Opportunities Fund SPC, Ltd. (acting on behalf of and for the account of the Series A Segregated Portfolio) (jointly and severally with Silar Advisors, "Silar") advanced over $50 million to Compass under a Master Repurchase Agreement ("MRA") which Compass used to engage in the purchase and sale transaction with USACM. In the 892 Case, among other things, this Court exercised in rem jurisdiction over the loan servicing relationship created by the LSAs, entered a Preliminary Injunction (the "Preliminary Injunction") (892 Doc. 199), and issued a series of interlocutory declarations concerning the rights, obligations, fees, and alleged wrongful conduct of the post-USACM servicers with respect to fifty-two of the USACM Loans from February 16, 2007, through January 19, 2010 (the "Post-USACM/Pre-Termination Servicing Period").

1    4.    The proceedings were further extended by the Asset Resolution Bankruptcy Cases.
2  Those cases were originally filed in New York, were transferred to Nevada, were fully withdrawn to
3  this Court, and are now pending before this Article III Court.

4    5.    The Court has entered a series of orders in the 892 Case and the Asset Resolution
5  Bankruptcy Cases which recognized that the ARC Estate's servicing rights and duties under the
6  LSAs were terminated as of January 19, 2010, recognized the assumption of servicing duties by,
7  among others, Cross FLS, LLC ("Cross"), with respect to twenty-two of the USACM Loans
8  starting in 2010, and mandated a claims procedure (the "Servicing Claims Procedure") binding on
9  Cross and all subsequent servicers for resolving claims for payment by persons or entities who
10 provided goods or services in connection with the servicing of the USACM Loans during the Post-
11 USACM/Pre-Termination Servicing Period. (See 892 Case Doc. No. 1630; AR Bk Doc. Nos. 356,
12 387, & 989; AR Bk January 19, 2010 Transcript at 57.)

13   6.    The Asset Resolution Bankruptcy Cases also involve numerous pending adversary
14 proceedings primarily relating to pre-petition preference and other claims (jointly and severally, the
15 "Adversaries"), including William A. Leonard, Chapter 7 Trustee v. Silar Advisors, LP, et al.,
16 Adversary Case No. 11-01-01100-RCJ (the "1100 Adversary").

17   7.    As explained in more detail in this Order, the Settlement resolves and/or impacts
18 numerous contested matters in the Asset Resolution Bankruptcy Cases, the Adversaries, and/or in
19 connection with the Servicing Claims Procedure. The ARC Estate is a named defendant in the 892
20 Case and numerous Direct Lenders have filed Proofs of Claim against the ARC Estate in the Asset
21 Resolution Bankruptcy Cases. This Court therefore has subject matter jurisdiction over this matter
22 under 28 U.S.C. § 1334.

23   8.    The Settlement involves core issues in the Asset Resolution Bankruptcy Cases: under
24 28 U.S.C. § 157(b)(A) (insofar as it pertains to administration of the ARC Estate); under 28 U.S.C.
25 § 157(b)(B) (insofar as it pertains to allowance or disallowance of claims); under 28 U.S.C. §
26 157(b)(C) (insofar as it pertains to counterclaims by the ARC Estate against persons filing claims
27 against the Estates); under 28 U.S.C. § 157(b)(D) (insofar as it pertains to orders in respect to
28 obtaining credit); under 28 U.S.C. §157(b)(M) (insofar as it pertains to orders approving the use of

property); and/or under 28 U.S.C. § 157(b)(O) (insofar as it is a proceeding affecting the liquidation of the assets of the ARC Estate or the adjustment of the debtor-creditor or the equity security holder relationship). To the extent the Settlement involves non-core issues in the Asset Resolution Bankruptcy Cases, this Court has already withdrawn the reference to those Bankruptcy Cases and is therefore presiding directly over them under Article III of the United States Constitution pursuant to 28 U.S.C. § 157(d).

9. The Settlement also resolves issues (the "USACM Plan Issues") as between the Direct Lenders, the Estates, the "Silar Parties" (defined below), and Boris Piskun ("Piskun") concerning the meaning and application of various provisions of the confirmed Third Amended Plan of Reorganization (the "USACM Plan"), the related Asset Purchase Agreement dated effective February 16, 2007 and amendments and documents relating thereto (the "APA"), a "Direct Lender Supplement" issued to Direct Lenders pursuant to the USACM Plan, the sale of assets which became the subject of the 892 Case, injunctive provisions in the USACM Plan, and related matters. Although the post-confirmation USACM Bankruptcy Cases are still being presided over by the Nevada Bankruptcy Court, Compass initially asserted USACM Plan Issues in an adversary proceeding filed against certain Direct Lenders in the USACM Bankruptcy Cases and those issues were later withdrawn to this Court upon the recommendation of the Nevada Bankruptcy Court and the consent of the parties as part of the consolidation of proceedings which eventually became known as the 892 Case. (892 Docs. 10 and 14)

10. The Settlement also involves final resolution of various issues relating to the servicing of the USACM Loans over which this Court has exercised in personam and in rem jurisdiction and issued injunctive relief in the 892 Case, and resolves hotly-contested federal and state claims pled in the 210 Case. This Court therefore also has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and/or 1332.

11. Venue is proper in this District under 28 U.S.C. §§ 1391(a), 1391 (b), 1408, and/or 1409.

12. The relief granted herein is authorized by, among other laws, 11 U.S.C. §§ 105, 363, 364, 503, and 507, 704, FRBP 4001(c), FRBP 9019, Treasury Regulation Section 301.7701-4(d),

1  Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulation

2  Section 1.671-4(a), Section 3(a)(10) of the Securities Act of 1933, and Nev. Rev. Stat. 645B.340 et

3  al.

4  **II.**

5  **<u>THE SETTLEMENT IS APPROVED AS FAIR AND REASONABLE</u>**

6       13.    Section 323(b) and other provisions of the Bankruptcy Code vest the Trustee with the

7  discretion to pursue claims, let them lie, or abandon them.  See <u>In re Dawnwood Properties/78</u>, 209

8  F.3d 114, 117 (2d Cir 2000).  However, FRBP 9019(a) provides that, "[o]n motion by the trustee and

9  after notice and a hearing, the court may approve a compromise or settlement."  The Trustee has

10  requested that the Court approve the Settlement on behalf of the Estates under this rule.

11       14.    It is well-established that the Court has wide discretion to approve a compromise if it

12  is "fair and equitable" and "reasonable, given the particular circumstances of the case."  See

13  <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610 (9th Cir. 1988).

> A settlement may be approved if it is fair and equitable when comparing the claims being compromised against the likely rewards of litigation.  See generally Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson, 390 U.S. 414, 425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).  In approving a compromise, the court is directed to consider (1) the probability of success in litigation of the dispute, (2) the difficulties to be encountered, if any, in the collection of an award, (3) the complexity, expense, inconvenience and delay of litigation, and (4) the interest of creditors in the case, giving deference to any reasonable views expressed.  See In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986).

20  <u>In re Endoscopy Ctr. of S. Nev., LLC</u>, 451 B.R. 527, 535-36 (Bankr. D. Nev. 2011); <u>TMT Trailer</u>

21  <u>Ferry, Inc. v. Anderson</u>, 390 U.S. 414 (1965).

22       15.    As set forth in more detail below and throughout this Order, the Court finds that the

23  Settlement is fair, reasonable, and adequate, has been reached in good faith by all of the parties

24  under all potentially-applicable standards (whether under federal law or the law(s) of Nevada,

25  California, Florida, New York, or some other state), and good cause exists for granting the Motion

26  and approving the Settlement.

27       16.    The first factor favoring Settlement is that it resolves extensive, expensive, and at

28  times seemingly-intractable litigation which started in 2007 and would only continue for many years

to come. Also, as a result of the Settlement, the Estates, the Direct Lenders, the Silar Parties, and Piskun have resolved issues with others – such as DACA, Pathfinder, Platinum, and Great White NV, Inc. – which, if not settled, would add still more burden, expense, and uncertainty to all concerned. The Settlement further benefits the Estates and other parties by requiring a $250,000 cash payment for a transfer of certain Adversaries and mechanisms for further narrowing or curtailing over one dozen Adversaries. This benefit is substantial, particularly in light of the fact that this Court has already ruled that the Estates "were not insolvent when they filed the chapter 11 cases." (AR Bk Doc. 884 at 18/line 2)

17. The second factor favoring Settlement is that it was negotiated in good faith and at arm's-length, and is not the product of fraud, collusion, or tortious conduct aimed at injuring the interest of any parties to the Settlement or of any non-settling parties. Bickel & Brewer, Janet Chubb, Lisa Rasmussen, The Majorie Firm Ltd., Sullivan Hill, and Laxalt & Nomura, Ltd. are very experienced lawyers in their fields. Silar also retained Hon. Eugene Sullivan (Ret.) of the law firm of Freeh, Sporkin, and Sullivan to assist as special settlement counsel. The lawyers vigorously and thoroughly presented the very hotly-contested issues in the litigation at every turn. The Silar Parties, the Trustee on behalf of the ARC Estate and the Estates, Piskun (defined below), and the B&B DL Settling Clients' (defined below) representatives, including, without limitation, Donna Cangelosi and Daniel Newman, worked very hard in the negotiations to protect the interests of their respective constituencies. As part of those efforts, counsel and the Parties pursued formal mediation and settlement discussions at various stages of the case and spent over a year since the trial in the 892 Case negotiating and preparing the settlement agreement to be presented to the Court and the various Parties In Interest (defined below). Additionally, Carol Kesler and Marion Dittman provided substantial administrative assistance.

18. The third factor favoring approval of the Settlement is it has received virtually unanimous support. As explained in more detail below, all of the more than 1,500 Bickel & Brewer Direct Lender clients who voted (the "B&B DL Settling Clients," defined further below) have approved the Settlement and none of them has opposed it. Taking into account settlements with various Direct Lenders, more than fifty-one percent of the Direct Lenders in all but one of the

USACM Loans which were the subject of the 892 Case have voted in favor of the Settlement, and no Direct Lender has filed an opposition to it. There was only one "limited" objection to the Settlement presented to the Court by any of the more than two-thousand creditors or other Parties in Interest in the Asset Resolution Bankruptcy Cases. That objection (the "Klestadt Objection") was filed by Tracy L. Klestadt and Klestadt & Winters, LLP (jointly and severally, "Klestadt") and did not ask the Court to deny approval The fourth factor favoring the Settlement is that it protects and does not harm the interests of valid creditors of the Estates. The ARC Estate has sufficient funds to make the distributions which may be payable on anticipated administrative claims and on what may be allowed unsecured claims against the ARC Estate. The ARC Estate will also continue to hold the DL Interests owned by the ARC Estate (and be directed in voting by the B&B DL Settling Clients) until all allowed administrative and unsecured claims are paid in full. In this connection, the Court reiterates that, with the exception of the Klestadt Objection, no creditor or other Party In Interest filed an objection to the Settlement of any kind.

19.     The fifth factor favoring the Settlement is that the ultimate outcome of the litigation in the 892 Case, the 210 Case, the 1100 Adversary, and the other Adversaries is in doubt. The issues raised in the litigation are numerous and inter-connected. Silar Parties and Asset Resolution have disagreed (and, but for the Settlement and the provisions contained in this Order, would continue to disagree) with many of the Court's legal rulings, including for example rulings about: the amount and timing of loan servicing compensation owed by the Direct Lenders under the LSAs; the scope, breadth, and effect of various provisions contained in the USACM Plan, the APA, the Direct Lender Supplement, and related orders in the USACM Bankruptcy Cases; application of the Nevada "mortgage broker" statute and escrow and power-of-attorney rules to Silar Parties and Asset Resolution; the vicarious liability of Silar Parties and Asset Resolution for the acts of Compass under principles of agency and respondeat superior; the duties owed by Direct Lenders under the LSAs (including liability for wrongful termination); and other issues. The ARC Estate, the B&B DL Settling Clients, the Silar Parties, and Piskun are jointly and severally referred to herein as the "Settling Parties". Appeals from these rulings in the 892 Case and the 210 Case would undoubtedly take many years, be very expensive, and leave the Direct Lenders and the defendants therein in a

continuing state of uncertainty. The cost of being "wrong" on these issues is extremely high to all of the parties. The certainty and protections provided to the parties in this Order are therefore very important to the B&B DL Settling Clients, the Silar Parties, and the ARC Estate and its creditors, and the parties would not have agreed to settle without such certainty and protections. Silar Advisors and its principals entered into the Settlement in full compliance with their fiduciary duties and despite the costs to Silar Advisors and its principals individually, in an effort to defend and protect the interests of Silar's various members, shareholders, limited partners, investors, and their Affiliates.

20.     A sixth factor favoring Settlement follows the fifth. The Settlement finalizes the process started by the Court in the 892 Case when it entered its in rem Preliminary Injunction over the USACM Loans collection and allocation process. The Preliminary Injunction followed a series of temporary restraining orders entered by the Nevada Bankruptcy Court presiding over the USACM Bankruptcy Cases under sections 105 and 141 of the Bankruptcy Code to enforce the terms of the Order confirming the USACM Plan. As a result of the permanent injunctive relief entered in connection with Settlement, unless they have agreed to a different treatment, all Direct Lenders in defaulted USACM Loans are assured that they will receive all future loan collections on a pro rata basis measured by the amount of the principal amount attributable to their investment after deducting: (a) valid pre-existing or future servicer advances made for their account for their loans; and (b) a one time, one-and-one-half percent of the collected amount servicing fee. (Under the Settlement, the B&B DL Settling Clients will receive their pro rata distributions without deductions for the servicer advances and a one-time fee, because they are compromising their Proofs of Claim against the ARC Estate and will be the owners of the equity interests in the ARC Estate.) In other words, the Settlement affirms the Court's interpretation of the collection waterfall ruled upon in the 892 Case and re-affirmed in the Asset Resolution Bankruptcy Cases, and entirely eliminates the "default interest", late fees, and any other fees component of the waterfall which would otherwise be payable to the ARC Estate at the bottom of the waterfall out of future collections. This is a substantial benefit to all Direct Lenders in the USACM Loans.

21.     The seventh factor favoring the Settlement is that it will put to rest questions

concerning collections by parties who ultimately prevail on the merits of damages claims. Although the 892 Case was tried to a jury and Silar announced an intention to post a $5 million deposit to supersede enforcement of the judgment, resolution of the appeals from any judgment could take several years. The Settlement provides for substantial immediate cash payments by Silar and Piskun and resolves competing claims against the same pool of assets between the ARC Estate on the one hand and the plaintiffs in the 892 Case and the 210 case on the other hand. Also, by ending litigation between the Direct Lenders, the Silar Parties, and the Estates, the Settlement ensures that no Direct Lender will be at risk of having to return distributions they have already received from USACM Loan collections.

22.     An eighth factor favoring the Settlement is that it provides substantial value to the ARC Estate and the Direct Lenders by providing a procedure for Silar or its designees to make up to $3 million in secured, super-priority "Protective Advance Loans" (further defined below) available to enhance still-outstanding USACM Loans or their related collateral and improve the likelihood of collections. These loans will be originated only upon approval of both the Court and the holders of more than fifty-one percent of the DL Interests in the relevant loan (as permitted by Nevada law and the Bankruptcy Code). These loans will be non-recourse to the Direct Lenders, will be at an interest rate and other terms below customary market standards, and will be subject to supervision by the Court at all stages of the process. Without the availability of such Protective Advance Loans, it is likely that several of the collateral properties will be lost to tax foreclosures or other events which require difficult-to-obtain funding. The first such Protective Advance Loan (for Margarita Annex) has already been approved by the Court and fully funded by Silar in the amount of $1,132,150.00.

23.     A ninth factor favoring the Settlement is that it may provide substantial value through the approval of a "Liquidating Trust" (also known as the "Claims Recovery Trust"). The terms and conditions relating to the Liquidating Trust are defined in detail below, and in the Trust Agreement (defined below, and a copy of which is attached hereto as Exhibit A) being approved by this Order. In general, the "Claims Recovery Trust" is established to allow the ARC Estate, Silar, and B&B DL Settling Clients who opt to join the ability to enhance their recoveries by seeking to aggregate their claims against:  (a) persons or entities who are not borrowers or guarantors of the USACM Loans

but whose acts and omissions allegedly caused the parties substantial damages relating to the USACM Loans (such as, for example, lawyers, sub-servicers, brokers, and others) (the "Professionals," defined further below); and (b) borrowers and guarantors of various USACM Loans who allegedly failed to repay the USACM Loans in whole or in part, as well as others, such as title companies, whose acts or omissions  harmed the Direct Lenders  in the USACM Loans ("Loan Claims," defined further below).  In this connection, the Court notes the following:

A.     Each B&B DL Settling Client who joins will receive the benefits of the pursuit of  non-Loan Claims by the Claims Recovery Trust and can decide if they wish to receive the benefits of  having the Trust also pursue their Loan Claims or take another course of action.  Joinder as direct or indirect beneficiaries in the Claims Recovery Trust is also open to other Direct Lenders who are invited to join for specific and narrow purposes and do not otherwise create a conflict with the interests of the Claims Recovery Trust.  This is an important feature in light of this Court's ruling that Direct Lenders may pool their interests in a USACM Loan to act together.  See McKnight v. Barkett, Case No. 2:10-cv-01617-RCF-GWF, Order entered March 14, 2012 [Doc. 170].  This is also an important feature of the Settlement because it will enable Direct Lenders to pursue collection on their USACM Loans without having to be named as parties to the litigation.  This feature of the Settlement is also important because it continues this Court's oversight of the provisions of the USACM Plan relating to the Direct Lenders and the "purchaser" of USACM's assets.

B.     This Court is not being asked to decide as part of the Settlement – and does not decide through this Order --whether any of the Professionals is liable to any Person or in what amounts, if any.  Those matters are to be left for litigation filed directly against the Professionals by the Liquidating Trust or others, and nothing in this Order is intended, or shall be construed, to be a finding as to whether or not the Professionals actually engaged in any wrongdoing.  However, Silar Advisors, the other Silar Parties, the ARC Estate, and/or the B&B DL Settling Clients contend that they have viable claims for millions of dollars of damages arising out of the acts and omissions of, among others,  the persons and entities  (jointly and severally with other Persons identified  below, the "Professionals"): Tyson Lomazow ("Lomazow");   Weil Gotshal & Manges, LLP and its "Affiliates" (as defined below)("Weil Gotshal");   Bullivant Houser Bailey PC and its Affiliates

("Bullivant"); Milbank, Tweed, Hadley & McCloy, LLP and its Affiliates ("Milbank"); Katherine Windler ("Windler"); Bryan Cave, LLP and its Affiliates ("Bryan Cave"); and Epstein Becker & Green, PC and its Affiliates ("Epstein Becker" or "EBG"). The Court is in no way pre-judging the sufficiency or insufficiency of the allegations or evidence against any Professional or deciding whether or not any particular alleged Cause of Action against any Professionals is assignable as a matter of law, or whether any Professional is or is not liable to the B&B DL Settling Clients, the ARC Estate, Silar, the Liquidating Trust, or any other person, or whether or not any Professional has valid defenses to any such claims. But the Court does find that the Settlement appropriately represents the efforts of Silar Advisors, the other Silar Parties, the Estates, the B&B DL Settling Clients, and Piskun to both mitigate the harms they claim to be caused by the Professionals and to attempt to enhance the prospects of recovering on what they believe to be separate and overlapping claims against the Professionals by seeking to pool them into a unified prosecution.

        C.     The Court also does not pre-judge any Loan Claims against borrowers, guarantors, and/or others which may be assigned to the Liquidating Trust under the Settlement. But the Court does find that the potential for recovery on those claims may be enhanced if they are pursued through the Liquidating Trust. By pooling specific claims in the Claims Recovery Trust, the Direct Lenders (including the ARC Estate):

        1.     Will enhance their ability to be insulated from the assertions of claims by the borrowers or guarantors for the alleged failures or wrongful conduct of USACM or any subsequent loan servicers in connection with the USACM Loans;

        2.     Will benefit from a common mechanism to make prompt decisions under the "51 percent rule" incorporated in the LSAs and established by Nevada law;

        3.     Will be able to attempt to obtain repayment of their USACM Loans without the need to hire separate counsel or fund litigation expenses; and

        4.     Will be able to pursue the collection actions in this Court (rather than in another court which is not as familiar with the lengthy and complex history and law relating to the issues).

        D.     The Court also finds that the Settlement enhances the prospects of recovery

through the terms of retention of counsel for the Claims Recovery Trust. As part of the Settlement, this Court approves retention by the Claims Recovery Trust of The Majorie Firm Ltd. as litigation counsel. Retention of that firm by the Claims Recovery Trust was an important component of the Settlement demanded by the B&B DL Settling Clients because that firm has demonstrated to the B&B DL Settling Clients a thorough knowledge of the facts and the law applicable to the claims which will be litigated by the Claims Recovery Trust. The Majorie Firm Ltd. will also represent the Claims Recovery Trust on a contingent fee basis at only twenty-five percent of any recovery. This is a considerably-better-than-market percentage for such cases and similar quality firms. The Majorie Firm Ltd. was unwilling to accept such retention unless Silar advanced funds to The Majorie Firm Ltd. to induce it to do so. The Court has reviewed *in camera* the retention agreement between Silar and The Majorie Firm Ltd. relating to the terms and conditions for advancing the funds and finds that they are fair, reasonable, and necessary to effectuate the terms of the Settlement. Silar will also assist in the prosecution of the claims and help defray litigation costs and expenses by funding $100,000 to the Claims Recovery Trust upon formation. The advanced funds, combined with the modified contingent fee representation by The Majorie Firm Ltd. and the required assistance of Silar Advisors and certain of its Affiliates in the prosecution of the claims for the Claims Recovery Trust, are important benefits to the Direct Lenders demanded by the B&B DL Settling Clients and the B&B DL Settling Clients would not have agreed to a Settlement without them.

E.    The composition of the Claims Recovery Trust Committees (comprised of the Trustee and representatives from the B&B DL Settling Clients and Silar) and the decision-making structure within the Committees ensures that each constituency has an appropriate voice in the decision-making. In particular, the Court notes that the Claims Recovery Trust will allow Direct Lenders to retain their right to decide the "fate" of their investments in the USACM Loans through decision-making which mirrors the 51 percent rule established by Nevada law. The Court also notes that, under the Settlement (and as described in more detail in Section IX below), the Trustee will be required to vote the DL Interests held by the ARC Estate as directed by the B&B DL Settling Clients through written instructions from a steering committee of B&B DL Settling Clients established for that purpose. Thus, this is the first time since USACM filed for bankruptcy protection that the

1  Direct Lenders will be in a position to fully exercise the power granted to them under the 51 percent

2  rule without interference by a servicer which is also a Direct Lender or by a trustee or Court

3  appointee who has a duty to constituents other than the Direct Lenders.

4      24.    In short, the Court finds that the terms of the Settlement (whether considered

5  individually or as a whole) provide immediate and substantial benefits to the Estates, the B&B DL

6  Settling Clients, the other Direct Lenders in the USACM Loans, and the Silar Parties. The benefits

7  outweigh the possibility of future relief after what will continue to be protracted and expensive

8  litigation. The Court also finds that the Settlement represents a good faith, reasonable effort by Silar

9  (individually and as agent) and the ARC Estate to mitigate the damages and injuries they have

10  incurred in connection with the USACM Loans.

11      25.    The Court therefore GRANTS the Motion in all respects.

12

13  **III.**

14  **THE SETTLEMENT IS SUPPORTED BY THE INFORMED CONSENT OF 100% OF**

15  **THOSE DIRECT LENDERS WHO ARE PLAINTIFFS**

16  **IN THE 892 CASE AND THE 210 CASE**

17      26.    Bickel & Brewer has filed a list (the "B&B Client List") which certifies under penalty

18  of perjury the individual and vesting names of all Direct Lenders represented by Bickel & Brewer at

19  any time in connection with the 892 Case, the 210 Case, the Asset Resolution Bankruptcy Cases

20  (including without limitation through Proofs of Claim or various contested matters), and/or any

21  related appeals. (AR Bank Doc. 1750) Those Direct Lenders signed a representation agreement

22  with Bickel & Brewer and McAlan Duncan, Esq. ("Duncan") (a duplicate of which has been filed

23  with the Court in a Rule 2019 statement, amendment, or supplement in the Asset Resolution

24  Bankruptcy Cases)(the "B&B/Duncan Retention Agreement") and were represented by Bickel &

25  Brewer in those proceedings in connection with the USACM Loans. All of the persons and entities

26  set forth on the B&B Client List are referred to as "B&B Clients." With the exception of forty-two

27  other individual and vesting names set out in the B&B Client List ("No-Contact Clients") and

28  Rodger Stubbs ("Stubbs"), all of the B&B Client List have agreed to the Settlement, in writing. All

of the B&B Client List, excluding the No-Contact Clients, are referred to herein as the "B&B DL Settling Clients."

27.     The B&B DL Settling Clients include all of the plaintiffs in the 892 Case, all of the plaintiffs in the 210 Case, and 98.51% of the Joint Proofs of Claim filed by Bickel & Brewer against the ARC Estate in the Asset Resolution Bankruptcy Cases. The remaining 1.49% is held by the No-Contact Clients.

28.     The Court has reviewed the declarations submitted in connection with the Motion, which attest that there were direct written communications about the Settlement with all the B&B DL Settling Clients, and that there were several telephonic conference calls for all B&B DL Settling Clients to ask questions and receive answers directly from Bickel & Brewer lawyers about the Settlement.

29.     Based upon the foregoing, the representations of Bickel & Brewer at the hearing of the Motion, and the record of all the proceedings in the 892 Case, the 210 Case, and the Asset Resolution Bankruptcy Cases, the Court:  (a) finds that each of the B&B DL Settling Clients has provided individualized, informed consent to the Settlement; (b) finds that each of the B&B DL Settling Clients has authorized Bickel & Brewer to receive in trust for the B&B DL Settling Clients all of the cash to be paid or released to the B&B DL Settling Clients under the Settlement; and (c) declares that Bickel & Brewer is authorized to execute releases of claims and other documents to otherwise close and implement the Settlement on behalf of each and every of the B&B DL Settling Clients. Other than  making the Assignments  (as defined below) of cash and other assets to Bickel & Brewer in trust for the B&B DL Settling Clients pursuant to this Order,   the Trustee,  the Silar Parties,  Piskun, and  their respective counsel shall not have any direct or indirect  responsibility, duty,  obligation, or liability  whatsoever  to any B&B DL Settling Client or any other person or entity relating to or arising out of  such Assignments.

30.     With respect to Stubbs, the Court finds that Bickel & Brewer appeared on his behalf in the 892 Case, he is a plaintiff in the 892 Case, he is not and has never been a Direct Lender, he acted as an agent or as a "Litigation Management Consultant" under the B&B/Duncan Retention Agreement, he has declined to participate in the Settlement, and he is therefore excluded from the

1  Settlement and is not included in the definition of "B&B DL Settling Clients". Upon the Effective

2  Date, the claims and counterclaims involving Stubbs and Silar in the 892 Case shall automatically be

3  deemed to be dismissed without prejudice.

4         31.    With respect to the No-Contact Clients, the Court finds that Bickel & Brewer has

5  been unable to communicate with them about the Settlement. None of the No-Contact Clients is a

6  plaintiff in either the 892 Case or the 210 Case. The Court directs that, except upon further order(s)

7  of the Court upon motion(s) by Bickel & Brewer, the B&B DL Settling Clients, or one or more No-

8  Contact Clients filed in the Asset Resolution Bankruptcy Cases, Bickel & Brewer and the other B&B

9  DL Settling Clients shall segregate from the consideration to be received to the B&B DL Settling

10 Clients and hold in trust for further distribution to No-Contact Clients the amount of such

11 consideration which would have been paid to the No-Contact Clients if they had joined in the

12 Settlement. Any No-Contact Client who accepts such segregated funds in whole or in part shall

13 automatically become a "B&B DL Settling Client" under this Order, and notice shall be provided to

14 Silar Parties counsel of such disbursement.

15 **IV.**

16 **THE SETTLEMENT IS SUPPORTED BY THE HOLDERS OF MORE THAN 51 PERCENT**

17 **OF THE DL INTERESTS IN ALL OF THE USACM LOANS**

18        32.    A list (the "Loan List") of all of the USACM Loans which were the subject of the 892

19 Case and/or which are the subject of the Settlement (the "Settlement Loans") is attached as Schedule

20 1 to the Trust Agreement attached hereto as Exhibit A.

21        33.    The DL Interests in the Settlement Loans listed on the Loan List as "ARC-Only

22 Loans" are entirely owned by the ARC Estate, and the Trustee has agreed to the Settlement on behalf

23 of the ARC Estate as the sole Direct Lender holding beneficial interests in those loans.

24        34.    The DL Interests in all of the other Settlement Loans listed on the Loan List (the

25 "Non-Wholly-Owned ARC Loans") belong to more than one natural person within the meaning of

26 Nev. Rev. Stat. 645B.340 et al. At the time the Motion was presented to the Court, the holders of

27 more than fifty-one percent of the DL Interests in all of the Non-Wholly-Owned-ARC Loans except

28 the "Marlton I" loan consented to the Settlement in writing with respect to those loans.

35.     The Settlement is therefore binding on all the owners or holders of DL Interests in all of the Settlement Loans, as well as their heirs, successors, and assigns.

## V.

## NO CREDITOR OR PARTY IN INTEREST (OUT OF THOUSANDS) IN THE ASSET RESOLUTION BANKRUPTCY CASES HAS OPPOSED THE SETTLEMENT

36.     The Motion has been duly served in accordance with the Bankruptcy Code, Rule 9014 and other rules of the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and other laws on all parties in interest in the Asset Resolution Bankruptcy Cases (jointly and severally, "Parties In Interest"), including without limitation: (a) all persons or entities who filed proofs of claim or interests in the Asset Resolution Bankruptcy Cases; (b) all persons or entities who are known to own or are believed to own Direct Lender Interests in the fifty-three USACM Loans which are the subject of the 892 Case; (c) the office of the United States Trustee; (d) all plaintiffs and defendants (or their counsel of record in 2012) in the 892 Case, the 210 Case, and the Adversaries; (e) all persons and entities who have been designated servicers of USACM Loans after January 10, 2010, including Cross and one of its principals Duncan (who has filed *pro hac vice* appearances and/or declarations on behalf of certain Direct Lenders in the 892 Case and the Asset Resolution Bankruptcy Cases); and (f) all persons or entities who have submitted claims in the Servicing Claims Procedure.

37.     Since the Asset Resolution Bankruptcy Cases were commenced, there have been close to two thousand filings by or on behalf of several thousand Parties In Interest.

38.     Only one "objection" – the "Klestadt Objection" – was filed with the Court in response to the Motion. The Klestadt Objection "applaud[s] the proposed settlement," states that it "does not seek to preclude this Court from approving the Settlement," and requests that the Court ensure that there is at least $1,032,435.66 held by the ARC Estate to protect Klestadt in the event the Court's sanctions are reversed and Klestadt is entitled to receive fees for its services through the date of the conversion. [AR Bk Doc. 1724 at 2/lines 3-10 & 4/lines 1-5]

39.     There are no objections by any Parties In Interest to the Settlement itself.

40.     The Court also hereby overrules the limited objection and request for set-aside made

1  in the Klestadt Objection.   The Court also hereby overrules all objections filed after the Court's

2  hearing on the Motion held on April 12, 2012.

3       41.    This Order is therefore binding on all creditors and other Parties In Interest in the

4  Estates.

5                                    **VI.**

6                    **THE "EFFECTIVE DATE" OF THE SETTLEMENT**

7       42.    This Order and the documents to be executed to implement the Settlement set forth all

8  of the material terms and conditions of the Settlement (the "Terms").  Each of the cash payments and

9  disbursements, approval of the Liquidating Trust agreement by the Trustee, the B&B DL Settling

10  Clients, Silar, and the Court, formation of the Liquidating Trust, the retention of The Majorie Firm

11  Ltd. by the Liquidating Trust on a reduced-contingent fee basis (together with the necessary  sums to

12  be advanced by Silar in connection therewith), the releases, the channeling injunctions, and all  other

13  Terms to be exchanged in the Settlement are a material, mutually-concurrent part of an integrated,

14  non-severable package which must be concurrently exchanged in order for any person or entity to be

15  obligated to close the Settlement.  If one or more of the Terms (including without limitation those

16  specified in the foregoing sentence) is not implemented or cannot be obtained, then there is no

17  Settlement.

18       43.    The "Effective Date" for the purposes of closing the Settlement shall be the later of

19  the date of:  (a) Final Approval (as defined below); and  (b) the concurrent exchange of all of the

20  Terms (including without limitation the making of the "Cash Payments" by Silar under Section VII

21  below). This Order is intended to and does represent a final, appealable disposition with respect to

22  all relief granted in the Order.  To the extent this Order refers to the "deemed automatic entry" of

23  other orders (such as, for example, dismissals) in various pending cases, the entry of such other

24  orders is intended to be ministerial only to further implement the Settlement Terms which are

25  approved and delineated in detail throughout this Order.  It is also anticipated that the various parties

26  may enter into one or more instruments further confirming the terms of this Order (such as, for

27  example, releases or assignment documents).   However, it is intended that this Order shall be

28  sufficient to effectuate such releases and assignments or other matters either as a matter of contract

1  (because the Order is agreed to by the Settling Parties), or as a matter of law through the power of

2  the Court, or both.

3      44.    Notwithstanding the foregoing, no person or entity shall be under an obligation to

4  close or implement the Settlement until "Final Approval" has been received and all of the Terms of

5  the Settlement can be concurrently exchanged.  "Final Approval" means the entry of a final, non-

6  appealed, and non-appealable order approving the Settlement.  If there has been a timely appeal or

7  appeals from or relating to this Order, "Final Approval" means the entry of a final, non-appealed,

8  and non-appealable order of the United States Court of Appeals for the Ninth Circuit or the United

9  States Supreme Court (as the case may be) which approves this Order.  If there is an appeal from this

10  Order approving the Settlement (or from an appeal or other appellate court proceeding from that

11  appeal), each of the Silar Parties, the B&B DL Settling Clients (but only as a group), and the Trustee

12  retains the right, at their sole and absolute discretion, not to close the Settlement if any such

13  appeal(s) or other appellate proceeding(s) could affect one or more of the benefits to be received by

14  that party from the Settlement (including without limitation a final disposition of all claims made or

15  unmade).  Notwithstanding the foregoing, however, the Silar Parties, the B&B DL Settling Clients,

16  and the Trustee shall use their best efforts and cooperate to close the Settlement despite any such

17  appeal(s).  Notwithstanding anything to the contrary in this Order or otherwise, if the Settlement is

18  closed by the Settling Parties and a term or provision of this Order is subsequently reversed,

19  modified, or held to be unenforceable as the result of an appeal of this Order by a particular Party In

20  Interest, then all other terms and provisions of this Order shall remain binding on such Party In

21  Interest and all terms and provisions of this Order shall remain binding on all other Parties In

22  Interest.

23      45.    In the event of any such appeal(s), the Silar Parties, the B&B DL Settling Clients

24  (but only as a group), and the Estates shall have fourteen (14) calendar days from the date of each

25  notice of appeal to provide written notice to the others that they are exercising their right not to close

26  the Settlement.  All stays applicable to all deadlines, hearing dates, and the entry of any Court orders

27  in the 892 Case, the 210 Case, and the Adversaries (including the 1100 Adversary) shall be vacated

28  immediately upon the exercise of a right not to enter into the Settlement.  If such stay is vacated, the

parties may immediately seek any hearing dates and the entry of any Court orders that were affected by the stay, and shall also have only ten (10) days to comply with any previously stayed case deadlines in the 892 Case, the 210 Case, and the Adversaries (including the 1100 Adversary).

### VII.

### CASH PAYMENTS BY SILAR UPON THE EFFECTIVE DATE

46.     As soon as practicable and no later than five business days after the later of Final Approval and only upon the concurrent exchange contemplated on the Effective Date Silar shall be required to and shall pay $4,500,000.00 (the "$4.5 Million Payment") to the Trustee in immediately-available funds for the benefit of the ARC Estate, which shall be earmarked to resolve any and all avoidance and other actions that have been, or could be, filed by the Trustee against Silar and the other Silar Parties.   The Trustee shall then immediately pay that sum in its entirety (without any reduction for administrative expenses, commissions, or any other fees) to Bickel & Brewer in trust for the B&B DL Settling Clients (as the sole equity owners of the ARC Estate).

47.     As soon as practicable and no later than five business days after the later of Final Approval and only upon the concurrent exchange contemplated on the Effective Date Silar shall deposit $100,000.00 (the "$100,000 Payment") with the Liquidating Trust, of which $20,000 will then be transferred to The Majorie Firm Ltd., to be held by The Majorie Firm Ltd. in trust for litigation expenses in connection with its representation of the Claims Recovery Trust.

### VIII.

### CASH PAYMENT AND OTHER SETTLEMENT CONSIDERATION FROM PISKUN

48.     As part of the Settlement, as soon as practicable and no later than five business days after the later of Final Approval and only upon the concurrent exchange contemplated on  the Effective Date, in addition to the other consideration to be provided by Piskun as reflected elsewhere in this Settlement Agreement, Piskun shall:  (a) pay  $50,000 in cash and provide a written undertaking to pay an additional $50,000 to Bickel & Brewer in trust for the B&B DL Settling Clients; (b) cooperate fully with the B&B DL Settling Clients in connection with their pending claims against the Compass Defendants (as defined below) in the 210 Case and in connection with any information requests or similar inquiries related to USACM Loans; and (c) provide the B&B DL

1    Settling Clients copies of all hard copy and electronic documents in his possession, custody, or

2    control relating to the subject matter of the 210 Case that are not privileged or for which the

3    privilege was waived at trial in the 892 Case.

4        49.    As part of the Settlement, as soon as practicable and no later than five business days

5    after Final Approval and only upon the concurrent exchange contemplated on  the Effective Date, in

6    addition to the other consideration to be provided by Piskun as reflected elsewhere in this Settlement

7    Agreement, Piskun shall pay $1,000 to the Trustee on behalf of the ARC Estate to resolve any and

8    all Causes of Action (as defined below)  by the Estates and for the other consideration to be given by

9    the Estates and the B&B DL Settling Clients under the Settlement.

10       50.    Upon the Effective Date, in addition to the other consideration to be provided by

11   Piskun as reflected elsewhere in this Order and only upon the concurrent exchange contemplated on

12   the Effective Date, Piskun shall as of the Effective Date:  (a) be deemed to have Assigned to the

13   Claims Recovery Trust all Causes of Action, if any, he holds against any person or entity relating to

14   the subject matter of the 892 Case or the 210 Case to the maximum extent permitted by law; (b)

15   cooperate fully with the Claims Recovery Trust in connection with their litigation of claims against

16   one or more of the Professionals and any other third parties, if necessary; and (c) provide to The

17   Majorie Firm Ltd. as counsel to  the Claims Recovery Trust the originals of all hard copy and

18   electronic documents in his possession, custody, or control relating to the USACM Loans and/or the

19   related collateral, and the relationships between the Professionals and the USACM Loans and/or the

20   related collateral.

21                                    IX.

22        **MATTERS RELATING TO THE ASSET RESOLUTION BANKRUPTCY CASES**

23       51.    As part of the Settlement, as of the Effective Date, all of the claims, rights, and

24   interests in (but not liabilities, if any, in connection with) the ARC Estate and the SPE Debtors

25   (jointly and severally, the "ARC Equity Interests") held by Silar shall be deemed to automatically be

26   transferred to the B&B DL Settling Clients.  Notwithstanding anything to the contrary in this Order

27   and upon further order of the Court, cash distributions made by the Trustee on account of or with

28   respect to ARC Equity Interests shall be disbursed to Bickel & Brewer in trust for the B&B DL

1   Settling Clients.

2         52.     Upon the Effective Date, with the exception of DL Interests and any "Liquidating

3   Trust Interests" held by the ARC Estate in connection with the Claims Recovery Trust or any other

4   trusts formed in connection with the Settlement at any time after this Order is entered (jointly and

5   severally, the "Liquidating Trusts"), the Trustee:  (a) will distribute the remaining assets of the ARC

6   Estate, and/or seek Court approval to make interim distributions, to the B&B DL Settling Clients as

7   the sole equity holders of the ARC Estate as early and as frequently as possible; and (b) will

8   distribute the remaining assets of the other Estates (including all collections from USACM Loans

9   that are currently being held in escrow by the Estates or otherwise at the direction of the Trustee) to

10   the Direct Lenders as soon as possible, including sending Bickel & Brewer in trust for the B&B DL

11   Settling Clients all distributions to be made to the B&B DL Settling Clients from any collections

12   from USACM Loans that are currently being held in escrow and any Collection Notices in

13   connection with those same USACM Loans to non-B&B DL Settling Clients no later than fourteen

14   days after the Effective Date.  Notwithstanding anything to the contrary in this Order, except for

15   those certain Causes of Action transferred under the Settlement as set forth in this Order, the Trustee

16   shall not without further order of the Court distribute any non-cash assets of the ARC Estate to the

17   B&B DL Settling Clients until the later of: (a) the termination of all Liquidating Trusts; and (b)

18   payment in full of all allowed claims and administrative fees and expenses by the Estates.  This

19   prohibition applies to, among other assets, the DL Interests and Liquidating Trust Interests held by

20   the ARC Estate.  Cash received by the ARC Estate from its DL Interests or Liquidating Trust

21   Interests may be distributed by the Trustee to the B&B DL Settling Clients upon further order of the

22   Court.

23         53.     Upon the Effective Date and thereafter: (a) the Trustee shall not seek to or actually

24   liquidate the DL Interests held by the ARC Estate in connection with any USACM Loans and/or

25   related collateral, in whole or in part, unless required to do so by the vote of 51% or more of the

26   other DL Interests in any loan and/or related collateral (this includes without limitation properties

27   held solely by the ARC Estate, such as for example Monaco and Cornman Toltec); and (b) the

28   Trustee shall vote the DL Interests held by the ARC Estate as directed by a "B&B DL Settling

Clients Instruction." "B&B DL Settling Clients Instruction" means a writing filed with the Court in the Asset Resolution Bankruptcy Cases by a steering committee acting on behalf of the B&B DL Settling Clients that directs the Trustee how to vote the DL Interests held by the ARC Estate with respect to a particular matter. The B&B DL Settling Clients shall be solely responsible for establishing the steering committee. The Trustee may file a motion with the Court seeking approval or guidance with respect to a B&B DL Settling Clients Instruction. In the event that the Trustee files such a motion, any one or more members of the steering committee may file responsive papers and appear *pro se* to respond to the Trustee's motion. Upon the Effective Date and thereafter, the Trustee will seek to efficiently and cost effectively operate the ARC Estate for and on behalf of the B&B DL Settling Clients by, whenever appropriate, issuing any electronic and/or telephonic communications to Bickel & Brewer for and on behalf of the B&B DL Settling Clients, rather than directly to the B&B DL Settling Clients through the use of the United States mails.

54. The Trustee will prosecute to a final conclusion the Asset Resolution Bankruptcy Cases, including the adversary proceeding against Citron Investment Group, Inc., a Florida corporation; Michael Citron, an individual resident of Florida; and Danielle Citron, an individual resident of Florida (jointly and severally, the "Citron Defendants"). After the Effective Date, the B&B DL Settling Clients may Assign their Causes of Action against the Citron Defendants (which are currently being asserted in the 210 Case) to the Trustee or the ARC Estate, if necessary or advisable to obtain complete relief against the Citron Defendants. As a result of this Order, none of the Silar Parties shall have any liability whatsoever with respect to any matter relating to the Citron Defendants.

55. Upon the Effective Date, the Trustee and the Estates shall immediately make distributions pursuant to the Stipulation And Order Resolving Disputes Regarding Pathfinder/Silar Settlement Agreement filed in the Asset Resolution Bankruptcy Cases on April 13, 2012 (AR Bk. Doc. 1754).

56. Upon approval of the Court, the Trustee and the Estates shall perform pursuant to the Settlement Agreement between the Estates and Debt Acquisition Company of America V, LLC, Vindrauga Corporation, Eagle Investment Partners, L.P., and Fiesta Stoneridge, LLC dated as of

March 23, 2012.

**X.**

**MATTERS RELATING TO LOAN COLLECTIONS/WATERFALL**

**A.  The 892 Case**

57.  On August 29, 2007, this Court affirmed the Nevada Bankruptcy Court's order confirming the USACM Plan under chapter 11 of the Bankruptcy Code over the objections of certain Direct Lenders, including DACA.  In that decision, among other things, this Court ruled that the "Bankruptcy Court's confirmation order does not purport to interpret the LSAs to define Compass' contractual rights, or lack thereof . . . [under the LSAs]," and that "[r]esolution of potential, future disputes regarding Compass' rights under the LSAs are a matter of contract interpretation . . . ." [Doc. 160 (Opinion) at 27/lines 3-8]  Compass received notice of the appeal and opted not to appear and assert a position contrary to the ruling ultimately entered by this Court.  The 892 Case is the "future dispute" anticipated by the Court's opinion.

58.  Among other things, the plaintiffs in the 892 Case sought to terminate Compass (and later Asset Resolution) as servicers for the USACM Loans, sought declarations concerning the measurement, timing, and amount of default-fee compensation that was due to be paid to those servicers under the LSAs, and sought an accounting of loan collections and damages for "loan servicer misconduct" based on those declarations.

59.  The original plaintiffs in the 892 Case were limited liability companies ("LLCs") representing greater than 51 percent of the DL Interests in fifty-two of the USACM Loans which were the subject of USACM's sale to Compass.  The remaining purchased USACM Loans were either owned entirely by USACM (and then Compass) or were resolved without controversy.  Although the plaintiff LLCs were eventually dismissed from the 892 Case, the case continued to be prosecuted by and against several "loan captains" and "key people" associated with the 52 USACM Loans at issue in the litigation.  [1832 Doc. 7 at 13-15; 09-15632 Transcript at 11/line 4]

**B.  The Direct Lenders' Common Interests**

60.  The Court has recognized that the LSAs and the Nevada statutes and regulations governing the LSAs created co-ownership interests in the same subject matter and a substantial

identity, community, or mutuality of interests among all of the Direct Lenders and between the Direct Lenders and the servicer with respect to each USACM Loan which was the subject of the USACM sale. [892 Doc. 1599 (Order) at 6] The LSAs at issue in the 892 Case, and the legal and factual issues involving collections and the measurement and timing of payment of base-servicing and other fees and servicer advances thereunder, were and are common to all Direct Lenders.

61. The claims and defenses asserted with respect to the issues under the LSAs in the 892 Case were and are typical of those which would be asserted by all Direct Lenders.

62. The Direct Lenders vigorously presented the issues in connection with the interpretation of the LSAs in the 892 Case. The loan servicers also acted or refused to act on grounds that applied generally to all of the Direct Lenders in the USACM Loans.

63. Inconsistent or varying adjudications with respect to the interpretation of the LSAs would establish incompatible standards of conduct for the loan servicers under the LSAs with respect to the same USACM Loan.

64. For these reasons and others, the Court protected the interests of all parties to all of the LSAs by entering the Preliminary Injunction in the 892 Case (which, as has been noted, was the result of a consolidation of various pending cases, including a core adversary proceeding brought by Compass to enforce the USACM Plan and related orders for which the automatic reference was withdrawn to this Court).

C. **The Preliminary Injunction**

65. The Preliminary Injunction preserved the *status quo* pending adjudication of the issues raised in the 892 Case and applied to all Direct Lenders through the Court's exercise of *in rem* jurisdiction "over the [USACM] Loans and LSAs relating thereto." (892 Doc. 199) See Morgan Stanley Mortgage Capital, Inc. v. Ins. Commission of State of Cal., 18 F.3d 790 (9th Cir. 1984).

66. Paragraph 14 of the Preliminary Injunction expressly required service of the Preliminary Injunction on all Direct Lenders in the USACM Loans by mail and further provided that any Direct Lender who was not a named plaintiff in the 892 Case "must file a written objection with this Court stating the specific basis for such objection within fifteen (15) days of the date hereof, or such Direct Lender shall otherwise be bound by the terms hereof . . . ." (892 Doc. 199 at 12, ¶ 14).

67.     The Preliminary Injunction was mailed to all Direct Lenders in the USACM Loans. No Direct Lender filed an objection to the relief set forth in the Preliminary Injunction.  Nor did any named party in the 892 Case or other Direct Lender appeal issuance of the Preliminary Injunction.

68.     The Ninth Circuit Court of Appeals has affirmed this Court's amendment of the Preliminary Injunction to add Asset Resolution as the replacement servicer to Compass. Cangelosi v. Silar Advisors, LP (In re USA Commer. Mortg. Co.), 397 Fed. Appx. 300, 306 (9th Cir. 2010) (unpublished) [892 Doc. 1877].

69.     The Ninth Circuit Court of Appeals has also affirmed this Court's application of the termination provision in the Preliminary Injunction as of January 10, 2010 to all of the LSAs purchased by Compass as to all Direct Lenders.  See 3685 San Fernando Lenders LLC v. Cross Equities Partners, LLC, et al., No. 09-16897, Doc 88-1 at 10-13 (9/19/11).

70.     The Ninth Circuit has also ruled that, "to the extent any party would argue that the Preliminary Injunction improperly affected their underlying rights in the LSAs, . . . such argument [w]as waived because no party . . . appealed the entry of the original preliminary injunction." See 3685 San Fernando Lenders LLC v. Cross Equities Partners, LLC, et al., No. 09-16897, Doc 88-1 at 12, n.4 (9/19/11).

71.     The Preliminary Injunction was therefore binding on all parties to the USACM Loans servicing relationship from November 2007 onward.

**D.  Servicing Under The Preliminary Injunction**

72.     The Preliminary Injunction was entered in part in response to motions initially filed by Compass which sought to maintain Compass' position as servicer during the Post-USACM/Pre-Termination Servicing Period.  (10-725 Doc. 3773)

73.     The Preliminary Injunction confirmed the "exclusive authority of Compass to act directly on behalf of the Direct Lenders as servicer" for the loans *pendente lite* and provided a mechanism for terminating the servicing relationship by motion.  (892 Doc. 199 at 4, ¶¶ 1 & 2, and at 9, ¶ 8)

74.     Compass acted as the servicer of the USACM Loans from February 16, 2007 (the effective date of the sale by USACM) through September 26, 2008 (when Asset Resolution

terminated Compass' rights under the MRA with respect to the LSAs and the USACM DL Interests). During those periods, the Direct Lenders sought in the 892 Case to terminate that servicing relationship in order to obtain day-to-day control over the collection of the USACM Loans and the protection of the underlying collateral (through, for example, payment of taxes, maintenance costs, and the like).

75.    [Omitted]

76.    The Settling Parties have alleged that that, during that period, Compass was substantially assisted with respect to its servicing decisions and communications with borrowers and Direct Lenders and by, among others: (a) Lomazow and other lawyers of Weil Gotshal, Bullivant, Milbank, Shepherd Mullin Richter & Hampton LLP, and/or other law firms (the "Servicing Lawyers"); (b) USACM and its agent or representative, Mesirow Financial Interim Management, LLC ("Mesirow") (acting as sub-servicers from February 16, 2007 through the end of April, 2007); and (c)  Windemere Capital, LLC ("Windemere") (acting as licensed sub-servicer from  November 2007 through at least September 2008).The Settling Parties have alleged that these decisions included, among other things, whether, when, and how: (a) to make demands for payment from borrowers; (b) to make, accept, or reject offers to settle with borrowers; (c) to foreclose on collateral; (d) to allocate and distribute collections; and (e) to inform Direct Lenders of the foregoing events and the material facts relating thereto and to receive (or not receive) consents under the LSAs.

77.    Lawyers for Milbank and Bullivant appeared before this Court and Judge Riegle in the USACM Bankruptcy Cases as counsel to various Compass Defendants through at least January 5, 2009. (892 Docs. 750-754)

78.    Lawyers from Weil Gotshal also appeared in the USACM Bankruptcy Cases before this Court on behalf of various Compass Defendants.

79.    This Court has ruled that Silar was vicariously liable to certain direct lenders on certain USACM Loans for acts by Compass relating to the servicing of USACM Loans because the MRA established a principal-agency relationship between Silar and Compass with respect to those matters.  Although the MRA cannot shield Silar from *respondeat superior* liability for servicer-related conduct of Compass, the Silar Parties are not vicariously liable for any acts or omissions of

Compass which either took place before the MRA was executed (February 16, 2007), which were performed outside the scope of the agency under the MRA, and/or which were undertaken for Compass' own account. This means, for example, that none of the Silar Parties is liable for purchases of DL Interests by Compass or its Affiliates or for any debts incurred by Compass to third parties hired or retained by Compass to assist Compass in the performance of Compass's duties to Silar or the Direct Lenders. Notwithstanding anything to the contrary, nothing in this paragraph 79 makes or shall be deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant, EBG, Windler, Bryan Cave or Sheppard Mullin Richter & Hampton, LLP and its Affiliates ("Sheppard Mullin"), with respect to Causes of Action brought against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other Direct Lenders, or the Liquidating Trust.

80.    As this Court has ruled, as a result of the assignment by Silar to Asset Resolution and the termination of Compass' rights under the MRA and related agreements by Asset Resolution as of September 26, 2008 as well as the Court's ensuing order joining Asset Resolution as a party to the 892 Case and the Preliminary Injunction: (a) Asset Resolution became the holder of the servicing rights and the DL Interests originally received by Compass through the purchase and sale transaction with the USACM estates; and (b) Asset Resolution, not the Silar Parties, became the owner of the servicing rights (and related receivables accrued thereunder) for the USACM Loans from September 26, 2008 through January 19, 2010. Asset Resolution was assisted in the servicing and administration of the Loans by Windemere (a Nevada-licensed sub-servicer) and by Servicing Oversight Solutions, LLC ("SOS").

81.    Silar advanced substantial sums to Asset Resolution earmarked for payments to SOS, Windemere, and other customary and standard servicing advances to protect the assets which were the subject of the MRA. The 1100 Adversary involves, among other things, preference and other claims by the ARC Estate relating to Asset Resolution's pre-petition payments to SOS. There have been no findings of wrongdoing by Silar or any of its principals in the 1100 Adversary. This Order fully and finally resolves these claims.

**E. The Preliminary Injunction "Waterfall" Procedure**

82.     The Preliminary Injunction set forth detailed procedures for handling loan collections when there was a payment in full, a "consensual discounted payoff," or a "non-consensual discounted payment."  (892 Doc. 199 at 6-8, ¶¶ 4-7)

83.     The segregation of collections into various categories: (a) allowed Compass and Asset Resolution to withdraw servicer advances and base servicing fees chargeable against the accounts of all Direct Lenders in the USACM Loans without further  Court order; (b) allowed Compass and Asset Resolution to withdraw payments for all "Compass Fees" (even default interest, late fees, and other non-base-servicing fees) chargeable against their own Direct Lender accounts AND against the accounts of any other Direct Lenders who did not object per the LSAs to the treatment proposed by Compass or Asset Resolution; (c) required Compass and Asset Resolution to set-aside the default interest, late fees, and other non-base-servicing fees  which were in "dispute" because the Direct Lenders in question did not consent to the payment of such fees as proposed by the loan servicer ("Disputed Fees"); and (d) allowed Compass and Asset Resolution to distribute payments to themselves and other Direct Lenders for their DL Interests.

84.     On November 15, 2007, Compass filed an accounting of loan collections and disbursements with the Court as required by section 9 of the Preliminary Injunction (the "Compass Accounting").  (892 Doc. 216)  No objections to that accounting were asserted by any Direct Lender. Section 6(d) of the Preliminary Injunction allowed Compass and Asset Resolution to receive fees with respect to DL Interests they owned and/or with respect to DL Interests held by persons who did not object to paying such fees.  Also, with the exception of the Gess Loan  (where the Court  directly ruled upon the allocation of cash from the liquidation of that loan), no Direct Lender asserted any objections in the Court to any base servicing fees taken by Compass or Asset Resolution under the Preliminary Injunction and/or the LSAs.   In fact, the original Complaint filed by the plaintiffs in the 892 Case acknowledged that "[p]ursuant to Section 5 of the Loan Servicing Agreement, the loan servicer had the right to retain, as compensation for servicing loans a servicing fee varying between 1-3% per annum." (See Case No. 3:07-cv-00241-RCJ-GWF Doc. 1, paragraph 56).  This allegation was essentially reiterated in paragraph 45 of the Third Amended Complaint filed in the 892 Case.

(892 Case Doc. 1499)

85.     Compass and Asset Resolution (respectively) – and not the Silar Parties – were responsible for retaining any base servicing fees and other payments from USACM Loan collections during the Post-USACM/Pre-Termination Servicing Period.  During trial in the 892 Case, Silar filed a notice of intent to deposit monies based on a tentative calculation of what might be payable to Direct Lenders solely based on the Court's "Gess  math"  (which Silar disputed) and without any considerations for Direct Lender consents, offsets for servicer advances, or  other deductions. [892 Doc. 1995]. On January 27, 2011, Silar filed a detailed supplemental accounting (the "Supplemental Silar Accounting") and served over 6,000 pages of supporting materials on counsel for the Trustee and the B&B DL Settling Clients. (Doc. 2041) Silar also provided its experts from a forensic accounting firm, Kroll, Inc., for deposition by Bickel & Brewer.  On August 9, 2011, the Court entered an order (892 Doc. 2188)  and the clerk entered a "judgment" (892 Doc. 2189) concerning the payment of $1,415,572.26 to the IOLTA account of Bickel & Brewer in connection with the B&B DL Settling Clients' contentions in the 892 Case that these collections were not properly accounted for under the Preliminary Injunction.  Silar contested those claims but agreed to settle the matter by depositing cash in the questioned amount with Bickel & Brewer until a review of the accounting could be made.  The Court found (and hereby affirms) that $375,112.43 of those funds represented monies received by Greenberg Traurig LLP ("Greenberg Traurig") on October 1, 2009 (i.e., contemporaneously with the resolution of the Anchor B Loan which was a subject of the trial in the 892 Case and just before the Asset Resolution Bankruptcy Cases were filed).  The Court further ruled (and hereby affirms) that Silar should be entitled to recover the $375,112.43, however collected from Greenberg Traurig, because Silar was in effect "returning" such sums through the $1,415,572.62 payment.  This $375,112.43 is the same sum of money that is referenced below in connection with the "GT Preference Claims."

86.     Paragraph 4 of the August 9, 2011 order directs that, except for $90,000 which was payable for attorneys fees and costs of an auditor, the remaining $1,325,572.26 was to be held in Bickel & Brewer's IOLTA account until an analysis could be conducted concerning how such monies should be allocated (892 Doc. 2188).   The accountings were based on conservative

assumptions and therefore did not contain additional appropriate deductions for Direct Lender consents, servicer advance offsets, and other matters. The Court now holds and hereby renders this final adjudication that no Silar Party is liable to any Direct Lender in any USACM Loan for violating the Preliminary Injunction or any other court orders, for breaching the LSAs, or for receiving or retaining any collections from USACM Loans, and the Silar Parties are fully and completely discharged from any further obligations or liabilities to all Direct Lenders and other Persons with respect to all USACM Loans. Notwithstanding anything to the contrary, nothing in this paragraph 86 makes or shall be deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant, EBG, Windler, Bryan Cave or Sheppard Mullin with respect to Causes of Action brought against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other Direct Lenders, or the Liquidating Trust.

**F. Status Of Servicing And Servicing-Related Loan Claims**

87. In an order entered on January 29, 2010 in the Asset Resolution Bankruptcy Cases, this Court ruled that, as a result of the Court's termination of Asset Resolution's servicing rights under the LSAs, the Trustee did not have authority to exercise any loan servicing rights purchased by Compass in the USACM Bankruptcy Cases and placed the Trustee in "nominal control" of the USACM Loans subject to Nevada law and further order of the Court. (AR Bk Doc. 356 at 2-3).

88. On February 8, 2010, the Court directed that "any direct lender may conduct and supervise the voting process to determine how 51% or more of the direct lenders, calculated by dollar amount in a Loan, intend to proceed with the management and direction of that Loan." (AR Bk Doc. 387 at 2/lines 12-15) The Court also ordered that the Trustee had the right and power to vote on behalf of the ARC Estate as a Direct Lender.

89. By Order entered on June 24, 2010 (AR Bk Doc. 989) (the "Cross Servicing Order"), this Court recognized that more than 51 percent of the holders of the DL Interests in nineteen of the USACM Loans elected to place the loan servicing rights with Cross and that Cross accepted that placement. Cross was also later recognized by this Court as the servicer for three other loans which were the subject of the 892 Case.

90. The Cross Servicing Order established the "Servicing Claims Procedure" under which

1  persons or entities seeking payment with respect to goods or services provided on account of the

2  USACM Loans would submit claims to Cross, Cross would submit objections, and the Court would

3  determine the allowability of such claims. (AR BK Doc. 989 at 6-7)

4       91.    The Cross Servicing Order further provided that, unless otherwise ordered by the

5  Court, claims allowed pursuant to the Servicing Claims Procedure "shall be paid directly to the

6  Claimant prior to any distribution to any direct lender in such Loan, and so long as any claim

7  remains unpaid Cross shall, promptly upon its receipt of any proceeds with respect to a Loan, notify

8  the Claimant holding an unpaid claim of the receipt of such proceeds and shall pay such unpaid

9  claim directly to the Claimant." (AR Bk Doc. 989 at 6/lines 21-26)

10      92.    The Cross Servicing Order further provided that the order "shall be binding on Cross

11  and any successor servicer of any Loan, and the obligation to first pay the allowed claims of the

12  Trustee and any Claimant shall be an obligation of any successor servicer, and shall be an obligation

13  of any successive servicer, and shall be subject to the jurisdiction of this court and the procedures set

14  forth in this order." (AR Bk Doc. 989 at 7/lines 3-6)

15      93.    The Trustee has submitted claims relating to numerous USACM Loans to Cross

16  under the Servicing Claims Procedure, and Silar has submitted "follow on" claims to Cross as well.

17  These claims are jointly and severally referred to herein as the "Pre-Cross Servicing Claims."

18      94.    The Pre-Cross Servicing Claims by the ARC Estate and Silar involve, among others,

19  requests for reimbursement of servicer advances actually made by the servicers and for third party

20  costs incurred but unpaid in connection with servicing (including in some cases claims for payment

21  by some of the lawyers who were involved in the "servicing misconduct" alleged in the 892 Case).

22  Cross filed a blanket objection to the Pre-Cross Servicing Claims but there has been no hearing with

23  respect to them.

24      95.    On June 21, 2012, almost two years after the Court entered the Order establishing the

25  Servicing Claims Procedures (AR BK Doc. 989), Cross sought to resign as successor servicer and

26  filed a "Status Report and Notice of Termination" (see AR Bk Doc. 1797). The Court has not ruled

27  on the effectiveness of such purported resignation or whether the Servicing Claims Procedure has

28  been complied with.

96.     The Settlement and this Order reaffirm and continue the Servicing Claims Procedure for the benefit of all Direct Lenders, the Silar Parties, the ARC Estate, and all other Parties In Interest with respect to the USACM Loans.

**G. The Court's "Waterfall" Rulings With Respect To Fees**

97.     Section 5 of the predominate form of LSAs governs the compensation owed to the loan servicers for the USACM Loans until the Court's January 19, 2010 termination of Asset Resolution as servicer.  Although there are some variations, the LSAs generally provide that:

> Lender authorizes USA[CM] to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed [zero to three percent] per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) any default interest collected from the Borrower pursuant to the terms of the Note.

(892 Doc. 2056, Ex. A) (italics added) The variations are two-fold.  First, the percentage amounts for the annual servicing fee vary from zero to three percent, depending on the LSA signed by a Direct Lender.  Second, although all of the LSAs contain the "retain monthly" and "collected from the Borrower pursuant to the terms of the Note" language, some of the LSAs do not provide for payment of default interest and/or late fees to the loan servicers.  (892 Doc. 765, Ex. A at 2-5)   The Court also notes that some Direct Lenders either never signed LSAs or (more likely) the LSAs they did sign were lost by USACM.

98.     The Court issued several rulings in the 892 Case which resolved the meaning of the base servicing fee provision in the LSAs and the ownership of the Disputed Fees as between and among the Direct Lenders, the Silar Parties, and the ARC Estate.  The Court hereby reiterates those rulings as binding on all Parties In Interest.   Notwithstanding anything to the contrary, nothing in this paragraph 98 makes or shall be deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant, EBG, Windler, Bryan Cave, or Sheppard Mullin with respect to Causes of Action brought against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other Direct Lenders, or the Liquidating Trust.

99.     First, the Court has ruled that there was no cash to "retain" or  to be "collected from the Borrower" for allocation to servicer compensation under the LSAs until each Direct Lender was

1   repaid the principal amount of their investment in the USACM Loan plus all due and owing regular

2   interest accruing on that investment.

3       100.    Second, the Court has ruled that the "retain" and "collect" language of the LSAs also

4   dictated that the loan servicer may look only to loan collections – and not the personal liability of

5   any Direct Lender – for the payment of loan servicing fees under the LSAs.

6       101.    Third, the Court has ruled that, for defaulted loans, the loan servicer was entitled to be

7   paid only one accrued annual servicing fee under the LSAs equal to one and one-half percent of the

8   amount ultimately collected on the loan.

9       102.    Based on these rulings, the Court directed the Trustee to disburse over $10 million of

10  Disputed Fees that were held under the Preliminary Injunction to Bickel & Brewer in trust for the

11  B&B DL Settling Clients and to other Direct Lenders, based on calculations submitted to the Trustee

12  and the Court through the declarations of Stubbs and Duncan. (Bk Docs. 990, 652, 653, 654, 655)

13  Those monies were disbursed pursuant to the Court's order.

14      103.    The Ninth Circuit has so far declined to review the merits of the Court's "waterfall"

15  rulings, noting that "Asset Resolution's right to compensation under the LSAs is an issue that will

16  likely re-appear in a future appeal following a final judgment" in the 892 Case.  See 3685 San

17  Fernando Lenders LLC v. Cross Equities Partners, LLC, et al., No. 09-16897, Doc 88-1 at 14

18  (9/19/11). Although the Compass Defendants (defined below) who are parties to the 892 Case are

19  expected to appeal these rulings, the rulings are binding on all other Parties In Interest through this

20  order. Notwithstanding anything to the contrary, nothing in this paragraph 103 makes or shall be

21  deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank,

22  Bullivant, EBG, Windler, Bryan Cave, or Sheppard Mullin with respect to Causes of Action brought

23  against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or

24  other Direct Lenders, or the Liquidating Trust.

25      104.    The Settlement therefore effectively finalizes the Court's waterfall rulings as to all

26  Parties In Interest except the Compass Defendants, Weil Gotshal, Lomazow, Milbank, Bullivant,

27  EBG, Windler, Bryan Cave, or Sheppard Mullin for collections for the Settlement Loans from the

28  issuance of the Preliminary Injunction forward.

105.    The Settlement also improves upon the potential recovery of collections by all Direct Lenders by affirming an abandonment by the ARC Estate of any right it may have to receive any "default fees," late fees, and any other fees (except the one-time base servicing fee) from future USACM Loan collections.

**H.  Settlement Terms Relating To The Waterfall And Past And Future Loan Collections**

**1.  Final Accounting For Past Loan Collections**

106.    Upon the Effective Date, the Court shall automatically be deemed to have  entered a final judgment: (a)  accepting the Compass Accounting (as it relates to the Silar Parties and the ARC Estate) and the Supplemental Silar Accounting; and (b) discharging the Silar Parties from any and all obligations, liabilities, or Causes of Action to further account for, pay over, or compensate any or all Direct Lenders or other Parties In Interest  for any collections the  Silar Parties  or Compass received directly or indirectly  for or relating to USACM Loans from February 16, 2007 through the Effective Date. Notwithstanding anything to the contrary, nothing in this paragraph 106 makes or shall be deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant, EBG, Windler, Bryan Cave, or Sheppard Mullin with respect to Causes of Action brought against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other Direct Lenders, or the Liquidating Trust.

107.    Upon the Effective Date: (a) all obligations of the Silar Parties directly or indirectly under the Preliminary Injunction, under the Order Approving Settlement Of Motions For An Order To Show Cause Why Silar And Its Principals Should Not Be Held In Contempt Of Court [892 Doc. 2188], and under the Judgment on Attorney's Fees [892 Doc. 2189] shall be deemed automatically fully and finally satisfied in all respects and none of the Silar Parties shall be subject to any Causes of Action by any Party In Interest relating directly or indirectly  to any  USACM Loan collections or disbursements or other matters which gave rise thereto; (b) the obligation to render an accounting to the Court with respect to any part of the $1,415,572.26 deposited by the Silar Parties with Bickel  & Brewer on March 1, 2011 in connection therewith shall be deemed fully discharged; and (c) $1,325,572.26 of the $1,415,572.26 deposit shall be automatically deemed to be held by Bickel & Brewer in trust solely for the B&B DL Settling Clients.

108.    Upon the Effective Date: (a)  Plaintiffs' Motion to Compel Silar Advisors, LP and Silar Special Opportunities Fund, LP to Deposit Funds with the Court (the "Deposit Motion") (892 Docs. 2133) shall automatically be deemed to be denied; (b) the proposed order submitted by the B&B DL Settling Clients in connection with their Deposit Motion (892 Doc. 2215) shall automatically be denied; and (c) this Court shall be deemed to have automatically declared as a final judgment in the Asset Resolution Bankruptcy Cases and in the newly-severed action from the 892 Case that any and all obligations, duties,  responsibilities,  or liabilities of the Silar Parties to any Party In Interest to  deposit, reimburse, pay over, compensate for, or otherwise account for any monies received in connection with  USACM Loans  from February 16, 2007 through the Effective Date have  been discharged in full and no Causes of Action by any Party In Interest against any Silar Parties shall lie with respect thereto.

109.    Based upon the findings made throughout this Order and as a result of the Settlement, upon the Effective Date this Court shall be automatically deemed to have declared as a final judgment in the Asset Resolution Bankruptcy Cases and in the newly-severed action from the 892 Case that: (a) the Silar Parties, Piskun (in his individual capacity), the Trustee, and the ARC Estate were and are persons who were performing and have performed acts under and in complete compliance with federal court orders with respect to all USACM Loan collections from February 16, 2007 through the Effective Date; and (b) such orders (including this Order) preempt state law with respect to such persons and entities relating to such matters.  For the avoidance of doubt, this declaration does not apply to any of the Compass Defendants.

## 2. **Allocation Waterfall For Future USACM Loan Collections**

110.    The Court hereby declares that, upon and as of the Effective Date, future loan collections by the ARC Estate or any successor servicer (as opposed to collections by the Liquidating Trust) for all outstanding USACM Loans shall be allocated and disbursed as follows:

A.    First to re-payment of any "Protective Advance Loan" to be separately approved by the Court as defined and further provided elsewhere in this Order;

B.    Second, to the payment, in equal priority, (i) of any unpaid fees payable by Direct Lenders pursuant to that certain Order Granting Motion To Authorize Payment of

1    Receivership Expenses (#1519) entered in the 892 Case as Doc. No. 2032, and (ii) to any Trustee's

2    compensation as approved by the Court;

3        C.    Third, to the payment of a one-time one-and-one half percent servicing fee

4    payable to the ARC Estate and charged to each Direct Lender's account pro rata calculated based on

5    the aggregate of the Direct Lenders' principal investment in the particular USACM Loan;

6        D.    Fourth, to the payment of all Allowed Servicing Claims (described and

7    determined under the procedure set forth below); and

8        E.    Fifth, after there has been a full repayment of the first, second, third, and

9    fourth tranches above, then the owners of DL Interests in that USACM Loan (including the DL

10   Interests held by the ARC Estate which are the subject of the Settlement) shall receive payment of

11   all remaining collected amounts pro rata according to the amount of their principal investments.

12   The foregoing declarations shall be binding on all Parties In Interest except the Compass

13   Defendants.

14       111.   Any sums paid to the ARC Estate for its DL Interests and/or for its Pre-Cross

15   Servicer Claims shall be paid solely to the ARC Estate for further distribution under the terms of this

16   Order and the Bankruptcy Code.

17       **3.  Procedure For Determination Of "Allowed Servicing Claims" For Future USACM**

18          **Collections**

19       112.   The Servicing Claims Procedure previously established by the Court is re-affirmed

20   and further implemented by the Settlement and this Order.  All Parties in Interest were provided with

21   notice of the Servicing Claims Procedure and the Settlement.  This Order is, therefore, binding on all

22   Parties In Interest and all present and future loan servicers of one or more of the Settlement Loans.

23   Notwithstanding anything to the contrary, nothing in this paragraph 112 makes or shall be deemed to

24   have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant,

25   EBG, Windler, Bryan Cave, or Sheppard Mullin with respect to Causes of Action brought against

26   one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other

27   Direct Lenders, or the Liquidating Trust.

28       113.   The Servicing Claims Procedure is the exclusive method by which Causes of Action

may be asserted by any person or entity for payment of fees or expenses charged for servicing-related activities for all Settlement Loans, including such claims by the ARC Estate (or the Trustee on its behalf). This Order also confirms that, with the exception of the waivers for B&B DL Settling Clients as a result of the Settlement, each and every Direct Lender is only entitled to receive loan collections which have been reduced through offset, recoupment, or otherwise by all servicer advances, fees or expenses charged for servicing-related activities, and base servicing fees due for that loan.

114. Within fourteen days from the Effective Date, the ARC Estate shall provide written notice (the "Collection Notice") by mail or, if available, e-mail or fax to all Direct Lenders (whichever is most cost-effective), other than the B&B DL Settling Clients, holding DL Interests in a USACM Loan for which a loan collection has been made that indicates that there has been or will be a collection in a specified amount and itemizing by name, description, and amount the servicer advances and base servicing fees to be charged *pro rata* against each DL Interest from that collection. The B&B DL Settling Clients shall provide the Trustee with a list of all Direct Lenders for each such USACM Loan known to the B&B DL Settling Clients; e-mail or regular mail sent to any Direct Lender on such list shall be deemed adequate notice to such Direct Lenders, and the Trustee may rely upon such list when sending Collection Notices to Direct Lenders. Absent any objection filed with this Court within fifteen days of receiving the Collection Notice: (a) the ARC Estate shall be entitled to receive the amount of servicer advances and base servicing fees shown in the Collection Notice for that USACM Loan; and (b) any other "Claimant" who is listed in the Collection Notice shall be paid the sum attributable to them. If there is a timely objection filed with this Court, the funds applicable to the objected item shall be set aside, the objection shall be promptly set for hearing, payment shall be made for the non-objected items, and the appropriate payment(s) of the remaining collections shall be paid *pro rata* to the holders of the DL Interests. The item(s) which were the subject of the objection shall either be resolved by the Court or may be settled by the parties without the need for Court approval. Upon the Effective Date, the ARC Estate (and the Trustee on its behalf) shall be deemed to have automatically released all rights and interests the ARC Estate may have to the recovery of base servicing fees, servicer advances, and any other

servicing charges or fees arising from or in connection with the USACM Loans from the accounts of the B&B DL Settling Clients. Notwithstanding the foregoing, the B&B DL Settling Clients' DL Interests shall be included in the determination of the *pro rata* allocations of allowed servicer advances and base servicing fees chargeable to Direct Lenders who are not B&B DL Settling Clients.

115. As of the Effective Date: (a) the Pre-Cross Servicer Claims of Silar shall be automatically deemed withdrawn, released, or abandoned as to all USACM Loans; (b) Silar shall forego all claims to the payment of any fees or service advances as to any USACM Loans or the related collateral (including without limitation the lien secured by the Fox Hills and/or Eagle Meadows water rights) through the Effective Date and (c) the reimbursement of such servicer advances shall be payable to the ARC Estate subject to the terms of the Settlement. Notwithstanding anything to the contrary, Silar expressly reserves and retains its rights under any Protective Advance Loans, including without limitation, the Margarita Annex Protective Advance Loan, and all rights under the Settlement.

116. Notwithstanding anything to the contrary: (a) the Silar Parties may hold DL Interests in one or more of the USACM Loans (including without limitation the Fox Hills or Eagle Meadows Loans) and shall share in the repayment of those interests along with and under the same method, timing, and all other circumstances as any and all other DL Interests; (b) the Silar Parties do not release, and shall retain any liens or Causes of Action as against, any person or entity who (i) has not provided a mutual release pursuant to the terms of this Order or (ii) sues one or more Silar Parties; and (c) the Silar Parties do not release any liens or Causes of Action they may hold with respect to or under the Settlement or this Order.

## XI.

## **MATTERS RELATING TO THE 892 CASE**

117. Upon the Effective Date, the Court shall be deemed to find that, although as between Compass and Silar, Silar was the owner of the assets originally purchased by Compass from USACM as a result of the MRA, Silar Parties reasonably relied upon Compass (and, the Settling Parties contend, others) to structure and implement servicing decisions and actions with respect to

the USACM Loans.  The Silar Parties did not authorize – and expressly prohibited   Compass – from violating any laws, regulations, contracts, or other duties to the Direct Lenders. The Silar Parties reasonably expected that Compass (and, the Settling Parties contend, others) would act in the best interests of – and certainly not harm the interests of – the Silar Parties and the Direct Lenders, who were respectively the immediate and ultimate intended beneficiaries of the servicing relationship. The Silar Parties (individually and as agents) reasonably relied on Compass (and, the settling parties contend, others) to fully, completely, and otherwise properly: (a) communicate with Direct Lenders about all material facts relating to the USACM Loans and collections; (b) safekeep the cash from loan collections; and (c) allocate and disburse that cash in full compliance with the LSAs, the Preliminary Injunction, and all applicable laws.

118.    Upon the Effective Date:  (a) all oral and written rulings  and/or findings by the Court or  jury that Silar, any of the other Silar Parties, Piskun, and/or the ARC Estate violated the mortgage broker, power of attorney, escrow agent, or other requirements of Nevada law (892 Doc. 1819 at 7/12 to 8/12) shall automatically be vacated *nunc pro tunc* and shall have no collateral estoppel or *res judicata* effect (and therefore no such rulings or findings have been made with respect to Silar, any of the other Silar Parties, Piskun, and/or the ARC Estate); (b) all oral and written rulings and/or findings by the Court or the jury that any of the Silar Parties, the ARC Estate, or Piskun engaged in conversion, conspiracy, "grievous and perfidious conduct," deliberate contravention of the intention and spirit of the LSAs, breach of fiduciary duty, elder abuse, misuse of  actual or putative powers of attorney, breach of the implied covenant of good faith and fair dealing, failure to act in good faith, acting in bad faith, reprehensible conduct, malice, or any acts or omissions which would support the imposition of any liability, compensatory, punitive, or statutory damages shall be deemed to be automatically vacated *nunc pro tunc* and shall have no collateral estoppel or *res judicata* effect (and therefore no such rulings or findings have been made with respect to Silar, any of the other Silar Parties, Piskun, and/or the ARC Estate); and (c) all responsibilities, duties, obligations, and/or liabilities of any kind and nature of the Silar Parties directly or indirectly arising out of or relating to the USACM Loans shall be deemed fully and finally satisfied as of the Effective Date.  Upon the Effective Date, there are no findings of wrongdoing by Silar, the Silar Parties, the ARC Estate and/or

Piskun, Notwithstanding the foregoing or anything else in this Order, nothing in this Order or any
order rendered in response to a motion brought pursuant to FRCP 60 shall preclude one or more of
the Professionals from: (a) obtaining a reduction of the Professional's own liability, if any, in
connection with a Cause of Action asserted against the Professional by proving de novo the
proportionate fault of others (including without limitation the Silar Parties, the ARC Estate, and/or
Piskun); or (b) asserting de novo the conduct of others (including without limitation the Silar
Parties, the ARC Estate, and/or Piskun) as a legal, equitable, or factual bar or defense to the
imposition of liability upon the Professional. In making this decision, the Court has considered the
objections and arguments of Weil Gotshal, Milbank, Lomazow, EBG, Sheppard Mullin, and
Bullivant, and all other relevant factors relating to all Parties In Interest, including without
limitation, the history of the litigation, all of the terms of the Settlement, the competing values of
finality of judgment, the right to relitigation of unreviewed disputes, the consequences and
attendant hardships of vacating the findings, conclusions, and rulings and precluding *res judicata*
and collateral estoppel effect, the danger of prejudice, delay, potential impact on proceedings,
reasons for delay, and good faith. The Court finds that those factors support the striking and/or
vacating of the findings, conclusions and rulings and precluding *res judicata* and collateral estoppel
effect. The Court specifically finds that neither Weil Gotshal, Milbank, Lomazow, EBG, Sheppard
Mullin, Bullivant, nor Windler/Bryan Cave will suffer undue hardships from vacating the findings,
conclusions, and rulings and precluding *res judicata* and collateral estoppel effect, even without but
especially in light of the "carve out" allowing those objecting persons and entities to litigate de novo
all factual and legal issues relating to any Causes of Action which are or may be brought against
them by the Settling Parties or the Liquidating Trust (and related defenses thereto).

119.    Upon the Effective Date but immediately following the foregoing rulings, the claims
and counterclaims between Stubbs, Silar Parties, and the ARC Estate in the 892 Case shall
automatically be dismissed without prejudice.

120.    Notwithstanding anything to the contrary in this Order, the Court shall continue to
reserve jurisdiction with respect to Cross, Stubbs and/or Duncan relating to matters over which this
Court exercised jurisdiction in the 892 Case and/or the Asset Resolution Bankruptcy Cases.

121.    Upon the Effective Date but immediately following the foregoing rulings, the claims and counterclaims between the B&B DL Settling Clients who are Plaintiffs in the 892 Case and all defendants in the 892 Case except the Compass Defendants shall be automatically severed into a new action (with a new caption and case number) and a take-nothing judgment shall then be entered in that newly-severed action as to the Silar Parties and the ARC Estate and an order of dismissal shall then be entered in that newly-severed action as to Piskun, with each party bearing its own costs and attorney's fees.

122.    The Court notes that, per the Court's direction prior to the Settlement, the Plaintiffs in the 892 Case submitted a detailed proposed Declaratory Judgment to be considered for entry by the Court in the 892 Case in addition to money judgments against the various defendants. (See 892 Doc Nos. 2213 & 2214)  The Court also notes that, through oversight, omission, and    inadvertence, identical  "judgments"  were filed of record in both the 892 Case and in Case No. 3:07-cv-241-RCJ-GWF (the "241 Case") on July 8, 2011 [241 Doc. No.  276] (the "241 Order").   The 241 Case was consolidated in the 892 Case [see 892 Doc. Nos. 253, 254, & 445] and no filings should have been made in the 241 Case.  The Court therefore has, by separate order entered in the consolidated 892 Case, vacated the 241 Order.  The Court specifically finds that the 241 Order should have never been entered on the docket of the 241 Case and such entry was a clerical error and a violation of the Court's consolidation orders directing all filings to be made in the "main" 892 Case.  Allowing the 241 Order to remain on the docket would create a misleading impression that it was intended by the Court to have the full and final force of a judgment, when it did not.  The Court also hereby declares that none of the "findings, conclusions, and rulings" in the 241 Order have any *res judicata* and/or collateral estoppel effect for the foregoing reasons and for the same reasons set forth in Paragraph 118 above.   In light of the rulings made in this Order and the fact that Compass and David Blatt remain defendants in the 892 Case, the Court finds:

A.    The rulings against those remaining defendants  shall stand but no final declaratory judgment is necessary in light of this Order and such rulings shall be bound up in a money judgment to be entered against such defendants;

B.    The final money judgment in the 892 Case must provide that Stubbs shall take

1  nothing as a Plaintiff because there was no evidence offered at the trial showing that he was a Direct

2  Lender or was otherwise entitled to obtain either declaratory relief or damages;

3          C.      The Court prevented all but fifty-two of the B&B DL Settling Clients from

4  participating in the recovery of damages against Compass and Blatt; and

5          D.      The Court therefore rules that, upon the Effective Date, the Court shall

6  automatically be deemed to have: (a) ruled that the form of declaratory judgment presented by

7  plaintiffs in the 892 Case (892 Doc. 2213) is denied as moot and the form of money judgment

8  presented by plaintiffs in the 892 Case (892 Doc. 2214) is denied without prejudice; and (b) directed

9  all plaintiffs in the 892 Case to re-file with the Court within ten days of the Effective Date with

10  notice to the remaining defendants in the 892 Case a proposed final money judgment in a form

11  consistent with the Court's rulings in the 892 Case and this Order.

12                                  **XII.**

13                  **MATTERS RELATING TO THE 210 CASE**

14          123.    On March 1, 2012 and March 15 2012, plaintiffs in the 210 Case filed notices of joint

15  dismissals with prejudice of all of their claims by and against certain individual defendants, together

16  with requests that severed orders be entered on those claims (210 Doc Nos. 131, 132, 133, 136, 137,

17  & 138).   These dismissals were not conditioned upon approval of the Settlement.  However, if the

18  severed dismissal orders have not already been entered as of the Effective Date, such orders shall be

19  deemed granted nunc pro tunc from March 1, 2012.

20          124.    On May 18, 2012, plaintiffs in the 210 Case filed a joint Notice of Dismissal Without

21  Prejudice of their claims against Craig Orrock and Great White NV, Inc. (210 Doc. No. 143).   That

22  notice was not conditioned upon approval of the Settlement; however, the Settlement contemplates a

23  mutual dismissal of claims with prejudice.   Consequently, if the severed dismissal order has not

24  already been entered as of the Effective Date, such orders shall be deemed granted *nunc pro tunc*

25  from May 18, 2012.

26          125.    Upon the Effective Date: (a) the claims and counterclaims between the B&B DL

27  Settling Clients who are Plaintiffs in the 210 Case, the remaining Silar Parties named in the 210

28  Case, and Piskun shall be automatically severed into a new action (with a new caption and case

number); and (b) a judgment declaring that plaintiffs shall take nothing on their claims against the remaining Silar Parties that are entities shall then be entered in that newly-severed action and an order of dismissal shall then be entered in that newly-severed action as to the remaining Silar Parties that are individuals and Piskun, with each party bearing its own costs and attorney's fees.

126.    Upon the Effective Date, the Claims Recovery Trust may move to intervene and be substituted as a party in interest for plaintiffs or otherwise in the 210 Case with respect to Causes of Action which are lawfully Assigned to it under the Settlement (as more particularly set forth in this Order).

## XIII.

## MATTERS RELATING TO THE ADVERSARIES

127.    Another significant part of the Settlement involves the disposition or "Assignment" of twenty-one Adversaries pending in the Asset Resolution Bankruptcy Cases.[1]

128.    Under the Settlement, all "Preference Claims" held by the ARC Estate and/or the B&B DL Settling Clients will either be dismissed as of the Effective Date, Assigned to the Claims Recovery Trust, or further disposed of as provided below. All Assignments of Causes of Action pursuant to the Settlement and this Order are Assignments of assets (Causes of Action) only and not an assumption by the assignee of any liabilities to the persons or entities which are actual or potential defendants to such Causes of Action (except that such assignments shall not operate to cut off as against the assignee defenses that were capable of being asserted against the assignor). "Preference Claims" means Causes of Action relating to pre-petition preference or other payments made by Asset Resolution to any person or entity except Leonard Mezei, whether such Causes of Action are known or unknown and whether or not they were asserted in the Adversaries or could have been asserted by the Trustee at any time before or after October 13, 2011.

129.    The Court finds that the dispositions and Assignments of the Adversaries established by the Settlement are in the best interests of the Estates, when considered separately or as a package with the other Settlement terms. The Court further finds that the ARC Estate is receiving substantial

---

[1] For the purposes of this Order, "Assign," "Assigns", "Assigned," or "Assignment" means transfer, grant, assign, convey, set over, pledge, give, and/or deliver to the fullest extent legally permissible on an "as-is" basis, without recourse, representation, or warranty of any kind by the assigning party.

value for these dispositions and Assignments, including the required payment of $250,000 of cash, and continuing interests in some of the "Recoveries" of those Causes of Action (as defined below) through beneficial interests in the Claims Recovery Trust. This section of the Order approves and effects those dispositions and Assignments to the fullest extent permitted by law.

130. Upon the Effective Date: (a) all Causes of Action asserted in the 1100 Adversary by the ARC Estate against the Compass Defendants (except for Piskun) shall be dismissed without prejudice; (b) the Causes of Action asserted by the ARC Estate against the remaining defendants in the 1100 Adversary who are individuals shall be deemed to be automatically dismissed with prejudice; and (c) a final take-nothing judgment shall be deemed automatically entered with respect to the Causes of Action asserted against the remaining defendants that are entities in the 1100 Adversary, with each party bearing its own costs and attorney's fees.

131. Upon the Effective Date, all Preference Claims asserted in the Adversaries against Klestadt & Winters, LLP (Case No. 11-01298) (the "Klestadt Adversary") and Repotex (Case No. 11-01305) (the "Repotex Adversary") shall automatically be deemed Assigned to the B&B DL Settling Clients, with any Recovery(ies)thereon to be enjoyed exclusively by them. The B&B DL Settling Clients shall be deemed to have been granted leave to intervene and be substituted as plaintiffs in these two Adversaries and shall file notice of such substitution within ten days after the Effective Date and thereupon the Repotex Adversary shall be consolidated with the 210 Case.

132. Upon the Effective Date, all Preference Claims asserted in Adversary Case No. 11-01299 against Greenberg Traurig and all Preference Claims held by the B&B DL Settling Clients against Greenberg Traurig (the "GT Preference Claims") shall automatically be deemed Assigned to the Claims Recovery Trust for liquidation in accordance with the terms of this Order and the applicable Trust Agreement. The B&B DL Settling Clients, the Trustee, and the Claims Recovery Trust shall cooperate with each other and use their best efforts to obtain for the sole and exclusive benefit of Silar or its designee(s) the first $375,112.43 (as previously discussed in this Order) of any Recovery from Greenberg Traurig, whether from GT Preference Claims or from other Causes of Action against Greenberg Traurig Assigned to the Claims Recovery Trust. The Claims Recovery Trust shall be deemed to have been granted leave to intervene and be substituted as plaintiff in the

Adversary against Greenberg Traurig and shall file notice of such substitution within ten days after the Effective Date.

133. Upon the Effective Date, all Preference Claims against Bryan Cave ("Bryan Cave Preference Claims") shall automatically be deemed Assigned to the Claims Recovery Trust for disposition in accordance with the terms of this Order and the applicable Trust Agreement. Silar, the Trustee, and the Claims Recovery Trust shall cooperate with each other and use their best efforts to obtain for the sole and exclusive benefit of the B&B DL Settling Clients the first $200,000.00 of a Recovery from the Bryan Cave Preference Claims. The Claims Recovery Trust shall be deemed to have been granted leave to intervene and be substituted as plaintiff in the Adversary against Bryan Cave and shall file notice of such substitution within ten days after the Effective Date.

134. Upon the Effective Date, all Preference Claims against Conway Mackenzie (but only to the extent of its previously received, but unused, retainer payment) ("Conway Mackenzie Preference Claims") and Thompson Hine ("Thompson Hine Preference Claims") shall automatically be deemed Assigned to the Claims Recovery Trust, for disposition in accordance with the terms of this Order and the applicable Trust Agreement. The Claims Recovery Trust shall be deemed to have been granted leave to intervene and be substituted as plaintiff in Adversary Case Nos. 11-1303 and 11-01311 and shall file notice of such substitution within ten days after the Effective.

135. Upon the Effective Date, a final take-nothing judgment shall be deemed to be entered in the Adversary against Craig Orrock and Great White-NV, Inc. (Case No. 11-01308), with all parties bearing their own costs and attorney's fees.

136. Upon the Effective Date, as soon as practicable and no later than five business days after Final Approval and upon the concurrent exchange contemplated by the Effective Date, Silar shall pay $250,000 (the "$250,000 Payment") to the ARC Estate in exchange for the concurrent, automatic Assignment of all Causes of Action held by the Estates and/or the B&B DL Settling Clients against the following persons or entities (jointly and severally, the "Remaining Preference Claims"): Kroll, Inc. (Case No. 11-01296); Patterson Belknap (Case No. 11-01300); Sullivan Group (Case No. 11-01301); Ellenoff Grossman (Case No. 11-01302); Kramer Levin (Case No. 11-01310); Conway Mackenzie (except to the extent of its previously received, but unused, retainer payment)

(Case No.11-01303); IW Osborne (Case No. 11-1306); Westwood Capital (Case No. 11-01307); 1st Service (Case No. 11-01309); Alternative Investment Consulting; Kolesar & Leatham (Case No. 11-01312); Gottex ABI and Gottex ABL (Case No. 11-01305); and Akerman Senterfitt  (Case No. 11-01313).

137.   Silar has indicated an intention to, is required to, and shall make the $250,000 Payment to the ARC Estate for the Remaining Preference Claims, which shall then be under the sole control of Silar or its designee(s) and be dismissed or transferred to the Silar Parties or their designees, with any recoveries enjoyed exclusively by them.  As of the Effective Date, Silar or its designees shall be deemed to have been granted leave to intervene and be substituted as plaintiff in the Adversaries relating to the Remaining Preference Claims and shall file notice of such substitution within ten days after the Effective Date.

138.   Upon the Effective Date, the B&B DL Settling Clients and/or the Trustee and/or the ARC Estate shall be barred and enjoined from pursuing any Preference Claims against any persons or entities not addressed in this Order.

**XIV.**

**ASSIGNMENTS OF PROFESSIONAL CLAIMS AND LOAN CLAIMS**

139.   Another significant part of the Settlement involves agreements by the Settling Parties with respect to Causes of Action against borrowers, guarantors, and other persons and entities whose acts or omissions the Settling Parties allege caused Silar Advisors, the other Silar Parties, the Direct Lenders, and the ARC Estate (jointly and severally, "Assigning Persons") to suffer substantial damages relating to the USACM Loans.  Such persons and entities are jointly and severally referred to by the Settling Parties (and therefore in this Order) as "Responsible Persons."

140.   The Settling Parties have alleged that many of the Responsible Persons' alleged  acts or omissions were directed to and/or caused damages to the Parties jointly and severally, that the Causes of Action alleged against them allegedly arise out of one or more common nucleus of operative facts, that litigation of the alleged Causes of Action could be expensive and protracted, that the evidentiary demands of a single suit may be great while an individual Assigning Person's recovery for that suit may be relatively small, that the Responsible Persons may have limited

resources to satisfy all of the damages sustained by all of the Assigning Persons, and that the Responsible Persons may try and avoid liability by essentially pitting the Assigning Persons against each other in separate cases. The Court acknowledges that the Settling Parties' views about those matters is an important predicate to the Settlement, and finds that it was and is reasonable for the Settling Parties to enter into the Settlement based in part on that view. Notwithstanding anything to the contrary, nothing in this Paragraph 140 makes or shall be deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant, EBG, Windler, Sheppard Mullin, or Bryan Cave with respect to Causes of Action brought against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other Direct Lenders, or the Liquidating Trust.

141.     The Court also finds that it was and is fair and reasonable for the Direct Lenders, the ARC Estate, and Silar to aggregate and jointly pursue their perceived Causes of Action against certain Responsible Persons under the terms set forth in this Order. The Court also finds that it is fair and reasonable for Piskun to Assign his Causes of Action to that joint endeavor. To that end, as further set forth in Section XV below, the parties have agreed to form and the Court has approved the Settling Parties' agreements concerning (among other things) the litigation, disposition, and allocation of proceeds from those Causes of Action, as well as the formation of the Claims Recovery Trust to receive Assignments of various Causes of Action to be pursued on behalf of the beneficiaries of that Trust to the fullest extent permitted at law (as set forth more fully in this Order and in the Liquidating Trust agreement). Notwithstanding anything to the contrary, nothing in this Paragraph 141 makes or shall be deemed to have made any finding or ruling which is binding on Weil Gotshal, Lomazow, Milbank, Bullivant, EBG, Windler, Sheppard Mullin, or Bryan Cave with respect to Causes of Action brought against one or more of them by the Silar Parties, the ARC Estate, the B&B DL Settling Clients or other Direct Lenders, or the Liquidating Trust.

142.     Upon the Effective Date and to the fullest extent permitted by applicable law, the ARC Estate, Silar (individually and as agent), and the B&B DL Settling Clients shall automatically be deemed to have Assigned to the Responsible Person Claims Recovery Trust all Causes of Action and/or related rights they possess against the following "Professionals" jointly and severally:

Lomazow; Weil Gotshal; Milbank; Bullivant, Windler; Bryan Cave; Greenberg Traurig and its Affiliates; Windemere and its Affiliates; Sheppard Mullin and its Affiliates; Gary Fragin; and Greg Fragin. These Assignments include to the fullest extent permitted by law all Causes of Action asserted against the Professionals in the 210 Case or in any of the Adversaries (including without limitation Adversary Case No. 11-1304, and Adversary Case No. 12-01154). The foregoing Assigned Causes of Action are referred to herein as the "Professional Claims." Notwithstanding anything to the contrary in this Order: (a) this Order does not recognize an automatic Assignment of Causes of Action against EBG to the Liquidating Trust upon entry of the Order (and each of the Settling Parties shall be deemed to have retained their Causes of Action, if any, against EBG); (b) nothing in this Order prevents the Assignment of Causes of Action against EBG, if any, to the Liquidating Trust as a "Future Assigned Asset" under the Trust Agreement (defined below) after the Liquidating Trust is formed; and (c) nothing in this Order shall preclude EBG from asserting all factual and legal defenses, if any, to any purported Assignment of such Causes of Action to the Liquidating Trust.

143. Upon and after the Effective Date, the B&B DL Settling Clients who join, and any other Direct Lenders who are invited to join, the Claims Recovery Trust may Assign to the Claims Recovery Trust to the fullest extent permitted by law their Causes of Action against those Responsible Persons (*i.e.*, borrowers, guarantors, and title companies) who have failed to comply with their obligations in connection with the USACM Loans, and the Liquidating Trust is authorized to pursue those Causes of Action on behalf of those Direct Lenders. All such Causes of Action are referred to herein as the "Loan Claims."

144. Upon the Effective Date, the ARC Estate shall automatically be deemed to have Assigned all its Loan Claims to the Claims Recovery Trust.

145. The Court finds: that the Loan Claims are based on the instruments governing the USACM Loans, including promissory notes, personal guaranty(ies), deeds of trust, and other related documents (the "Instruments"); that the Instruments provide they are governed by Nevada law and the venue for any litigation related to the Instruments is Nevada; and that the ARC Estate has Loan Claims based on its DL Interests in the USACM Loans. Pursuant to 28 U.S.C. § 1334(b), the Court,

therefore, has jurisdiction and venue over the Loan Claims.

146. The Court finds that the Instruments include promissory notes and personal guaranty(ies) for each of the USACM Loans that can be separately pursued by the Claims Recovery Trust on behalf of the ARC Estate and the participating Direct Lenders if those documents waive the one action rule and the borrower and guarantor are separate and distinct persons. In that event, the Instruments do not require the Direct Lenders, including the ARC Estate, to first foreclose the borrowers of those USACM Loans to be able to pursue the guarantors on their personal guarantys, or preclude the ARC Estate and the Direct Lenders from pursuing the personal guarantys if they have previously transferred their promissory notes for those USACM Loans.

147. The Court finds that, pursuant to Nev. Rev. Stat. 645B.340, as long as the holders of 51% or more of the DL Interests in a USACM Loan agree to take actions in connection with the Loan on behalf of all the DL Interests in the Loan (including without limitation, pursuing foreclosure of the collateral for the Loan, retaining, terminating, or settling relationships with a loan servicer or authorized agent to take approved actions for the Loan, modifying the terms of the Loan, and/or managing and disposing of the collateral for the loan ), a Direct Lender acting under such vote and/or the Liquidating Trust acting under such vote shall be authorized to undertake the actions contemplated by such vote on behalf of all of the DL Interests in the Loan. The Court also rules that, pursuant to Nev. Rev. Stat. 645B.015(6) and 645B.016, section 2 and other applicable law, any Direct Lender acting under such vote, the Liquidating Trust, and any and all "Trust Representatives" (as defined in the Liquidating Trust Agreement referred to in Section XV of this Order) are exempt from and shall not: (a) be required to obtain separate written powers of attorney from each or any of the Direct Lenders in the USACM Loan; (b) be deemed to be "mortgage brokers," "mortgage agents," "mortgage bankers," "escrow agents," or "loan servicers" under Nevada law; and/or (c) be required to be licensed by the State of Nevada, or required to hold powers of attorney under Nevada law with respect to the USACM Loans.

148. Notwithstanding anything to the contrary, the Assignments of Professional Claims and/or Loan Claims do not include any Causes of Action against one or more of "Compass Defendants." "Compass Defendants" means, jointly and severally: Compass Partners LLC, a

Delaware limited liability company; Compass USA SPE, LLC, a Delaware limited liability company; Compass Financial Partners, LLC, a Nevada limited liability company; Compass Financial Partners, LLC, a Delaware limited liability company; Compass FP Corp., a Delaware corporation; Compass USA Holding, LLC, a Delaware limited liability company; Compass USA, LP, a Delaware limited partnership; Compass USA GP, LLC, a Delaware limited liability company; Repotex, Inc., a Delaware corporation; Leonard Mezei; Oakbridge Capital, Inc., a Delaware corporation; Economic Growth Group, Inc., a New York corporation; Jay Cohen; Ron Friedman; David Blatt; and Mark Olson. The B&B DL Settling Clients, the ARC Estate and the Silar Parties shall each retain any Causes of Action they hold against Compass Defendants. Notwithstanding anything to the contrary, the ARC Estate, the B&B DL Settling Clients, and/or the Silar Parties may Assign other Causes of Action to the Liquidating Trust as a "Future Assigned Asset" within the meaning of the Trust Agreement referred to in Section XV below to the fullest extent permitted by law.

**XV.**

**LIQUIDATING TRUST**

149. The Trustee has attached to this Order the form of the trust agreement (the "Trust Agreement") for the Claims Recovery Trust. The Trust Agreement has been approved by the Trustee, the Silar Parties, and the B&B DL Settling Clients. Upon the Effective Date: (a) the Court will be automatically deemed to have approved the Trust Agreement to the extent permitted by law (b) the Claims Recovery Trust shall be deemed to have been formed pursuant thereto; and (c) the Court shall be deemed to have incorporated by reference all of the terms of the Trust Agreement as an integral part of this Order to the extent permitted by law. For ease of reference, this Order employs the same defined terms as the terms defined in the Trust Agreement.

150. The Court finds that the terms and conditions of the Trust Agreement are fair, equitable, reasonable, and appropriate.

151. There has been a full and fair opportunity for all persons who will be Beneficiaries and/or their counsel to participate in the process of creating the Liquidating Trust and Assigning assets to it. The Trust Agreement is a material Term of the Settlement, which has been carefully

negotiated by the parties, and was the subject of a duly-noticed hearing to all Parties In Interest (none of whom objected to the Liquidating Trust). All Initial Beneficiaries of the Liquidating Trust were represented by counsel in connection with the creation of the Liquidating Trust.

152. Counsel for the parties to the Settlement, as officers of the court, have summarized the negotiating history in their statements at the hearing. Additionally, judicial notice was taken of the conduct of the parties, including the Trustee for the ARC Estate, in the numerous proceedings before the Court over the past five or more years. There is nothing to suggest any collusion in the preparation and submission of the Settlement. To the contrary, it is apparent that these attorneys and the client representatives, including the Trustee for the ARC Estate, have represented the interests of their respective "sides" aggressively throughout this case; that the Settlement is the product of arms-length bargaining; and that the Terms of the Settlement (including the Trust Agreement) are in the best interests of those for whom the Settlement was reached.

153. The Court approves the retention of The Majorie Firm Ltd. as counsel to the Liquidating Trust under the terms and conditions set forth in this Order and in the Trust Agreement. This Order and the Trust Agreement shall be deemed to be a written retention agreement by the Liquidating Trust of that firm for the purposes of any ethics rules requiring that contingent fee agreements be in writing. Francis B. Majorie shall be permitted to appear before this Court without the need for maintaining local counsel.

154. This provision of the Order sets forth the "Loan Claims Assignment Procedure" described in the Trust Agreement. No Loan Claims shall be Assigned to the Liquidating Trust except as provided in this paragraph and in the Trust Agreement. Neither the Liquidating Trust nor any Trust Representative has any duty of any kind to *sua sponte* consider whether or not the Liquidating Trust might or should seek an Assignment(s) of Loan Claims. However, any Direct Lender in any USACM Loan may ask the DL Committee (with the Silar Committee Appointee Abstaining) to consider whether the Liquidating Trust should accept an Assignment of a Loan Claim and, if so, under what terms and conditions. If the DL Committee (with the Silar Committee Appointee Abstaining) determines in its Sole and Absolute Discretion that the Liquidating Trust may seek to receive an Assignment of a Loan Claim:

A. The DL Class Communications Consultant shall, at the direction of the DL Committee provide by US mail, email, or on a website established by the DL Committee a "Notice Of Loan Claims Assignment" to all known Direct Lenders holding DL Interests in the USACM Loan which is the subject of the Loan Claims sought to be Assigned. The Notice of Loan Claims shall set forth such information deemed appropriate by the DL Committee (with the Silar Committee Appointee Abstaining) and at least the following: (i) a general description of the Loan Claim; (ii) the identity(ies) of the Responsible Persons that are the subject of the Loan Claim; (iii) contact information for the DL Communication Consultant; (iv) any specific material terms or conditions applicable to the proposal which are not already addressed in this Order or in the Trust Agreement; and (v) any applicable deadlines with respect to the Notice.

B. With respect to Direct Lenders holding DL Interests in the USACM Loan which is the subject of the Loan Claims who are Beneficiaries of the Liquidating Trust at the time of the Notice, the Notice may provide that such Direct Lenders will be deemed to have accepted the Notice and agreed to become a member of the Loan-Specific DL Sub-Class related to the Notice unless that Direct Lender has within twenty calendar days of the Notice provided the DL Class Communication Consultant written notice of a decision to opt-out of the Loan-Specific DL Sub-Class.

C. With respect to known Direct Lenders holding DL Interests in the USACM Loan which is the subject of the Loan Claims who are not Beneficiaries of the Liquidating Trust at the time of the Notice, the Notice shall contain a copy of this Order and the Trust Agreement and may provide that such Direct Lenders will be deemed to have rejected the Notice and declined to become a member of the Loan-Specific DL Sub-Class related to the Notice unless that Direct Lender has within at least twenty calendar days of the Notice provided the DL Class Communication Consultant written notice of a decision to opt-in to the Loan-Specific DL Sub-Class.

155. The Court finds that the Liquidating Trust is comparable to a nominee and the Assignments of Causes of Action or DL Interests to the Liquidating Trust as of the Effective Date or any time thereafter in exchange for Liquidating Trusts Interest(s), and any and all ballots and

other communications relating thereto, did not, are not, and do not constitute the solicitation, offering to purchase or sell, or actual purchase or sale of a security or investment contract or the rendering of investment services or advice within the meaning of the Securities Act of 1933, the Securities Exchange Act of 1934 or Rule l0b-5 promulgated thereunder, the Trust Indenture Act of 1939, the Investment Advisors Act of 1940, Investment Company Act of 1940, ERISA, elder abuse law, mortgage broker law, escrow agent law, or any other federal or state statute, law, rule, or regulation (jointly and severally, "Securities Laws"). Notwithstanding anything to the contrary, in the event any matter or any act or omission undertaken by the ARC Estate, the Trustee, the B&B DL Settling Clients, the Silar Parties, the Liquidating Trust, and/or Trust Representatives (jointly and severally, "Covered Persons") now or in the future pertaining to the Liquidating Trust is deemed to be governed by the Securities Laws, the Court finds that such matters are exempt from registration pursuant to Section 3(a)(10) of the Securities Act of 1933 and all other similar Securities Laws and/or that such Covered Persons are exempt from application of Securities Laws with respect thereto. This provision applies, without limitation, to all matters relating to the formation of the Liquidating Trust and the acceptance of Assigned Assets at any time and from time to time (including without limitation under the Loan Claims Assignment Procedure).

156. This Order is entered pursuant to Treas. Reg. §301.7701-4(d), the guidelines for liquidating trusts as set forth in Internal Revenue Service Rev. Proc. 94-45, 1994-2 C.B. 684, Rev. Proc. 91-15, 1991-1 C.B. 484, and Treas. Reg. §1.671-4(a). Any taxes imposed upon the Liquidating Trust shall be paid by the Liquidating Trust and assessed against the asset or proceeds with which the tax is associated.

157. The Court recognizes that, in light of the fact-specific issues concerning the USACM Loans, it may be necessary or appropriate to obtain additional rulings from the Court concerning tax matters relating to DL Interests, including without limitation allowing Direct Lenders to abandon those interests under the Internal Revenue Code. The Court retains jurisdiction to allow Direct Lenders to seek such orders from time to time.

## XVI.

### MATTERS RELATING TO SANCTIONS

158.    On May 25, 2010, this Court entered an Order On Certain Direct Lenders' Motion For The Imposition Of Sanctions (the "Sanctions Order") (AR Bk Doc. 884).    The Sanctions Order entered sanctions against various outside counsel, namely, Klestadt, Windler, and Bryan Cave.    The remaining parties who were sanctioned under the Sanctions Order included Silar Advisors, Sara Pfrommer ("Pfrommer") and other internal persons who are Silar Affiliates (such remaining parties, referred to herein jointly and severally as the "Represented Parties").

159.    The Sanctions Order was appealed.    On March 6, 2012, the Ninth Circuit Court of Appeals ruled that it did not have jurisdiction to hear the consolidated appeals from the Sanctions Order and dismissed the appeals.    (Case 10-16970 Doc. No. 62-1)    A Petition for Rehearing en banc was filed and denied.    (Case 10-16974 Doc. 69).

160.    Part of the Settlement involves a joint motion for an order vacating the sanctions and findings, conclusions, and rulings in the Sanctions Order with respect to the Represented Parties. The Court finds that good cause exists for granting this relief.    The Court therefore rules that, upon the Effective Date: (a) all   sanctions   against the Represented Parties shall be automatically be deemed vacated *nunc pro tunc* as of May 25, 2010; (b) the motion for sanctions filed  against the Represented Parties (AR. Bk. Doc. 392) shall be denied *nunc  pro tunc* as to the Represented Parties; and (c) the $279,615.47 paid into the registry of the Court by Silar in connection with the Sanctions Order shall automatically be disbursed (the "Disbursement") to Bickel & Brewer in trust for the B&B DL Settling Clients.    The Disbursement shall constitute a payment in full by Silar of the attorney's fees and costs portion of the award in the Sanctions Order.

161.    Notwithstanding anything to the contrary herein, Silar shall retain all of its Causes of Action against Klestadt, Windler, and/or Bryan Cave with respect to the matters which gave rise to the Sanctions Order or the Disbursement.    Also, upon the Effective Date, Silar shall have the continuing right to require the B&B DL Settling Clients to provide releases of all Causes of Action (including without limitation rights under the Sanctions Order) against Klestadt (except with respect to any Causes of Action pending in the Klestadt Adversary), Windler, Bryan Cave, or Pfrommer

jointly or severally in exchange for receiving a mutual release of Causes of Action from such person(s) or entity(ies).

162. Due to the denial of the petition for rehearing in the Ninth Circuit, it appears that this Court presently has jurisdiction to immediately render the foregoing relief with respect to the Sanctions Order and the $279,615.47 paid into the Court's registry. If the Court does not have jurisdiction over the Sanctions Order at this time, the Court does have authority under FRCP 62.1 to indicate what it would do in the event the Represented Parties' appeal from the Sanctions Order is remanded to this Court. Counsel is authorized to submit this Order and any appropriate motion to the Ninth Circuit so that the Court's relief with respect to the Settlement can be fully and completely granted. Upon confirmation that this Court has jurisdiction, the Represented Parties are jointly and severally authorized to submit to this Court in their discretion one or more separate orders confirming that the Sanctions Order has been vacated *nunc pro tunc* as to each of the Represented Parties.

## XVII.

## THE THREE MILLION DOLLAR SILAR LOAN FACILITY

163. As part of the Settlement, Silar or its designees ("Silar Lender") has agreed to make one or more secured loans through one or more advances (jointly and severally, the "Protective Advance Loans") for the purposes of preserving or protecting the USACM Loans and/or the related collateral (including without limitation funding tax protests and paying property tax liabilities), as set forth more fully in this Order.

164. When the Motion was filed, the parties agreed that the total amount of Protective Advance Loans would not exceed $3 million, and this maximum amount would be reduced by each Protective Advance Loan which is made. Since the filing of the Motion, the Court has already approved a Protective Advance Loan in the amount of $1,132,150 relating to the USACM Loan known as Margarita Annex. (AR Bk Doc. 1779) Silar has already funded this loan. Each Protective Advance Loan shall be subject to Court approval on motion, shall be for the benefit of a specific USACM Loan and/or related collateral, and must be approved by the holders of 51% or more of the DL Interests in the applicable USACM Loan and/or related collateral. A Protective Advance Loan

shall be made as either:  (a) an "earmarked, super-priority" loan to the ARC Estate for further lending (as in the structure set forth in the Order approving the Protective Advance Loan  for the Margarita Annex USACM Loan (see AR Bk Doc. 1779); or (b) as a "super-priority" first lien loan to either one or more real estate investment trusts, limited partnerships, limited liability companies, or other legal entities formed by the Direct Lenders (jointly and severally, the "Investment Vehicle").

165.    The specific terms and conditions of each Protective Advance Loan are subject to underwriting and approval by the Silar Lender, as well as negotiation and the execution of definitive documents on a loan-by-loan basis.  It is anticipated that each Protective Servicer Advance Loan will include at least the following terms and conditions, unless the Silar Lender agrees to more favorable terms to the Direct Lenders  (such as, for example, lending up to a higher LTV)  in its sole and absolute discretion:

A.    The holders of 51% or more of the DL Interests in a USACM Loan and/or the related collateral agree to  release and/or ratify a release of  the Silar Lender and  the Silar Parties from any and all Causes of Action in connection with that USACM Loan and/or related collateral;

B.    The Protective Advance Loan shall be secured by the assets owned by or pledged to the ARC Estate's earmarked loan or to the Investment Vehicle and/or by the USACM Loan and/or the related collateral;

C.    Interest on the Protective Service Advance Loan  will accrue at the compounded monthly rate of six percent per annum and shall be due no later than three years and six months from the date of the advance(s);

D.    The Protective Advance Loan shall have a maximum of 30/70 loan-to-value ratio and other reasonable credit requirements and security terms which would be  required  by  third parties at arm's-length for similar loans; and

E.    The advances made pursuant to the Protective Advance Loan shall be secured by one or more super-priority liens (the "Lien") against the assets of the ARC Estate's earmarked loan or Investment Vehicle and/or the USACM Loan and/or the related collateral.  The Lien shall be approved by the Court, shall be recorded  in any and all states deemed appropriate in the Silar Lender's discretion (including for example only,  in Nevada, in any state  in which a  Direct Lender

holding an interest in the USACM Loan resides,   the state(s) in which the Investment Vehicle is registered, formed, or otherwise present, and/or the state(s) in which the collateral securing the USACM Loan are located (provided, however,  a  failure to record the Lien  shall not  be a requirement of its validity or perfection);

F.      Notwithstanding anything to the contrary, all  Protective Advance Loans shall have a maturity date of no later than June 30, 2017; and

G.      The Protective Advance Loan shall be protected by an injunction requiring payment under section 105 of the Bankruptcy Code.

166.    Notwithstanding anything to the contrary: (a) the Silar Parties may provide assistance with respect to the B&B DL Settling Clients' efforts to structure the Investment Vehicle, but the B&B DL Settling Clients shall ultimately rely solely and exclusively upon the advice of their own professionals in doing so and the Silar Parties shall have no role whatsoever in the final decisions and/or in the structuring, underwriting, proposing, offering, and/or issuing of any securities relating thereto; and (b) the B&B DL Settling Clients, in their sole discretion, may use up to $100,000 of the $3 million aggregate limit for Protective Advance Loans to form and organize the Investment Vehicle.

167.    Notwithstanding anything to the contrary, net proceeds from the Protective Advance Loans which are repaid, in whole or in part, on or before June 30, 2013 shall be made available by Silar for new Protective Advance Loans.

168.    The Court retains jurisdiction to hear and rule upon motions concerning the Protective Advance Loans.

## XVIII.

## CONCURRENT MUTUAL RELEASES

169.    Upon and as of the Effective Date and subject to the limitations set forth in this section XVIII, the B&B DL Settling Clients, Janet L. Chubb, Jones Vargas, Armstrong Teasdale, and/or Lisa Rasmussen, the Silar Parties, Piskun, the Trustee, and the Estates shall automatically be deemed to have acquitted, released, forgiven, cancelled, waived, and forever discharged each other jointly and severally from any and all Causes of Action held by them against the others which

directly or indirectly arise in whole or in part out of: (a) one or more acts or omissions by the released Person (as defined below) or their "Affiliates" (as defined below) from the beginning of time up to and including the Effective Date; and/or (b) one or more acts or omissions by any Person from the beginning of time up to and including the Effective Date for whose acts or omissions the released Person or their Affiliates could be held subject to liability. Notwithstanding anything to the contrary, no Person shall be deemed released unless they are also deemed to have provided a release. This provision is referred to herein as the "Release."

170. "Person" means a natural person, corporation, limited liability company, partnership, limited partnership, trust, estate, or any other legally recognized entity. Each of the Persons providing the foregoing mutual Releases shall be deemed to have expressly waived the provisions, rights and benefits of California Civil Code §1542 or any similar provision in any other jurisdiction. Each of the Persons providing the foregoing Releases shall be deemed to have represented and warranted that the releasing Person owns the Causes of Action which are the subject of their Release, has not transferred, pledged, or assigned such Causes of Action in whole or in part, and has authority to deliver the Release.

171. "Silar Parties" means the following Persons, jointly and severally: Silar Advisors, LP (a limited partnership organized and existing under Delaware law with a principal place of business in New York); Silar Special Opportunities Fund, LP, a limited partnership organized and existing formed under Delaware law with a principal place of business in New York; Silar Special Opportunities Ltd., a corporation organized under the laws of the Cayman Islands, SMOF A, LLC formerly known as SSOP, LLC, a limited liability company organized and existing under Delaware law with a principal place of business in New York; Silar Managed Opportunities Fund, SPC, Ltd., a segregated portfolio company organized under the laws of the Cayman Islands individually and acting on behalf of and for the account of the Series A Segregated Portfolio; Robert Leeds; Hin-King Tai; Jay Gracin; Min Choi (mis-named in various pleadings as "Min Ko-Hen"); Cade Liu; Asset Resolution, LLC (as debtor but not debtor-in-possession); Michael Reiner; Servicing Oversight Solutions, LLC, a dissolved limited liability company once formed under Connecticut laws (Connecticut secretary of State Business Filing Number 0004223505) and Servicing Oversight

1  Solutions, LLC, a limited liability company formed under Delaware law; Greene Law, PC; and any

2  and all Affiliates of the foregoing.

3      172.   "Affiliates" means, jointly and severally, all present and former officers, directors,

4  employees, managers, principals, agents, sub-agents, partners, general partners, limited partners,

5  members, investors, parent companies, owners, subsidiaries, stockholders, representatives, trusts,

6  estates, heirs, executors, assigns, successors, predecessors, insurers, or shareholders of the person or

7  entity subject to the release or Causes of Action (the "Affiliated Person"), any and all entities that are

8  or were at any point managed by the Affiliated Person, any entity in which the Affiliated Person has

9  a majority or controlling beneficial or legal interest, and any person or entity whose acts or

10  omissions would render the Affiliated Person liable under principles of *respondeat superior*,

11  principal/agent, aiding and abetting, piercing the veil, disregard of corporate form, conspiracy, joint

12  venture, or any other legal, equitable, statutory, regulatory, or other principle of vicarious or

13  secondary liability.

14      173.   Notwithstanding anything to the contrary, the foregoing Releases do not and shall not

15  be deemed to acquit, release, forgive, cancel, waive, or discharge any Causes of Action against the

16  following Persons: (a) the Compass Defendants; (b) the Professionals; (c) the Citron Defendants; (d)

17  Joseph Milanowski; (e) Thomas Hantges; (f) the USACM entities, USACM estates, or any trusts

18  created by or in connection with the USACM Third Plan of Reorganization; (g) Stubbs; (h) Duncan;

19  (i) Cross Equities Partners, LLC, Cross FLS, LLC, Cross Servicing Group, LLC, Cross Litigation

20  Management Co., LLC, BFB Partners, LLC, Asset Resolution Group, LLC, CRS Realty GP, LLC or

21  any of their respective Affiliates (jointly and severally, "Cross"); (j) Granite, FLS or any of its

22  Affiliates ("Granite"); (k) any borrower or guarantor under a USACM Loan; (l) Bickel & Brewer or

23  any of its Affiliates, or (m) any Person who is or may be the subject of one or more of the Causes of

24  Action being Assigned as part of the Settlement to either the Claims Recovery Trust, or to the B&B

25  DL Settling Clients, or to Silar or its designee(s).

26      174.   For the purposes of this Order, "Causes of Action" means:

27      A.   All claims, counterclaims, cross-claims, and/or third-party claims, suits,

28  complaints, charges, requests of charges, questionnaires, defenses, referrals, reports, notices, causes

of action, demands, rights, debts, liens, liabilities, obligations, damages, offsets, reimbursements, indemnification, contribution, expenses, compensation, attorneys' fees, loss, detriment, or controversies or any other remedies or relief of any character whatsoever (whether known or unknown, whether now existing or hereafter arising, whether asserted or un-asserted, whether accrued or un-accrued in the assigning or releasing  Persons' favor, and whether or not the subject of a tolling agreement) at law, in equity, under statute, regulation, rule, decree, order, judgment, contract, agreement,   status or relationship. or any source of duty or obligation of any kind whatsoever.

B.      "Causes of Action" also includes, by way of example and not by way of limitation, claims for violations of federal or state racketeering statutes, breaches of the LSAs, liability arising out of the purchase of assets from USACM, violations of the Preliminary Injunction entered in the 892 Case, contempt, sanctions, violations of Nevada or other state statutes or regulations, elder abuse, conspiracy, violations of any criminal statutes or regulations, treble damages, punitive damages, fraudulent inducement, breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, constructive fraud, fraud, conspiracy, concert of action, contempt, servicing misconduct, accounting, respondeat superior, aiding and abetting, indemnity, contribution, co-venturer liability, accounting, audit, award, conversion, exemplary damages, misappropriation, fraudulent transfers, fraudulent conveyances, negligence, malpractice, gross negligence, reckless misconduct, servicer misconduct, tortious interference, implied or express warranty, intentional misrepresentation, negligent misrepresentation, impairment or damage to collateral, statutory misrepresentation, promissory estoppel, trespass, receipt of property through false pretenses, breach of partnership agreement(s), breach of trust, piercing the veil and/or other forms of  disregarding the separateness of a corporation or other entity, joint venture, partnership, trust, libel, slander, defamation, bankruptcy claim or proof of claim, claims under the United States Bankruptcy Code, Preference Claims, breaches or contempt of any order, preliminary injunction, or permanent injunction, and/or any claim under any other federal or state statute, regulation, rule, or law, or authority.

C.      "Causes of Action" also includes by way of example and not limitation,

claims, rights, or causes of action that the releasing or Assigning Person might not now know or expect to exist in their respective favor as of the Effective Date, even if knowledge of such might have otherwise materially affected the granting of the Assignment or the Release, and even if the Person may later discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of the Assigned or Released claims, rights, or causes of action, and even if the Assigned or Released claims, rights, or causes of action come into existence in the future from any act or omission through the Effective Date.

**XIX.**

**INJUNCTIVE RELIEF TO IMPLEMENT THE SETTLEMENT**

175. The Court finds that the USACM Plan precludes any Person from asserting a Cause of Action directly against a Direct Lender arising out of the acts or omissions of USACM through February 16, 2007 (including without limitation any alleged failure to fund a loan in whole or in part). In addition, Nev. Rev. Stat. 645B.175 now provides that "Any duty, responsibility or obligation of a mortgage broker pursuant to this chapter is not delegable or transferable to an investor, and, if an investor only provides money to acquire ownership of or a beneficial interest in a loan secured by a lien on real property, no criminal or civil liability may be imposed on the investor for any act or omission of a mortgage broker." The Court therefore hereby permanently enjoins all Persons under section 105(a) of the United States Bankruptcy Code from suing any Direct Lender for the acts or omissions in connection with the USACM Loans of USACM, the loan servicers during the Post-USACM/Pre-Termination Servicing Period, and thereafter. Any Direct Lender who is sued for such acts or omissions may seek immediate relief from this Court, including removal of the suit in which such Causes of Action are being asserted.

176. Upon the Effective Date, all Persons are hereby permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting against the Silar Parties, the ARC Estate (unless a timely Proof of Claim has been filed against it), or Piskun any Causes of Action (however denominated) directly or indirectly relating to or arising out of the USACM Loans, including without limitation, whether the injury to such Person: (a) is the Person's actual or threatened liability to any holder of a DL Interest, borrower, guarantor, or other Persons in connection with or relating

directly or indirectly with respect to any USACM Loan (including without limitation any amounts paid in settlement of such actual or threatened liability or any attorney's fees, costs, or expenses); and/or (b) reasonably flows from liability or the risk of liability for Causes of Action which are or could be asserted against the Person in the 892 Case, the 210 Case, the 1100 Adversary, any of the Adversaries, or any other existing or future litigation. Nothing in this Order precludes such Person from obtaining a reduction of their own liability in connection with a Cause of Action asserted against them based on the proportionate fault of others (including without limitation the Silar Parties). Notwithstanding anything to the contrary, Weil, Lomazow, Milbank, Bullivant, Sheppard Mullin, Bryan Cave, Windler, and EBG are not enjoined from asserting any Cause of Action which is both: (a) not a claim for contribution or indemnity; and (b) not permitted by law to be enjoined by virtue of the Court's approval of the Settlement. For the sake of clarity, Weil, Lomazow, Milbank, Sheppard Mullin, Bullivant, Bryan Cave, Windler and EBG are barred, enjoined and restrained only from commencing, prosecuting, or asserting Causes of Action which are barred by virtue of the Court's approval of the Settlement, this Order, and/or applicable law.

177. Upon the Effective Date, all Persons are hereby permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting against the Silar Parties, the ARC Estate, or Piskun any Causes of Action based on any alleged wrongdoing that was undertaken by them while servicing the USACM Loans and/or the related collateral if 51% or more of Direct Lenders in any of the USACM Loans and/or the related collateral have agreed to the Settlement. In this regard, the B&B DL Settling Clients and the ARC Estate are deemed by the Court to have voted all the DL Interests in any of the USACM Loans and/or related collateral held by them in favor of approving such releases.

178. Upon the Effective Date, the Silar Parties, Piskun, the Trustee, the Estates, and the B&B DL Settling Clients (jointly and severally, "Enjoined Persons") are enjoined from, directly or indirectly, through any manner or means: (a) asserting formally or informally any Causes of Action against any Enjoined Person; and/or (b) taking any acts, directly or indirectly, with the purpose, intent, or foreseeable effect of undermining, impairing, interfering with, or otherwise negatively impacting the efforts of the Claims Recovery Trust to collect on the Trust Assets which have been

Assigned to it; and/or (c) suggesting, proposing, encouraging, enticing, inspiring, inducing, coordinating, helping, contacting, soliciting, assisting, contributing to, aiding, abetting, or otherwise enabling any Person to undertake acts which are enjoined under subsections (a) or (b).

179.    Upon the Effective Date and except as may be required by law or legal process, or with the prior written approval of Silar, the Enjoined Persons are enjoined from, directly or indirectly, through any manner or means communicating with the press or making any public comments directly or indirectly (including without limitation comments on the internet) about the Settlement or disparaging any other Enjoined Person.  Notwithstanding the foregoing, the Enjoined Persons may refer to the take-nothing judgments and dismissals and state that the litigation was settled on terms acceptable to all parties.

180.    Notwithstanding anything to the contrary in this Order or the Trust Agreement:

A.    Any acts or omissions by the Claims Recovery Trust and/or Trust Representatives and/or persons or entities who are providing business, consulting, litigation support, and/or other services in connection with the liquidation of Trust Assets (including without limitation the assertion of Causes of Action) are not prohibited or enjoined by this Order;

B.    Any acts or omissions by an Enjoined Person which directly or indirectly assist the activities of the Claims Recovery Trust are not prohibited or enjoined by this Order;

C.    Any acts or omissions by an Enjoined Person which directly or indirectly involve the assertion of Causes of Action against one or more of the Persons listed in paragraph 173 of this Order are not prohibited or enjoined by this Order;

D.    Nothing in this Order is intended to or does: (1) limit or preclude Piskun's counsel, Laxalt & Nomura, Ltd., from continuing to serve as counsel for the non-settling Compass Defendants and defend their interests; and/or (2) limit or preclude any Person from asserting Causes of Action as defenses or offsetting counterclaims or from obtaining a reduction of their own liability in connection with a Cause of Action asserted against such Person; and/or (3) limit or preclude any Enjoined Person from asserting a Cause of Action for violations of this Order, the Trust Agreement, or the Instruments of Closing; and/or (4) limit or preclude any Enjoined Person from asserting a Cause of Action against any Person who did not provide and receive a mutual release under the

Settlement; and

E.      Nothing in this Order is intended to or does constitute a release of or prohibition or injunction against  the assertion of Causes of Action between or among B&B DL Settling Clients, Bickel & Brewer, Stubbs,  Duncan, Cross or their respective Affiliates.

181.    A bond of $1,000 to be automatically deemed posted by the ARC Estate as of the Effective Date in favor of the Estates, the B&B DL Settling Clients, the Silar Parties, and Piskun to make the foregoing injunctions effective.

182.    The Court finds that these injunctions are a necessary and material part of the Settlement, promote the policy of encouraging settlement, and are appropriate to protect the ARC Estate and other settling Persons and to promote equity, and provide compensation to injured Persons from Persons responsible for the harm. The foregoing injunctions also supplement the injunctions contained in the order confirming the USACM Plan. See Miller v. Christopher, 887 F.2d 902 (9th Cir. 1989); N.R.S. 17.245; Doctors Company v. Vincent, 120 Nev. 644, 650, 98 P.3d 681, 686 (2004); Eichenholtz v. Brennan, 52 F.3d 478, 452-453 (3rd Cir. 1995); see also 11 U.S.C. Sec. 105(a) ("[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"); In re Stonebridge Techs., Inc., 430 F.3d 260, 266 (5th Cir. 2005) (extending "related to" jurisdiction in a dispute between two non-bankrupt third parties).

183.    In addition to all other remedies available for a violation of an injunction in this Order, the Person harmed by the violations shall be entitled to assert all Causes Of Action against the "Violator" which were otherwise the subject of a release or dismissal in the Settlement but such Causes of Action shall be subject to all defenses, if any, by the Violator.   Notwithstanding anything to the contrary in this Order or the Settlement, if the "Violator" is a Person who is included in the definition of B&B DL Settling Clients or Silar Parties, then the "Violator" shall only be the specific Person who engaged in the violation or breach and the Releases and protections accorded to all other Persons in the defined group shall retain their Releases and protections.   The Court shall retain continuing exclusive jurisdiction to enforce these injunctions to the fullest extent allowed by the law, whether or not the Asset Resolution Bankruptcy Cases are ultimately dismissed.

## XX.

## **MISCELLANEOUS**

184.    The Court acknowledges that the Estates, the Silar Parties, Piskun, and the B&B DL Settling Clients (each, a "Party" and, jointly and severally, the "Parties") have made the following representations, warranties, and agreements to or with each other, that such representations, warranties, and agreements shall survive the closing of the Settlement and all other performances under this Order, and hereby adopts as part of this Order the following:

A.    The Parties acknowledge that they have asserted contested, competing claims against each other that are uncertain as to both liability and amount and that could be subject to various potential outcomes.  The Parties have agreed to enter into the Settlement in order to put to rest all controversy and to avoid further expense and burdensome, protracted and costly litigation which would be involved in defending against all the claims raised in the pending litigation and related claims, without in any way acknowledging any fault or liability; and each Party has denied and continues to deny all charges of wrongdoing or liability whatsoever asserted or which could have been asserted against them.  By entering into the Settlement, no Party to the Settlement has admitted liability or damages to any other person or entity.

B.    Notwithstanding anything to the contrary stated therein, nothing in this Agreement or in its attachments is intended to preclude any Party from suing another Party for breach of this Settlement Agreement.

C.    The exchanges of releases, cash, assets, and other consideration relating to the Settlement are being effected solely with a *bona fide* intent to compromise disputed debts for a fair and reasonable value and are not being effected to hinder, delay, or defraud any creditors.

D.    The Parties, other than the Trustee, have represented to each other that they own or control the Causes of Action being released or transferred in the Settlement and such Causes of Action have not been sold, and/or are not presently pledged, assigned, hypothecated, and/or otherwise transferred.  The Trustee, on behalf of the ARC Estate, represents that he has applied for and received Court authorization to enter into the Settlement and that, to the best of his knowledge, such Causes of Action have not been sold, and/or are not presently pledged, assigned, hypothecated,

1   and/or otherwise transferred.  No Party represents or warrants to the other Parties that there will be

2   any recovery on any of the Causes of Action being assigned under the Settlement and each and every

3   Party acknowledges that such assignment(s) are being made on an "as is, where is" basis.

4       E.      The Parties shall execute and deliver all such documents and to take all such

5   further actions as may be reasonably necessary from time to time to carry out the intent and purpose

6   of the Settlement and to consummate the transactions contemplated in this Order.

7       F.      Any and all Causes of Action or controversies arising under or relating to the

8   Settlement or this Order, including without limitation a failure to close, whether arising in contract

9   or tort or by statute or otherwise, shall initially be submitted to non-binding mediation before the

10  Hon. Walter Hagan (Ret.) or another mediator mutually-agreeable to the Persons engaged in the

11  dispute and, if mediation is unsuccessful, shall be litigated exclusively in this Court (Jones, C.J.)

12  and, if such court no longer has jurisdiction, then in any court of competent jurisdiction.

13      G.      This Order confirms and implements the Settlement Agreement submitted to

14  the Court in connection with the Motion.  Each Party has contributed to the drafting of this Order

15  and to any instruments executed in connection with the closing of the Settlement under this Order

16  (jointly and severally, "Instruments of Closing").  The language used in this Order and any

17  Instruments of Closing (including without limitation the Trust Agreement) shall be deemed to be the

18  language mutually chosen by the Parties to express their intent, and no rule of strict construction

19  shall be applied against any Party.  The Parties have been represented by their own counsel in

20  connection with the negotiation and execution of this Order and the Instruments of Closing, they

21  have received legal advice concerning the terms and conditions of the Settlement and this Order,

22  they fully understand all of the terms and provisions of the Settlement, and they executed the

23  Settlement freely, of their own will, and without any duress of any kind.

24      H.      This Order, the Trust Agreement, the Settlement Agreement, and the

25  Instruments of Closing contain the entire agreement among the Parties and supersedes all

26  negotiations, understandings, representations, statements, or agreements with respect to the subject

27  matter hereof. Such prior negotiations, understandings, representations, statements, or agreements

28  are terminated and are not being and may not be relied upon by any Party.

1        I.     The Parties reserve the right to seek Court approval to supplement or amend

2 this Order and the Court reserves jurisdiction to do so to the fullest extent permitted by law.

3       **IT IS SO ORDERED this** _6th day of September, 2012.

4

5                                                         Honorable Robert C. Jones

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LOCAL RULE 9021 DECLARATION**

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the Court's ruling and that:

☐ The court has waived the requirement set forth in LR 9021(b)(1).

☐ No party appeared at the hearing or filed an objection to the motion.

☒ I have delivered a copy of this proposed order to all counsel who appeared at the hearing of the Motion, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

- Frank Majorie – Approved;
- Robert Millimet – Approved;
- Daniel Hayward – Approved;
- Boris Piskun – Approved;
- Timothy Cory – Not Approved;
- Lawrence Barth, Todd Bice – Not Approved;
- Von Heinz/ Jennifer Hostetler – Not Approved;
- Gayle Kern/Ori Katz – Not Approved;
- Dennis Prince – Not Approved;
- McAlan Duncan – No Response;
- Jann Chubb – No Response

☐ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

Dated this 23rd day of August, 2012.

SULLIVAN, HILL, LEWIN, REZ & ENGEL
A Professional Law Corporation

By: _____/s/ Jonathan S. Dabbieri_____
James P. Hill
Jonathan S. Dabbieri
Elizabeth E. Stephens
Attorneys for Chapter 7 Trustee,
William A. Leonard, Jr.
###

EXHIBIT A

# CLAIMS RECOVERY TRUST AGREEMENT

## (A LIQUIDATING TRUST)

**Dated**

**_____, 2012**

# TABLE OF CONTENTS

Page

**ARTICLE I       INTRODUCTION**

1.1    The USACM Bankruptcy Cases ...................................................................1

1.2    The Related Asset Resolution Bankruptcy Case ..........................................1

1.3    The Causes of Action.....................................................................................1

1.4    Alleged Misconduct by Responsible Persons...............................................2

1.5    Aggregation of Causes of Action..................................................................2

1.6    The Settlement Order and Other Orders .......................................................2

**ARTICLE II       DEFINITIONS**

2.1    Defined Terms. ..............................................................................................3

2.2    Headings ......................................................................................................31

**ARTICLE III       DECLARATION OF TRUST AND GENERAL PROVISIONS**

3.1    Declaration/Establishment of Trust .............................................................31

3.2    Name ............................................................................................................32

3.3    Principal Office ............................................................................................32

3.4    Purpose ........................................................................................................32

3.5    Vesting of Trust Assets................................................................................32

3.6    Appointment in Lieu of Vesting ..................................................................32

3.7    Powers..........................................................................................................33

3.8    Cy Pres/Reservation of Equity Jurisdiction ................................................37

**ARTICLE IV       ASSIGNMENTS OF TRUST ASSETS**

4.1    Professional Claims .....................................................................................37

4.2    Preference Claims ........................................................................................38

4.3    Assigned Loan Claims and DL Interests .....................................................39

4.4    Assigned Compass Interests and Piskun Causes of Action .........................43

4.5    Future Assigned Assets/Additional Parties.................................................43

# TABLE OF CONTENTS

Page

4.6     Additional Provisions Relating to Assigned Causes of Actions ................ 44

4.7     Initial Cash ................................................................................................. 46

**ARTICLE V     DISTRIBUTIONS OF RECOVERIES FOR ALL NON-LOAN CLAIM CAUSES OF ACTION**

5.1.    Non-Loan Claim Distribution Overview ...................................................... 46

5.2.    Distribution Decision(s) for Non-Loan Claims ........................................... 46

5.3.    In-Kind Recoveries for Non-Loan Claims .................................................. 46

5.4.    Distribution Waterfall for Recoveries on Non-Loan Claims ..................... 47

5.5.    Distributions For Causes of Action Against GT ......................................... 49

5.6.    Distributions For Causes of Action Against Bryan Cave ........................... 49

**ARTICLE VI     DISTRIBUTIONS AND OTHER MATTERS RELATING TO LOAN CLAIMS AND COLLATERAL DISPOSITION DECISIONS**

6.1.    Intention ....................................................................................................... 49

6.2.    Application of Article VI ............................................................................. 50

6.3     Distribution Decision(s) for Loan Claims ................................................... 50

6.4     In-Kind Distributions for Loan Claims ....................................................... 50

6.5     Distribution Waterfall for Recoveries on Loan Claims ............................. 50

6.6     Foreclosures of Collateral Securing USACM Loans .................................. 52

6.7     Handling of DL Cash ................................................................................... 55

**ARTICLE VII     BENEFICIARIES AND LIQUIDATING TRUST INTERESTS**

7.1.    Beneficiaries ................................................................................................ 55

7.2.    Liquidating Trust Interests .......................................................................... 56

7.3.    Limitation Of Beneficiary Liability ............................................................ 56

7.4.    LTI Register ................................................................................................. 56

7.5.    Assignments of Liquidating Trust Interests ............................................... 57

7.6.    Securities Laws ............................................................................................ 58

7.7.    Waivers ........................................................................................................ 58

# TABLE OF CONTENTS

Page

**ARTICLE VIII   THE LIQUIDATING TRUSTEE**

8.1.   Appointment ........................................................................59

8.2.   Resignation .........................................................................60

8.3.   Removal .............................................................................60

8.4.   Successor............................................................................60

8.5.   Liquidation Duties of the Liquidating Trustee...........................61

8.6.   Powers of Liquidating Trustee.................................................61

8.7.   Trustee Counsel ...................................................................61

8.8.   Compensation of the Liquidating Trustee..................................62

**ARTICLE IX        TRUST COMMITTEES**

9.1.   Establishment Of Trust Committee(s) .......................................63

9.2.   Selection of Committee Members .............................................64

9.3.   Authority of the Committee.....................................................64

9.4.   Regular Meetings of the Committees .........................................65

9.5.   Committee Member Compensation ...........................................66

9.6.   Resignation of Committee Members ..........................................66

9.7.   Removal of Committee Members ..............................................67

9.8.   Successor Committee Members.................................................67

**ARTICLE X        RETENTION AND PAYMENT OF THE MAJORIE FIRM LTD.**

10.1.   Retention ...........................................................................68

10.2.   Carve-Outs .........................................................................68

10.3.   Payment.............................................................................69

10.4.   Litigation Expenses Paid Or Incurred By TMF ..........................69

10.5.   TMF's Representation and Defense of the Beneficiaries .............69

10.6   Additional ..........................................................................69

# TABLE OF CONTENTS

Page

**ARTICLE XI      TAX MATTERS**

11.1      Intention ................................................................69

11.2      Tax Treatment ........................................................72

11.3      Allocations of Liquidating Trust Taxable Income or Loss ......................72

11.4      Distribution Reserve Account ....................................72

11.5      Tax Withholdings.....................................................73

11.6      Expedited Determination of Taxes ...........................73

**ARTICLE XII      STANDARD OF CARE; LIMITED LIABILITY**

12.1      Standard Of Care.....................................................74

12.2      Indemnification .......................................................75

12.3      Insurance And Bonding ...........................................76

12.4      Affiliate Service Providers.......................................76

12.5      Express Exculpatory Clauses in Instruments............76

12.6      Actions under Court Supervision.............................77

**ARTICLE XIII      REPORTS TO BENEFICIARIES**

13.1      Reports.....................................................................77

13.2      Books And Records .................................................78

**ARTICLE XIV      DURATION; WIND-UP**

14.1      Term; Termination Of The Trust .............................79

14.2      Continuance of Trust for Winding Up .....................80

**ARTICLE XV      MISCELLANEOUS PROVISIONS**

15.1      Laws as to Construction...........................................80

15.2      Jurisdiction..............................................................80

15.3      Severability .............................................................81

15.4      Notices.....................................................................81

15.5      Fiscal Year ..............................................................82

# TABLE OF CONTENTS

Page

15.6   Confidentiality ............................................................................82

15.7   Entire Agreement ........................................................................82

15.8   Counterparts ...............................................................................83


**Schedule 1**   --   <u>Schedule of USACM Loans</u>

**Schedule 2**   --   <u>Litigation Trust Interests of Initial B&B DL Beneficiary Group</u>

**Schedule 3**   --   <u>Adversary Proceedings</u>

# CLAIMS RECOVERY TRUST AGREEMENT

For the exchange of mutual promises and other consideration (the receipt, adequacy, and sufficiency of which are hereby acknowledged and confessed), the "Parties" (as defined below) enter into this Agreement as follows:

## ARTICLE I.    INTRODUCTION

**1.1    The USACM Bankruptcy Cases.**  This is an irrevocable liquidating trust agreement (the "Agreement") primarily established for the joint pursuit, recovery, and distribution of damage claims arising out of, relating to, and following a massive, interstate ponzi-scheme in which insider managers and brokers of USA Commercial Mortgage Company and its affiliates ("USACM") fraudulently induced thousands of persons across the United States to invest hundreds of millions of dollars in fractionalized "direct lender" beneficial interests ("DL Interests") in what were falsely represented to be fully-secured, short-term commercial real estate loans to independent borrowers and guarantors (the "USACM Loans"). USACM eventually became the debtors in chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court") bearing primary Case No. BK-S-06-10725-LBR (the "USACM Bankruptcy Cases").

**1.2    The Related Asset Resolution Bankruptcy Case.**  This Agreement relates to proceedings  removed from the Nevada Bankruptcy Court from the USACM Bankruptcy Cases to the Honorable Robert C. Jones of the United States District Court for the District of Nevada (the "Court"), the jointly-administered chapter 7 bankruptcy cases of Asset Resolution LLC ("Asset Resolution") and various affiliated special purpose entities which were removed in their entirety and are now pending before the Court as lead case number BK-S-09-32824-RCJ (the "Asset Resolution Bankruptcy Case"), and two related civil cases pending in the Court styled *3685 San Fernando Lenders, LLC, et al. v. Compass USA SPE, LLC, et al.*, Case No. 2:07-cv-00892-RCJ-GWF (the "892 Case") and *Leonard  C. Adams, et al. v. Silar Advisors, LP, et al.*, Case No. 3:11-cv-00210-RCJ-VPC (the "210 Case").

**1.3    The Causes of Action.**  This Agreement covers certain "Causes of Action" (defined below) and other related assets (more particularly defined below jointly and severally as "Trust Assets") held by the Parties against some natural persons, corporations, limited liability companies, partnerships, limited partnerships, trusts, estates, and other legally-cognizable entities (jointly and severally, "Persons") who are either the named borrowers or guarantors of the USACM Loans or whose  alleged acts or omissions allegedly caused the Parties to suffer substantial damages relating to the USACM Loans (jointly and severally and as defined in more detail below, "Responsible Persons").

1.4     **Alleged Misconduct By Responsible Persons.**  This Agreement primarily relates to alleged conduct by Responsible Persons involving the origination and/or non-payment of the USACM Loans, the sale to Compass USA SPE LLC and related entities ("Compass Entities") of loan servicing agreements (the "LSAs") and/or DL Interests held by USACM in sixty-five USACM Loans and/or related collateral properties pursuant to a Third Amended Plan of Reorganization approved in the USACM Bankruptcy Cases over the objections of certain direct lenders, the financing of the Compass Entities' purchase through a Master Repurchase Agreement by Silar Advisors, LP as agent, the servicing of the loans by Compass and then by Asset Resolution and the chapter 7 bankruptcy estate of Asset Resolution (the "Estate"), the termination of Asset Resolution  and the Estate as servicer, and other matters.  A list of the sixty-five USACM Loans is attached hereto as **Schedule 1** and made a part hereof.

1.5     **Aggregation Of Causes of Action.** The  Parties  believe  that  many  of  the Responsible Persons' alleged acts or omissions were directed to and/or caused damages to the Parties jointly and severally, that the Causes of Action arise out of one or more common nucleus of operative facts, that litigation of the Causes of Action could be expensive and protracted, that the evidentiary demands of a single suit may be great while an individual Party's recovery for that suit may be relatively small, that the Responsible Persons may have limited resources to satisfy all of the damages sustained by all of the Parties, and that the Responsible Persons may try and avoid liability by essentially pitting the Parties against each other in separate cases.  For those reasons, the Parties have agreed to aggregate and jointly pursue their Causes of Action and/or related rights against certain Responsible Persons and other Trust Assets under the terms set forth in this Agreement.

1.6     **The Settlement Order And Other Orders.**   This Agreement is being entered into in connection with and pursuant to that certain Agreed Order Regarding Settlement and Related Relief (the "Settlement Order") entered in the Asset Resolution Bankruptcy Case.  This Agreement, the Settlement Order, and any subsequent orders entered by the Court touching upon this Agreement or the Trust created hereby (jointly and severally, the "Orders"), as well as the Settlement Agreement (defined below), shall be construed *in pari materia*, and all Parties hereto shall be deemed to have been equally responsible for the drafting thereof.

# ARTICLE II.     DEFINITIONS

2.1 **Defined Terms.** The following terms shall have the following meanings under this Agreement:

"**Absolute Immunity**" means full, complete, unconditional, and absolute immunity from any and all Causes of Action held by any Person of any nature, type, or source and from any damages, declaratory relief, temporary, preliminary, or permanent injunctive relief, or other remedy of any type whatsoever whether under existing or future applicable laws.

"**Abstain**" or "**Abstained**" or "**Abstaining**" or "**Abstention**" mean, jointly and severally, to refrain from voting. Notwithstanding anything to the contrary in this Agreement, the Orders, or any applicable law, if a Committee Member Abstains, the Committee Member and the Committee Member's Affiliates: (a) shall have Absolute Immunity directly or indirectly arising out of or relating to the act of refraining to vote, the making or not making of any disclosures to any Person relating to the subject matter of the vote, the subject matter of the vote, and/or the transaction(s) which were undertaken or not undertaken as a result of the vote; and (b) such transaction(s) which were undertaken or not undertaken as a result of the vote shall constitute Indemnified Matters; and (c) such abstaining Committee Member and the Committee Member's Affiliates shall be indemnified against Losses by the Trust pursuant to Section 12.2 hereof.

"**Additional Parties**" means such other Persons jointly and severally who, after the initial execution of this Agreement, are joined as Parties to this Agreement pursuant to the procedures set forth in the Orders or this Agreement.

"**Additional Designated Professionals**" means those Persons who are subject to Causes of Action which become Future Assigned Assets under this Agreement and are designated as Professionals at the time the Causes of Action are Assigned to the Liquidating Trustee or Trust. Notwithstanding anything to the contrary, the Trustee and the Liquidating Trustee are not and cannot be "Additional Designated Professionals."

"**Adverse Action**" means the assertion by demand or otherwise of a Cause of Action.

"**Adverse Claimant**" means, jointly and severally: a Person who engages in an Adverse Action towards or against the Trust or an Assigning Party; a Responsible Person; or a Prohibited Person.

"**Adversary Proceedings**" means, jointly and severally, those adversary proceedings listed on **Schedule 3** hereto (which is incorporated herein by reference).

"**Advisory Board(s)**" means a group of advisors selected by a Governing Committee to assist that Governing Committee and the Liquidating Trustee with respect to matters relating to a particular area or areas of that Governing Committee's powers and responsibilities. Notwithstanding anything to the contrary, (a) no Prohibited Person may be a member of an Advisory Board; and (b) with respect to Advisory Boards appointed by the DL Committee: (i) no more than two Persons may be selected for a particular Advisory Board; (ii) the names of those selected by a Governing Committee to be members of an Advisory Board must be published to the Beneficiaries immediately upon their appointment and if any objections are made to those appointments then those appointments shall be subject to approval by a majority vote of the affected Beneficiaries; and (iii) Advisory Board members shall be deemed to be volunteers and not entitled to any compensation for their time (unless agreed to by the Appointing Beneficiary Class).

"**Affiliates**" means, jointly and severally, all present and former officers, directors, employees, managers, principals, agents, sub-agent, attorneys, partners, general partners, limited partners, members, investors, parent companies, owners, subsidiaries, stockholders, representatives, trusts, estates, heirs, executors, assigns, successors, predecessors, insurers, or shareholders of a Person. Notwithstanding anything to the contrary, "Affiliates" shall not include Compass Defendants, Citron Defendants, Adverse Claimants, or any Responsible Persons who may be liable under Causes of Action Assigned to the Trust.

"**Agreement**" means this irrevocable liquidating trust agreement.

"**Appointing Beneficiary Class**" means the Beneficiary Class which appoints a Committee Member or makes any other decision which relates solely to that Beneficiary Class' interests. With respect to the DL Class, the "Appointing Beneficiary Class" may also refer to the Loan-Specific DL Sub-Class as determined by the DL Committee (with the Silar Committee Member Appointee Abstaining).

"**Appointment Certificate**" means a sworn certificate by a Person accepting appointment as a Liquidating Trustee, a Committee Member, an Advisory Board member, or some other position relating to the Trust under this Agreement.

"**Approved Transferee**" means, jointly and severally: a spouse of a Beneficiary; a trust for the benefit of the Beneficiary; an entity wholly-owned by a Beneficiary; another Beneficiary; an Affiliate of Silar Parties; and any Person approved by the Committee of the Whole who is not a Prohibited Person.

"**Asset Resolution**" has the meaning set forth in Article I.

"**Asset Resolution Bankruptcy Case**" has the meaning set forth in Article I.

"**Assign**", "**Assigns**," "**Assigned**," or "**Assignment**" means transfer, grant, assign, convey, set over, pledge, give, pay, and/or deliver to the fullest extent legally permissible on an "as-is" basis, without recourse, representation, or warranty.

"**Assigned Causes of Action**" means, jointly and severally, Assigned Professional Claims, Assigned Preference Claims, Piskun Assigned Causes of Action, Causes of Action directly or indirectly acquired through Assigned Compass Interests, Loan Claims, and all other Causes of Action which have been Assigned to the Trust from time to time or at any time.

"**Assigned DL Interests**" means, jointly and severally, all DL Interests assigned to the Trust by any Party from time to time and at any time.

"**Assigned Loan Claims**" means, jointly and severally, all Loan Claims which are Assigned to the Trust from time to time and at any time pursuant to the Loan Claims Assignment Procedure. Notwithstanding anything to the contrary in this Agreement, if one member of the Committee of the Whole or the DL Committee dissents from a material decision made by the other members of the Committee of the Whole or the DL Committee in connection with any decision relating to Assigned Loan Claims, then the Trust and/or the Liquidating Trustee cannot take any further action with respect to that material decision unless and until a majority of the Initial B&B DL Beneficiary Group or the DL Interests affected by that decision, as the case may be, authorizes the Committee of the Whole or the DL Committee to take such action.

"**Assigned Professional Claims**" means all Causes of Action held by a Party against a Professional.

"**Assigned Preference Claims**" means, jointly and severally: GT Preference Claims; Bryan Cave Preference Claims; Conway MacKenzie Preference Claims; Thompson Hine Preference Claims; Remaining Preference Claims; and all Other Preference Claims.

Notwithstanding anything to the contrary in this Agreement, Assigned Preference Claims does not include Preference Claims against Leonard Mezei.

"**Assigning Party**" means a Party who Assigned a Cause of Action, a DL Interest or other Trust Asset to the Liquidating Trustee and/or Trust under this Agreement.

"**B&B DL Settling Clients**" has the same meaning as set forth in the Settlement Order.

"**Beneficiary**" or "**Beneficiaries**" means Initial Beneficiaries and Additional Parties who become Beneficiaries, jointly and severally.

"**Beneficiary Class**" means: each of the Estate; Silar (as a class); and the DL Class or a Loan-Specific DL Sub-Class (as applicable) (as a class). A "Beneficiary Class" may also include Additional Parties (as either a separate class or within another class, as the context requires).

"**Bryan Cave**" or "**BC**" means Bryan Cave, LLP and any and all lawyers employed by or associated with that firm in the practice of law.

"**Bryan Cave Preference Claims**" means all Preference Claims held by the Estate and/or the B&B DL Settling Clients against Bryan Cave.

"**Cause**" means: (a) commission of any act of fraud or dishonesty by the Person in connection with the providing of services under this Agreement; (b) commission of willful misconduct by the Person that is materially injurious to the Trust; (c) criminal felony indictment of the Person relating to the providing of services hereunder; (d) death or incapacity of the Person; (e) continued willful failure by the Person to materially perform the duties of that Person as set forth herein which failure is not cured within thirty (30) days of written notice issued by the Committee of the Whole; or (f) any other ground for removal of a bankruptcy trustee under applicable bankruptcy law.

"**Causes of Action**" means all claims, counterclaims, cross-claims, and/or third-party claims, suits, complaints, charges, requests of charges, questionnaires, defenses, referrals, reports, notices, causes of action, demands, rights, debts, liens, liabilities, obligations, damages, offsets, reimbursements, indemnification, contribution, expenses, compensation, attorneys' fees, loss, detriment, or controversies or any other remedies or relief of any character whatsoever (whether

known or unknown, whether now existing or hereafter arising, whether asserted or un-asserted, whether accrued or un-accrued, and whether or not the subject of a tolling agreement) at law, in equity, under statute, regulation, rule, decree, order, judgment, contract, agreement, status or relationship, or any source of duty or obligation of any kind whatsoever. "Causes of Action" includes, by way of example and not by way of limitation, claims for violations of federal or state racketeering statutes, breaches of the LSAs, liability arising out of the purchase of assets from USACM, violations of the Preliminary Injunction entered in the 892 Case, contempt, sanctions, violations of Nevada or other state statutes or regulations, elder abuse, conspiracy, violations of any criminal statutes or regulations, treble damages, punitive damages, fraudulent inducement, breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, constructive fraud, fraud, conspiracy, concert of action, contempt, servicing misconduct, accounting, *respondeat superior*, aiding and abetting, indemnity, contribution, co-venturer liability, accounting, audit, award, conversion, exemplary damages, misappropriation, fraudulent transfers, fraudulent conveyances, negligence, malpractice, gross negligence, reckless misconduct, servicer misconduct, tortious interference, implied or express warranty, intentional misrepresentation, negligent misrepresentation, impairment or damage to collateral, statutory misrepresentation, promissory estoppel, trespass, receipt of property through false pretenses, breach of partnership agreement(s), breach of trust, piercing the veil and/or other forms of disregarding the separateness of a corporation or other entity, joint venture, partnership, trust, libel, slander, defamation, bankruptcy claim or proof of claim, claims under the United States Bankruptcy Code, breaches or contempt of any order, preliminary injunction, or permanent injunction, and/or any claim under any other federal or state statute, regulation, rule, or law, or authority.

"**Citron Defendants**" means, jointly and severally: Citron Investment Group, Inc., a Florida corporation; Michael Citron, an individual resident of Florida; and Danielle Citron, an individual resident of Florida.

"**Collateral Disposition**" means, jointly and severally, a judicial or non-judicial foreclosure, elimination of a lien, and/or an Assignment (by sale, joint venture, or otherwise) of real property or other collateral securing a USACM Loan.

"**Collateral Disposition Decisions**" means, jointly and severally, any decision which directly or indirectly relates to a Collateral Disposition. For clarification and avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the 51 Percent Rule will control any Collateral Disposition Decisions made by the DL Committee (with the Silar Committee Member

Appointee Abstaining) in connection with a USACM Loan that has not been foreclosed, and the requirements of an operating agreement will control any Collateral Disposition Decisions made by the DL Committee (with the Silar Committee Member Appointee Abstaining) in connection with any real property collateral obtained from a foreclosed USACM Loan.

"**Collateral-Property Specific Expenses**" means the liabilities (whether actual, accrued, or contingent), expenses, and/or other financial obligations relating to the administration, enforcement, liquidation, foreclosure cost, or property management expense attributable to specific collateral for a particular USACM Loan, including without limitation servicer advances and base servicing fees as provided in the Order and Receiver (Tom Grimmett) Fees.

"**Committees**" means, jointly and severally, the Committee of the Whole and Other Committees.

"**Committee Member(s)**" means, jointly and severally, those Persons who are appointed to and accept positions as members of Committees. Notwithstanding anything to the contrary, no Prohibited Person may be a Committee Member.

"**Committee Member Compensation**" means the amount, terms, and conditions of compensation established for Committee Members by the Appointing Beneficiary Class which has the right to appoint the Committee Member under this Agreement, as further discussed in Section 9.5 of this Agreement. Committee Member Compensation for a particular Committee Member shall be payable solely out of the Distributions payable to the Appointing Beneficiary Class. Notwithstanding anything to the contrary, all Committee Member Compensation shall be charged against and payable from Distributions to the Appointing Beneficiary Class and not the Trust in general or any other Beneficiary Class.

"**Committee of the Whole**" means a committee formed under this Agreement comprised of five members, with each member having one vote in a majority-rules process (unless a unanimous vote is expressly required elsewhere in this Agreement). The five members of the Committee of the Whole shall be: (i) the Liquidating Trustee; (ii) two members appointed by Silar in its Sole And Absolute Discretion; and (iii) two members appointed by the Initial B&B DL Beneficiary Group in its Sole And Absolute Discretion. Silar shall be solely responsible for all aspects of the appointment of the two Silar Committee Member Appointees, and the B&B DL Settling Clients, and the Estate shall have Absolute Immunity with respect thereto. The B&B DL Settling Clients shall be solely responsible for all aspects of the appointment of the two

Committee Members to be appointed by the Initial B&B DL Beneficiary Group, and Silar Parties, the Estate, TMF, and their respective Affiliates shall have Absolute Immunity with respect thereto (and any related Losses shall constitute Indemnified Matters subject to the protections of Section 12.2 for matters in which Silar has Abstained).

"**Compass Defendants**" means, jointly and severally: Compass Entities; Repotex; Leonard Mezei; Oakbridge Capital, Inc., a Delaware corporation; Economic Growth Group, Inc., a New York corporation; Jay Cohen; Ron Friedman; David Blatt; and Mark Olson.

"**Compass Entities**" means, jointly and severally: Compass Partners LLC, a Delaware limited liability company; Compass USA SPE, LLC, a Delaware limited liability company; Compass Financial Partners, LLC, a Nevada limited liability company; Compass Financial Partners, LLC, a Delaware limited liability company; Compass FP Corp., a Delaware corporation; Compass USA Holding, LLC, a Delaware limited liability company; Compass USA, LP, a Delaware limited partnership; and Compass USA GP, LLC, a Delaware limited liability company.

"**Compass Interests**" means Interests in one or more of the Compass Entities.

"**Conway MacKenzie Preference Claims**" means all Preference Claims held by the Estate and/or the B&B DL Settling Clients against Conway MacKenzie (but only to the extent of its previously received, but unused, retainer payment).

"**Court**" has the meaning set forth in Article I.

"**Covered Person(s)**" means, jointly and severally, the Trustee, the Governing Committees, Committee Members, the Advisory Boards, Beneficiaries, and each of their respective officers, directors, employees, shareholders, partners, limited partners, members, consultants, agents, attorneys, and other professionals.

"**Designated Percentage Distribution Amount**" means: (a) with respect to Recoveries from Assigned Professional Claims, 20.5% to the Initial B&B DL Beneficiary Group, 79% to Silar or its designee(s), and .5% to the Estate; (b) with respect to Recoveries from Assigned Preference Claims (but except as stated otherwise in this Agreement), 84.5% to the Initial B&B DL Beneficiary Group, 15% to Silar or its designee(s), and .5% to the Estate; (c) with respect to Recoveries from Assigned Loan Claims, 84.5% to the DL Class, 15% to Silar or its designee(s), and .5% to the Estate and (d) with respect to Recoveries from Future Assigned Assets, such

percentages as are established by the Committee of the Whole in accordance with Article IV of this Agreement. Notwithstanding anything to the contrary, distributions resulting from Collateral Disposition Decisions are to be paid solely to the applicable Loan-Specific DL Sub-Class (as further provided for in Section 6.6 of this Agreement).

"**Direct Lenders**" means, jointly severally, Persons who hold, own, or control DL Interests in USACM Loans.

"**Disabling Condition**" means a circumstance in which irrevocable vesting of legal title in or to a Trust Asset in the Liquidating Trustee or the Trust or pursuit of a Cause of Action: (a) fails; (b) is not permitted or is prohibited by applicable law which is not preempted by the Orders or other federal law; (c) will give rise to valid affirmative defense(s) by a Responsible Person or to any other impediment to a Recovery from a Cause of Action which would otherwise be a Trust Asset under this Agreement (including, without limitation, standing); or (d) will otherwise defeat the purposes of the Settlement, the Trust, the Orders, or this Agreement.

"**Distribution**" means the Assignment by the Trust to a Beneficiary or other Person (such as, by way of example only, the Liquidating Trustee or TMF) of cash or other Trust Assets in kind from a Recovery according to the applicable Distribution Waterfall.

"**Distribution Decisions**" means all material decisions relating to Distributions of Recoveries under this Agreement (including without limitation the computation, allocation, application, and payment of a Recovery of any and all deductions from such Recovery), unless stated to the contrary in this Agreement.

"**Distribution Notice**" is a schedule of a proposed Net Distribution reflecting the amount of the gross Recovery relating to the proposed distribution, itemizations by category and amount of all sums to deducted from the Recovery before making proposed Net Distributions to each Beneficiary Class, the amount of the proposed distribution to be made to each Beneficiary Class, any additional deductions from the amount of the proposed distribution within a Beneficiary Class, and the resulting amount of the  proposed Net Distribution  to each Beneficiary.

"**Distribution Waterfall**" means, jointly and severally, the computation, allocation, and application, and payment of a Distribution under Articles V or VI of this Agreement.

"**DL Beneficiaries**" means all Persons who were Direct Lenders at the time they became Parties to this Agreement. Notwithstanding anything to the contrary, the Estate shall not be included as a DL Beneficiary for the purposes of the Distribution Waterfall but shall instead be included in its own Distribution category, except to the extent that the Estate holds a DL Interest in a Loan Claim or with respect to Collateral Disposition Decision, in which event it shall obtain its *pro rata* Recovery pursuant to its DL Interest in addition to its separate Recovery under the Distribution Waterfall.

"**DL Class**" means the class (as a class) of DL Beneficiaries who Assigned to the Trust either Loan Claims and/or DL Interests in particular USACM Loan(s) from which the Trust is obtaining a Recovery in whole or in part. It is anticipated that the DL Class will be sub-divided into one or more Loan-Specific DL Sub-Class(es) for Loan Claims only. Distributions to DL Beneficiaries in a particular DL Class (or, if applicable, sub-class) shall be shared solely by the DL Beneficiaries in that class or sub-class and shall be allocated *pro rata* to such DL Beneficiaries based on the original principal amount of each DL Beneficiary's DL Interest in the USACM Loan which is the subject of the Recovery.

"**DL Class Communication Consultant**" means the Person(s) designated by the DL Committee (with the Silar Committee Member Appointee Abstaining) to facilitate all communications among DL Beneficiaries on the one hand and the Trust and Trust Representatives on the other hand. As a condition to being a Beneficiary of the Trust, each DL Beneficiary agrees to use their best efforts to communicate only through the DL Class Communication Consultant and not directly with Trust Representatives. Notwithstanding anything to the contrary, the DL Class Communication Consultant must be approved by a majority vote of the Initial B&B DL Beneficiary Group, with such vote not occurring until at least two weeks after at least three bids to be the DL Class Communication Consultant are obtained by the DL Committee and circulated to the Initial B&B DL Beneficiary Group. All compensation, costs, and expenses relating to the DL Class Communication Consultant shall constitute a DL Class Expense solely of the Initial B&B DL Beneficiary Group.

"**DL Class Expense(s)**" means expenses: (a) incurred by or at the request of the DL Committee, including without limitation: compensation of the Committee Members appointed by or for the DL Class, compensation (if any) to Advisory Board members selected by the DL Committee, and compensation (if any) to advisors retained by the DL Committee or DL Committee Member Appointees to assist them in representing the interests of the DL Class; (b) all

organizational, separate legal, filing, auditing, administration, tax return preparation, financial statement and/or report preparation, ordinary course accounting fees and expenses, overhead, office space, secretarial, book-keeping, telephone, postage, data storage, physical storage, and other expenses incurred to represent the interests of the DL Class; (c) all communication, balloting, photocopy, telecommunication and other expenses attributable to communications between the DL Committee and the members of the DL Class, including without limitation expenses relating to meetings and related travel and the compensation, costs, and expenses of the DL Class Communication Consultant; (d) reasonable premiums for insurance; (e) the costs and expenses of any litigation involving the DL Committee generally, including indemnification obligations and the amount of any judgments or settlements paid in connection therewith; (f) Collateral-Property Specific Expenses (as described in more detail with respect to the DL Class Expenses Reserve); and (g) any entity level taxes, fees or other governmental charges levied against the Trust. The following shall apply to DL Class Expenses:

1.      At no time and under no circumstances shall DL Class Expenses be borne by any Beneficiary other than a DL Beneficiary.

2.      The DL Committee (with the Silar Committee Member Appointee Abstaining) may in its Sole And Absolute Discretion determine from time to time that other costs or expenses shall be deemed DL Class Expenses and/or may allocate and/or charge DL Class Expenses against DL Class Distributions of Recoveries from time to time.

3.      The DL Committee (with the Silar Committee Member Appointee Abstaining) shall have the power to make Protective Tranche Loans to the Trust or to another Beneficiary Class or to a Loan-Specific DL Sub-Class, at such times and on such terms and conditions as it determines to be appropriate in its Sole And Absolute Discretion.

4.      The DL Committee (with the Silar Committee Member Appointee Abstaining) shall have the power to borrow a Protective Tranche Loan from the Trust, any Beneficiary Class or any other Person, to be repaid as a DL Class Expense on such terms and conditions as it determines to be appropriate in its Sole And Absolute Discretion (but at all times in priority to the repayment of other DL Class Expenses).

"**DL Class Expenses Reserve**" means a reserve for the payment of DL Class Expenses funded by the DL Class Surcharge. The following shall apply with respect to the DL Class Expenses Reserve:

      A.     The DL Committee (with the Silar Committee Member Appointee Abstaining) may determine to increase or decrease the DL Class Expenses Reserve in its Sole And Absolute Discretion in light of available and anticipated cash, the liquidation goals of the Trust, the potential Recovery amount for particular Trust Assets, the Litigation Expenses and out of pocket costs reasonably anticipated for liquidation of Trust Assets, and any other factors the DL Committee determines to be appropriate in its Sole And Absolute Discretion.

      B.     The DL Committee (with the Silar Committee Member Appointee abstaining) shall have the power to authorize payments from the DL Class Expenses Reserve or Distributions payable to DL Beneficiaries for DL Class Expenses in its Sole And Absolute Discretion.

      C.     The DL Committee (with the Silar Committee Member Appointee Abstaining) shall have the power to authorize the monthly payment of Litigation Expenses for Assigned Loan Claims in its Sole and Absolute Discretion.

      D.     The DL Committee (with the Silar Committee Member Appointee Abstaining) may create sub-accounts for Collateral-Property Specific Loan Expenses to accrue or from which the DL Committee may advance funds to a DL Class or sub-class to enable the DL Class or sub-class to pursue foreclosure proceedings or other actions that are unique to the DL Class or sub-class and not otherwise funded by the Trust or a Protective Advance Loan, with any such advances to be repaid by the DL Class or sub-class from funds obtained pursuant to a Collateral Disposition Decision, or from a Recovery out of the Distributions to be received by the DL Class or sub-class under the Distribution Waterfall.

      E.     Upon the termination of the Trust, any funds remaining in the DL Expenses Reserve after payment of all DL Class Expenses shall be disbursed to the Initial B&B DL Beneficiary Group pro rata by the DL Committee (with the Silar Committee Member Appointee Abstaining).

"**DL Class Surcharge**" means the percentage of every dollar of Distribution payable to the DL Class (or a Loan-Specific DL Sub-Class) from a Recovery, on a Recovery by Recovery basis, that is earmarked to pay DL Class Expenses, as determined by the DL Committee (with the Silar Committee Member Appointee Abstaining) in its Sole and Absolute Discretion. The DL Class Surcharge is intended by the B&B DL Settling Clients to be used to maintain an average of one year's budget in the DL Expenses Reserve to fund DL Class Expenses. The one year's budget shall be established within three months of the establishment of the Trust and published to all the DL Beneficiaries.

"**DL Committee**" means a Committee formed under this Agreement as a standing sub-committee of the Committee of the Whole, comprised of four members, with each member having one vote in a majority-rules process, as follows: the Liquidating Trustee; two Committee of the Whole members appointed by the Initial B&B DL Beneficiary Group; and one Committee of the Whole member appointed by Silar. The DL Committee and the DL Class Communication Consultant shall be solely and exclusively responsible for all balloting and other communications with, and all Net Distributions to, the DL Beneficiaries; the Trust, all Trust Representatives other than DL Committee Member Appointees, the Estate, and Silar Parties shall have Absolute Immunity with respect to all matters directly or indirectly relating to or arising out of such balloting, communications, and Net Distributions, including without limitation any duty to render an accounting. Due to the large number of DL Beneficiaries, all DL Beneficiaries agree to follow the communication procedures established by the DL Class Communication Consultant and to use their best efforts not to contact any Trust Representatives directly. In the event of the need to break a deadlock amongst the members of the DL Committee, the tiebreaking vote(s) shall be cast by the applicable Advisory Board members, with any further stalemate to be broken by a majority vote of all affected DL Beneficiaries.

"**DL Committee Member Appointees**" means, jointly and severally, Committee Members appointed by the Initial B&B DL Beneficiary Group.

"**DL Interests**" means fractionalized "direct lender" beneficial interests in a USACM loan.

"**DL Loan Claim Beneficiaries**" means, jointly and severally, DL Beneficiaries who have assigned Loan Claims to the Trust and are entitled to Distributions with respect to Recoveries on such Loan Claims.

"**Effective Date**" has the same meaning as provided in the Settlement Order.

"**Encumbrance Decisions**" means, jointly and severally, any decision or action which would cause Collateral-Property Specific Expenses to be paid or incurred, whether pursuant to the 51 Percent Rule in connection with a USACM Loan that has not been foreclosed, or pursuant to the requirements of an operating agreement governing the Direct Lenders' interests in the real property collateral obtained from a foreclosed USACM Loan. For clarification and avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the 51 Percent Rule will control any Encumbrance Decisions made by the DL Committee (with the Silar Committee Member Appointee Abstaining) in connection with a USACM Loan that has not been foreclosed, and the requirements of an operating agreement will control any Encumbrance Decisions made by the DL Committee (with the Silar Committee Member Appointee Abstaining) in connection with any real property collateral obtained from a foreclosed USACM Loan.

"**Estate**" has the meaning set forth in Article I.

"**Estate Expenses**" means, jointly and severally, expenses incurred by or at the request of the Liquidating Trustee or the Estate relating to the administration of the Estate and which are not General Trust Expenses, Trustee Compensation, and/or Trustee Attorney's Fees to be paid under this Agreement. At no time and under no circumstances shall Estate Expenses be borne by any Beneficiary other than the Estate.

"**First $375,000 From GT**" means the payment to Silar or its designee(s) of every dollar from any and all Recoveries for any Cause of Action against Greenberg Traurig until Silar or its designee(s) has received $375,112.43 from such Recoveries.

"**Future Assigned Assets**" means, jointly and severally, Causes of Action or other assets (including without limitation DL Interests) which are from time to time Assigned to and accepted by the Liquidating Trustee on behalf of the Trust for the further benefit of the applicable Beneficiaries under this Agreement at any time after two days following the Effective Date.

"**General Trust Expenses**" means, jointly and severally: (a) sums reasonably necessary to meet current or long-term liabilities of the Trust; (b) sums for reasonable administrative costs, including, but not limited to, Trustee's Attorney's Fees, accounting functions, Trust-related travel expenses, overhead for office storage space, secretarial assistance, bookkeeping assistance,

telephones, postage, and similar expenses, and fees, costs, and expenses of professionals or advisors; (c) sums to pay any entity-level taxes, fees or other governmental charges levied against or imposed on the Trust; (d) sums to pay the Litigation Expenses of any litigation involving the Trust generally (as opposed to Trust Asset-specific litigation); (e) Liquidation Consulting Fees; (f) Litigation Expenses (but only if they remain after all Causes of Action Assigned to the Trust have been liquidated); and (g) sums to pay Indemnification Obligations of the Trust and to pay the amount of any Losses, judgments, or settlements paid in connection with the Indemnified Matters. Notwithstanding anything to the contrary, General Trust Expenses do not include and shall never include DL Class Expenses, Loan Claim Expenses, Collateral Property Specific Expenses, Silar Expenses, or Estate Expenses.

"**General Trust Reserve**" means a reserve for the payment of General Trust Expenses and Protective Tranche Loans unanimously approved (excluding Abstentions) by the Committee of the Whole. The following shall apply to the General Trust Reserve upon determination by the unanimous consent of the Committee of the Whole:

    A.   The Committee of the Whole may determine to increase or decrease the General Trust Reserve in its Sole And Absolute Discretion in light of available and anticipated cash, the liquidation goals of the Trust, the potential Recovery amount for particular Trust Assets, the Litigation Expenses and out of pocket costs reasonably anticipated for liquidation of Trust Assets, the amount of anticipated General Trust Expenses, and any other factors the Committee of the Whole determines to be appropriate.

    B.   The Committee of the Whole shall have the power to authorize payments from the General Trust Reserve for General Trust Expenses in whole or in part in its Sole And Absolute Discretion.

    C.   The Committee of the Whole shall have the power to authorize the Trust to make a Protective Tranche Loan to be repaid as a General Trust Expense on such terms and conditions it determines to be appropriate in its Sole And Absolute Discretion.

    D.   The Committee of the Whole shall have the power to authorize the Trust to borrow a Protective Tranche Loan to be repaid as a General Trust Expense on such terms and conditions it determines to be appropriate in its Sole And Absolute Discretion.

E.     Upon the termination of the Trust, any funds remaining in the General Trust Reserve after payment of all General Trust Expenses shall be disbursed to the Estate, Silar or its designees, and the DL Class based upon the amounts contributed by each Beneficiary Class from Recoveries.

"**General Trust Reserve Surcharge**" means one percent (1%) of a Recovery.  The General Trust Reserve Surcharge is intended to be used to maintain an average of **$200,000.00** in the General Trust Reserve to fund General Trust Expenses.  In the event that the General Trust Reserve contains the intended average balance, then the Committee of the Whole in its Sole and Absolute Discretion may determine the amount of the General Trust Surcharge applicable to a Recovery, on a Recovery by Recovery basis, but in no event shall such assessed General Trust Surcharge exceed 2.5**%** of any Recovery (except to meet then outstanding Indemnification Obligations, in which case the assessment shall be made in an amount necessary to meet the then outstanding Indemnification Obligations).  The Committee of the Whole in its Sole and Absolute Discretion, acting with the unanimous consent of the entire Committee of the Whole, may adjust the intended average balance of the General Trust Reserve.

"**Governing Committee**" means the Committee which is charged with the right or the responsibility to make a decision with respect to a matter under this Agreement.

"**Greenberg Traurig**" or "**GT**" means Greenberg Traurig, LLP and any and all lawyers employed by or associated with that firm in the practice of law.

"**GT Preference Claims**" means all Preference Claims held by the Estate and/or the B&B DL Settling Clients against Greenberg Traurig.

"**Indemnification Matters**" means any matter for which the Trust has an Indemnification Obligation.

"**Indemnification Obligation**" means any obligation of the Trust to provide indemnification of Losses to any Person under this Agreement, including without limitation those obligations arising out of Abstentions or otherwise under Section 12.2 of this Agreement.

"**Information**" has the meaning set forth in section 16.6.

"**Initial B&B DL Beneficiary Group**" means the B&B DL Settling Clients as a class.

"**Initial Beneficiaries**" means, jointly and severally: the Estate; Silar or its designee(s); and B&B DL Settling Clients.

"**Initial Cash**" means, jointly and severally, the $100,000 Payment.

"**Initial Parties**" means, jointly and severally, Leonard and Initial Beneficiaries.

"**In-Kind**" means anything other than cash.

"**In-Kind Distribution**" means Distribution of an In-Kind Recovery without liquidation to cash before the Distribution.

"**In-Kind Recovery**" means the Recovery of anything other than cash.

"**Instructions**" means instructions from the Court regarding the interpretation or application of this Agreement or the Orders or regarding administration of the Trust in similar manners and circumstances as would be sought and available from a district court, probate court, chancery court, court in equity, or other court charged with administration of trusts in one or more states in the United States.

"**Interests**" means, jointly and severally, stock, general partnership, limited partnership, limited liability company membership and/or related "creditor" rights, or other equity, ownership, or investment interest of any character or nature whatsoever, as well as the right to succeed to any of the foregoing.

"**Klestadt Preference Claims**" means those Preference Claims held by the Estate or the B&B DL Settling Clients (as defined in the Settlement Order) against Klestadt & Winters LLP.

"**Leonard**" means William A. Leonard, Jr., in his capacity as chapter 7 trustee of the Estate and as the initial Liquidating Trustee of the Trust.

"**Liquidation Consulting Fees**" means, jointly and severally, fees for Persons (including without limitation Committee Members) who provide business consulting, litigation support, and

**PAGE 18**

other services in connection with the liquidation of Trust Assets which are Assigned to the Trust. The terms and conditions of Liquidation Consulting Fees to be charged shall be set by the Committee of the Whole in its Sole And Absolute Discretion. Liquidation Consulting Fees shall be deemed General Trust Expenses.

"**Liquidation Decision(s)**" means, jointly and severally, all material decisions relating to liquidation of a Trust Asset, including without limitation whether or not to drop a Cause of Action or pursue a Recovery in whole or in part, to file or not file suit, or to settle or not settle and on what terms. Notwithstanding anything to the contrary in this Agreement: (a) all Collateral Disposition Decisions and Encumbrance Decisions with respect to Trust Assets shall be made solely by the DL Committee (with the Silar Committee Member Appointee Abstaining), as provided throughout this Agreement; and (b) no resolution of a Cause of Action resulting from a Liquidating Decision may: (1) require the Estate or any other Beneficiary or Silar Parties to admit fault or wrongdoing; or (2) expose the Estate or any other Beneficiary or Silar Parties to Losses or to a potential Cause of Action by the Responsible Person with whom the Trust has resolved a Cause of Action (without the prior consent of any such affected Person).

"**Liquidating Trustee**" means all Persons who are appointed to and accept the position of Liquidating Trustee under the terms and conditions of this Agreement.

"**Liquidating Trust Interest**" means a Beneficiary's allocable share of distributions from the Trust under the terms and conditions and as otherwise provided in this Agreement.

"**Litigation Expenses**" means, jointly and severally, all cost and expenses incurred in connection with the liquidation/litigation of a Cause of Action which has been Assigned to the Trust, including without limitation, costs and expenses associated with the following: expert witnesses and consultants; responding to discovery requests (including internal and out of pocket costs and attorney's fees), copying, scanning and/or data converting, storing, and processing documents, transcripts, videos, and other data or materials; investigative activities; travel; litigation support services; demonstrative exhibits; written and/or video depositions; postage; deliveries; long-distance telephone; and local counsel other special counsel; and "Costs and Expenses" as defined in the TMF Retention Agreement. Notwithstanding anything to the contrary, Litigation Expenses shall not include General Trust Expenses, DL Class Expenses, Collateral-Property Specific Expenses, Silar Expenses, or Estate Expenses.

"**Loan Claim(s)**" means, jointly and severally, all Causes of Action against borrowers

and/or guarantors of USACM Loans and their Affiliates who may be liable for advances made with respect to USACM Loans, as well as all Causes of Action against other third parties related to USACM Loans (for example but not by way of limitation., title companies) which are not Non-Loan Claims and are Assigned to and accepted by the Liquidating Trustee on behalf of the Trust pursuant to the Loan Claim Assignment Procedure for the further benefit of the DL Loan Claims Beneficiaries (whether those Persons are Initial Parties or Additional Parties), Silar or its designee(s), and the Estate. Upon receipt of an Assignment of a Loan Claim, the Liquidating Trustee and the Trust: (a) shall be the successor to the Asset Purchaser pursuant to the Third Amended Plan of Reorganization in the USACM Bankruptcy Cases and the orders, rulings, and findings of the Bankruptcy Court relating to the Third Amended Plan and/or sale of assets to Compass Entities thereunder; and (b) shall hold such Loan Claims free and clear of any Causes of Action (including without limitation defenses) directly or indirectly arising out of or relating to any alleged or actual act or omission of USACM or the USACM Estate.

"**Loan Claim(s) Assignment Procedure**" means the procedure by that name set forth in the Settlement Order and as may be amended or supplemented from time to time by other Orders. No Loan Claims shall be Assigned to the Liquidating Trust except as provided in the Orders or this Agreement. Neither the Trust nor any Trust Representative has any duty of any kind to *sua sponte* consider whether or not the Trust might or should seek an Assignment(s) of Loan Claims. However, any Direct Lender in any USACM Loan may ask the DL Committee (with the Silar Committee Appointee Abstaining) to consider whether the Trust should accept an Assignment of a Loan Claim and, if so, under what terms and conditions. If the DL Committee (with the Silar Committee Appointee Abstaining) determines in its Sole and Absolute Discretion that the Trust may seek to receive an Assignment of a Loan Claim:

    A.    The DL Class Communications Consultant shall, at the direction of the DL Committee, provide by US mail, e-mail, or on a website established by the DL Committee a "Notice Of Loan Claims Assignment" to all Direct Lenders holding DL Interests in the USACM Loan which is the subject of the Loan Claims sought to be Assigned. The Notice of Loan Claims shall set forth such information deemed appropriate by the DL Committee (with the Silar Committee Appointee Abstaining) and at least the following: (i) a general description of the Loan Claim; (ii) the identity(ies) of the Responsible Persons that are the subject of the Loan Claim; (iii) contact information for the DL Class Communication Consultant; (iv) any specific material terms or conditions applicable to the proposal which are not already addressed in the Orders or in this Agreement; and (v) any applicable deadlines with respect to the Notice.

B.      With respect to Direct Lenders holding DL Interests in the USACM Loan which is the subject of the Loan Claims who are Beneficiaries of the Trust at the time of the Notice, the Notice may provide that such Direct Lenders will be deemed to have accepted the Notice and agreed to become a member of the Loan-Specific DL Sub-Class related to the Notice unless that Direct Lender has within twenty calendar days of the Notice provided the DL Class Communication Consultant written notice of a decision to opt-out of the Loan-Specific DL Sub-Class.

C.      With respect to Direct Lenders holding DL Interests in the USACM Loan which is the subject of the Loan Claims who are not Beneficiaries of the Trust at the time of the Notice, the Notice shall contain a copy of the Orders and this Agreement and may provide that such Direct Lenders will be deemed to have rejected the Notice and declined to become a member of the Loan-Specific DL Sub-Class related to the Notice unless that Direct Lender has within at least twenty calendar days of the Notice provided the DL Class Communication Consultant written notice of a decision to opt-in to the Loan-Specific DL Sub-Class.

"**Loan Claim Expenses**" means all the liabilities (whether actual, accrued, or contingent), expenses (including, without limitation, related Litigation Expenses), and/or other financial obligations attributable to a specific Loan Claim and which are not Collateral-Property Specific Expenses.

"**Loan Claim Recovery**" means a Recovery from a Loan Claim.

"**Loan-Specific DL Sub-Class**" means a sub-class of the DL Class which is comprised solely of DL Beneficiaries for Loan Claims relating to a specific USACM Loan.    The Parties contemplate that there will be more than one Loan-Specific DL Sub-Class.  Each Beneficiary in a particular Loan-Specific DL Sub-Class must be a Direct Lender in the USACM Loan which is the subject of that sub-class.  Each Loan-Specific DL Sub-Class shall be formed pursuant to the Loan Claims Assignment Procedure.  Any DL Beneficiary who has not been joined to a Loan-Specific DL Sub-Class pursuant to the Loan Claims Assignment Procedure shall be excluded from the right to receive any Distribution from a Recovery with respect to the Loan Claims for which the sub-class was formed, except as may be required by applicable law.

"**Losses**" means, jointly and severally, all losses, costs, damages, and reasonable and documented out-of-pocket expenses (including, without limitation, fees and expenses of attorneys and other advisors, Litigation Expenses, costs and expenses responding to discovery, any court costs and reasonable travel expenses).

"**LSAs**" has the meaning set forth in Article I.

"**Net Distribution(s)**" means a Distribution to an applicable Beneficiary after all deductions as provided in this Agreement. All Net Distributions authorized under this Agreement shall be made by issuing a check to each payee and delivering that check by U.S. regular mail, unless other arrangements are made between the Liquidating Trustee and each payee. The reasonable costs of distributing such checks via U.S. regular mail shall be deducted from the amounts paid to each payee. Net Distributions payable to the Estate shall be made to Leonard, as chapter 7 trustee of the Estate, for further distribution in accordance with the Orders and the Bankruptcy Code. Net Distributions payable to Silar shall be made to Silar or its designee(s). Unless the Court enters one or more orders directing otherwise, Net Distributions for all other Beneficiaries shall be payable to the name and address for the Liquidating Trust Interest reflected in the Trust Register for such Beneficiaries.

"**Nevada Bankruptcy Court**" has the meaning set forth in Article I.

"**Non-Loan Claim(s)**" means, jointly and severally, any and all Assigned Preference Claims, Assigned Professional Claims, and Future Assigned Assets which are not designated as Loan Claims by the Governing Committee when they are Assigned to the Trust.

"**Orders**" has the meaning set forth in Article I.

"**Other Committees**" means, jointly and severally, the Silar Committee, the DL Committee, and any other committee or sub-committee established by the Committee of the Whole, the Silar Committee, or the DL Committee under this Agreement.

"**Other Preference Claims**" means any and all Preference Claims held by the Estate or the B&B DL Settling Clients against any Person, excluding GT Preference Claims; Bryan Cave Preference Claims; Conway MacKenzie Preference Claims; Thompson Hine Preference Claims; and Remaining Preference Payment Claims.

"**Parties**" means, jointly and severally: Leonard; the Estate; B&B DL Settling Clients; Silar; and Additional Parties.

"**Permitted Person(s)**" means, jointly and severally any Person who has been appointed to be a Committee Member and who is not a Prohibited Person.

"**Persons**" means, jointly and severally, natural persons, corporations, limited liability companies, partnerships, limited partnerships, trusts, estates, government, governmental agency, governmental department, and all other legally-cognizable entities in all capacities.

"**Piskun**" means Boris Piskun, a named defendant in the 892 Case and the 210 Case.

"**Piskun Assigned Causes of Action**" means the Causes of Action Assigned to the Trust or the Liquidating Trustee on its behalf by Piskun pursuant to the Orders.

"**Preference Claims**" means, jointly and severally, all Causes of Action relating to or arising out of pre-petition preference or other payments made to a Person by Asset Resolution or the Estate, including without limitation all Causes of Action asserted in the Adversary Proceedings and all known and unknown Causes of Action which could be filed by the Estate on or after October 13, 2011 against any Person (whether or not such Person is a named defendant in an Adversary Proceeding).  Notwithstanding anything to the contrary, Preference Claims shall not include Causes of Action against Leonard Mezei.

"**Privilege(d)**" means subject to attorney-client privilege, work product exemption, trade secrets protection, confidentiality protection or prohibition, or other privilege or exemption from disclosure available under applicable law.

"**Professional**" or "**Professionals**" means one or more of the following Persons, jointly and severally: Tyson Lomazow and his Affiliates; Weil Gotshal & Manges, LLP and its Affiliates; Milbank, Tweed, Hadley & McCloy LLP and its Affiliates; Bullivant Houser Bailey PC and its Affiliates; Windler and her Affiliates; Bryan Cave and its Affiliates; Greenberg Traurig and its Affiliates; Windemere Capital, LLC and its Affiliates; Sheppard Mullin Richter & Hampton, LLP and its Affiliates; Gary Fragin; Greg Fragin; and Additional Designated

Professionals.  Notwithstanding anything to the contrary, the Trustee and the Liquidating Trustee are not and cannot be "Professionals."

"**Prohibited Persons**" means, jointly and severally: Responsible Persons; Adverse Claimants; and any other Person who, in the Sole and Absolute Discretion of the Committee of the Whole, has an adverse interest to the Trust or the Beneficiaries.

"**Protective Advance Loan**" means, jointly and severally, Court-approved loans made on a super-priority basis with respect to a particular USACM Loan by any Person (including without limitation any Protective Advance Loan made by Silar or its designee(s) as described in the Settlement Order).  Notwithstanding anything to the contrary, in the event a single Recovery results from the simultaneous resolution of a Cause of Action which serves as collateral for a Protective Advance Loan and a Cause of Action which is not collateral for a Protective Advance Loan, then the Protective Advance Loan shall have absolute priority of repayment from that Recovery and such repayments shall be charged solely to the DL Class (or Loan-Specific DL Sub-Class, as the case may be) and not to any other Beneficiary Class.

"**Protective Tranche Loan**" means, jointly and severally, loans or advances that are not Protective Advance Loans and are made by any Person (including without limitation this Trust and any Beneficiary Class) for the benefit of the Trust or a particular Beneficiary Class in order to fund the liabilities (whether actual, accrued, or contingent), expenses, and/or other financial obligations of the Trust or a particular Beneficiary Class under this Agreement.

"**Receiver (Tom Grimmett) Fees**" means fees payable by Direct Lenders pursuant to that certain Order Granting Motion To Authorize Payment of Receivership Expenses (#1519) entered in the 892 Case as Doc. No. 2032.

"**Recoveries**," "**Recovery**," or "**Recovered**" jointly and severally mean the receipt at any time and/or from time to time of money, proceeds, stock, options, warrants, securities, profits interests, joint venture interests, carried interests, partnership interests, limited liability company membership interests, interests in real property, interests in personal property, leasehold interests, DL Interests, any type of other legal, contractual, equitable, statutory, or beneficial rights or interests, settlements, judgments, credits, favorable offsets, favorable recoupments,  favorable transactions of any type, or any other things of value of any kind, in whole or in part, directly or indirectly arising out of, relating to, or affecting liquidation of  a Trust Asset.

**PAGE 24**

"**Remaining Preference Claims**" means all Preference Claims held by the Estate and/or the B&B DL Settling Clients against the following: Kroll, Inc.; Patterson Belknap; the Sullivan Group; Ellenoff Grossman; Kramer Levin; Conway MacKenzie (except to the extent of its previously received, but unused, retainer payment); IW Osborne; Westwood Capital; First (1st) Service; Alternative Investment Consulting; Kolesar Leatham; Gottex ABI; Gottex ABL; and Ackerman Consulting; and Affiliates of the foregoing.

"**Repotex**" means Repotex, Inc., a Delaware corporation.

"**Repotex Preference Claims**" means those Preference Claims held by the Estate against Repotex.

"**Representative Capacity**" means one or more the following, jointly and severally: co-venturers with and among the Beneficiaries; equitable lien-holder(s); the Beneficiaries' appointed true and lawful attorney-in-fact or representative; collection manager(s); nominee(s) for collection; agent(s) for collection; assignee(s) for collection; collateral assignee(s); transferee(s) for collection; claims servicer(s); claims aggregator(s); disbursing agent(s); claims administrator(s); successor(s) to the Asset Purchaser under the USACM Plan; and/or any other legal or equitable capacity which would provide the Trust or the Liquidating Trustee the power, authority, ability, and/or standing to sue and collect the Causes of Action for the Beneficiaries as anticipated by this Agreement and the Orders.

"**Responsible Person(s)**" means, jointly and severally, a Person who has an adverse interest as a legal or practical matter with respect to the liquidation of any Trust Asset (including without limitation Assigned Causes of Action). By way of explanation only and not limitation, "Responsible Persons" include borrowers, guarantors, former brokers, employees, or other agents of USACM, Professionals, or other Persons who may be the subject of a Cause of Action which is Assigned to the Trust. Notwithstanding anything to the contrary in this Agreement, or the Orders, the Trustee, the Liquidating Trustee, B&B DL Settling Clients, and/or Silar Parties are not and cannot be "Responsible Persons."

"**Settlement**" means the terms of the settlement reflected in the Settlement Order.

"**Settlement Agreement**" means the initialed settlement agreement attached to the Joint Motion for Approval of Settlement, filed March 15, 2012, Docket No. 1706 in Case No. 09-32824-rcj.

"**Settlement Order**" has the meaning set forth in Article I.

"**Settling B&B DL Clients**" has the meaning set forth in the Orders.

"**Silar Advisors**" means Silar Advisors, L.P., individually and as investment manager and agent.

"**Silar**" means, jointly and severally, Silar Advisors and certain investors and participants for whom Silar Advisors acted as investment manager or agent, including without limitation Silar Special Opportunities Fund, LP and SMOF-A, LLC and excluding Compass Defendants.

"**Silar Class Expense(s)**" means expenses: (a) incurred by or at the request of the Silar Committee, including without limitation: compensation of the Committee Members appointed by or for the Silar Class, compensation (if any) to Advisory Board members selected by the Silar Committee, and compensation (if any) to advisors retained by the Silar Committee or Silar Committee Member Appointees to assist them in representing the interests of the Silar Class; (b) all organizational, separate legal, filing, auditing, tax return preparation, financial statement and/or report preparation, ordinary course accounting fees and expenses, administration, overhead, office space, secretarial, book-keeping, telephone, postage, data storage, physical storage and other expenses incurred to represent the interests of the Silar Class; (c) all communication, balloting, photocopy, telecommunication and other expenses attributable to communications between the Silar Committee and the members of the Silar Class, including without limitation expenses relating to meetings and related travel and the compensation, costs, and expenses of consultants engaged by Silar; (d) reasonable premiums for insurance; (e) the costs and expenses of any litigation involving the Silar Committee generally, including Indemnification Obligations and the amount of any judgments or settlements paid in connection therewith to the extent such are not fully satisfied by the Trust under Section 12.2 hereof; (f) Liquidation Expenses to the extent such are not fully satisfied by the Trust; and (g) any entity level taxes, fees or other governmental charges levied against the Silar Class.

The following shall apply to Silar Class Expenses:

1.      At no time and under no circumstances shall Silar Class Expenses be borne by any Beneficiary other than a Silar Beneficiary.

2.      The Silar Committee (with the DL Committee Member Appointee Abstaining) may in its Sole And Absolute Discretion determine from time to time that other costs or expenses shall be deemed Silar Class Expenses and/or may allocate and/or charge Silar Class Expenses against Silar Class Distributions of Recoveries from time to time.

3.      The Silar Committee (with the DL Committee Member Appointee Abstaining) shall have the power to make Protective Tranche Loans to the Trust or to another Beneficiary Class or to a Loan-Specific DL Sub-Class, at such times and on such terms and conditions as it determines to be appropriate in its Sole And Absolute Discretion.

4.      The Silar Committee (with the DL Committee Member Appointee Abstaining) shall have the power to borrow a Protective Tranche Loan from the Trust, any Beneficiary Class or any other Person, to be repaid as a Silar Class Expense on such terms and conditions as it determines to be appropriate in its Sole And Absolute Discretion (but at all times in priority to the repayment of other Silar Class Expenses).

"**Silar Class Expenses Reserve**" means a reserve for the payment of Silar Class Expenses funded by the Silar Class Surcharge.  The following shall apply with respect to the Silar Class Expenses Reserve:

A.  The Silar Committee (with the DL Committee Member Appointee Abstaining) may determine to increase or decrease the Silar Class Expenses Reserve in its Sole And Absolute Discretion in light of available and anticipated cash, the liquidation goals of the Trust, the potential Recovery amount for particular Trust Assets, the Litigation Expenses and out of pocket costs reasonably anticipated for liquidation of Trust Assets, and any other factors the Silar Committee  (with the DL Committee Member Appointee Abstaining) determines to be appropriate in its Sole And Absolute Discretion.

B. The Silar Committee (with the DL Committee Member Appointee abstaining) shall have the power to authorize payments from the Silar Class Expenses Reserve or Distributions payable to Silar for Silar Class Expenses in its Sole And Absolute Discretion.

C. The Silar Committee (with the DL Committee Member Appointee Abstaining) shall have the power to authorize the monthly payment of Litigation Expenses for Assigned Loan Claims in its Sole and Absolute Discretion.

D. Upon the termination of the Trust, any funds remaining in the Silar Expenses Reserve after payment of all Silar Class Expenses shall be disbursed to Silar.

"**Silar Class Surcharge**" means one (1) percent of every dollar of Distribution payable to Silar from a Recovery. The DL Class Surcharge is intended by Silar to be used to maintain an average of $150,000 in the Silar Expenses Reserve to fund Silar Class Expenses. In the event that the DL Expenses Reserve contains the intended average balance, then the Silar Committee (with the DL Committee Member Appointee Abstaining) may determine in its Sole and Absolute Discretion the amount of the Silar Class Surcharge applicable to a Recovery, on a Recovery-by-Recovery basis. The Silar Committee (with the DL Committee Member Appointee Abstaining) may adjust the intended average balance of the Silar Expenses Reserve from time to time in its Sole and Absolute Discretion.

"**Silar Committee**" means a Committee formed under this Agreement as a standing sub-committee of the Committee of the Whole, comprised of four members, with each member having one vote in a majority-rules process, as follows: the Liquidating Trustee; two Committee of the Whole members appointed by Silar; and one Committee of the Whole member appointed by the Initial B&B DL Beneficiary Group.

"**Silar Committee Member Appointees**" means, jointly and severally, Committee Members appointed by Silar.

"**Silar Party(ies)**" means, jointly and severally, Silar and its Affiliates.

"**Sole And Absolute Discretion**" means the discretion to make any decision for any reason or no reason, without regard to the interests of and without being subject to any fiduciary duty, duty of good faith and fair dealing, or any other duty to any Party.

"**Thompson Hine Preference Claims**" means all Preference Claims held by the Estate and/or the B&B DL Settling Clients against Thompson Hine.

"**TMF**" means, jointly and severally, The Majorie Firm Ltd., Francis B. Majorie PC, Francis B Majorie individually, any lawyers associated with one or more of them in the practice of law, and their Affiliates. Notwithstanding the foregoing, with respect to the right to receive TMF Contingency Fees, "TMF" means only The Majorie Firm Ltd.

"**TMF Contingency Fee**" means a fee equal to twenty-five percent of a Recovery received by the Trust from a Trust Asset. Notwithstanding the foregoing, TMF and the DL Committee (with the Silar Committee Member Appointee Abstaining) may agree to a different fee only with respect to foreclosure proceedings initiated and pursued by the Trust that result in additional, reasonably foreseeable value to the DL Interests in the USACM Loan other than merely acquiring legal title to the real property collateral, as further discussed in Section 6.6 of this Agreement. The terms of such different fee, however, cannot (without Silar's consent, which may be given or not given in Silar's Sole And Absolute Discretion) reduce the amount which Silar or its designees would otherwise be entitled to receive under the Distribution Waterfall from a Recovery with respect to such additional, reasonably foreseeable value. Such different fee shall also be deemed a "TMF Contingency Fee."

"**TMF Retention Agreement**" means, jointly and severally, the retention agreement with The Majorie Firm, Ltd. approved by the Settlement Order and any other retention agreement between the Trust and The Majorie Firm, Ltd.

"**Transferred Estate Assets**" means, jointly and severally, the Causes of Action of the Estate and other Assets of the Estate which have been Assigned to the Trust by the Estate.

"**Trust**" means the irrevocable liquidating trust established under the Orders and the terms and conditions set forth in this Agreement.

"**Trust Assets**" means, jointly and severally: the $100,000 Payment; Piskun Assigned Causes of Action; Assigned Compass Interests; Assigned Causes of Action; Assigned Loan Claims; Assigned DL Interests (if any are Assigned); Future Assigned Assets; and Recoveries derived or recovered on or from one or more of the foregoing.

"**Trust Changes**" means interpretations, modifications, amendments, supplements or termination of one or more provisions of this Agreement or the Orders in whole or in part.

"**Trust Register**" means those books and records relating to Liquidating Trust Interests maintained pursuant to such reasonable regulations as the Liquidating Trustee may prescribe.

"**Trust Representatives**" means, jointly and severally, the Liquidating Trustee, counsel to the Liquidating Trustee (acting in such capacity), Committee Members, Persons who are members of Advisory Boards, TMF, and their respective Affiliates.

"**Trustee's Attorney's Fees**" means reasonable attorney's fees and costs charged by separate counsel to the Liquidating Trustee for legal services which were necessarily and reasonably required by the Liquidating Trustee to perform his/her duties as Liquidating Trustee under this Agreement.

"**Trustee Compensation**" means a fee equal to three percent of a Recovery received by the Trust from Trust Assets. For purposes of clarity, Trustee Compensation shall be charged pursuant to the foregoing formula against the total amount of the Recovery and not just the amount received by the Estate for the Estate's Liquidating Trust Interests. Notwithstanding anything to the contrary, if the sole action by the Trust is the acquisition of legal title to real property collateral, then no Trustee Compensation is owed, as further provided in Section 6.6 of this Agreement.

"**USACM**" has the meaning set forth in Article I.

"**USACM Bankruptcy Cases**" has the meaning set forth in Article I.

"**Unreimbursed Litigation Expenses**" means Litigation Expenses which were paid, incurred, or advanced by the Trust, TMF, or any other Person on behalf of the Trust, but have not yet been reimbursed by the Trust.

"**Unreimbursed Loan Claim Expenses**" means Loan Claim Expenses which were paid, incurred, or advanced by the Trust, DL Class, or any other Person on behalf of the Trust, but have not yet been reimbursed by the Trust.

"**USACM Loans**" has the meaning set forth in Article I.

"**Veto**" means, notwithstanding anything to the contrary in the Agreement, the power in the veto-holder's Sole And Absolute Discretion to direct or veto any decision of a Governing Committee.

"**Windler**" means Katherine Windler.

"**$100,000 Payment**" means the $100,000.00 paid by Silar pursuant to the Settlement Order.

"**51 Percent Rule**" means the rights and responsibilities accorded to the holders of DL Interests under NRS 645B.340 as may be amended and interpreted by the courts from time to time, all related regulations, and all related rulings by the Court in the 892 Case and/or the Asset Resolution Bankruptcy Case.

"**210 Case**" has the meaning set forth in Article I.

"**892 Case**" has the meaning set forth in Article I.

**2.2**    **Headings.**    The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.   The provisions of Article I shall be deemed to be material parts of this Agreement and not mere recitals.

## ARTICLE III.    DECLARATION OF TRUST AND GENERAL PROVISIONS

**3.1**    **Declaration/Establishment Of Trust.**  In order to implement the settlement and liquidation approved by the Orders and for good and valuable consideration (the sufficiency of which is hereby acknowledged by the Parties), the Parties hereby declare and establish as of the Effective Date an irrevocable liquidating trust for the Trust Assets under the terms and conditions set forth in this Agreement.

**3.2**    **Name.**  The name of the Trust is "**The Claims Recovery Trust**".

**3.3    Principal Office.**  The principal office of the Trust shall be in care of The Majorie Firm Ltd., 3514 Cedar Springs Road, Dallas, Texas 75219 or such other address designated by the Committee of the Whole.  The Trust shall not be required to qualify or register to do business in any state.

**3.4    Purpose.**  The primary purpose of this Agreement and the Trust created hereby is to implement part of the settlement approved by the Court in the Orders by providing a mechanism for: (a) aggregating certain Causes of Action in which the Beneficiaries share a common interest; (b) overseeing and directing the liquidation of such Causes of Action on a unified basis; and (c) distributing recoveries on such Causes of Action and any other Trust Assets as set forth more fully in this Agreement.

**3.5    Vesting of Trust Assets.**    Unless doing so would defeat the purposes of the Settlement, the Trust, the Orders, or this Agreement: (a) legal title to all Trust Assets shall be irrevocably vested in the Liquidating Trustee on behalf of the Trust for the further benefit of the Beneficiaries for the uses and purposes stated in this Agreement and the Orders, free and clear of all liens, claims, demands, offsets, recoupments, or encumbrances except those imposed by the Orders or this Agreement; and (b) upon Assignment, the Liquidating Trustee and/or Trust shall succeed to all the Assigning Party's rights, title, and interests in and to the Trust Assets and such Assigning Party shall have no further interest in or with respect to the Trust Assets other than indirectly as a Beneficiary of the Trust.

**3.6    Appointment In Lieu Of Vesting.**  Notwithstanding anything to the contrary in this Agreement or the Orders, if there is a Disabling Condition with respect to the Liquidating Trustee's efforts to obtain a maximum Recovery in connection with a Cause of Action or other Trust Assets, then:

(a)    The Assigning Party shall be deemed to have duly appointed the Liquidating Trustee and/or Trust to a Representative Capacity; or

(b)    In addition or in the alternative, the legal vesting shall be deemed to have not occurred as to such Cause of Action or other Trust Asset and legal title in and to such Cause of Action or other Trust Asset shall be deemed retained by the Assigning Party, the Liquidating Trustee on behalf of the Trust shall retain a beneficial interest in a Recovery from such Cause of Action or other Trust Asset, and such Cause of Action or other Trust Asset and any Recovery

thereon shall be administered and distributed as closely and consistently as possible with the terms of this Agreement as if the Liquidating Trustee or Trust held legal title; or

(c)     In addition or in the alternative, the Liquidating Trustee and/or Governing Committee may petition the Court to obtain such relief as may be necessary and appropriate to effectuate the purposes and intent of the Orders and this Agreement for the benefit of the Beneficiaries with respect to such Cause of Action or other Trust Asset and any Recovery thereon.

**3.7    Powers.**

(a)     The Trust and/or the Liquidating Trustee acting on behalf of the Trust may engage in all activities authorized by law, consistent with the purpose of the Trust being recognized as a grantor or liquidating trust under United States income tax laws and regulations.

(b)     The Trust and/or the Liquidating Trustee acting on behalf of the Trust are hereby vested with and shall be deemed to have acquired all rights, powers, authority, and duties necessary and appropriate to liquidate Trust Assets and implement the purposes of the Trust and the provisions of this Agreement and the Orders, subject to the other provisions of this Agreement and/or instructions of the Governing Committee(s) as set forth in this Agreement.  Such rights, powers, authorities, and duties shall include without limitation those granted a trustee under bankruptcy law with respect to disposition of the Causes of Action, as well as the right, power, authority, and duty to undertake the following as more fully provided in this Agreement:

(1)     Hold, manage, liquidate, convert to cash, establish and manage reserves for or out of, and distribute Trust Assets for the benefit of the Beneficiaries, as set forth in this Agreement;

(2)     Investigate, pursue, sue on or defend, prosecute, compromise, adjust, arbitrate, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle the Causes of Action belonging to the Trust, by any method deemed appropriate (including without limitation, through judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity);

(3)     Avoid and recover transfers pursuant to the Preference Claims assigned to the Trust, as may be permitted by the Bankruptcy Code (with full powers of a bankruptcy trustee vested in the Liquidating Trustee) or applicable state law;

(4)     Seek the examination of any Person, subject to the provisions of Bankruptcy Rule 2004 or any other applicable law or rule;

(5)     Act as a signatory;

(6)     File all tax and regulatory forms, returns, reports and other documents required with respect to the Trust and this Agreement and request any appropriate tax determination with respect to the Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(7)     Retain The Majorie Firm Ltd. to represent the Trust on the terms and conditions set forth in the Orders and this Agreement, and any local counsel to assist The Majorie Firm Ltd. on reasonable terms and conditions as agreed to by the Liquidating Trustee;

(8)     Obtain reasonable insurance coverage with respect to the liabilities and obligations of members of the Committee of the Whole under this Agreement (in the form of an officers' and directors' policy and/or an errors and omissions policy or otherwise);

(9)     Retain advisors, including Liquidation Consultants, to assist the Trust without Court approval and pay such advisors reasonable compensation for services rendered and reasonable and documented out-of pocket expenses incurred;

(10)     Retain, approve compensation arrangements for, and pay out of Trust Assets without Court approval an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Trust to prepare and file any tax returns, informational returns, or periodic or current reports as required by this Agreement, the Orders, or applicable laws;

(11)     Retain, approve compensation arrangements for, and pay out of Trust Assets consultants, asset managers, and other third parties as the Governing Committee

may deem to be necessary or advisable to assist the Governing Committee in carrying out the purposes of this Agreement (provided, however, that under no circumstance may a Beneficiary Class' Recovery be charged with such expenses unless that Beneficiary Class consents);

(12)    Obtain insurance coverage with respect to real and personal property that may become Trust Assets, if any;

(13)    Provide reports to all Trust Beneficiaries;

(14)    Establish and maintain as cost-effectively as possible a website for the purpose of providing notice of Trust activities in lieu of sending written notice to Beneficiaries, subject to providing notice of such website to such holders;

(15)    Take or refrain from taking any and all other actions that the Governing Committee reasonably deems necessary or convenient for the continuation, protection, and maximum liquidation of Trust Assets or to carry out the purposes hereof;

(16)    Enter into all documents and agreements deemed by the Governing Committee to be necessary or appropriate, and take all action deemed by the Governing Committee to be necessary or appropriate, in order to carry out the terms and purposes of this Agreement;

(17)    Seek approval of the Court, as and when determined by the Liquidating Trustee or the Governing Committee to be necessary, appropriate, required, prudent, or advisable for any decision of, or action(s) taken, to be taken, or not to be taken by the Liquidating Trustee or the Trust pursuant to the terms of this Agreement or the Orders; and

(18)    Accept one or more Assignments of Future Assigned Assets and/or allow the joinder of Additional Parties to the Trust, as provided in this Agreement and the Orders.

(c)    The Trust and/or the Liquidating Trustee acting on behalf of the Trust may assert demands and appear in litigation concerning Causes of Action and other Trust Assets in their own

right or in a Representative Capacity.

(d)    In light of the extraordinary and unusual circumstances giving rise to the need for and creation of the Trust and the potential benefits derived to the Trust and Beneficiaries of employing the rights and privileges of class actions to assist in the liquidation of Trust Assets, with respect to or in any proceeding involving Causes of Action to which the Trust or the Liquidating Trustee is a party:

(1)    The Trust and/or the Liquidating Trustee may seek (and TMF may seek on their behalf) appointment as, and may serve as a representative of, a class of litigants. The class may include the Trust and/or the Liquidating Trustee, some or all of the Beneficiaries, or both. The class may also include Persons who are not Beneficiaries;

(2)    The Trust and/or the Liquidating Trustee and/or Trust Representatives may undertake a course of conduct or make decisions which are in the interests of the class as a whole even if they may conflict in some way with some interests of the Beneficiaries or the Trust, as may be required of class representatives;

(3)    It is not and shall not be deemed to be a conflict of interest or a conflict of duties to the Beneficiaries for the Trust or Trust Representatives to serve the class or make decisions required of a class representative or class counsel for the benefit of the class as a whole (as opposed to the interests of the Beneficiaries or Trust alone); and

(4)    Trust Representatives shall have Absolute Immunity from Causes of Action arising under or relating to this Agreement with respect to matters governed by section 3.7(d) of this Agreement.

(e)    If the Governing Committee determines that it is necessary or advisable to join the Estate as a party to any demand or to any proceeding in order to fully and effectively pursue liquidation of the Causes of Action or other Trust Assets, then the Estate shall join in such demand or proceeding and shall pursue such demands and proceeding(s) itself or with the Trust and/or the Liquidating Trustee for the benefit of the Beneficiaries in the same manner, circumstance, terms, and conditions as if they were being pursued by the Trust or the Liquidating Trustee under this Agreement. In that event, all Estate Expenses arising from the joinder of the Estate shall be borne exclusively by the applicable Beneficiary Classes (other than the Estate) and

under no circumstances shall be borne by the Estate itself.

**3.8    Cy Pres/Reservation Of Equity Jurisdiction.**    This Agreement, as well as the Trust created by this Agreement and the Orders, are subject to the continuing and exclusive jurisdiction of the Court with respect to all material matters requiring interpretation or application of this Agreement, the Orders, or matters directly or indirectly pertaining to the Trust (for example, matters affecting the economics, standing, or affairs of the Trust).  The Liquidating Trustee and Committee Members shall have the right to seek Instructions from the Court at any time and from time to time.  Trust Changes may be made by the Court, upon motion, in order to best effectuate the intent of the Parties and the purposes of the Trust.  Notwithstanding anything to the contrary in this Agreement or the law: (a) only the Liquidating Trustee or Committee Members shall have standing to seek Trust Changes or Instructions; and (b) no Trust Changes or Instructions may, without the affected Person's consent, deprive a Party of any material rights established by this Agreement or the Orders or deprive a Beneficiary of material value of that Beneficiary's Liquidating Trust Interest.

# ARTICLE IV.    ASSIGNMENTS OF TRUST ASSETS

**4.1    Professional Claims.**

(a)    <u>Assignments of Professional Claims</u>.    Each of the Parties hereby Assigns to the Liquidating Trustee on behalf of the Trust for the further benefit of the Beneficiaries all of such Party's rights, titles and interests in and to the Assigned Professional Claims to be held in trust to and for the benefit of the Beneficiaries for the uses and purposes stated in this Agreement and the Orders.  The Liquidating Trustee hereby accepts the Assigned Professional Claims in trust to and for the benefit of the Beneficiaries for such uses and purposes.

(b)    <u>Liquidation Decision-maker For Assigned Professional Claims</u>. Subject to a Veto by Silar, all Liquidation Decisions with respect to Assigned Professional Claims shall be made by the Silar Committee in its Sole And Absolute Discretion.

**4.2 Preference Claims.**

(a)    <u>Assignment of Preference Claims</u>.    The Estate and the B&B DL Settling Clients hereby Assign to the Liquidating Trustee on behalf of the Trust for the further benefit of the

Beneficiaries all of each such Party's rights, titles and interests in and to all Preference Claims to be held in trust to and for the benefit of the Beneficiaries for the uses and purposes stated in this Agreement and the Orders. The Liquidating Trustee hereby accepts the Assigned Preference Claims in trust to and for the benefit of the Beneficiaries for such uses and purposes or for other disposition as provided in this Agreement.

(b)　　Liquidation Decision-maker For Assigned Preference Claims. Subject to a Veto by Silar and except as otherwise provide in this Agreement, all Liquidation Decisions with respect to the following Assigned Preference Claims shall be made by the Silar Committee in its Sole And Absolute Discretion: GT Preference Claims; Bryan Cave Preference Claims; and Remaining Preference Claims. Subject to a Veto by the Initial B&B DL Beneficiary Group and except as otherwise provide in this Agreement, all Liquidation Decisions with respect to the following Assigned Preference Claims shall be made by the DL Committee in its Sole And Absolute Discretion: Conway McKenzie Preference Claims (but only to the extent of its previously-received but unused retainer) and Thompson Hine Preference Claims.

(c)　　Immediate Disposition Of Certain Preference Claims. Notwithstanding anything to the contrary in this Agreement:

(1)　　The Estate and/or the Trust shall Assign the Klestadt Preference Claim and the Repotex Preference Claim to the B&B DL Settling Clients, as further provided in the Settlement Order and with all Liquidation Decisions and all Recoveries therefrom to be made enjoyed exclusively by B&B DL Settling Clients at their sole expense;

(2)　　The Trust shall, after the $250,000 Payment is made to the Estate as provided for in the Settlement Order, and at Silar's option in its Sole And Absolute Discretion, either: (i) dismiss some or all of the Adversary Proceedings with respect to some or all of the Remaining Preference Claims; and/or (ii) Assign some or all of the Remaining Preference Claims to Silar or its designees, with all Liquidation Decisions and all Recoveries therefrom to be made enjoyed exclusively by Silar or its designee(s) at its/their sole expense; and

(3)　　To the extent not already dismissed with prejudice pursuant to the Settlement Order, all Other Preference Claims which were or are held by the Estate and/or the B&B DL Settling Clients (including without limitation those against Great White NV,

Inc. and Silar Parties) shall be deemed released as of the Effective Date. The Liquidating Trustee acting on behalf of the Trust shall execute such documents as may reasonably be requested by Silar Parties to further confirm and reflect such releases.

**4.3    Assigned Loan Claims and DL Interests.**

(a)    <u>Assignments</u>.

(1)    Assignments of Loan Claims to the Liquidating Trustee on behalf of the Trust and/or to the Trust is governed by the Loan Claim Assignments Procedure set forth in the Settlement Order and in any subsequent Orders. No Assignment of a Loan Claim shall be effective unless and until the Assignment has become effective pursuant to the Loan Claims Assignments Procedure. Therefore, neither the Trust nor any Trust Representative has any contractual, fiduciary, or other duty with respect to any Loan Claim and the Trust and all Trust Representatives shall have Absolute Immunity with respect to all Loan Claims until a Loan Claim has been Assigned to the Trust in compliance with the Loan Claims Assignments Procedure.

(2)    Each of the Parties hereby acknowledges that any Loan Claims which are Assigned to the Trust or the Liquidating Trustee on behalf of the Trust are Assigned and accepted in trust to and for the benefit of the Beneficiaries as set forth in this Agreement and the Orders. The Liquidating Trustee hereby acknowledges that he accepts the Assigned Loan Claims in trust to and for the benefit of the Beneficiaries as set forth in this Agreement and the Orders.

(b)    <u>Liquidation Decision-maker</u>. All Liquidation Decisions with respect to Assigned Loan Claims shall be made by the DL Committee in its Sole And Absolute Discretion (with the Silar Committee Member Appointee Abstaining), with advice from any Loan Advisory Board.

(c)    <u>Special Matters Relating To Assigned DL Interests</u>.

(1)    Notwithstanding anything to the contrary in this Agreement, the Assignment of Assigned Loan Claims, Assigned Compass Interests and/or of any

other Assigned Causes of Action is not intended to, shall not be construed to, and does not Assign any DL Interest held by a Direct Lender in or to any USACM Loan unless either: (A) that Direct Lender has executed a separate writing expressly and specifically making or confirming an Assignment of one or more of their DL Interests to the Trust or the Liquidating Trustee on behalf of the Trust (including without limitation under the Loan Claims Assignment Procedure or pursuant to the foreclosure process set forth in section 6.6 below); or (B) that Direct Lender is a member of a Loan-Specific DL Sub-Class and a court of competent jurisdiction has determined that the non-Assignment of that Direct Lender's DL Interests is a Disabling Condition with respect to Recovery by the Trust from an Assigned Loan Claim or other Cause of Action relating to that DL Interest. If a court of competent jurisdiction has determined that the non-Assignment of a DL Interest is a Disabling Condition with respect to Recovery by the Trust from an Assigned Loan Claim or other Cause of Action relating to that DL Interest, then the DL Interest of the Beneficiary for the particular USACM Loan (and only for that USACM Loan) which is the subject of that Assigned Loan Claim or other Cause of Action relating to that DL Interest shall be automatically deemed to have been assigned to the Trust *nunc pro tunc* in the nature of a springing or shifting executory interest, as of the Assignment date of and under the same terms and conditions as the related Loan Claim or Cause of Action..

(2) Notwithstanding anything to the contrary in this Agreement, if a Beneficiary's DL Interest has been Assigned to the Trust:

(A) In all instances, the Assignment shall be deemed to have been made only to the nature and extent necessary and solely for the purpose of furthering the orderly liquidation purposes of the Trust, and not for the purpose of engaging in any trade or business. It is the intention of the Parties that any Assignment of a DL Interest to the Trust be effective solely to provide the Trust standing to pursue Loan Claims against borrowers, guarantors, and other Responsible Persons, and/or to pursue the foreclosure of the real property collateral securing a USACM Loan. In the event of the Assignment of any DL Interests to the Trust, the Trust, every Trust Representative (except DL Committee Member Appointees), Silar Parties, and the Estate shall have Absolute Immunity with respect to

management, oversight, servicing, development, maintenance, repairs, or any other tasks relating to the real property collateral and/or for any and all expenses (including without limitation taxes or insurance), Collateral-Property Specific Expenses, or other liabilities relating to such collateral before or after foreclosure.

(B)     Except as may be otherwise ordered by the Court upon application of the Committee of the Whole, the Assignment of the DL Interest to the Trust is and shall be irrevocable by the Beneficiary, subject to Section 4.3(c)(2)(E) of this Agreement.  The Beneficiary therefore: (1) shall no longer have the right or the ability to Assign the DL Interest to any other Person or to sue the borrower, guarantor(s), or any other Responsible Person under the applicable loan documents; and (2) must look solely to receiving a distribution on the Beneficiary's Liquidating Trust Interest if, as, and when otherwise provided in this Agreement;

(C)     The DL Committee (with the Silar Committee Member Appointee Abstaining) shall be authorized to vote in its Sole and Absolute Discretion all DL Interests Assigned to the Trust for any matters that are subject to the 51 Percent Rule.  Notwithstanding the foregoing, however, for any Liquidation Decisions or Encumbrance Decisions pertaining to a USACM Loan that has been Assigned to the Trust, the DL Committee (with the Silar Committee Member Appointee Abstaining) shall be authorized to vote all DL Interests Assigned to the Trust only if at least 66 percent of those DL Interests have voted in writing to authorize the DL Committee to approve and undertake the Liquidation Decisions or Encumbrance Decisions.

(D)     If the DL Committee (with the Silar Committee Member Appointee Abstaining) determines in its reasonable discretion that such action will assist in the effective and efficient maximization of a Loan Claim, then the Liquidating Trustee shall have authority to form a single member limited liability company under Nevada or other state law (with the Liquidating Trustee being the sole member) to hold and liquidate the DL Interests and/or Causes of Action in trust for the Beneficiaries as

otherwise provided in this Agreement and to liquidate those Trust Assets through that entity. The Liquidating Trustee shall manage the limited liability company and its assets pursuant to the directions of the DL Committee (with the Silar Committee Member Appointee Abstaining). Such limited liability company shall be subject to the Court's jurisdiction in the similar manner and circumstances as the Court exercised jurisdiction over the limited liability companies created under the Preliminary Injunction issued in the 892 Case. To that end, the Liquidating Trustee may, with the approval of the DL Committee, voluntarily file a petition in bankruptcy for such limited liability company if the Liquidating Trustee reasonably believes that such a filing will assist the Liquidating Trustee or Trust in liquidating the Trust Assets. In the event of such filing, the Liquidating Trustee shall seek withdrawal of the reference and/or transfer of the case to the Court as a related case to the Asset Resolution Bankruptcy Case; and

(E) The Assignment of a DL Interest to the Trust shall revert "as is" to the appropriate DL Beneficiary upon final resolution of the USACM Loan to which that DL Interest relates or at such earlier time determined to be appropriate by the DL Committee in its Sole And Absolute Discretion (with the Silar Committee Member Appointee Abstaining).

**4.4    Assigned Compass Interests and Piskun Causes of Action**

(a)    <u>Assignments</u>.  Each of the Parties hereby Assigns to the Liquidating Trustee on behalf of the Trust for the further benefit of the Beneficiaries all of such Party's rights, titles, and interests in and to all Compass Interests to be held in trust for the uses and purposes stated in this Agreement and the Orders and the Liquidating Trustee hereby accepts the Assigned Compass Interests in trust to and for the benefit of the Beneficiaries for such uses and purposes. The Parties hereby declare that the Liquidating Trustee has received the Piskun Assigned Causes of Action behalf of the Trust to be held in trust to and for the benefit of the Beneficiaries for the uses and purposes stated in this Agreement and the Orders.

(b)    <u>Carve-Out</u>.    Notwithstanding anything to the contrary in this Agreement, the Assignment of Compass Interests and/or of Causes of Action in this Agreement is not intended to,

shall not be construed to, and does not Assign any Causes of Action which have been released by the Settlement or are held by any of the Parties against the Citron Defendants or the Compass Defendants.

(c)     Declaration Of Special Purpose.   The Parties declare that their purpose in Assigning the Compass Interests and in having the Trust receive Piskun Assigned Causes of Action is to enable the Liquidating Trustee and/or Trust to supplement or strengthen Recoveries for the Beneficiaries by obtaining or controlling Causes of Action held by Compass Entities or Piskun for possible liquidation by the Trust for the benefit of the Beneficiaries.

(d)     Liquidation Decision-maker.   Liquidation Decisions with respect to Compass Interests and Piskun Assigned Causes of Action shall be made by the Committee of the Whole, with deference being given to enhancing and not undermining the efforts of the Governing Committees to liquidate Causes of Action over which they have decision-making power.

**4.5     Future Assigned Assets/Additional Parties.**

(a)     Purpose.   The Parties acknowledge that there may be other Causes of Action or other assets which may strengthen or enhance Recoveries for the Trust on behalf of the Beneficiaries and that Assignment and acceptance of such Causes of Action or other assets may be held by the Initial Parties or other Persons who wish to become Additional Parties.   The Committee of the Whole is therefore hereby vested with the power to decide to accept Future Assigned Assets for the Trust and/or to allow Additional Parties to join the Trust as Beneficiaries on such terms and conditions the Committee of the Whole determines to be appropriate in its Sole And Absolute Discretion.

(b)     Mechanism. Unless otherwise agreed to in a writing approved by the Committee of the Whole at the time of the Assignment, Assignments of Future Assigned Assets: (a) shall be pursued and obtained pursuant to a procedure similar to the Loan Claims Assignment Procedure set forth in the Orders; (b) shall be made to the Liquidating Trustee on behalf of the Trust for the further benefit of the Beneficiaries for the uses and purposes stated in this Agreement and the Orders; and (c) shall be accepted by the Liquidating Trustee in trust to and for the benefit of the Beneficiaries for such uses and purposes.

(c)     Characterization.     The characterization of a Future Assigned Asset (as an Assigned Professional Claim, an Assigned Preference Claim, an Assigned Loan Claim, or some other category) and/or any particular terms or conditions relating to the Future Assigned Assets (concerning, by way of example, only liquidation, allocation, distribution, or decision-making power) shall be set forth in the writing approved by the Committee of the Whole at the time the Assignment is accepted.

(d)     Liquidation Decision-maker. Unless otherwise approved by the Committee of the Whole, all Liquidation Decisions with respect to Future Assigned Assets shall be made by the Governing Committee which has authority to make Liquidation Decisions for Trust Assets of similar character.

**4.6     Additional Provisions Relating to Assigned Causes of Action**

(a)     Defensive Matters.     Notwithstanding anything to the contrary in this Agreement:

(1)     Each Assigning Party retains and reserves from their respective Assignments of Causes of Action the right to defend themselves against any Adverse Action undertaken by an Adverse Claimant by asserting any Cause of Action which they have Assigned to the Liquidating Trustee or the Trust as a defense to, recoupment against, or offset against any such Adverse Action, as if the Assigning Party continues to hold all of the right, title, and interest in and to such Assigned Cause of Action.

(2)     In order to balance and protect the interests of all of the Parties, the Assigning Party and the Liquidating Trust and Trustee shall cooperate and coordinate with respect to the defense of the Adverse Action and the affirmative prosecution of the Assigned Causes of Action.  Such cooperation and coordination shall include without limitation, if necessary and appropriate to protect the Assigning Party, the other Parties to this Agreement, or the Trust: intervention in or with respect to the Adverse Action by the Liquidating Trustee, the Trust, and/or the Estate; removal of or requests to transfer the Adverse Action to the Court; and joint representation by litigation counsel to the Trust of both the Trust and the Assigning Party against whom the claim is being made.

(b)     Overlapping Recoveries By Trust And Individual Parties.

(1)     Except to the extent this Agreement or the Orders expressly provide otherwise, in the event there is an actual or potential conflict with respect to any Recovery by the Liquidating Trustee or Trust for the Beneficiaries for any Trust Asset under this Agreement on the one hand and any Recovery against the Compass Defendants, the Citron Defendants, or any other Persons by any of the Parties for their own account on the other hand, if the matter cannot be resolved through a unanimous vote of the Committee of the Whole, the Trust shall pursue binding arbitration of the dispute before an arbitrator appointed upon motion  by  Judge Jones of the Nevada Federal Court.

(2)     At any time and from time to time on and after the Effective Date, the Trust shall cooperate with Bickel & Brewer as counsel for B&B DL Settling Clients and Bickel & Brewer shall cooperate with the Trust to coordinate the prosecution of Causes of Action in the 892 Case and the 210 Case and other matters to ensure that the interests of the Trust, the B&B DL Settling Clients and the Silar Parties are protected in a manner consistent with this Agreement.  If necessary or advisable, The Majorie Firm Ltd. (as counsel to the Trust and/or Silar Parties) and Bickel & Brewer (on behalf of the B&B DL Settling Clients) may enter into a joint agreement to preserve the respective Privileges of the Trust and/or the Silar Parties and the B&B DL Settling Clients.  TMF may not waive any Privileges held by the Trust and/or the Liquidating Trustee without first obtaining the consent of the Liquidating Trustee.

(c)     <u>Protections Against Claim By Responsible Persons</u>. Notwithstanding  anything  to the contrary in this Agreement, no resolution of a Cause of Action which is Assigned pursuant to this Agreement or the Orders either to the Trust, to the B&B DL Settling Clients, or to Silar may: (1) require the Estate or any other Beneficiary or the Silar Parties to admit fault or wrongdoing; or (2) expose the Estate or any other Beneficiary or the Silar Parties to an actual or possible Cause of Action by the Responsible Person with whom the Trust, the B&B DL Settling Clients, or Silar has resolved the Cause of Action**.**

**4.7**     **Initial Cash.**   Each of the Parties hereby declares that, upon payment by Silar, the Initial Cash shall be a Trust Asset for use pursuant to this Agreement for the further benefit of the Beneficiaries.  The Parties also agree that the Initial Cash shall be transferred to the Liquidating Trustee to be held in trust and/or transferred in accordance with the terms of this Agreement and the Settlement Order.

# ARTICLE V    DISTRIBUTIONS OF RECOVERIES FOR ALL NON-LOAN CLAIM CAUSES OF ACTION

**5.1    Non-Loan Claim Distribution Overview.**    This Article V shall apply to Recoveries with respect to all Non-Loan Claims.  It is the intention of the Parties that the Trust make Distributions of cash to Beneficiaries for Non-Loan Claim Recoveries on a Recovery-by-Recovery basis, as and when there is a Recovery, as soon as practicable from the date the Trust receives the Recovery, except to the limited extent that the Governing Committee determines in its Sole And Absolute Discretion that the Recovery is nominal and it would be more economical to retain the Recovery for Distribution along with another Recovery in the future (provided, however, that the Recovery shall be segregated and not commingled with any other funds held by the Trust, and shall under no circumstances be deemed General Trust Reserves or other funds that are available for the Trust to pay Trust Compensation, TMF Contingency Fees, General Trust Expenses, General Trust Reserve Surcharges, Litigation Expenses, or Committee Member Compensation).  All income earned and Recoveries received with respect to Non-Loan Claims shall be Distributed in accordance with this Agreement and all applicable laws.

**5.2    Distribution Decision(s) for Non-Loan Claims.**    The Committee of the Whole shall make all Distribution Decisions with respect to all Non-Loan Claims pursuant to the terms of this Agreement.  The Governing Committee responsible for Liquidation Decisions may request from time to time, and if so requested the Committee of the Whole shall promptly provide from time to time, an advance calculation of all sums which will be payable under the Distribution Waterfall for that Recovery so that the Governing Committee will be better able to negotiate liquidation terms and ultimately make Liquidation Decisions.

**5.3    In-Kind Recoveries for Non-Loan Claims.**  In the event a Recovery from a Non-Loan Claim is an In-Kind Recovery in whole or in part, the Governing Committee responsible for the Liquidation Decision shall continue to have the power to decide the best manner and circumstances for liquidating the In-Kind Recovery to cash for the highest and best price and, upon receipt of cash from such liquidation, the Committee of the Whole shall be responsible for the Distribution Decision and ultimate Distribution Waterfall of such cash.  Unless they agree in writing to accept an In-Kind payment (which they may do or not do jointly or severally in their Sole And Absolute Discretion): (a) neither the Liquidating Trustee nor TMF shall be required to accept In-Kind payments for Trustee Compensation or for the TMF Contingency Fee; and (b) Silar may not be required to accept an In-Kind Distribution.  Notwithstanding anything to the contrary in this Agreement, the DL Committee (with the Silar Committee Member Appointee and

the Liquidating Trustee Abstaining) may approve in its Sole and Absolute Discretion In-Kind Distributions to DL Beneficiaries.

**5.4    Distribution Waterfall For Recoveries On Non-Loan Claims**.  It is the intention of the Parties that Distributions from each gross Recovery from a Non-Loan Claim shall be applied first to certain expenses which are generally applicable to the Trust as a whole and then allocated to each Beneficiary Class for the making of Net Distributions to each member of each of the Beneficiary Classes (*i.e.*, Distributions shall be made after payment of expenses applicable to each particular Beneficiary Class).  To that end, Distributions arising out of Recoveries for Non-Loan Claims shall be made in the following steps:

(a)    Step One.  Each dollar of cash generated from a Recovery with respect to a Non-Loan Claim shall be Distributed by the Liquidating Trustee (as directed by the Committee of the Whole) in absolute priority under the following Distribution Waterfall:

(1)    To pay all Trustee Compensation due with respect to that Recovery only until paid in full; then

(2)    To pay TMF Contingency Fees with respect to that Recovery only until paid in full; then

(3)    To pay or reimburse all Unreimbursed Litigation Expenses, if any, due with respect to that Recovery only until paid in full; then

(4)    To pay all unpaid and unreimbursed General Trust Expenses, if any, due from that Recovery, until paid in full; then

(5)    To pay the General Trust Expense Surcharge, if any, due from that Recovery until paid in full; then

(6)    Each Beneficiary Class, in accordance with the Designated Percentage Distribution Amount for that Beneficiary Class for that Recovery and for further Net Distributions to each Beneficiary in each Beneficiary Class, under Step Two below.

(b)    Step Two.  After the payments and/or allocations set forth in section 5.4(a) are made, the cash from the Recovery payable to each Beneficiary Class under section 5.4(a)(6) shall be allocated and Distributed as follows:

(1)    Each dollar of Recovery payable to the DL Class shall be Distributed in absolute priority under the following Distribution Waterfall;

(A)    To pay all sums due for any Protective Tranche Loan which is due

to be paid out of the Recovery, until paid in full; then

        (B)    To pay all unpaid and unreimbursed DL Class Expenses due to be paid out of the Recovery (in the absolute priority set forth in the definition of DL Class Expenses), if any, until paid in full; then

        (C)    To pay the DL Class Surcharge due from the Recovery, if any, until paid in full; then

        (D)    To pay the DL Beneficiaries, pro rata based upon their Liquidating Trust Interests.

Notwithstanding anything to the contrary, the DL Committee (with the Silar Committee Member Appointee Abstaining) shall be solely responsible for all calculations and Net Distributions to the DL Class under this section 5.4(b)(1).

        (2)    Each dollar of Recovery payable to the Silar Class shall be Distributed in absolute priority under the following Distribution Waterfall;

        (A)    To pay all sums due for any Protective Tranche Loan which is due to be paid out of the Recovery, until paid in full; then

        (B)    To pay all unpaid and unreimbursed Silar Class Expenses due to be paid out of the Recovery (in the absolute priority set forth in the definition of Silar Class Expenses), until paid in full; then

        (C)    To pay the Silar Class Surcharge due from the Recovery, until paid in full; then

        (D)    To Silar or its designee(s).

Notwithstanding anything to the contrary, the Silar Committee (with the DL Committee Member Appointee Abstaining) shall be solely responsible for all calculations and Net Distributions to Silar under this section 5.4(b)(2).

        (3)    Each dollar of Recovery payable to the Estate shall be Distributed to the Estate without any deductions except as may be approved by the Court in the Asset Resolution Bankruptcy Cases.  Notwithstanding anything to the contrary, the Liquidating Trustee shall be solely responsible for the ultimate disposition of all Distributions to the Estate under this section 5.4(b)(3).

        **5.5**    **Distributions For Causes of Action Against GT.**  Notwithstanding anything to the contrary, if the Trust obtains a Recovery for a Cause of Action against Greenberg Traurig: (a) Silar or its designee(s) shall receive every dollar of that Recovery until Silar or its designee(s) has

received the First $375,000 From GT; (b) every dollar of Recovery from Greenberg Traurig above the First $375,000 From GT shall be distributed according to the Distribution Waterfall set forth in section 5.4 of this Agreement; and (c) no Litigation Expenses or TMF Contingency Fee shall be charged to any Beneficiaries except Silar in connection with the pursuit or Recovery of the First $375,000 From GT.

**5.6    Distributions For Causes of Action Against Bryan Cave.**    Notwithstanding anything to the contrary, with respect to distributions from Recoveries from Bryan Cave, the first $200,000 collected under this Agreement shall be paid to the Initial B&B DL Beneficiary Group, and every dollar thereafter shall be distributed according to the Distribution Waterfall set forth in section 5.4 of this Agreement.

# ARTICLE VI    DISTRIBUTIONS AND OTHER MATTERS RELATING TO LOAN CLAIMS AND COLLATERAL DISPOSITION DECISIONS.

**6.1    Intention.**    It is the intention of the Parties that the Trust shall provide Direct Lenders with the opportunity to enhance the prospects of obtaining Recoveries with respect to their DL Interests by aggregating and jointly prosecuting their Loan Claims with other Direct Lenders in the same USACM Loan and/or by foreclosing on the collateral of USACM Loans.  To that end, the Orders and this Agreement create a framework for the Trust to prosecute such Loan Claims and foreclosures on behalf of the Direct Lenders and other Beneficiaries as provided in this Agreement.  The Parties intend that Liquidation Decisions with respect to such collection and foreclosure activities and the benefits and costs associated with those activities be undertaken on a separate USACM Loan-by-Loan basis.   The Parties also intend that, except for the Net Distributions to be made to the Estate and Silar with respect to a Loan Claim Recovery (but not with respect to the liquidation of any real property collateral securing a USACM Loan), the only other Persons who will receive the benefit of a Recovery will be the DL Loan Claim Beneficiaries in the particular USACM Loan which generated that Recovery.  Similarly, the Parties intend that, with no exceptions, Loan Claim Expenses shall be solely borne by, charged to, and paid by the DL Class for the particular Loan Claim Recovery.

**6.2    Application of Article VI.**  The Parties acknowledge that each USACM Loan involves different facts and circumstances and it may be necessary or appropriate to obtain one or more Orders with respect to particular Loan Claims which become Trust Assets and/or the

foreclosure of collateral securing USACM Loans. However, unless stated otherwise in an Order, this Article VI shall apply to Distributions of Recoveries with respect to all Loan Claims and/or the foreclosure of collateral securing USACM Loans.

**6.3    Distribution Decision(s) For Loan Claims.**   Subject to Section 4.3 of this Agreement, the DL Committee (with the Silar Committee Member Appointee Abstaining) shall make all Distribution Decisions with respect to all Loan Claims.  If a Recovery from a Loan Claim is an In-Kind Recovery in whole or in part, the DL Committee (with the Silar Committee Member Appointee Abstaining) shall continue to exercise its power to make Liquidation Decisions with respect to the best manner and circumstances for either:  (a) liquidating the In-Kind Recovery to cash for the highest and best price for further Distribution; or (b) making an In-Kind Distribution.

**6.4    In-Kind Distributions For Loan Claims**.  With respect to only Loan Claims and not Collateral Disposition Decisions, unless they agree in writing to accept an In-Kind payment for Recoveries on any Loan Claims (which they may do or not do jointly or severally in their Sole And Absolute Discretion): (a) neither the Liquidating Trustee nor TMF shall be required to accept In-Kind payments for Trustee Compensation or for the TMF Contingency Fee; and (b) Silar may not be required to accept an In-Kind Distribution.  Notwithstanding anything to the contrary in this Agreement, the DL Committee (with Silar Committee Member Appointee and the Liquidating Trustee Abstaining) may approve in its Sole and Absolute Discretion In-Kind Distributions to DL Beneficiaries.

**6.5    Distribution Waterfall For Recoveries On Loan Claims.**  It is the intention of the Parties that Distributions from each gross Recovery from a Loan Claim shall be applied first to certain expenses which are generally applicable to the Trust as a whole and then allocated to each Beneficiary Class for the making of Net Distributions to each member of each of the Beneficiary Classes (*i.e.*, Distributions shall be made after payment of expenses applicable to each particular Beneficiary Class).  To that end, Distributions arising out of Recoveries for Loan Claims shall be made in the following steps:

(a)    Step One.  Each dollar of cash generated from a Recovery with respect to a Loan Claim shall be Distributed by the Liquidating Trustee (as directed by the Committee of the Whole) in absolute priority under the following Distribution Waterfall:

(1)    To pay all Trustee Compensation due with respect to that Recovery only until paid in full; then

(2)    To pay TMF Contingency Fees with respect to that  Recovery only until

paid in full; then

      (3)      To pay or reimburse all Unreimbursed Litigation Expenses, if any, due with respect to that Recovery only until paid in full; then

      (4)      To pay outstanding General Trust Expenses, if any, due from that Recovery, until paid in full; then

      (5)      To pay the General Trust Expense Surcharge, if any, due from that Recovery until paid in full; then

      (6)      To each Beneficiary Class, in accordance with the Designated Percentage Distribution Amount for that Beneficiary Class for that Recovery and for further Net Distributions to each Beneficiary in each Beneficiary Class, under Step Two below.

      (b)    <u>Step Two</u>.  After the payments and/or allocations set forth in section 6.5(a) are made, the cash from the Recovery payable to each Beneficiary Class under section 6.5(a)(6) shall be allocated and Distributed as follows:

      (1)      Each dollar of Recovery payable to the DL Class shall be Distributed in absolute priority under the following Distribution Waterfall;

        (A)      To pay all sums for any Protective Advance Loan (but only to the extent of the allocable pro rata beneficial interests for the applicable Loan-Specific DL Sub-Class) which is due to be paid out of the Recovery, if any, until paid in full; then

        (B)      To pay all sums due for any Protective Tranche Loan which is due to be paid out of the Recovery, until paid in full; then

        (C)      To pay all unpaid and unreimbursed DL Class Expenses due to be paid out of the Recovery (in the absolute priority set forth in the     definition of DL Class Expenses), if any, until paid in full; then

        (D)      To pay the DL Class Surcharge due from the Recovery, if any, until paid in full; then

        (E)      To the DL Beneficiaries, pro rata based upon their Liquidating Trust Interests.

        Notwithstanding anything to the contrary, the DL Committee (with the Silar Committee Member Appointee Abstaining) shall be solely responsible for all calculations and Net Distributions to the DL Class under this section 6.5(b)(1).

      (2)      Each dollar of Recovery payable to the Silar Class shall be Distributed in absolute priority under the following Distribution Waterfall;

        (A)      To pay all sums due for any Protective Tranche Loan which is due to be paid out of the Recovery, until paid in full; then

        (B)      To pay all unpaid and unreimbursed Silar Class Expenses due to be paid out of the Recovery (in the absolute priority set forth in the definition of DL Class Expenses), until paid in full; then

        (C)      To pay the Silar Class Surcharge due from the Recovery, until paid

in full; then

> (D)     To Silar or its designee(s).

Notwithstanding anything to the contrary, the Silar Committee (with the DL Committee Member Appointee Abstaining) shall be solely responsible for all calculations and Net Distributions to Silar under this section 6.5(b)(2).

(3)     Each dollar of Recovery payable to the Estate shall be Distributed to the Estate without any deductions except as may be approved by the Court in the Asset Resolution Bankruptcy Cases.  Notwithstanding anything to the contrary, the Liquidating Trustee shall be solely responsible for the ultimate disposition of all Distributions to the Estate under this section 6.5(b)(3).

**6.6     Foreclosures Of Collateral Securing USACM Loans.**

(a)     It is the intention of the Parties that the Trust may facilitate Direct Lenders in the foreclosure of collateral securing USACM Loans without receiving an Assignment of Loan Claims.  This section 6.6 governs that process, unless one or more Orders states otherwise.

(b)     <u>Assignments</u>.

(1)     No Assignment or receipt of foreclosure property to or by the Trust shall be effective unless and until the Assignment has become effective pursuant to the Loan Claims Assignments Procedure, as applied to Collateral Dispositions.  Therefore, neither the Trust nor any Trust Representative has any contractual, fiduciary, or other duty with respect to any foreclosure property or special purpose entity formed to take title to such property, and the Trust and all Trust Representatives shall have Absolute Immunity with respect to all such property until it has been Assigned to the Trust in compliance with the Loan Claims Assignments Procedure, as applied to Collateral Dispositions.

(2)     Each of the Parties hereby acknowledges that any such property Assigned to the Trust or the Liquidating Trustee on behalf of the Trust is Assigned and accepted in trust to and for the benefit of the Loan-Specific DL Sub-Class as set forth in this Agreement and the Orders.  The Liquidating Trustee shall acknowledge that he accepts such foreclosure property or special purpose entity formed to take title to such property in trust to and for the benefit of the Loan-Specific DL Sub-Class as set forth in this Agreement and the Orders.

(c) Collateral_Disposition Decisions. The DL Committee (with the Silar Committee Member Appointee Abstaining) shall be solely responsible for making all Collateral Disposition

Decisions, in its Sole and Absolute Discretion. In the event that the Trust pursues and obtains a foreclosure on the real property collateral securing a USACM Loan, that collateral shall be assigned to a limited liability company or other entity on behalf of all DL Interests in that USACM Loan consistent with the requirements set forth in Sections 4.3(c)(2)(C), (D), (E) of this Agreement and Nevada law; provided, however, that if there are any Unreimbursed Litigation Expenses relating to such USACM Loan, such limited liability company or other entity shall consent to the entry of a judicial lien securing the first priority repayment of such amounts (subject only to the priority repayment of any related Protective Advance Loan then outstanding, if applicable). Neither the Liquidating Trustee, TMF, any Silar Committee Member Appointee, nor any Trust Representative (other than DL Committee Member Appointees) shall participate in or have any responsibility for Collateral Disposition Decisions and/or taking or not taking any actions relating thereto, including without limitation obtaining the foreclosure, forming the limited liability company or other entity, Assigning the real property collateral to the limited liability company or other entity, or liquidating the real property collateral. The Trust, the Liquidating Trustee, Silar Parties, TMF, and all Trust Representatives (except DL Committee Member Appointees) shall have Absolute Immunity from Collateral Disposition Decisions or activities implementing Collateral Disposition Decisions.

(d) Trustee Compensation/TMF Contingency Fee. No Trustee Compensation or TMF Contingency Fee shall be due or payable from Collateral Disposition Decisions or activities implementing Collateral Disposition Decisions. Notwithstanding anything to the contrary, the DL Committee (with the Silar Committee Member Appointee Abstaining) and/or TMF may agree in their Sole And Absolute Discretion that, in light of the particular circumstances related to that specific USACM Loan, the foreclosure proceedings may result in additional, reasonably foreseeable value to the DL Interests in the USACM Loan other than merely acquiring legal title to the real property collateral (such as obtaining an agreed, consent, or other judgment against the borrower and/or guarantor of the applicable USACM Loan). In that event, a Recovery that exceeds an "as is" baseline established with respect to such additional, reasonably foreseeable value that is agreed to by the Trustee and TMF on the one hand and approved by the Loan-Specific DL Sub-Class pursuant to the 51 Percent Rule on the other hand at the time the Trust and TMF agree to accept and pursue such foreclosure proceedings shall trigger the payment of Trustee Compensation and/or TMF Contingency Fees; provided, however, that the Trustee and TMF shall have Absolute Immunity and no duty with respect to such proceedings prior to such acceptance. Such a Recovery (in addition to the Loan-Specific DL Sub-Class obtaining legal title to the real property collateral) shall be Distributed in accordance with Section 6.5 of this

Agreement, with only the Loan-Specific DL Sub-Class receiving any Net Distribution from the Recovery after it alone pays the Trustee Compensation, the TMF Contingency Fee, the Litigation Expenses, the General Trust Expenses, the DL Class Expenses, the Collateral-Property Specific Expenses, and/or the Committee Member Compensation arising in connection with the Collateral Disposition Decision.

(e) <u>Distributions Of Proceeds From Collateral Dispositions</u>.  Each dollar of cash generated from a Recovery with respect to a Collateral Disposition shall be Distributed by the Liquidating Trustee (as directed by the DL Committee with the Silar Committee Member Appointee Abstaining) in absolute priority under the following Distribution Waterfall:

(1)     To pay all sums due to TMF or the Trustee in connection with the matters accepted pursuant to Section 6.6 (d) above; then to

(2)     To repay the Protective Advance Loan, if any, secured by the Recovery until paid in full; then to

(3)     To pay all sums due for any Protective Tranche Loans payable from the Recovery until paid in full; then to

(4)     To pay all unpaid and unreimbursed DL Class Expenses applicable to the Recovery until paid in full; and then to

(5)     To pay all Receiver (Tom Grimmett) Fees owed from the Recovery until paid in full; and then to

(6)     To each member of the Loan-Specific DL Sub-Class in accordance with their DL Interests, after deductions for any Bickel & Brewer waterfall contingency fees payable solely by B&B DL Settling Clients in the USACM Loan, or any base servicing fees and servicer advances owed by non B&B DL Settling Clients.  The Bickel & Brewer waterfall contingency fees, if any, shall be Distributed to Bickel & Brewer, and the base servicing fees and servicer advances, if any, shall be Distributed to the Estate.

**6.7     Handling Of DL Cash.**  At all times and in all circumstances, the DL Committee (with the Silar Committee Member Appointee Abstaining) shall be solely entrusted with accounting for and segregating all Litigation Expenses, General Trust Expenses, DL Class Expenses, Collateral-Property Specific Expenses, Loan Claim Expenses, and/or Committee

Member Compensation chargeable to a particular DL Class in connection with Loan Claims and Collateral Disposition Decisions to ensure that the other Direct Lenders in the Trust do not bear and pay such expenses. The costs associated with such accounting shall be borne by, chargeable to, and paid by only funds from the DL Expenses Reserve. The Trust and all Trust Representatives except DL Committee Members shall have Absolute Immunity with respect to such matters.

# ARTICLE VII        BENEFICIARIES AND LIQUIDATING TRUST INTERESTS

**7.1.    Beneficiaries.**    By agreeing to be a Party to this Agreement, each Beneficiary shall be deemed to have affirmed the Assignments of Trust Assets attributable to them and shall be entitled to participate in the rights due to a Beneficiary under this Agreement, including the right to receive distributions from the Trust with respect to their Liquidating Trust Interests as provided in this Agreement. At any time and from time to time, at the reasonable request of the Liquidating Trustee, each Beneficiary shall: (a) execute and/or deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed) which relate to an Assigned Cause of Action or DL Interest and are not Privileged; (b) take, or cause to be taken, all such further actions as the Liquidating Trustee or The Majorie Firm Ltd. may reasonably request in order to evidence or effectuate their Assignment of Trust Assets and the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder and under the Orders and this Agreement; (iii) cooperate with the Liquidating Trustee in connection with liquidating Trust Assets; and (iv) cooperate with the Trust for tax withholding purposes, including furnishing the Trust with their Social Security Numbers and/or tax identification numbers upon joining the Trust. Notwithstanding anything to the contrary, the Committee of the Whole may remove a Beneficiary from the Trust for Cause. If the removed Beneficiary opposes such removal, he or she may contest such removal, but only by filing an action with the Court, which shall have exclusive jurisdiction and be the exclusive venue for any such action.

**7.2    Liquidating Trust Interests.**    The ownership of a Liquidating Trust Interest shall not entitle any Beneficiary to any title in or to the Trust Assets as such (which title shall be vested in the Liquidating Trustee for the Trust), or to any right to call for a partition or division of the Trust Assets, or to require an accounting or Distribution of Trust Assets (except as provided in Articles V or VI of this Agreement), or to obtain disclosure of trade secrets, confidential, or

privileged information from the Trust. If Assignment of legal title in or to a Trust Asset is subject to a Disabling Event, the Beneficiary shall continue to retain a Liquidating Trust Interest relating to that Trust Asset for the purpose of distributions of Recoveries with respect to that Trust Asset and shall hold legal title to that Trust Asset in trust for the Trust, as set forth in this Agreement. No Beneficiary shall be considered a creditor of the Trust as the result of holding a Liquidating Trust Interest. A Liquidating Trust Interest is personal property, and upon the death, insolvency or incapacity of an individual Beneficiary, such Beneficiary's interest shall pass to the legal representative of such Beneficiary and such death, insolvency or incapacity shall not terminate or affect the validity of this Agreement.

**7.3    Limitation of Beneficiary Liability.** No provision of this Agreement, and no mere enumeration herein of the rights or privileges of any Beneficiary, shall give rise to any liability of such Beneficiary solely in its capacity as such, whether such liability is asserted by creditors or by any other Person. Beneficiaries are deemed to receive Liquidating Trust Interests in accordance with the provisions of this Agreement and the Orders without further obligation or liability of any kind, but subject to the provisions of this Agreement.

**7.4    LTI Register.**

(a)    All Liquidating Trust Interests shall be represented by book entries on the books and records of the Trust. The Liquidating Trustee, pursuant to the direction and oversight of the Committee of the Whole, shall cause the Trust Registry to be maintained with respect to Liquidating Trust Interests and the Beneficiaries of the Trust. In addition to other information determined to be appropriate by the Liquidating Trustee and the Committee of the Whole, the Trust Register shall reflect the Liquidation Trust Interests of each Beneficiary in the Initial B&B DL Beneficiary Group set forth on **Schedule 2** hereto (which shall be attached to this Agreement within 30 days of entry of the Settlement Order).

(b)    Beneficiaries and their duly authorized representatives shall have the right to inspect the Trust Register upon reasonable prior written notice to the Liquidating Trustee, for a valid purpose reasonably related to the Liquidating Trust Interest of such Beneficiary, and in accordance with all reasonable requirements prescribed by the Committee of the Whole (including without limitation maintenance of confidentiality and attorney client privilege, work product and other exemptions from discovery relating to Causes of Action owned by the Trust).

**PAGE  56**

(c)     The Liquidating Trustee and the Committee of the Whole may deem and treat the Beneficiaries of record in the Trust Register as the absolute owners of any such Liquidating Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.  The Liquidating Trustee and the Committee of the Whole shall not be charged with having received notice of any claim or demand to such Liquidating Trust Interests or the interest therein of any other Person, except as provided in Section 7.5 of this Agreement.

**7.5     Assignments Of Liquidating Trust Interests.**  No Assignment of a Liquidating Trust Interest, if any, may be effected by a Beneficiary, except:

(a)     A Beneficiary may Assign a Liquidating Trust Interest to an Approved Transferee at any time.

(b)     Upon transfer of a Liquidating Trust Interest to an Approved Transferee and acceptance of the transfer by the Liquidating Trustee, the Approved Transferee shall be deemed the holder of that Liquidating Trust Interest and have the same rights, benefits, and obligations as the transferor and the transferor shall have no further right or interest in or with respect to the Liquidating Trust.  Any transfer shall not be effective unless written notice of the name and contact information of such Approved Transferee is provided to the Liquidating Trustee and until the Liquidating Trustee has, pursuant to the direction of the Committee of the Whole, consented to the transfer.  In the event that any such consent is granted, the Liquidating Trustee may, but has no duty to, add such restrictions upon transfer and other terms to this Agreement as are deemed necessary or appropriate by the Liquidation Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

(c)     The failure of any Beneficiary to comply with these provisions shall void any transfer of the Liquidated Trust Interest, and the proposed transferee shall have no rights under this Agreement.

**7.6     Securities Laws.**

(a)     Pursuant to the Orders entered under the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust, including to Additional Parties, shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws

requiring registration of securities. The Trust is organized as a liquidating entity in the process of liquidation, and therefore should not be considered, and the Trust does not and will not hold itself out as, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940 as amended.

(b)    If the Committee of the Whole determines, with the advice of counsel, that the Trust is or may be required to comply with registration and reporting requirements of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, or the Investment Company Act of 1940 as amended, then:

(1)    The Liquidating Trustee shall take any and all actions as directed by the Committee of the Whole to comply with such registration and reporting requirements, if any, and file periodic reports with the Securities and Exchange Commission and any other appropriate regulatory bodies; and/or

(2)    The Committee of the Whole may from time to time amend this Agreement and/or obtain from the Court an order nunc pro tunc to the date of the Trust Order making such changes as are deemed necessary or appropriate to ensure that neither the Liquidating Trustee, the Trust, members of the Committee of the Whole, Beneficiaries, or their counsel are or were subject to such registration or reporting requirements.

**7.7    Waivers.**  As a condition to being a Beneficiary and pursuant to the Orders, the Estate, each Beneficiary in the Initial B&B DL Beneficiary Group, and all Additional Parties shall be deemed to have released all Causes of Action that each such Party has or may have against Silar Parties arising out of any act, omission, transaction or occurrence from the beginning of time through the date each such Person became a Party to this Agreement and, if any such Party Assigns a Future Assigned Asset to the Trust, then through the date of each such Assignment.  As a condition to being a Beneficiary and pursuant to the Orders, Silar shall be deemed to have released all Causes of Action that Silar has or may have against the Estate or the B&B DL Settling Clients arising out of any act, omission, transaction or occurrence from the beginning of time through the date Silar became a Party to this Agreement and, if Silar Assigns a Future Assigned Asset to the Trust, then through the date of each such Assignment.  As a condition to being a Beneficiary and pursuant to the Orders, every Person who becomes an Additional Party shall be deemed to have released all Causes of Action that each such Additional Party has or may have against the Estate, the B&B DL Settling Clients, and/or Silar Parties arising out of any act,

omission, transaction or occurrence from the beginning of time through the date each such Person became a Party to this Agreement and, if any such Additional Party Assigns a Future Assigned Asset to the Trust, then through the date of each such Assignment. By becoming a Party, the Estate, the B&B DL Settling Clients, and all Additional Parties shall be deemed to have stipulated and agreed that they each have, and by operation of the Orders shall be deemed to have, expressly waived the provisions, rights and benefits of California Civil Code §1542, or any similar provision in any other jurisdiction. California Civil Code §1542 provides as follows:

> "**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS OR CAUSES OF ACTION WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR**."

The release granted by this provision is specifically intended to be and is a general release of Causes of Action the Party might not now know or expect to exist in their respective favor, even if knowledge of such Causes of Action might have otherwise materially affected the granting of the release and even if the Party discovers facts in addition to or different from those which the Party knew or believed to be true with respect to the subject matter of the released Causes of Action and even if facts relating to the Cause of Action have been concealed or hidden.

## ARTICLE VIII   THE LIQUIDATING TRUSTEE

**8.1     Appointment.** The Parties hereby appoint Leonard and Leonard hereby accepts appointment as the initial Liquidating Trustee will serve until his resignation and the appointment of a successor or until his removal by the Court pursuant to Section 8.3 of this Agreement.

**8.2     Resignation.**  The Liquidating Trustee may resign by giving not less than ninety (90) days prior written notice to the Court and to the Committee of the Whole, unless there are not sufficient funds for the Trust in the Liquidating Trustee's reasonable business judgment to pursue the litigation of any Causes of Action by the Trust, in which case the Liquidating Trustee may resign immediately upon written notice to the Court.  Such resignation will become effective on the later to occur of:  (a) the day specified in such notice; and (b) the appointment of a successor trustee as provided herein and the acceptance by such successor trustee of such appointment

through the filing of an Appointment Certificate. If a successor trustee is not appointed or does not accept appointment within ninety (90) days following delivery of notice of resignation, the Liquidating Trustee may file a motion with the Court, upon notice and hearing, for the appointment of a successor trustee.

**8.3    Removal.**    The Liquidating Trustee may be removed by the Court upon the finding by the Court of Cause following a petition for removal by one or more members of the Committee of the Whole or any Beneficiary.

### 8.4 Successor.

(a)    In the event of a vacancy in the position of the Liquidating Trustee (whether by removal, resignation, death, or other legal incapacity), the vacancy will be filled by the appointment of a successor approved by the Court after an opportunity for a hearing (provided, however, that only the Liquidating Trustee or the Committee of the Whole shall have standing to seek such appointment).

(b)    Any successor appointed hereunder shall execute and file an Appointment Certificate with the Court in the Asset Resolution Bankruptcy Case and, thereupon without any further act, the successor become vested with all the rights, powers, and duties of the Liquidating Trustee for the Trust and Trust Assets with like effect as if originally named in this Agreement.

(c)    Immediately upon the filing of the Appointment Certificate, all rights, powers, duties, authority, and privileges of the Liquidating Trustee will be vested in and undertaken by the successor without any further act, and the successor will not be liable personally for any act or omission of any predecessors.

(d)    Upon the filing of the Appointment Certificate, the predecessor Liquidating Trustee shall, if applicable, when requested in writing by the successor trustee, execute and deliver any instrument or instruments required to convey and transfer all rights, powers, documents, money, property, and other Trust Assets to such successor trustee upon the trust herein expressed, without recourse to such predecessor trustee.

**8.5    Liquidation Duties Of The Liquidating Trustee.**  The Liquidating Trustee shall, in the exercise of the Liquidating Trustee's reasonable business judgment and in consultation with

and pursuant to the decisions of the Governing Committees as set forth in this Agreement and the Orders, in an orderly and efficient manner liquidate and convert the Trust Assets to cash and make timely distributions as provided for in this Agreement and the Orders. Liquidation may be accomplished through the prosecution, compromise and settlement, sale, abandonment, or dismissal of any or all Causes of Action or other Trust Assets.

8.6 **Powers of Liquidating Trustee.** Pursuant to the directions of the Governing Committees as set forth in this Agreement, the Liquidating Trustee shall have all rights, powers, authority, and duties necessary and appropriate to liquidate Trust Assets and implement the purposes of the Trust and the provisions of this Agreement and the Orders. The Liquidating Trustee shall not be required to take any action that, in the reasonable business judgment of the Liquidating Trustee, is not permitted by, or is in conflict with, applicable law, the terms of the Orders or this Agreement or that may subject the Trustee to objectively unreasonable liability or expense.

8.7 **Trustee Counsel.** The Liquidating Trustee may retain separate counsel to advise him with respect to matters relating to his services to be rendered as the Liquidating Trustee of the Liquidating Trust. The Trustee's Attorney's Fees charged by such separate counsel shall whenever feasible be allocated by the Liquidating Trustee's counsel (with such allocations being subject to review and revision by the Committee of the Whole) to the Beneficiary Class which either directly or indirectly caused or substantially benefitted by the matter which led to the incurrence of Trustee's Attorney's Fees. If such allocation is not feasible, such Trustee's Attorney's Fees shall be paid or reimbursed by the Trust as a General Trust Expense. Notwithstanding anything to the contrary: (a) unless the Committee of the Whole approves a greater amount (which it may do so in response to a request by the Liquidating Trustee) or the Liquidating Trustee obtains a Court order directing payment of such greater amount, neither the Trust nor any Beneficiary Class (or all combined) shall be required to pay or reimburse more than an annual aggregate amount of $100,000 of Trustee's Attorney's Fees; and (b) the Trust and/or any Beneficiary Class shall only be obligated to pay Trustee's Attorney's Fees only if and when there are sufficient cash Recoveries to pay such fees.

8.8 **Compensation of the Liquidating Trustee.**

(a) For his services to the Trust, the Liquidating Trustee shall be paid Trustee Compensation upon the occurrence of a Distribution in accordance with the Distribution

Waterfalls set forth in Articles V and VI of this Agreement. Notwithstanding anything to the contrary in this Agreement, Assignment of Trust Assets into the Trust shall not be deemed to be a payment or disbursement for purposes of compensation to the Trustee, but all subsequent Distributions of Trust Assets after they were initially transferred to the Trust (except for the transfer of real property collateral to limited liability companies pursuant to Collateral Disposition Dispositions, or the return to the DL Class of DL Interests that were Assigned to the Trust to remedy a Disabling Condition) shall trigger compensation payable to the Liquidating Trustee.

(b)     Notwithstanding anything to the contrary, with respect to the Preference Claims transferred to the Trust, Trustee Compensation shall be paid as follows:

(1)     The first $375,000 received and distributed by the Trust on account of the GT Preference Payment Claims will not trigger Trustee Compensation, but all other sums received and distributed on account of the GT Preference Payment Claims will trigger Trustee Compensation;

(2)     All Distributions made by the Trust on account of the Bryan Cave Preference Payment Claims will trigger Trustee Compensation;

(3)     All Distributions made by the Trust on account of the Preference Payment Claims against Conway MacKenzie or Thompson Hine will trigger Trustee Compensation;

(4)     The $250,000 Payment in connection with the Remaining Preference Payment Claims that is required to be paid to the Estate under the Settlement Order shall trigger Trustee Compensation, but any Distributions made thereafter on account of the Remaining Preference Payment Claims to Silar will not trigger Trustee Compensation; and

(5)     Because the Klestadt and Repotex Preference Claims will be transferred or assigned to the B&B Settling Clients rather than to the Trust pursuant to the Settlement Order, Distributions on account of such claims will not trigger Trustee Compensation

(c)     Notwithstanding his entitlement to the Trustee Compensation, the Liquidating Trustee shall also continue to possess the right to receive compensation under section 326 of the Bankruptcy Code and other applicable law as the chapter 7 trustee of the Estate relating to the disbursement or turnover of any assets of the Estate which are not transferred to the Trust,

including without limitation the disbursements to be made to the B&B DL Settling Clients pursuant to the Settlement Order (other than in connection with the Silar Settlement Payment as defined in the Settlement Order).

(d)     Notwithstanding anything to the contrary, under no circumstance shall the Person serving as Liquidating Trustee and Chapter 7 Trustee be entitled to collect more than one three percent fee with respect to any Distribution or item of collection.

(e)     In the event that the Liquidating Trustee's appointment terminates at any time for any reason other than Cause, the Liquidating Trustee shall be entitled to payment of any earned but unpaid portion of Trustee Compensation and any unreimbursed business expenses incurred prior to such termination.  In the event of a termination for Cause, the Court shall determine what fees and unreimbursed business expenses shall be payable to the terminated Liquidating Trustee. In the event a successor Liquidating Trustee is appointed, such successor trustee shall be compensated in accordance with this Agreement.

## ARTICLE IX     TRUST COMMITTEES

### 9.1.   Establishment Of Trust Committee(s).

(a)     The Parties hereby establish the Committee of the Whole, the Silar Committee, and the DL Committee to be responsible for making certain decisions concerning the Trust, to provide the Liquidating Trustee with advice, and to assist the Liquidating Trustee in the performance of the Liquidating Trustee's duties, as set forth in more detail in this Agreement and the Orders.

(b)     The Committee of the Whole, the Silar Committee, and/or the DL Committee may form one or more Advisory Boards which may be comprised of one or more Persons who are not members of the Committee of the Whole.  By way of example only, the DL Committee may form one or more Advisory Boards with respect to specific USACM Loans which would be comprised of Beneficiaries who made Assignments of DL Interests to the Trust for that particular loan but who are not themselves members of the Committee of the Whole. The members of such Advisory Boards shall enjoy the same privileges, immunities, and other protections as Committee Members, and any compensation to be paid to such Advisory Board members shall be charged to and paid solely by the Beneficiary Class for whose interests the Advisory Board was established.

### 9.2. Selection of Committee Members.

(a)     Silar in its Sole And Absolute Discretion shall select Silar's two members of the Committee of the Whole and the Silar Committee.  The names of those two members shall be provided to the Trustee and the Initial B&B DL Beneficiary Group as soon as practicable after the Settlement Order is entered.

(b)     The Initial B&B DL Beneficiary Group's two members on the Committee of the Whole and the DL Committee shall be selected by the Initial B&B DL Beneficiary Group, in their Sole And Absolute Discretion, as soon as practicable after the Settlement Order is entered.  Only Persons from the Initial B&B DL Beneficiary Group may serve as a Committee Member and/or vote to select such members.  Any Person from the Initial B&B DL Beneficiary Group who seeks to serve as a Committee Member will be included on a written ballot to be sent to all the Initial B&B DL Beneficiary Group for a vote.  The vote totals shall be tabulated and confirmed by Bickel & Brewer, and the two Persons from the Initial B&B DL Beneficiary Group who receive the largest vote totals shall be selected as the Initial B&B DL Beneficiary Group's members on the Committee of the Whole and the DL Committee.  The names of those two members shall be provided by Bickel & Brewer to the Liquidating Trustee and Silar as soon as practicable after the Settlement Order is entered, and the Liquidating Trustee and Silar may rely on such notice provided by Bickel & Brewer.

### 9.3     Authority of the Committees.

(a)     The Committee of the Whole and each other Governing Committee shall have the power and authority to direct the Liquidating Trustee to undertake any and all actions that are reasonable and necessary in connection with the Trust and Trust Assets, as provided for or as reasonably contemplated by this Agreement, including without limitation: (1) obtaining Future Assigned Assets for the Trust in order to more fully implement the purposes of the Trust; and/or (b) inviting and accepting Persons as Additional Parties to this Agreement for specific Causes of Action or other USACM Loan-specific purposes pursuant to the Orders and this Agreement.

(b)     The Trust will pursue those Causes of Action determined to be appropriate by the Governing Committee, subject to the terms of this Agreement.

(c)     In the event the Liquidating Trustee requires guidance with respect to allocation of resources (such as for example who to sue when) or other issues involving matters which overlap

between the Silar Committee and the DL Committee, then the matter shall be resolved by the Committee Of The Whole (provided, however, the respective Governing Committees shall at all times control the Liquidation Decisions).

(d)    The Committee of the Whole shall be responsible for, retain, account for, and authorize the disbursement of all funds maintained in the General Trust Reserve and the DL Class Expenses Reserve.

**9.4    Regular Meetings of the Committees.**  Meetings of the Committees shall be held with such frequency, in person or by telephone or otherwise, as the Committees may determine or any Committee Member may reasonably request.  All actions, decisions or determinations by any Committee shall be authorized, and effective, only after a formal meeting or written consent in lieu of a meeting of all of the applicable Committee Members after notice as provided herein.  To the extent practicable, a meeting shall not proceed unless:  (1) all Committee Members are present in person or by phone; (2) 48 hours advance notice of the meeting was provided to all Committee Members (whether or not such Committee Members are required to or may elect to Abstain) and Silar; and (3) all information to be considered at the meeting was provided to all Committee Members at least 48 hours in advance of the meeting.  In the event a Committee Member is unable or refuses to attend a meeting despite proper notice, the meeting shall be adjourned for an additional 48 hours and then, may be held in the absence of such Committee Member, so long as a majority of the members of the Committee are present and issue a vote, with a majority of the votes cast constituting the decision of the Committee.  Committee Members who are present and dissent from any decisions made and approved by the Governing Committee may communicate the basis of their dissent to the Beneficiaries in their Sole And Absolute Discretion.  Committee Members may also Abstain from voting on a matter and such abstention shall provide the Committee Member with Absolute Immunity.  Notwithstanding anything to the contrary in this Agreement, if a vacancy exists with respect to a Committee Member position at the time a meeting is requested, then such meeting must be postponed until the earlier of: (a) seven (7) calendar days from the meeting date set forth in the notice of the meeting or (b) the next business day following the date on which the Beneficiary Class responsible for appointing such Committee Member has duly appointed a replacement Committee Member on at least an interim basis.    If there is a bona fide emergency and an interim replacement Committee Member cannot be appointed on a timely basis, the meeting may be held and the remaining Committee Member appointed by such Beneficiary Class shall also have the right to cast the vote which would have otherwise been available to the Committee Member being replaced.

**9.5** **Committee Member Compensation.** Each Committee Member (other than the Liquidating Trustee) shall be entitled to receive Committee Member Compensation only upon a Recovery, in the amount of $175 per hour, billable in 1/10 per hour increments and/or such other rates, amounts, and supplemental fees agreed to by the Appointing Beneficiary Class to be charged with such fees. Each Committee Member shall be responsible for maintaining records of their billable time, segregated as to time spent for general administration of the Trust and by Cause of Action, for approval by Committee of the Whole in its Sole And Absolute Discretion. Such records shall be submitted to the Committee of the Whole at the time of a Distribution Decision. Notwithstanding the foregoing, upon the approval of the Committee of the Whole, Committee Members may be reimbursed, as a General Trust Expense, reasonable out-of-pocket expenses incurred in performing services for the Trust and/or in connection with the Trust Assets. Notwithstanding anything to the contrary, the Committee of the Whole, in its Sole And Absolute Discretion, shall determine the amount of Committee Member Compensation, if any, owed to a Committee Member that resigns or is removed as such.

**9.6** **Resignation of Committee Members.** A Committee Member may resign by giving not less than sixty (60) days prior written notice to the Committee of the Whole, unless there is not sufficient funds for the Trust in the Committee Member's reasonable business judgment to pursue the litigation of any Causes of Action by the Trust, in which case the Committee Member may resign immediately upon written notice to the Committee of the Whole. Such resignation will become effective on the later to occur of: (a) the day specified in such notice; and (b) the appointment of a successor Committee Member as provided herein and the acceptance by such successor of such appointment through the filing of an Appointment Certificate. If a successor member is not appointed or does not accept appointment within sixty (60) days following delivery of notice of resignation, the member may file a motion with the Court, upon notice and hearing, for the appointment of a successor member.

**9.7** **Removal of Committee Members.** A Committee Member may be removed by the unanimous vote of all other Committee Members or by the vote of more than 60% of the Beneficiary Class that appointed the Committee Member, but only for Cause. If the removed Committee Member opposes such removal, he or she may contest such removal, but only by filing an action with the Court, which shall have exclusive jurisdiction and be the exclusive venue for any such action.

**9.8** **Successor Committee Members.**

(a)     In the event of a vacancy in the position of a member of the Committee of the Whole (whether by removal, resignation, death, or other legal incapacity), the vacancy will be filled by the appointment of a successor approved by a majority vote of the Beneficiary Class to which the vacancy belongs.  The procedures set forth in Section 9.2 of this Agreement shall apply to the appointment of successor Committee Members.  With respect to the DL Committee Member Appointees, until the successor Committee Member is appointed, the "runner up" in the most recent vote of the DL Class shall become, if not otherwise disabled or unwilling, the interim DL Committee Member.

(b)     Any successor Committee Member appointed hereunder shall execute and file with the Court in the Asset Resolution Bankruptcy Case an Appointment Certificate expressly assuming all of the obligations of a Committee Member and, thereupon without any further act, the successor Committee Member become vested with all the rights, powers, and duties of the predecessor member with like effect as if originally named in this Agreement.

(c)     Immediately upon the filing of the Appointment Certificate, all rights, powers, duties, authority, and privileges of the removed or resigned Committee Member will be vested in and undertaken by the successor Committee Member without any further act, and the successor Committee Member will not be liable personally for any act or omission of any predecessors.

(d)     Upon the filing of the Appointment Certificate, the predecessor Committee Member shall, if necessary, when requested in writing by the successor Committee Member, execute and deliver any instrument or instruments required to convey and transfer all powers of being a Committee Member to such successor Committee Member, without recourse to such predecessor trustee and without waiver of any rights by the predecessor.

## ARTICLE X     RETENTION AND PAYMENT OF THE MAJORIE FIRM LTD.

**10.1   Retention.**   Pursuant to the Orders, the Trust shall retain The Majorie Firm Ltd. as special litigation counsel to the Trust under the terms set forth in the Orders, this Agreement, and any supplemental or amended fee agreements as may be executed from time to time by the Trust. The Majorie Firm Ltd. shall be paid the TMF Contingency Fee upon a Distribution of a Recovery in accordance with the Distribution Waterfall set forth in Articles V and VI of this Agreement.

The Majorie Firm Ltd. has received one or more payments or advances from Silar in order to induce The Majorie Firm Ltd. to accept this retention, which shall be disclosed to the Committee of the Whole on a confidential basis and shall be repaid to the Silar Parties out of the TMF Contingency Fee as reimbursement of attorneys' fees paid by the Silar Parties on terms agreed to between the Silar Parties and The Majorie Firm Ltd.  In addition, as additional consideration for the advance, The Majorie Firm Ltd. may negotiate an additional fee reimbursement with Silar, which will also be repaid to Silar or its designee(s) out of the TMF Contingency Fee as reimbursement of attorneys' fees paid by Silar.

**10.2   Carve-Outs.**  Notwithstanding anything to the contrary in this Agreement:

(a)    No TMF Contingency Fee or reimbursement of expenses shall be made by the Trust in connection with:  (1) the $100,000 Payment; (2) the $250,000 Additional Payment made under the Settlement Order; or (3) the Recovery of the first $375,000 from Greenberg Traurig pursuant to the GT Preference Payment Claims.

(b)    TMF shall have no obligation to pursue Causes of Action on behalf of the Trust in the event that TMF is not admitted in jurisdictions in which any Causes of Action are pursued and TMF either cannot obtain *pro hac vice* status in those jurisdictions or cannot otherwise provide services in connection with such Causes of Action.  If TMF is able to secure *pro hac vice* status or is otherwise substantially involved in the pursuit of such Causes of Action even though local counsel is also retained, The Majorie Firm Ltd. shall be entitled to the TMF Contingency Fee for Recovery(ies) on such Causes of Action and the Trust (as further allocated among the appropriate Beneficiary Classes) shall bear the attorney's fees and costs of local counsel as a Litigation Expense.

**10.3   Payment.**  Payment of the TMF Contingency Fee to The Majorie Firm Ltd. shall be made from time to time as there are Recoveries pursuant to the Distribution Waterfall. In no event shall the amount, payment, or receipt of the contingency fees for The Majorie Firm Ltd. be reduced or require approval by the Court.

**10.4   Litigation Expenses Paid Or Incurred By TMF.**  TMF shall not be obligated to advance payment for or incur any third-party Litigation Expenses on behalf of the Trust.   If TMF does advance payment for third party Litigation Expenses, the Governing Committee shall have the [right to approve any item of third-party Litigation Expense which would exceed $4,000 per monthly invoice from a single vendor.]

**10.5    TMF's Representation And Defense Of The Beneficiaries.**  If any or all of the Beneficiaries become the subject of Adverse Claims by an Adverse Claimant, TMF shall defend them as part of TMF's Retention Agreement by the Trust.   By becoming Parties to this Agreement and as further provided in the Orders, each Beneficiary waives all conflicts of interest with respect to such joint representation of the Trust, Silar Parties and their Affiliates, or other Parties. Such representation shall not disqualify TMF or any of its lawyers from continuing to represent Silar Parties or their Affiliates.  If TMF is required to withdraw from representing the Trust or any other Party due to an actual conflict of interest, it may continue to represent Silar Parties and their Affiliates.  TMF may apply for Instructions from the Court in the event of any possible or actual conflicts.

**10.6    Additional.**  The terms set forth in this Agreement are not intended to describe all of the terms and conditions of TMF's retention by the Trust, and TMF's retention by the Trust shall be governed by the terms set forth in the Orders and in such other agreements as may be executed by TMF and the Trust or other Parties from time to time.

# ARTICLE XI    TAX MATTERS

**11.1    Intention.**   It is the intention of the Parties (as approved by the Court) that the Trust will constitute a "grantor trust" for federal income tax purposes and that the Liquidating Trustee shall operate the Trust as "liquidating trust" within the meaning of Treasury Regulation §301.7701-4(d). This Agreement is not intended to create a "business trust" for purposes of Bankruptcy Code section 101(9)(A)(v) or otherwise any entity eligible to commence or be the subject of a proceeding under the Bankruptcy Code.  The Parties also agree as follows:

(a)    The Liquidating Trustee shall administer and maintain the Trust in compliance with the guidelines for liquidating trusts as set forth in Internal Revenue Service Rev. Proc. 94-45, 1994-2 C.B. 684, Rev. Proc. 91-15, 1991-1 C.B. 484, and Treas. Reg. §1.671-4(a) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service.  For federal income tax purposes, all Parties to this Agreement shall: (1) treat the Assignment of Transferred Estate Assets to the Trust pursuant to this Agreement and the Orders as an Assignment of Transferred Estate Assets to the Initial Beneficiaries followed by a transfer of the Transferred Estate Assets to the Trust (with the Initial Beneficiaries being treated as grantors of the Trust); and (2) treat the Assignment of Causes of Action and other Trust Assets of all Beneficiaries except the Estate as a grant to the Trust by all Beneficiaries except the Estate.

(b)     To ensure compliance with the guidelines for liquidating trusts:

(1)     The Trust and its beneficiaries shall use and agree on consistent valuations of all Trust Assets and such valuations shall be used for all federal income tax purposes.

(2)     Regardless of whether a reserve is established for disputed claims, all of the Trust's income shall be treated as subject to tax on a current basis, and the Trust's taxable income will be allocated to the grantee/beneficiaries, who shall be responsible for payment of any tax due.

(3)     Notwithstanding any other provision, The Trust shall not receive or retain cash or cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities (including disputed claims) or to maintain the value of the Trust Assets during liquidation.

(4)     Except as required as reasonably necessary to maintain the value of the Trust Assets and to further the liquidating purpose of the Trust, the investment powers of the Liquidating Trustee are limited to investments in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

(5)     The Trust shall, at least annually, distribute to the beneficiaries, in the manner and percentages set forth in this Trust Agreement, its net income plus all net proceeds from the sale or liquidation of Trust Assets, provided that the Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Trust Assets or to meet claims and contingent liabilities (including disputed claims).

(6)     The Trustee shall make continuing efforts to liquidate and otherwise dispose of Trust Assets, to make timely distributions, and to not unduly prolong the duration of the Trust.

(7)     The Trust shall not hold any operating assets of a going business, a partnership interest in a partnership that holds operating assets, or 50% or more of the stock of a corporation with operating assets; provided, however, that in the event the Trust comes into transitory ownership or control of commercial, rental, or residential properties,

as a result of foreclosing upon real property collateral, the Liquidating Trustee shall dispose of such property as expeditiously as possible consistent with realizing the fair value of such property, and shall contract with one or more independent property management companies to operate the property pending disposition.

(c)     The Trust and Trust Assets will be administered consistent with the liquidating purpose of a liquidating trust, and with no objective to continue or to engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with the liquidating purposes of the Trust (including without limitation, preservation of the liquidation value of the Causes of Action and other Trust Assets).

(d)     In the event the Trust is determined or may be determined not to be a liquidating trust for the purposes of federal taxation, the Liquidating Trustee may with the advice and consent of the Committee Of The Whole undertake such acts and/or transactions which are deemed necessary and advisable to provide as closely as possible the tax and other economic attributes of a liquidating trust to the Parties.  The Liquidating Trustee may, but is not obligated to, (i) seek Court approval of such acts and/or transaction(s) to do so; and (ii) seek a private letter ruling from the Internal Revenue Service as to the classification of the Trust for Federal income tax reporting purposes.  The Liquidating Trustee may with the advice and consent of the Committee of the Whole make technical amendments to the Trust in the event such amendments are necessary to qualify the Trust for favorable tax treatment in response to a private letter ruling request.

**11.2   Tax Treatment.**  For all U.S. federal income tax purposes, all parties (including, without limitation, the Trustee and the Beneficiaries) will treat the Liquidating Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d).  Consistent with this treatment, for all U.S. federal income tax purposes, the transfer of the Trust Assets to the Trust shall be treated as:

(a)     A transfer of the Trust Assets (subject to any obligations relating to those assets) directly to those Persons receiving Liquidating Trust Interests, followed by

(b)     The transfer by such Beneficiaries to the Liquidating Trust of the Trust Assets in exchange for Liquidating Trust Interests.

Accordingly, the Liquidating Trust shall be treated for U.S. federal income tax purposes as a grantor trust and those Persons receiving Liquidating Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Trust

Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 11.3    Allocations of Liquidating Trust Taxable Income or Loss.

Allocations of net taxable income or net taxable loss of the Liquidating Trust for a tax year among the Beneficiaries shall be allocated equally among the Liquidating Trust Interests in each of the Trust Assets pursuant to their Liquidating Trust Interests. To the extent of any Assignments of Liquidating Trust Interests in accordance with this Agreement, the Committee of the Whole shall promptly establish a standard convention for allocating and apportioning taxable income and loss between a transferor and its transferee and shall not be required to so allocate and apportion based on the actual Trust activities prior and subsequent to the date of any Assignment. The Committee of the Whole, through the Liquidating Trustee, shall notify the Beneficiaries of the convention adopted promptly after such adoption.  The Committee of the Whole shall use its discretion to establish a fair and equitable convention to apply and may, but is not required to, adopt a monthly, quarterly or similar record date convention.

### 11.4    Distribution Reserve Account.

The Estate shall maintain a reserve for payment of all Proofs of Claim filed against the Estate to the extent those claims are not yet subject to a final order sustaining an objection thereto and have not otherwise been adequately provided for by the Trustee on behalf of the Estate. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Estate or the Trust of a private letter ruling or of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall:  (i) timely elect to treat any proceeds received from the liquidation of Trust Assets that are held in a reserve account as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9; and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  Accordingly, such reserve account will be subject to tax annually on a separate entity basis on any net income earned with respect to such reserved proceeds and all disbursements from such reserves will be treated as received by holders of Proofs of Claim against the Estate in respect of those Claims as if paid by the Estate.  All Parties (including the Trustee and the Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

**11.5   Tax Withholdings.**

The Liquidating Trustee shall withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment, Distribution or allocation of income or gain to the holders of Liquidating Trust Interests.  All such amounts withheld, and paid to the appropriate taxing authority, shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of this Agreement.  The Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as it in his sole discretion deems necessary to effectuate this Agreement.  The Trustee may refuse to make a Distribution to any holders of a Liquidating Trust Interest that fail to furnish such information in a timely fashion, until such information is delivered; provided, however, that upon the delivery of such information by the holder of the Liquidating Trust Interest, the Liquidating Trustee shall make such distribution to which the holder of the Liquidating Trust Interest is entitled, without interest.

**11.6   Expedited Determination of Taxes.**

The Liquidating Trustee may request an expedited determination of taxes of the Trust, including in connection with any reserve account, the Estate under section 505(b) of the Bankruptcy Code, any or all returns filed for, or on behalf of, the Trust or the Estate for any or all taxable periods (or part thereof) through the dissolution of the Trust, or the abandonment of real property collateral or a DL Interest.

# ARTICLE XII   STANDARD OF CARE; LIMITED LIABILITY

**12.1   Standard of Care.**   Trust Representatives shall enjoy all of the privileges and immunities available to trustees under the Bankruptcy Code and other applicable law and as set forth herein:

(a)   Trust Representatives may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Liquidating Trustee to be genuine and to have been signed or presented by the proper party or parties;

(b)     No Trust Representative shall be liable for any act or omission taken or omitted to be taken by them in good faith, other than acts or omissions which are finally judicially determined to have resulted substantially from such Person's own gross negligence or willful misconduct.  Each of the Trust Representatives may, in connection with the performance of his/her functions, and in his/her Sole And Absolute Discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Trust Representatives shall be under no obligation to consult with attorneys, accountants, financial advisors or agents, and their good faith determination not to do so shall not result in the imposition of liability on such Trust Representative, unless such determination is finally judicially determined to have been based substantially on gross negligence or willful misconduct.  Any action taken or omitted to be taken with the approval of a Governing Committee shall conclusively be deemed to not constitute gross negligence or willful misconduct;

(c)     No Trust Representative shall be liable for any act or omission taken or omitted to be taken by the Liquidating Trustee or any instruction given to the Liquidating Trustee in good faith, other than acts or omissions which are finally judicially determined to have resulted substantially from their own gross negligence or willful misconduct; and

(d)     The Liquidating Trustee and other Trust Representatives shall be entitled to all protections and immunities afforded to chapter 7 trustees under the Bankruptcy Code and liquidating trustees under liquidating trusts, and nothing in this Agreement shall impair, modify, or limit such protections and immunities.

**12.2    Indemnification.**

(a)     To the fullest extent permitted by law, the Trust, to the extent it has or receives or may receive assets available for that purpose, shall indemnify, defend, and hold harmless present and/or former Trust Representatives, Beneficiaries, and/or Silar Parties from and against any and all Losses sustained as a result of or in connection with the assertion of Causes of Action against any present and/or former Trust Representatives, Beneficiaries, and/or Silar Parties as a result of: (1) any actions taken or omitted by the Trust or by Trust Representatives (including without limitation the assertion of Causes of Action or the events, transactions, or occurrences which underlie such Causes of Action); and/or (2) the assertion of Causes of Action by a Responsible Person against any Beneficiaries arising out of or relating to events, transactions, or occurrences

which underlie Causes of Action which have been Assigned to the Trust; and/or (3) Losses incurred by a Committee Member or the Committee Member's Affiliates to the extent they are related to action or inaction by the Trust or a Committee in connection with a matter to which there was an Abstention by such Committee Member (including matters where such Committee Member is deemed to have Abstained).

(b)     The Trust shall pay in advance or reimburse reasonable and documented out-of-pocket Losses and expenses (including advancing reasonable Litigation Expenses) incurred by the Trust Representatives or any Beneficiary who is or is threatened to be named or is made a defendant or a respondent in a proceeding which is covered by this Section 12.2.

(c)     Notwithstanding anything to the contrary in this Agreement or the Orders, the Trust's Indemnification Obligations shall not extend to Losses sustained by Trust Representatives from acts or omissions which are judicially determined by a final (non-appealed and non-appealable) order or judgment to constitute gross negligence or willful misconduct by the Trust Representatives seeking the indemnification.

(d)     Notwithstanding anything to the contrary in this Agreement or the Orders, the Trust's Indemnification Obligations to DL Beneficiaries and/or DL Committee Appointees shall not extend to Losses related to or in connection with (i) any judgment or other judicial award against Direct Lenders (in such capacity) for Causes of Action by a borrower or guarantor for a USACM Loan and/or any settlement with such borrowers or guarantors; and/or (ii) any Collateral Disposition Decision, Encumbrance Decision, and/or Collateral Property Specific Expenses, and/or (iii) or any matter directly or indirectly concerning a USACM Loan or DL Interests which does not involve the assertion of a Loan Claim; and provided, further that the Losses described in this paragraph 12.2(d)  shall be borne exclusively by the DL Class and the Trust may retain Net Distributions payable to the DL Class from any and all Trust Assets to pay or reserve for payment of such Losses.

(e)     Any Trust Representative, Beneficiary, or Silar Party may waive the benefits of indemnification under this Section 12.2, but only by an instrument in writing executed by such Trust Representative.

(f)     The rights to indemnification under Section 12.2 are not exclusive of other rights which any Trust Representative, Beneficiary, or Silar Party may otherwise have at law or in equity,

including without limitation, common law rights to indemnification or contribution. Nothing in this Section 12.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under this Agreement, or any other agreement or instrument to which that Person is a party.

**12.3    Insurance And Bonding.**    The Liquidating Trustee shall obtain, to the extent practical, a fiduciary bond and insurance coverage (in the form of an errors and omissions policy, directors and officers policy, comprehensive general liability policy, or otherwise) with respect to the liabilities and obligations of the Trust or Trust Representatives under this Agreement, it being understood that such coverage shall constitute an expense of administration of the highest and first priority and that the cost of such insurance shall be deemed a General Trust Expense.

**12.4    Affiliated Service Providers.**    Notwithstanding anything to the contrary in this Agreement, any Person shall be entitled to be selected by the Liquidating Trustee, pursuant to the direction of the Committee of the Whole, to provide services to the Trust or in connection with the Trust Assets, so long as:  (a) such services are at or below the market rate for such services, as determined by a competitive bidding process based on the submission of bids from at least three parties; and (b) the Liquidating Trustee first obtains the consent of the Governing Committee to retain any such Person.  The limitations included in this provision, however, apply only to services that are reasonably contemplated to require the Trust to pay more than $4,000 to any such Person.

**12.5    Express Exculpatory Clauses in Instruments.** As far as practicable, the Liquidating Trustee shall cause any written instrument creating an obligation of the Trust to include a reference to this Agreement and to provide that none of the Beneficiaries or Trust Representatives shall be liable thereunder and that the other parties to such instrument shall look solely to the Trust Assets for the payment of any claim thereunder or the performance thereof; provided, however, that the omission of such provision from any such instrument shall not render any Beneficiary or Trust Representative liable nor shall the Liquidating Trustee be liable to anyone for such omission.

**12.6    Actions Under Court Supervision**.  Notwithstanding anything to the contrary in this Agreement or otherwise, neither the Trust, the Trust Representatives, nor the Governing Committees, nor the Advisory Board(s) or their members, nor the Beneficiaries shall, in connection with any matters relating directly or indirectly to the Trust, Trust Assets, or the performance of activities under this Agreement: (1) be deemed "mortgage brokers," "mortgage

agents," "mortgage bankers," "escrow agents," or "loan servicers" under Nevada law or any other law; (2) be required to be licensed or registered to do business by or in the State Of Nevada or any other state; or (3) be required to obtain any separate written powers of attorney from Beneficiaries under or in compliance with Nevada law or any other state.

# ARTICLE XIII      REPORTS TO BENEFICIARIES

### 13.1    Reports.

(a)      The Trustee shall cause to be prepared, as applicable, financial reports of the Trust, to be delivered to the Beneficiaries together with any annual income tax reporting of the Trust, either: (i) at such times as may be required by applicable law; (ii) not less than semi-annually; or (iii) at such times as reasonably requested by Committee of the Whole. The materiality and scope of financial determinations shall be established between the Liquidating Trustee and the appointed accountants with a view toward safeguarding the value of the Trust Assets, but nothing relating to the mutually agreed scope of work shall result in any limitation of scope that would cause the accountants to qualify their opinion as to scope of work with respect to such financial statements.

(b)      The Trustee may post any report required to be provided under this Section 13.1 on a website maintained by the Trustee or file such report with the Court in lieu of actual notice to the Beneficiaries (unless otherwise required by law). The Trustee shall provide the Beneficiaries notice of the web address where the information received pursuant to this Section 13.1 will be posted.

(c)      From the Effective Date until the Asset Resolution Bankruptcy Case is closed, the Liquidating Trustee shall, within forty-five (45) days of the end of each calendar year, file with the Court and submit to the United States Trustee annual reports setting forth all receipts and disbursements of the Trust as required by the guidelines of the United States Trustee.

### 13.2    Books and Records.

(a)      The Liquidating Trustee shall have the responsibility of storing and maintaining such books and records he receives in connection with Trust Assets until one year after the date that each such Trust Asset is liquidated or, if applicable, abandoned (or as otherwise ordered by the Court), after which time such books and records may be abandoned or destroyed without further Court order. The DL Beneficiaries shall cooperate with the Liquidating Trustee to

facilitate the delivery and storage of their books and records in accordance herewith at the Principal Office of the Trust. The DL Beneficiaries shall be entitled to reasonable access to any books and records transferred to the Trust for all necessary corporate purposes, including, without limitation, defending or prosecuting litigation, determining insurance coverage, filing tax returns, and addressing personnel matters. For purposes of this section, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the DL Beneficiaries maintained by or in possession of third parties and all of the claims and rights of the DL Beneficiaries in and to their books and records, wherever located.

(b)      The Liquidating Trustee shall maintain books and records relating to the Trust Assets and income of the Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Any ledger setting forth the Trust Assets shall measure value for purposes of distribution and compensation hereunder as of the date such assets are converted into cash. Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting and securities law requirements of the Trust. Nothing in this Agreement requires the Liquidating Trustee to file any accounting or seek approval of any court with respect to the administration of the Trust, or as a condition for managing any payment or distribution out of the Trust Assets.

(c)      The DL Beneficiaries shall maintain their own books and records related to the Trust, including DL Class Expenses, budgets, and Distributions, which shall be made available to any DL Beneficiaries upon reasonable advance notice.

(d)      Silar shall maintain its own books and records related to the Trust, including Silar Class Expenses, budgets, and Distributions.

## ARTICLE XIV    DURATION; WIND-UP

### 14.1    Term; Termination Of The Trust.

(a)      The Trust shall be terminated at such time as: (i) all of the Trust Assets have been distributed pursuant to the Orders and this Agreement; (ii) the Committee of the Whole determines, in its Sole And Absolute Discretion, that the administration of the Trust Assets is not likely to yield sufficient additional Recoveries to justify further pursuit; and (iii) all Distributions required to be made under this Agreement have been made; provided, however, that the Trust shall

be terminated no later than five (5) years from the Effective Date unless an extension is granted by the Court pursuant to Section 14.1(b) below.

(b)     Notwithstanding the foregoing, the Court, upon motion by the Liquidating Trustee or a Committee Member and after a hearing held within six (6) months before the expiration of the original term or any extended term, may extend, for a fixed period, the term of the Trust if it is necessary to facilitate or complete the liquidation of the Trust Assets.  The Court may approve multiple extensions of the term of the Trust; provided, however, that such extensions, on a cumulative basis, may not exceed three (3) years without a favorable private letter ruling from the Internal Revenue Service that any further extensions would not adversely affect the status of the Trust as a liquidating trust for United States federal income tax purposes.

(c)     If at any time the Committee of the Whole determines, in reliance upon such professionals as the Liquidating Trustee may retain on behalf of the Trust, that the expense of administering the Trust so as to make a final distribution to the Beneficiaries is likely to exceed the value of Trust Assets remaining in the Trust, the Liquidating Trustee or the Committee of the Whole may apply to the Court for authority to:  (i) reserve any amounts necessary to dissolve the Trust; (ii) donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from United States federal income tax under section 501(a) of the Tax Code that is unrelated to the Estate, the Trust, and any insider of the  Liquidating Trustee; and (iii) terminate the Trust.

### 14.2   Continuance of Trust for Winding Up.

After the termination of the Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Liquidating Trustee shall continue to act as such until his duties have been fully performed.  Prior to the final distribution of all of the remaining Trust Assets, the Liquidating Trustee shall be entitled to reserve from such Trust Assets any and all amounts required to provide for its own costs and expenses until such time as the winding up of the Trust is completed.  Upon termination of the Trust, the Liquidating Trustee shall retain, until the expiration of the applicable statute of limitations in respect of the taxable years of the Trust's existence unless otherwise ordered by the Court, as a cost of administering the Trust, the books, records, Trust Beneficiary lists, the Trust Register, and certificates and other documents and files that have been delivered to or created by the Trust.  At the Liquidating Trustee's Sole and Absolute Discretion, all of such records and documents may, but need not, be destroyed at any time after the expiration of the applicable statute of limitations in respect of the taxable year in

which the affairs of the Trust were completed and wound up.  Except as otherwise specifically provided herein, upon the termination of the Trust, the Liquidating Trustee shall have no further duties or obligations hereunder.

## ARTICLE XV    MISCELLANEOUS PROVISIONS

### 15.1  Laws as to Construction.

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.**

### 15.2  Jurisdiction.

Without limiting any Person's right to appeal any order of the Court, notwithstanding anything contained herein to the contrary, the Parties agree that:  (i) the Court shall have exclusive jurisdiction and venue over the Trust and its Causes of Actions, as well as any claims that are commenced against the Trust to the fullest extent permitted by law; (ii) the Court shall have jurisdiction to the greatest extent possible to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby; and (iii) any and all actions related to the foregoing or to this Agreement, or to any action taken, or failed to be taken, by the Liquidating Trustee or the Governing Committees shall be filed and maintained in the Court, and the Parties, including the Beneficiaries, hereby consent to and submit to the exclusive jurisdiction and venue of the Court.  Notwithstanding the foregoing, the Committee of the Whole shall have the power and authority to direct the Liquidating Trustee to bring any action in any court of competent jurisdiction to prosecute in whole or in part any claims or Causes of Action which have been Assigned to the Trust.

### 15.3  Severability.

If any non-material provision of this Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall

not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

### 15.4    Notices.

All notices, requests, or other communications to the Parties shall be in writing and shall be sufficiently given only if:  (i) delivered in person; (ii) sent by electronic mail or facsimile communication (as evidenced by a confirmed fax transmission report); (iii) sent by registered or certified mail, return receipt requested; or (iv) sent by commercial delivery service or courier. Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the addresses or facsimile numbers listed in the Trust Register.  All notices shall be effective and shall be deemed delivered:  (i) if by personal delivery, delivery service, or courier, on the date of delivery; (ii) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (iii) if by mail, three days after the notice has been deposited in the mail.  Any Party from time to time may change its e-mail and/or mailing address, facsimile number, or other information for the purpose of notices to that Party by giving notice specifying such change to the Liquidating Trustee.  Any Party that provides their e-mail address shall be deemed to have consented to receiving all notices by e-mail.  All Parties are encouraged to provide e-mail addresses for receiving notices to reduce the cost of administering the Trust.

### 15.5    Fiscal Year.

The fiscal year of the Trust will begin on the first day of January and end on the last day of December of each year.

### 15.6    Confidentiality.

From the date the Trust is established through two years after the Trust is fully wound down and closed (or such later date as may be required by law), the Trustee, the Governing Committees, Committee Members, the Advisory Boards, and the Beneficiaries shall themselves, and shall instruct their respective other Covered Persons to hold strictly confidential any material, nonpublic information of or pertaining to the Trust Assets or to any entity to which any of the Trust Assets relates or of which it has become aware in its capacity (the "Information").  Notwithstanding the foregoing, such Persons may disclose Information:  (a) to the extent

disclosure is required by applicable law, order, regulation or legal process; (b) in respect of Information that was publicly available to a Covered Person or its Affiliates prior to the disclosure of such Information pursuant to this Agreement; and (c) to any Permitted Transferee of a Trust Interest once the Assignment to the Permitted Transferee is effective (and such Person is therefore bound by this Agreement). In the event that any Covered Person is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation, demand or similar legal process) to disclose any Information, such Covered Person shall notify the Committee of the Whole reasonably promptly (unless prohibited by law) so that the Liquidating Trustee, pursuant to the direction of the Committee of the Whole, may seek an appropriate protective order or other appropriate remedy or waive compliance with the terms of this section.  In the event that no such protective order or other remedy is obtained, or that the Liquidating Trustee waives compliance with the terms of this section and a Covered Person is legally compelled to disclose the Information: (a) the Covered Person will furnish only that portion of the Information which the Covered Person (as advised by counsel) is legally required to furnish; and (b) the Covered Person shall give the  Liquidating Trustee written notice (unless prohibited by law) of the Information to be disclosed as far in advance as practicable and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

### 15.7    Entire Agreement.

This Agreement (including the statements in Article I and the attached Schedules), the Orders, and the Settlement Agreement constitute the entire and a single agreement by and among the Parties, and there are no representations, warranties, covenants or obligations except as set forth herein or therein.  This Agreement, the Orders, and the Settlement Agreement supersede all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the Parties, relating to any transaction contemplated hereunder.   Except as otherwise specifically provided herein, in the Orders, or in the Settlement Agreement, nothing in this Agreement is intended or shall be construed to confer upon or to give any Person other than the Parties thereto and their respective heirs, administrators, executors, successors, or assigns any right to remedies under or by reason of this Agreement.  In the event of a conflict among this Agreement, the Orders, and the Settlement Agreement, then the Orders, this Agreement, and then the Settlement Agreement shall control.  Nothing in this provision shall preclude obtaining Instructions or Trust Changes from the Court.

### 15.8    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement. Delivery of a facsimile or other electronic transmission of an executed counterpart shall have the same effect as delivery of the original executed counterpart.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective duly authorized agent as of the day and year first written above.


**INITIAL B&B DL BENEFICIARY GROUP**

By:_____     By:_____
Name:                          Name:
Title: DL Committee Member Appointee     Title: DL Committee Member Appointee


**SILAR ADVISORS, LP,** for itself and on behalf of the **SILAR PARTIES**

By:_____
Name:
Title:


**THE ESTATE**

By:_____, as Chapter 7 Trustee and not individually
Name: William A. Leonard, Jr.
Title:   Chapter 7 Trustee


**I HEREBY ACCEPT APPOINTMENT AS LIQUIDATING TRUSTEE**


_____
Name: William A. Leonard, Jr.

**SCHEDULE 1**

# SCHEDULE 1:

## CLAIMS RECOVERY TRUST AGREEMENT

| # | USACM LOAN NAME |
|---|---|
| 1 | 3685 San Fernando Road Partners |
| 2 | 5055 Collwood, LLC |
| 3 | 60th Street Venture, LLC |
| 4 | 6425 Gess, LTD |
| 5 | Amesbury/Hatters Point |
| 6 | Anchor B, LLC |
| 7 | BarUSA/$15,300,000 |
| 8 | Bay Pompano Beach |
| 9 | Binford Medical Developers |
| 10 | Brookmere/Matteson $27,050,000 |
| 11 | Bundy Canyon $1,050,000 |
| 12 | Bundy Canyon $2,500,000 |
| 13 | Bundy Canyon $5,000,000 |
| 14 | Bundy Canyon $5,725,000 |
| 15 | Bundy Canyon $7,500,000 |
| 16 | Cabernet |
| 17 | Castaic Partners I, LLC (Tapia Ranch) |
| 18 | Castaic Partners II, LLC |
| 19 | Castaic Partners III, LLC |
| 20 | Charlevoix Homes, LLC |
| 21 | Clear Creek Plantation |
| 22 | Columbia Managing Partners |
| 23 | ComVest Capital |
| 24 | Copper Sage Commerce Center Phase II |
| 25 | Cornman Toltec 160, LLC |
| 26 | Del Valle - Livingston |
| 27 | Eagle Meadows Development |
| 28 | Fiesta Murrieta |
| 29 | Fiesta Oak Valley |
| 30 | Fiesta USA/Stoneridge |
| 31 | Foxhill 216, LLC |
| 32 | Gateway Stone |
| 33 | Gramercy Court Condos |
| 34 | Harbor Georgetown |
| 35 | Hesperia II |
| 36 | HFA - Clear Lake 1st |
| 37 | HFA - Clear Lake 2nd |
| 38 | HFA - Windham |
| 39 | HFAH/Monaco |
| 40 | Huntsville |
| 41 | Interstate Commerce Center Phase II |

# SCHEDULE 1:

## CLAIMS RECOVERY TRUST AGREEMENT

| # | USACM LOAN NAME |
|----|-----------------|
| 42 | La Hacienda Estate, LLC |
| 43 | Lake Helen Partners |
| 44 | Lerin Hills |
| 45 | Margarita Annex |
| 46 | Marlton Square 1st |
| 47 | Marlton Square 2nd |
| 48 | Mountain House Business Park |
| 49 | Oak Shores II |
| 50 | Ocean Atlantic $9,425,000 (1st) |
| 51 | Ocean Atlantic 2nd |
| 52 | Palm Harbor One |
| 53 | Rio Rancho Executive Plaza, LLC |
| 54 | Shamrock Tower, LP |
| 55 | Slade Development |
| 56 | Southern California Land 2nd |
| 57 | Standard Property Development |
| 58 | SVRB 1st $4,500,000 |
| 59 | SVRB 2nd $2,325,000 |
| 60 | Ten-Ninety, Ltd./$4,150,000 |
| 61 | The Gardens Phase II |
| 62 | The Gardens, LLC $2,425,000 |
| 63 | The Gardens, LLC Timeshare |
| 64 | University Estates |
| 65 | Wasco Investments |

**SCHEDULE 2**

**SCHEDULE 2**

Schedule 2 to Trust Agreement

Litigation Trust Interests of Initial B&B DL Beneficiary Group

**TO BE APPENDED AFTER ENTRY OF AGREED ORDER REGARDING SETTLEMENT AND RELATED RELIEF**

**SCHEDULE 3**

Schedule 3 to Trust Agreement

ARC Adversary Actions

| ADV. CASE NO. | DEFENDANT | COMPLAINT FILED | PRE-TRIAL CONFERENCE |
|---|---|---|---|
| 11-01080 | CITRON | 3/09/2011 | 7/23/2012 (CALENDAR CALL) |
| 11-01296 | KROLL | 10/13/2011 | 7/23/2012 |
| 11-01297 | BRYAN CAVE | 10/13/2011 | 7/23/2012 |
| 11-01298 | KLESTADT WINTERS | 10/13/2011 | 7/23/2012 |
| 11-01299 | GREENBERG TRAURIG | 10/13/2011 | 7/23/2012 |
| 11-01300 | PATTERSON BELKNAP | 10/13/2011 | 7/23/2012 |
| 11-01301 | SULLIVAN GROUP | 10/13/2011 | 7/23/2012 |
| 11-01302 | ELLENOFF GROSSMAN | 10/13/2011 | 7/23/2012 |
| 11-01303 | CONWAY MACKENZIE | 10/13/2011 | 7/23/2012 |
| 11-01304 | BULLIVANT HOUSER | 10/13/2011 | 7/23/2012 |
| 11-01304 | EPSTEIN BECKER | 10/13/2011 | 7/23/2012 |
| 11-01305 | GOTTEX ABI | 10/13/2011 | 7/23/2012 |
| 11-01305 | GOTTEX ABL | 10/13/2011 | 7/23/2012 |
| 11-01305 | REPOTEX-CLASS A | 10/13/2011 | 7/23/2012 |
| 11-01306 | I.W. OSBORNE | 10/13/2011 | 7/23/2012 |
| 11-01307 | WESTWOOD CAPITAL | 10/13/2011 | 7/23/2012 |
| 11-01308 | GREAT WHITE INV. | 10/13/2011 | 7/23/2012 |
| 11-01309 | 1ST SERVICE | 10/13/2011 | 7/23/2012 |
| 11-01310 | KRAMER LEVIN | 10/13/2011 | 7/23/2012 |
| 11-01311 | THOMPSON HINE | 10/13/2011 | 7/23/2012 |
| 11-01312 | KOLESAR & LEATHAM | 10/13/2011 | 7/23/2012 |
| 11-01313 | AKERMAN SENTERFITT | 10/13/2011 | 7/23/2012 |
| 12-01154 | WEIL GOTSHAL, MILBANK TWEED, LOMAZOW | 6/29/2012 | 9/17/2012 |

341315-v1

**EXHIBIT D**
**THE SERVICING TRANSFER ORDER**

5985230-1

1

2

3
**Entered on Docket**
**June 24, 2010**
4

5

SULLIVAN, HILL, LEWIN, REZ & ENGEL
6  A Professional Law Corporation
   James P. Hill, CA SBN 90478 (Pro Hac Vice)
7    Christine A. Roberts, NV SBN 6472
   Elizabeth E. Stephens, NV SBN 5788
8  228 South Fourth Street, First Floor
   Las Vegas, NV 89101
9  Telephone:  (702) 382-6440
   Fax Number: (702) 384-9102
10

   Attorneys for Chapter 7 Trustee,
11  William A. Leonard, Jr.

12                    UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF NEVADA
13

14  In re                                    )   CASE NO. BK-S-09-32824-RCJ (Lead Case)
                                             )
15  ASSET RESOLUTION, LLC,                   )   Jointly Administered with Case Nos.:
                                             )   BK-S-09-32831-RCJ; BK-S-09-32839-RCJ; BK-
16          Debtor.                          )   S-09-32843-RCJ; BK-S-09-32844-RCJ; BK-S-09-
                                             )   32846-RCJ; BK-S-09-32849-RCJ; BK-S-09-
17                                           )   32851-RCJ; BK-S-09-32853-RCJ; BK-S-09-
                                             )   32868-RCJ; BK-S-09-32873-RCJ; BK-S-09-
18                                           )   32875-RCJ; BK-S-09-32878-RCJ; BK-S-09-
                                             )   32880-RCJ; BK-S-09-32882-RCJ
19  _____     )
    Affects:                                 )   Chapter 7
20  ☒ All Debtors                            )   **ORDER ON TRUSTEE'S MOTION TO**
    ☐ Asset Resolution, LLC, 09-32824       )   **APPROVE TRANSFER OF LOAN**
21  ☐ Bundy 2.5 Million SPE, LLC, 09-32831  )   **SERVICING AGREEMENTS AND RELATED**
    ☐ Bundy Five Million SPE, LLC, 09-32839 )   **RIGHTS (NINETEEN LOANS)**
22  ☐ CFP Anchor B SPE, LLC, 09-32843       )
    ☐ CFP Cornman Toltec SPE, LLC, 09-32844 )   Date:   May 5, 2010
23  ☐ CFP Gess SPE LLC, 09-32846            )   Time:   9:00 a.m.
    ☐ CFP Gramercy SPE, LLC, 09-32849       )
24  ☐ Fiesta Stoneridge, LLC, 09-32851      )   Ctrm:   RCJ - Courtroom 7D
    ☐ Fox Hills SPE, LLC, 09-32853          )           Lloyd D. George Courthouse
25  ☐ HFAH Monaco SPE LLC, 09-32868         )           333 Las Vegas Blvd. South
    ☐ Huntsville SPE LLC, 09-32873          )           Las Vegas, NV 89101
26  ☐ Lake Helen Partners SPE LLC, 09-32875 )                   AND
    ☐ Ocean Atlantic SPE LLC, 09-32878      )           RCJ - Courtroom - 6
27  ☐ Shamrock SPE LLC, 09-32880            )           Lloyd D. George  Courthouse
    ☐ 10-90 SPE LLC, 09-32882               )           333 Las Vegas Blvd. South
28                                          )           Las Vegas, NV  89101
                                            )   Judge:  Hon. Robert C. Jones

The motion of William A. Leonard, Jr., chapter 7 trustee ("Trustee") in these jointly administered cases, for an Order to Approve Transfer of Loan Servicing Agreements and Related Rights (Nineteen Loans) (the "Motion") came on regularly for hearing on May 5, 2010, at 9:00 a.m., the Honorable Robert C. Jones, District Judge, presiding.

James P. Hill and Jonathan S. Dabbieri of Sullivan, Hill, Lewin, Rez, & Engel appeared on behalf of the Trustee; other appearances were as noted in the record.

The Court having read and considered the papers with respect to the Motion and good cause appearing, the Court finds and rules as follows, all capitalized terms herein being as defined in the Motion:

1.      The following loans and related loan servicing agreements are included within the Motion and this Order:

        a.      The loan (including all amendments and modifications) in the original amount of $3,700,000.00 and evidenced by the promissory note dated December 22, 2005 and executed by 60th Street Venture, LLC, a California limited liability company as borrower, and secured by a deed of trust (this loan is sometimes referred to as 60th Street).

        b.      The loan (including all amendments and modifications) in the original amount of $4,250,000.00 and evidenced by the promissory note dated August 31, 2005 and executed by Binford Medical Developers, LLC, an Indiana limited liability company as borrower, and secured by mortgage (this loan is sometimes referred to as Binford).

        c.      The loan (including all amendments and modifications) in the original amount of $2,000,000.00 and evidenced by the promissory note dated May 2, 2005 and executed by Bundy Canyon Land Development, LLC, a California limited liability company as borrower, and secured by a deed of trust (this loan is sometimes referred to as Bundy 2.5).

        d.      The loan (including all amendments and modifications) in the original amount of $1,500,000.00 and evidenced by the promissory note dated January 14, 2005 and executed by Bundy Canyon Land Development, LLC, a California limited liability company as borrower, and secured by a deed of trust (this loan is sometimes referred to as Bundy 5.0).

e.      The loan (including all amendments and modifications) in the original amount of $4,900,000.00 and evidenced by the original promissory note dated August 17, 2005 and executed by Bundy Canyon Land Development, LLC, a California limited liability company as borrower, and secured by a deed of trust (this loan is sometimes referred to as Bundy 7.5).

f.      The loan (including all amendments and modifications) in the original amount of $4,500,000.00 and evidenced by the promissory note dated January 11, 2006 and executed by Comvest Capital Satellite Arms, Inc., a Florida corporation, as borrower, and secured by mortgage (this loan is sometimes referred to as Comvest).

g.      The loan (including all amendments and modifications) in the original amount of $18,000,000.00 and evidenced by the promissory note dated August 25, 2005 and executed by Del Valle Capital Corporation, Inc., a California corporation as borrower, and secured by a deed of trust (this loan is sometimes referred to as Del Valle Livingston).

h.      The loan (including all amendments and modifications) in the original amount of $29,600,000.00 and evidenced by the promissory note dated October 19, 2005 and executed by Fox Hills 185, LLC, a California limited liability company, Fox Hills River East, LLC, a California limited liability company, Fox Hills 119, LLC, a California limited liability company, Fox Hills 62, LLC, a California limited liability company, and Fox Hills 37, LLC, a California limited liability company, as borrowers, and secured by a deed of trust (this loan is sometimes referred to as Eagle Meadows)

i.      The loan (including all amendments and modifications) in the original amount of $6,500,000.00 and evidenced by the promissory note dated April 14, 2005 and executed by Fiesta Development, Inc., a California corporation, as borrower, and secured by a deed of trust (this loan is sometimes referred to as Fiesta Murrieta)

j.      The loan (including all amendments and modifications) in the original amount of $25,755,000.00 and evidenced by the promissory note dated January 23, 2006 and executed by Fox Hills 216, LLC, a California limited liability company, Fox Hills 73, LLC, a California limited liability company, Fox Hills 50, LLC, a California limited liability company, Fox Hills 26, LLC, a California limited liability company, Fox Hills Nursery, LLC, a California limited liability company,

Fox Hills Mitigation, LLC, a California limited liability company, and Fox Hills Fresno Slough, LLC, a California limited liability company, as borrowers, and secured by a deed of trust (this loan is sometimes referred to as Fox Hills 216).

        k.       The loan (including all amendments and modifications) in the original amount of $2,425,000.00 and evidenced by the promissory note dated August 15, 2005 and executed by The Gardens, LLC, a Florida limited liability company, as borrower, and secured by mortgage (this loan is sometimes referred to as Gardens, LLC 2.425).

        l.       The loan (including all amendments and modifications) n the original amount of $8,800,000.00 and evidenced by the promissory note dated August 16, 2004 and executed by Harbor Georgetown, LLC, a Michigan limited liability company, as borrower, and secured by mortgage (this loan is sometimes referred to as Harbor Georgetown).

        m.       The loan (including all amendments and modifications) in the original amount of $14,800,000.00 and evidenced by the promissory note dated January 6, 2005 and executed by HFA Clear Lake, LLC, a Florida limited liability company as borrower (this loan is sometimes referred to as HFA Clear Lake).

        n.       The loan (including all amendments and modifications) in the original amount of $9,000,000.00 and evidenced by the promissory note dated March 31, 2004 and executed by West Hills Park Joint Venture, a Texas general partnership, as borrower, and secured by a deed of trust (this loan is sometimes referred to as Huntsville).

        o.       The loan (including all amendments and modifications) in the original amount of $3,900,000.00 and evidenced by the promissory note dated December 7, 2004 and executed by Old City, L.C. and Lake Helen Partners, LLC, Florida limited liability companies, as borrowers, and secured by mortgage (this loan is sometimes referred to as Lake Helen).

        p.       The loan (including all amendments and modifications) in the original amount of $10,600,000.00 and evidenced by the promissory note dated July 26, 2004 and executed by John E. King and Carole D. King, husband and wife, as borrowers, and secured by a deed of trust (this loan is sometimes referred to as Margarita Annex).

q.     The loan (including all amendments and modifications) in the original amount of $6,960,000.00 and evidenced by the promissory note dated June 10, 2004 and executed by Pegasus - MH Ventures I, LLC, , a California limited liability company, as borrower, and secured by a deed of trust (this loan is sometimes referred to as Mountain House).

r.     The loan (including all amendments and modifications) in the original amount of $7,725,000.00 and evidenced by the promissory note dated June 6, 2005 and executed by John E. King and Carole D. King, husband and wife, as borrowers, and secured by a deed of trust (this loan is sometimes referred to as Oak Shores II).

s.     The loan (including all amendments and modifications) in the original amount of $8,300,000.00 and evidenced by the promissory note dated January 23, 2006 and executed by Ocean Atlantic Chicago, LLC, a Delaware limited liability company, as borrower, and secured by a deed of trust (this loan is sometimes referred to as Ocean Atlantic 9.425).

2.     More than 51% of the holders of the direct lenders' beneficial interests with respect to each of the loans identified above (hereinafter each a "Loan") have elected to place the loan servicing rights of each Loan with Cross, FLS ("Cross").  The Trustee shall, within five days of the entry of this order, make available to Cross for pick up at their current location in Connecticut or deliver to Cross at Cross' expense (i) originals of all Promissory Notes and Deeds of Trust and the originals, if within the control of the Trustee or copies if the Originals are not in the control of the Trustee, (ii) records and loan servicing files (including, but not limited to all detailed accounting records, evaluation reports, borrower litigation histories (including supporting legal correspondence but excluding correspondence and other items as to which the Trustee and/or any predecessor servicer may claim a privilege from disclosure to the direct lenders) and other related records pertaining to the servicing of the Loan as agent for the benefit of the direct lenders) held by Asset Resolution, LLC and/or its subservicers related to such Loans to such entity as the direct lenders may direct, to wit Cross.

3.     It is hereby ordered that the Trustee is relieved of all duties as loan servicer for such Loans and is hereby authorized and directed to deliver the originals of all loan servicing records and files held by him and related to such Loans to Cross.

4. Claims resolution procedure:

a. As to each Loan, the Trustee shall provide notice of the entry of this order to each person or entity known by the Trustee to assert a claim arising on or before the date of this order and against any Loan, including against any of the above captioned debtors or any predecessor loan servicer, that is the subject of this order. Such a person or entity is referred to in this order as a "Claimant".

b. Any Claimant shall within 30 days of entry of this order, deliver to Cross a statement of its claim, together with substantiating documentation therefore, in substantially the form of a bankruptcy Proof of Claim -- (Official Form B10). Any claim not asserted within such 30 days shall thereafter be barred.

c. If Cross objects to a claim, it shall, within 30 days of its receipt of the claim, notify the Claimant of the objection and the bases therefore. If Cross does not object to the claim, the claim shall be deemed allowed and shall become payable from the proceeds of the Loan as and when collected, as set forth below.

d. If an objection to a claim has not been resolved within 60 days of its receipt by Cross, either Cross or the Claimant may file a motion with the court to obtain a ruling on the claim and objection, and the court hereby reserves jurisdiction, in these proceedings and in the proceedings entitled *In re USA Commercial Mortgage Company*, United States District Court for the District of Nevada, Case No. 2:07-cv-00892, to determine the allowability of such claims and any objections thereto.

e. As to each Loan, unless otherwise ordered by this court, claims allowed pursuant to this procedure shall be paid by Cross directly to the Claimant prior to any distribution to any direct lender in such Loan, and so long as any claim remains unpaid Cross shall, promptly upon its receipt of any proceeds with respect to a Loan, notify the Claimant holding an unpaid claim of the receipt of such proceeds and shall pay such unpaid claim directly to the Claimant.

f. Cross shall provide a quarterly report to the Trustee regarding the status of the Loans. Such report shall be provided on January 15, April 15, July 15, and October 15. Such report will include an update regarding the status of each Loan and the proceeds or anticipated proceeds of

each Loan.  A copy of the report shall also be provided to each Claimant with a claim on such Loan, by mailing a copy of the report to the address shown on such Claimant's claim.

g.     This order shall be binding on Cross and any successor servicer of any Loan, and the obligation to first pay the allowed claims of the Trustee and any Claimant shall be an obligation of any successor servicer, and shall be subject to the jurisdiction of this court and the procedures set forth in this order.

**IT IS SO ORDERED** this 23    lay of June, 2010.

_____

Honorable Robert C. Jones

**RULE 9021 DECLARATION**

In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

☐ The court has waived the requirement of approval under LR 9021.

☒ This is a chapter 7 or 13 case, and either with the Motion, or at the hearing, I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

- William A. Leonard, Jr. is the appointed Chapter 7 Trustee.
- James P. Hill, Esq., Jonathan S. Dabbieri, Esq. and Elizabeth E. Stephens appeared for William A. Leonard, Jr.
- All other appearances are noted on the Court's record.

☐ This is a chapter 9, 11, or 15 case, and I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

☐ I certify that I have served a copy of this order with the motion, and no parties appeared or filed written objections.

Dated this 1st day of June, 2010.

SULLIVAN, HILL, LEWIN, REZ & ENGEL
A Professional Law Corporation

By: _____/s/ Elizabeth E. Stephens_____
Elizabeth E. Stephens
Attorneys for Chapter 7 Trustee,
William A. Leonard, Jr.

###

**<u>EXHIBIT E</u>**
**BALLOT**

5985230-1

## HFA-CLEAR LAKE BALLOT

### RETURN BALLOT TO:
### Fax Number (702) 479-7276

### *DEADLINE*: MARCH 19

You are being asked to vote your Direct Lender interest in HFA-CLEAR LAKE (hereafter referred to as the "Asset") to select or reject CROSS FLS, LLC to assist you with the management of the Asset according to the terms of the *Majority Administration and Cooperation Agreement*. Should 51% of the Beneficial Interest of the Asset (**$8,106,855.00 DL interest**) select CROSS FLS, then CROSS FLS will commence developing an Asset evaluation plan, Asset protection alternatives and assessing strategic options for the Asset. Upon selection, CROSS FLS will assume responsibility for Direct Lender communications and the balloting required for Direct Lender decisions.

#### *Please check or initial the appropriate box:*

I **select** CROSS FLS, LLC to manage HFA-CLEAR LAKE. By signing this ballot, I am agreeing to the terms of the *Majority Administration and Cooperation* Agreement and to return the notarized signature page 6 of the *Majority Administration and Cooperation Agreement.* Once 51% of the beneficial interest has selected CROSS FLS, I agree to send via US Mail, the notarized signature page of the Majority Administration and Cooperation Agreement and any accompanying payments. *I understand CROSS FLS cannot and will not act without the approval of 51% of the Beneficial Interest of the Asset.*

I **do not select** CROSS FLS, LLC to manage HFA-CLEAR LAKE. I understand that 51% majority of the Beneficial Interest determines the terms and decisions of the Asset, therefore, if 51% of the beneficial interest selects CROSS FLS, then this Asset will be managed by CROSS FLS and I will be subject to the terms of the *Majority and Administration Agreement*. I may object to being bound by the decisions of 51% of the Beneficial Interest by filing a motion with the District Court of Nevada.

Further, I understand the District Court of Nevada has ordered that the Direct Lenders are responsible for the management of their assets. By rejecting CROSS FLS, I understand that I (along with 51% of the Beneficial Interest) am responsible to manage the Asset and Direct Lender activities; to seek solutions to pay arrears property taxes; and recover any value in my Asset. If 51% Beneficial Interest cannot agree to an asset management solution, then the Asset may be lost to tax foreclosure, or the District Court may impose a court appointed receiver to manage the Asset.

| | | |
|---|---|---|
| Signature 1 | Date 3/14/10 | Signature 2 |

Printed Name  Michael K.M.Au

Printed Name

Vesting Name  Michael K.M.Au, a married man dealing with his sole & separate property

Original invested dollars  $50,000

**<u>EXHIBIT F</u>**
**TERMINATION REPORT**

5985230-1

Richard F. Holley, Esq. (NV Bar No. 3077)
Email: rholley@nevadafirm.com
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)                 E-filed on: June 21, 2012
Email: oatamoh@nevadafirm.com
COTTON, DRIGGS, WALCH,
HOLLEY, WOLOSON & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:     702/791-0308
Facsimile:     702/791-1912
*Attorneys for Cross FLS, LLC*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

In re:

ASSET RESOLUTION, LLC,

          Debtor.

Affects:
- ☐ All Debtors
- ☒ Asset Resolution, LLC, 09-32824
- ☐ Bundy 2.5 Million SPE, LLC, 09-32831
- ☐ Bundy Five Million SPE, LLC, 09-32839
- ☐ CFP Anchor B SPE, LLC, 09-32843
- ☐ CFP Cornman Toltec SPE, LLC, 09-32844
- ☐ CFP Gess SPE LLC, 09-32846
- ☐ CFP Gramercy SPE, LLC, 09-32849
- ☐ Fiesta Stoneridge, LLC, 09-32851
- ☐ Fox Hills SPE, LLC, 09-32853
- ☐ HFAH Monaco SPE, LLC, 09-32868
- ☐ Huntsville SPE, LLC, 09-32873
- ☐ Lake Helen Partners SPE, LLC, 09-32875
- ☐ Ocean Atlantic SPE, LLC, 09-32878
- ☐ Shamrock SPE, LLC, 09-32880
- ☐ 10-90 SPE, LLC, 09-32882

CASE NO. BK-S-09-32824-RCJ (Lead Case)
Jointly Administered with Case Nos.:
BK-S-09-32831-RCJ; BK-S-09-32839-RCJ;
BK-S-09-32843-RCJ; BK-S-09-32844-RCJ;
BK-S-09-32846-RCJ; BK-S-09-32849-RCJ;
BK-S-09-32851-RCJ; BK-S-09-32853-RCJ;
BK-S-09-32868-RCJ; BK-S-09-32873-RCJ;
BK-S-09-32875-RCJ; BK-S-09-32878-RCJ;
BK-S-09-32880-RCJ; BK-S-09-32882-RCJ

Chapter 7

**CROSS FLS, LLC'S STATUS REPORT
AND NOTICE OF TERMINATION OF
MAJORITY ADMINISTRATIVE AND
COOPERATION AGREEMENTS**

Date of Hearing:  N/A
Time of Hearing: N/A

Judge: Hon. Robert C. Jones

Cross FLS, LLC ("Cross"), a Texas limited liability company, by and through its counsel, Richard F. Holley, Esq. and Ogonna M. Atamoh, of the law firm of Cotton, Driggs, Walch, Holley, Woloson & Thompson, hereby submits this Status Report and Notice of Termination of Majority Administrative and Cooperative Agreements.

. . .

. . .

. . .

. . .

09558-01/901630.doc

## BACKGROUND

USA Commercial Mortgage Co. ("USA Commercial") was a loan servicing company that went bankrupt. At an auction pursuant to those bankruptcy proceedings, Compass USA SPE, LLC ("Compass") purchased USA Commercial's interest in thousands of Loan Servicing Agreements ("LSA"). Those LSAs were contracts between USA Commercial and various financial institutions ("Direct Lenders") that had lent money for the purchase of commercial real estate. The LSAs gave USA Commercial the right to administer the loans on behalf of the Direct Lenders. Silar Advisors, LP and Silar Special Opportunities Fund, LP (collectively, "Silar") financed Compass' purchase of the LSAs, retaining a security interest in the LSAs. Silar later assigned the loan and corresponding security interest in the LSAs to Asset Resolution LLC ("Asset Resolution"), an entity created and owned by Silar for this purpose. Asset Resolution eventually foreclosed on the LSA's.

On October 14, 2009, Asset Resolution and Silar filed a Notice of Commencement of Chapter 11 Bankruptcy Cases (Dkt. No. 1547), indicating that Asset Resolution, but not Silar itself, had filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. On November 24, 2009, the Bankruptcy Court for the Southern District of New York granted Asset Resolution's motion for transfer of venue, transferring the bankruptcy action to the Bankruptcy Court for the District of Nevada and giving this Court exclusive jurisdiction over the bankruptcy estate of Asset Resolution.

By this Court's order entered January 29, 2010 [Dkt. No. 356], the cases were converted to cases under chapter 7 of the bankruptcy code, nunc pro tunc as of January 19, 2010. Asset Resolution is the lead debtor and the cases are jointly administered under Lead Case No. 09-32824-RCJ. William A. Leonard, Jr. was selected as Trustee on January 29, 2010.

On or about January 21, 2010, this Court granted the Direct Lenders Motion to Terminate Compass and Asset Resolution as Servicer [Dkt. No. 1630].

On November 24, 2010, the court entered its Nunc Pro Tunc Order Re: Trustee's continued authority to Service Loans on an Interim Basis, ruling that the Trustee's authority was on an interim basis only for the purpose of preserving the status quo until a successor was elected

1   by a vote of 51% of the Direct Lenders in a particular loan, pending further order of the court.

2   See Nunc Pro Tunc Order [Dkt. No. 1312], Case No. BK-S-09-32824-RCJ.

3          1.     On June 24, 2010, an Order on Trustee's Motion to Approve Transfer of Loan

4   Servicing Agreements and Related Rights (Nineteen Loans) was entered by the Court, relieving

5   the Trustee of his loan servicing duties, and to transfer to Cross all loan servicing records,

6   ordering as follows:

7                 It is hereby ordered that the Trustee is relieved of all duties as loan
                  servicer for such Loans and is hereby authorized and directed to
8                 deliver the originals of all loan servicing records and files held by
                  him and related to such Loans to Cross.
9

10         See Order, ¶3, Dkt. No. 989, Case No. BK-S-09-32824-RCJ, a true and correct copy of

11  which is attached hereto as **Exhibit "5"**.

12  **Servicing History**

13         Cross is in the business of providing loan administration and management services.

14         On June 24, 2010, the Court entered an Order on Trustee's Motion to Approve Transfer

15  of Loan Servicing Agreements and Related Rights (Nineteen Loans) ("Cross Order") [Dkt. No.

16  989], relieving the Trustee of his loan servicing duties, and to transfer to Cross all loan servicing

17  records.

18         The Cross Order also established a claims resolution procedure (the "Loan Claims

19  Procedure") under which persons or entities seeking payment with respect to goods or services

20  provided on account of the loans would submit claims, Cross would submit objections, and the

21  Court would determine the allow-ability of such claims. [Dkt. No. 989 at pp. 6-7.]

22         The Cross Order further provided that, unless otherwise ordered by the Court, claims

23  allowed pursuant to the Loan Claims Procedure "shall be paid directly to the Claimant prior to

24  any distribution to any direct lender in such Loan, and so long as any claim remains unpaid Cross

25  shall, promptly upon its receipt of any proceeds with respect to a Loan, notify the Claimant

26  holding an unpaid claim of the receipt of such proceeds and shall pay such unpaid claim directly

27  to the Claimant." [Dkt. No. 989 at p. 6, ll. 21-26.]

28  . . .

- 3 -

1          The Cross Order further provided that the order "shall be binding on Cross and any

2   successor servicer of any Loan, and the obligation to first pay the allowed claims of the Trustee

3   and any Claimant shall be an obligation of any successor servicer, and shall be an obligation of

4   any successive servicer, and shall be subject to the jurisdiction of this court and the procedures

5   set forth in this order." [Dkt. 989 at p. 7, ll. 3-6.].

6        2.     Cross entered into a series of Majority Administrative and Cooperation

7   Agreements ("MAC Agreements") with direct lenders for the loans managed by Cross.  The

8   MAC Agreements expressly provide for the effective date of the MAC Agreement and Cross's

9   termination under the MAC Agreement, as follows:

10       **4. Effective Date and Termination.** This Agreement shall

11  commence and be effective (the "Effective Date") on the date that
    CROSS and a Majority of Direct Lenders execute this Agreement

12  for the Loan/Property.  Until the Effective Date, CROSS has no
    duties or responsibilities toward the Direct Lenders, and will not

13  take any action on the Direct Lender's behalf.  This Agreement
    shall remain in effect until the Loan or Property is completely

14  liquidated.  Notwithstanding the above, **this Agreement may be
    terminated by CROSS or the Direct Lenders holding fifty-one**

15  **percent (51%) of the total beneficial interests in the Loan upon
    thirty (30) days written notice to the other party.** In the event

16  CROSS is terminated by fifty-one percent (51%) of the total
    beneficial interests in the Loan, CROSS shall be due all

17  Administration Management Fees accrued to date plus CROSS
    shall be due Disposition and Success Fees to the extent a sale (or

18  joint venture) occurs within 180 days after termination or the sale
    is to a party (or affiliate) that CROSS introduced or was in

19  negotiations with prior to the Agreement being terminated.

20  (Emphasis added).

21  <u>**PURPOSE / SCOPE OF TERMINATION**</u>

22       On May 8, 2012, Cross exercised its termination rights under the remaining MAC

23  Agreements pursuant to a Termination Letter. A true and correct copy of the Termination Letter

24  is attached hereto as **Exhibit "A"**.

25       The purpose of this filing is to inform the Court of the termination of Cross as described

26  in the Termination Letter, which includes (i) the current status of all assets (as described in

27  Exhibit B of the Termination Letter), (ii) the escrow accounts and balances for certain assets

28

- 4 -

1   holding funds (as described in Exhibit C of the Termination Letter) and (iii) the notification of

2   administration fees owed to Cross (as described in Exhibit D of the Termination Letter).

3           In addition, this filing is made to inform the Court and serve notice to the direct lenders

4   of the location of the servicing files and original records. The servicing files and original records

5   are being kept in storage for the benefit of the direct lenders. Once Cross receives instructions

6   from the Court or 51% of the direct lenders, Cross will transition the files to the appropriate

7   party.

8           As referenced in the Termination Letter, the principle goal of Cross was to educate the

9   direct lenders on their assets and to provide disposition opportunities for the direct lenders to

10  vote their interest. Specific details as to the scope and nature of this undertaking are provided in

11  the Termination Letter attached as **Exhibit "A"**. On almost all loans, the direct lenders have had

12  multiple disposition offers or joint ventures to consider.

13          With the full support and cooperation of the direct lender body, Cross was able to

14  facilitate resolutions to a number of troubled assets, including: 60th Street Ventures, Castaic II,

15  Castaic III, ComVest, Del Valle, Fox Hills Water Rights, Harbor Georgetown, Huntsville and

16  Ocean Atlantic & Tapia Ranch.

17          As it pertains to the remaining assets, certain direct lender loan representatives have made

18  it abundantly clear to Cross that they do not desire to pursue disposition offers; rather, the direct

19  lenders would like to pursue loan litigation and other long term development options for which

20  they do not require the services of Cross. As a result and in respect of direct lender wishes,

21  Cross terminated its services pursuant to the terms of the MAC Agreements.

22          Dated this _21st_ day of June, 2012.

23                                      COTTON, DRIGGS, WALCH,
                                        HOLLEY, WOLOSON & THOMPSON
24
                                        _Richard F. Holley_
25                                      Richard F. Holley, Esq. (NV Bar No. 3077)
                                        Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
26                                      400 South Fourth Street, Third Floor
                                        Las Vegas, Nevada 89101
27                                      *Attorneys for Cross FLS, LLC*

28

- 5 -

# EXHIBIT "A"

**<u>Termination of Majority and Administration and Cooperation Agreement &</u>**
**<u>Report to the Direct Lenders Regarding Status of Assets</u>**

May 8, 2012

**<u>History of Loan Servicing Prior to Cross</u>**

Servicing of the USA Capital loan portfolio has had a tumultuous history. After USA Capital filed bankruptcy in April of 2006, the servicing rights were transferred to Compass USA SPE, LLC which was controlled by Silar Advisors, L.P. through a Master Repurchase Agreement. Ultimately, the loan servicing contract between Compass/Silar and the direct lenders was terminated and the loan servicing rights were nominally awarded to William Leonard ("Trustee") subject to 51% of the direct lenders in a loan deciding how they would like to manage their assets.

**<u>Summary of Asset Management Provided by Cross</u>**

In June of 2010, the Court recognized the direct lenders right to manage their own assets and approved Cross FLS, LLC ("Cross") as administrative agent under the Majority Administration and Cooperation Agreement (the "MAC Agreement") for certain loans that achieved a 51% approval percentage for the MAC Agreement.

The ultimate goal of Cross, as set out in the MAC Agreement, was to provide the direct lenders a structure where they could make their own decisions on how to manage their assets based on obtaining 51% approval from their fellow investors. Simply put, Cross recognized that the direct lenders were the true owners of the loans for which they invested and as a result, the MAC Agreement gave the direct lenders a platform to control their assets themselves. The objective of Cross was to educate the lenders on their assets and to create a system for which the lenders could vote their interest such that once 51% is obtained for certain decisions, Cross would act as administrative agent for and on behalf of the direct lenders. In essence, Cross was responsible for carrying out the wishes of the direct lenders once a 51% threshold was met.

The first order of business undertaken by Cross was to educate the direct lenders on their assets so they could make informed decisions. In speaking with the direct lenders at this time, they knew very little about their investments. As a result, it became critical to provide the direct lenders with as much information as possible about their assets so they could make informed decisions when it came time to vote on disposition strategies and/or other issues facing their assets; including, title defects, foreclosure procedures, property tax solutions, joint ventures, farm-crop leases, etc.

Upon providing the Trustee proof that over 51% of the direct lenders approved the MAC Agreement in certain loans in early April of 2010, Cross requested the servicing files and more importantly a copy of all valuation reports that would give the direct lenders insight into the value of their assets. Unfortunately, the only information turned over to Cross were dated

USACM loan files that did not contain any current valuation related materials to assist the lenders in valuating their assets.

As a result, Cross undertook the responsibility of drafting a detailed Asset Summary Report for each asset. Cross spent significant time researching and working with extensive broker networks in each specific geographical area to create the Asset Summary Reports detailing all facets of the direct lenders' assets. The Asset Summary Report provided the lenders with critical information which they could use in making decisions as to how to best maximize their investment. The Asset Summary Report included information such as loan/asset status, market conditions, current market comparables, tax status and disposition opportunities. A detailed description of the contents of each Asset Summary Reports is set forth on **Exhibit "A"** of this letter.

Once all Asset Summary Reports were completed for each property managed by Cross, they were distributed to the lenders for their review and also posted on a website Cross created for the direct lenders which was segregated by loan and controlled by secure passwords (www.crossflsassets.com). After the Asset Summary Reports were distributed for direct lender review, Cross set up conference calls specific for each loan/asset, providing the opportunity for all lenders to ask questions they may have on their asset and/or to ask Cross to perform additional research. The conference calls educating the direct lenders about their assets began in August of 2010 and were finalized in September of 2010.[1]

Concurrently, Cross began the process of procuring and presenting the direct lenders disposition opportunities. Disposition opportunities involved (i) selling their interest in the loan documents (if the asset was still in note status), (ii) selling the property (if the property was owned by the direct lenders) or (iii) joint ventures. Upon Cross receiving an offer, Cross would distribute it to the direct lenders as well as have the offer posted to the secure section of Cross Assets website. Cross would also provide all lenders pro-forma disbursement statements showing an approximate line item Net Recovery based on the specific offer. Cross would subsequently host conference calls to engage the direct lenders into disposition discussions about their property and answer any questions the direct lenders may have.

As a result of the communications and conversations with the direct lenders, the direct lenders would provide Cross direction in countering the offer and/or modifying certain aspects. This process would sometimes go back and forth for weeks if not months between follow up conference calls and additional counters. Once an offer was agreed upon, Cross would send a voting ballot communication to all direct lenders who would either accept or reject the final offer. This process would also take months including simultaneous reminder vote emails and direct phone calls to lenders advising them to vote.

Once a vote concluded, Cross would enlist the assistance of a few fellow direct lenders (Carol Kessler, Daniel Newman and Donna Cangelosi), to verify all ballots and make a declaration stating the results of the voting process. If the statutory 51% was not reached on an offer, Cross notified the proposed buyer, the lenders and the Trustee of such and continued to market the property. If a 51% majority was reached, Cross alerted the proposed buyer, lenders and the Trustee of the results and monitored the buyers due diligence timeline and worked with the title company in an effort to effectuate a closing through escrow. In certain circumstances, assets

---

[1] Since that time, Cross has held numerous follow-up conference calls as well as separate conference calls once an offer or disposition strategy was put in place by the direct lenders.

were further encumbered by title problems and/or the necessity of non-judicial foreclosure process which Cross also administered. Cross routinely worked with taxing authorities and municipalities to postpone tax sales so the direct lenders could recoup their outstanding values in their assets. Further, Cross was instrumental in procuring the payment of valuable entitlements on certain assets so resources such as water rights were not lost for non-payment of associated district fees. Cross also assisted the Trustee with the Ex Parte application process to be submitted to the Court for Court approval of sale.

Once a sale closed through escrow, Cross distributed to all direct lenders a communication advising them of the closing and posted all the closing documents obtained from the title company on the Cross Assets website for their accessibility. Cross informed all direct lenders that upon the close of escrow all proceeds were to be held by and between the Title Company and/or the Trustee. A detailed summary of the disposition efforts of Cross as well as the current status of each asset is set forth on **Exhibit "B"** of this letter.

In addition to providing direct lenders with disposition opportunities, Cross created revenue opportunities on certain assets through leases, release of funds in attorney trust funds accounts and other avenues of recovery. A list of the cash proceeds held in escrow by Bridge Title for the benefit of direct lenders is set forth on **Exhibit "C"** of this letter.

## Termination of Cross

Although it has been a pleasure to serve as Administrative Agent under the MAC Agreement to the direct lenders, Cross hereby gives the direct lenders official notice of its immediate termination pursuant to Section 4 of the MAC Agreement on all assets for which Cross worked in its capacity as Administrative Agent, except for the assets set forth below and only for the limited purpose of assisting the direct lenders in closing the existing contracts or dispute resolutions pending for which Cross reserves the right to receive its full compensation per the MAC Agreement:

1. Comvest – final disposition of contract with ESO Satellite Arms, LLC.
2. Fox Hills – (i) final disposition of contract with Angiola Water District and (ii) final resolution of the disputed funds between the direct lenders and Fox Hills Fresno Slough, LLC (entity controlled by members not related to Borrower).
3. Eagle – final disposition of contract with Angiola Water District.

The Administrative Management Fees outstanding and owing to Cross as of the date of this letter by loan is set forth on **Exhibit "D"**. To the extent there is a final disposition of the loans/assets, Cross reserves the right to be paid any and all fees due Cross under the MAC Agreement. As promised by Cross, these fees are not personal in nature to the direct lenders and as a result, Cross is only reserving its right to be paid if the direct lenders receive payment at some point in the future.

As stated above, the principle purpose of Cross was to educate the direct lenders on their assets and to provide disposition opportunities for the direct lenders to vote their interest. Cross believes it has accomplished this task. It was never the intention of Cross to provide itself a permanent employment position with regards to the assets. On almost all loans, direct lenders have had multiple disposition offers or joint venture offers to consider. With regards to the

remaining assets that have not been resolved, certain loan representatives have made it clear to Cross that they do not desire to pursue disposition offers at this time. Rather, the direct lenders would like to pursue loan, litigation and other longer term development options for which they do not require the services of Cross. As a result, Cross desires to respect the wishes of the direct lenders and has agreed to terminate its services so the direct lenders can pursue these endeavors.

As mentioned above, Cross wishes to thank all the direct lenders for their involvement the past two years. Cross sincerely appreciates the opportunity to serve the direct lenders and we wish them the very best in the future.

Sincerely,

Cross FLS, LLC

**Exhibit "A"**
**Detailed Description of Asset Summary Report Provided by Cross**

I.   Loan Information
- Location
- Unpaid Principle Balance
- Lien Position
- Origination Date
- Base, Default & Maturity Interest Rate
- Borrower Sponsor(s)
- Guarantor(s)
- Collateral Description
- Related Loans

II.  Project Overview
- Aerials
- Zoning, Mapping & Plat configurations
- Description of purpose of original loan
- Ordinance Compliance
- Development Plans

III. Market Data
- Current Market conditions for subject property
- Resale/Foreclosure Information
- Sales Comparables for similarly situated properties

IV.  Tax Overview
- Current Tax situation
- Delinquent Taxes
- Assessed Value of property per tax roll
- Tax Parcel information
- Tax Collector and Tax Assessor contact information
- Status of Tax foreclosure proceedings

V.   Insurance
- Pricing for General liability, Excess Liability and Environmental coverage

VI.  Environmental Overview
- Existence of known Environmental concerns

VII. Market Indication of Value
- Expected Recovery Amount from Silar filing
- Assessed Value from County Tax Assessor's Office
- Market Indication of Value from current Broker Opinions

VIII. Resolution Strategies
- Cash Sale Strategy
- Joint Venture Opportunities
- Lender Interest Sale
- Wait and Hold Strategy
- Trustee and Other Third Party Claims

<u>Exhibit "B"</u>
<u>Cross Loan & Property Administrative Status Update</u>

## I. <u>General Administration</u>

This list reflects the USACM loans and REO properties that Cross was appointed to serve as Administrative Agent on behalf of the direct lenders under the MAC Agreement executed by more than 51% of the direct lenders. This list is being provided as <u>Exhibit "B"</u> to the termination letter being submitted by Cross to the direct lenders. This list will reflect information regarding loan and REO organization, work-outs, dispositions and the current status of loan/REO proposals brought by Cross to the direct lenders. This exhibit does not fully detail all the efforts of Cross with regards to each of the loan/REO assets, but it is meant to provide a summary of events and the current status for each asset.

i. <u>Communication Platform:</u> Upon Cross receiving the loan administration duties on the following loans/REO assets, Cross organized communication platforms for the accessibility of all direct lenders and created a secure password protected website (www.crossflsassets.com) to post all asset related documents and communications for the benefit of all direct lenders. Through the course of Cross's appointment, Cross held multiple conference calls, hosting upwards to one hundred direct lenders per call on technology driven conferencing platforms. Direct lender communications were also emailed with loan updates, offers, defaulted property tax updates, cash calls, voting ballots, reminder vote emails and so forth to ensure direct lender participation. Cross presented information and allowed the direct lenders the ability to determine the outcome of their own loans/REO assets.

ii. <u>Asset Summary Reports:</u> On the front end of this assignment, Cross spent months researching and working with extensive broker networks in each specific asset geography area to create extensive Asset Summary Reports detailing all facets of their the direct lenders' assets. These Asset Summary Reports included a full loan overview description of the specific loan and property, project overviews including location maps, aerial property photos, plat maps, entitlement maps, market data, recent market sales & listing comparables, macro and micro market summaries, detailed property tax overviews, insurance disclaimers, environmental overviews, market indications of value, resolution strategies and Trustee / third party claims that maybe affecting the loan or REO property. At the time Cross presented all the direct lenders with the Asset Summary Reports and held the initial conference calls over a fourteen day period, it became apparent that the vast majority of direct lenders had never even seen a photo of their property yet alone a complete package detailing the assets, the property taxes that were in arrears, borrower and guarantor information, market studies, local project comparables, etc.

iii. <u>Property Tax Lists:</u> Within the Asset Summary Reports, Cross went to great lengths to create very detailed property tax sheets listing all individual parcels by Assessor Parcel Numbers and in a line item format detailed all tax arrears by year and listed their assessed values. Cross also included specific contact information for the county tax appraisers, records clerk and tax offices. Cross provided tax delinquent dates, tax default dates and specific county tax auction dates should the taxes remain unpaid. Cross provided this information in the event any one lender or group of direct lenders desired to pay their tax

obligation. Cross also worked with Republic Title and ran title prelim reports on all property collateral to help educate the direct lenders as to their own individual loan collateral and/or REO asset. Cross then posted the extensive prelim reports on the Cross Assets website for the benefit of all direct lenders and for their own record keeping. It has been an objective of Cross to always reference the Asset Summary Reports on every conference call hoping to continually educate the direct lenders.

iv.  <u>Letter of Intents & Offers</u>:  Once Cross received an offer, Cross would draft a communication to be sent to the direct lenders as well as have the offer posted to the secure Cross Assets website. Cross would also provide all direct lenders pro-forma disbursement statements showing an approximate line item Net Recovery based off the specific offer. Cross would then host a conference call and engage the direct lenders in a discussion to better understand their motivations and desires. At this time, Cross would take direction from the direct lenders as to countering the offer and/or tightening up certain aspects of the offer. This process would sometimes go back and forth for weeks if not months between follow up conference calls and additional counters.  Once an offer was agreed upon, Cross would send a voting ballot communication to all direct lenders and would then wait for votes to come in either accepting or rejecting the final offer. This process would also take months including simultaneous reminder vote emails and direct phone calls to direct lenders advising them to vote.  Once a vote concluded, Cross would enlist the assistance of a few fellow direct lenders, Carol Kessler, Daniel Newman and Donna Cangelosi, to verify all ballots and make appropriate declarations.  Cross did this for transparency reasons.  If the statutory 51% was not reached on an offer, Cross notified the proposed buyer, the direct lenders and the Trustee of such status and continued to market the property.  If a 51% majority was reached, Cross alerted the proposed buyer, direct lenders and the Trustee and monitored the buyers due diligence timeline and worked with the Title Company in an effort to effectuate a closing through escrow. This assumes no title problems arose and/or a foreclosure process was not needed. Cross would also assist the Trustee in his Ex Parte application process to be submitted to the Court for Court approval of sale. Once a sale closed through escrow, Cross sent all direct lenders a communication advising them of the close and posted all the closing documents obtained from the Title Company onto the Cross Assets website for their accessibility. Cross informed all direct lenders that upon the close of escrow all proceeds were to be held by and between the Title Company and the Trustee.

## II. 60th Street Venture, LLC

Current Status:  Sold Loan/Note.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $495,000.

During the time Cross managed this loan, Cross brought the direct lenders numerous proposals from loan/note buyers, some of which were turned down by the direct lenders and/or did not achieve the statutory 51% beneficial interest vote required to approve such a sale.

In early 2011 Cross identified a title problem whereby the direct lenders were in a second lien position behind Bank of America and subsequently Silver Point Capital. Cross worked on the title problem for three months and was successful in having the Title Company demand a

substitute trustee deed and full reconveyance lien release from Silver Point Capital along with a lost note affidavit and a zero demand letter stating no monies are owed to Silver Point Capital. This allowed the direct lenders to reposition their interest from a second lien position to a first lien position and effectuate a sale of the note.

In April 2011 the direct lenders voted a beneficial interest amount equal to 57.57% in favor of selling the note and loan documents to RVJ Development, a DACA entity for $390,000. A final vote tally declaration was made by Carol Kesler on April 4, 2011 certifying the direct lender vote approving the note and loan sale. In addition to the note sale, Cross was able to uncover approximately $396,000 in proceeds being held by the Trustee. Over a course of three months, Cross was successful at having the Trustee reserve the funds for benefit of the direct lenders. The note sale to RVJ Development closed through escrow on July 15, 2011. Cross informed all direct lenders that upon the close of escrow all proceeds were to be held by and between the Title Company and the Trustee. All closing documents were sent to the Trustee and to Cross by the Title Company. Cross posted all documents on Cross' website for the direct lenders accessibility.

## III. Amesbury

Current Status: Lender Managed.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $750,000.

Cross completed the Asset Summary Report on this asset in August of 2010 and conducted a conference call with the direct lenders at that time. Although there were many unresolved questions with regards to the condo development project and prior loan payoffs, the remaining collateral provided to Cross was a vacant mill building containing approximately 136,000 gross square feet. Cross contacted numerous developers and the original plan of converting the mill building to a finished condominium project was cost prohibitive at that time. Cross also researched whether it would be feasible to convert the existing mill building to boat storage to be used by the adjacent marina but that too was not a viable project. Instead of continuing to accrue administration fees when no likely exit strategy existed, Cross terminated its involvement in this loan in August of 2011. It is the understanding of Cross that this asset is currently managed by the direct lenders in this loan.

## IV. Binford Medical Developers

Current Status: Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $3,500,000.

In September of 2010, Cross held a conference call to discuss a letter of intent from Binford Medical Developer LLC ("BMD") to purchase the note. On September 16, 2006, Cross sent the direct lenders a ballot to vote on the proposal from BMD as well as Proforma Disbursement Statement. On October 15, 2010, Cross notified the lenders that 68.22% of the lenders accepted the BMD proposal and Cross would proceed with closing the transaction per the terms of the ballot.

On October 22, 2010, Cross informed the direct lenders that Binford Borrower filed bankruptcy. In speaking with the borrower, this was done to postpone the tax sale for delinquent taxes on the property. As a result, Cross worked diligently with the Borrower and the US Trustee to move forward with the BMD sale. On November 2, 2010, Cross informed the lenders that the borrower filed a motion to dismiss the borrower bankruptcy. Cross also posted the Motion to Dismiss on the Cross website for the direct lenders to review.

On December 16, 2010, Cross sent a communication to the direct lenders that the closing date for the BMD sale was to occur on December 15, 2010. In discussions with the BMD, it was clear they were not in a position to close. Consequently, Cross scheduled another conference call on December 21, 2010 with the direct lenders so they could provide Cross with direction on how to proceed with this asset.

In the following months, Cross and the direct lenders had numerous discussions on how to best move forward with this asset. On March 7, 2011, Cross sent a communication to the Binford direct lenders that a fellow direct lender, Dennis Raggi, offered to fund the delinquent taxes and foreclosure costs so the direct lenders could foreclose on this asset. Cross held an additional conference call on March 22, 2011 with the direst lenders to discuss the Raggi funding. On April 2, 2011, Cross sent the direct lenders a ballot to vote on the Raggi tax payment and foreclosure financing. At this time, Cross also informed the direct lenders of a new joint venture proposal on behalf of the borrower and posted the joint venture proposal on the website for the lenders to consider.

Although the Raggi ballot was sent to the direct lenders on April 2, 2011, 51% of the direct lenders had not approved the ballot by July of 2011. As a result, Cross held another conference call on August 16, 2011 to discuss the Raggi ballot and to answer any questions the direct lenders may have with regards to the current status of this asset. On the conference call, Cross informed the lenders about the current status of the taxes which a tax sale was scheduled to occur on September 22, 2011.

On August 28, 2011, Cross informed the direct lenders that over 55% of the direct lenders agreed to the Raggi financing proposal. Although Cross and Raggi worked diligently with a number of law firms to document and close the financing prior to the tax sale, Cross informed the lenders that Raggi was not able to document his tax/foreclosure financing before the tax sale deadline. Cross also worked diligently with the Trustee to have the tax sale stayed but the taxing authorities did not recognize the automatic stay from the Trustee. As a result, the tax sale occurred on September 23, 2011. Per Indiana statute, the lenders have a year redemption period to redeem their taxes prior to the direct lenders losing the property.

Throughout the past year, Cross has had numerous conversations with Krieg Devault, the law firm hired on behalf of the direct lenders to finalize the Raggi financing, on the possibility of entering into a forbearance agreement with the borrower so the taxes could be redeemed and the lenders could move forward with their foreclosure in an uncontested manner. In recent months, Cross was asked if it would stop all on-going efforts with this loan so a number of direct lenders could assemble their own joint venture proposal. Cross agreed to this request. Cross understands the lender initiated joint venture has been progressing for the past couple of months but Cross is unaware of the latest status of events regarding the joint venture.

## V. Bundy 2.5 Million SPE, LLC

Current Status: REO Outstanding.

Prior to Cross receiving the loan administration duties on this REO, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $137,700.

Over the course of 2011, Cross prospected and received a few verbal offers to acquire the property but the amounts offered never surpassed the amount of money owed in property tax arrears. Cross held a conference call on April 12, 2011 and sent out a joint venture offer and held a vote whereby the direct lenders only voted 32% beneficial interest to approve the sale, not achieving the statutory 51% beneficial interest vote required to approve such a sale or joint venture.

Cross was able to locate a group that was interested in acquiring this asset for an amount greater than the taxes owed. On August 29, 2011, Cross held a conference call, submitted the offer and held a vote whereby the direct lenders rejected the offer. Cross then renegotiated with the proposed buyer and structured a joint venture whereby the incoming buyer would partner with the direct lenders, pay off taxes, and add value to the property for future development and/or sale.

During this time Cross discovered that the Operating Agreement for this REO was still in the name as Compass and it appeared that Compass created the Operating Agreement upon the foreclosure of the loan and creation of the SPE LLC. Compass had elected themselves sole manager of the SPE LLC thereby creating difficulty for the direct lenders to obtain any operational ownership. Cross alerted the Trustee of this fact and to date no response has been given to Cross. Cross also alerted the Trustee of the punitive property tax situation and encouraged the Trustee to contact the tax office to inform the county of the Trustee's Bankruptcy Automatic Stay. In March 2012 the Trustee confirmed that the tax office does recognize the Bankruptcy Automatic Stay.

## VI. Bundy Five Million SPE, LLC

Current Status: REO Outstanding.

Prior to Cross receiving the loan administration duties on this REO, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $365,400.

Over the course of 2011, Cross prospected and received a few verbal offers to acquire the property but the amount offered never surpassed the amount of money owed in property tax arrears. Cross held a conference call on April 12, 2011 and sent out a joint venture offer and held a vote whereby the direct lenders only voted 24% beneficial interest to approve the sale, not achieving the statutory 51% beneficial interest vote required to approve such a sale or joint venture.

Cross was able to locate a group that was interested in acquiring this asset for an amount greater than the taxes owed. On August 29, 2011, Cross held a conference call, submitted the offer and held a vote whereby the direct lenders rejected the offer. Cross then renegotiated with the proposed buyer and structured a joint venture whereby the incoming buyer would partner with

the direct lenders, pay off taxes, and add value to the property for future development and/or sale.

During this time Cross discovered that the Operating Agreement for this REO was still in the name as Compass and it appeared that Compass created the Operating Agreement upon the foreclosure of the loan and creation of the SPE LLC. Compass had elected themselves sole manager of the SPE LLC thereby creating difficulty for the direct lenders to obtain any operational ownership. Cross alerted the Trustee of this fact and to date no response has been given to Cross. Cross also alerted the Trustee of the punitive property tax situation and encouraged the Trustee to contact the tax office to inform the county of the Trustee's Bankruptcy Automatic Stay. In March 2012 the Trustee confirmed that the tax office does recognize the Bankruptcy Automatic Stay.

In June 2011, Cross worked with International Equity Research Group to locate dormant funds being held and payable to the Bundy 5 direct lenders. The amount totals approximately $22,753. Cross sent a letter from International Equity Research Group to the direct lender communication team (led by Donna Cangelosi) to take a vote so Cross could effectuate a release of the funds. Cross has not received any feedback from the direct lender communication team.

## VII. Bundy Canyon $5,725,000

Current Status: Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $500,000.

Over the course of 2011, Cross prospected and received a few verbal offers to acquire the note but the amount offered never surpassed the amount of money owed in property tax arrears. Cross held a conference call on April 12, 2011 and sent out a joint venture offer and held a vote whereby the direct lenders only voted 23% beneficial interest to approve the sale, not achieving the statutory 51% beneficial interest vote required to approve such a sale or joint venture.

Cross was able to locate a group that was interested in acquiring this asset for an amount greater than the taxes owed. On August 29, 2011, Cross held a conference call, submitted the offer and held a vote whereby the direct lenders rejected the offer. Cross then renegotiated with the proposed buyer and structured a joint venture whereby the incoming buyer would partner with the direct lenders, pay off taxes, and add value to the property for future development and/or sale. Cross also alerted the Trustee of the punitive property tax situation and encouraged the Trustee to contact the tax office to inform the county of the Trustee's Bankruptcy Automatic Stay. The Trustee confirmed that the tax office does recognize the Bankruptcy Automatic Stay.

## VIII. Bundy Canyon $7,500,000

Current Status: Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $100,000.

Over the course of 2011, Cross prospected and received a few verbal offers to acquire the note but the amount offered never surpassed the amount of money owed in property tax arrears. Cross held a conference call on April 12, 2011 and sent out a joint venture offer and held a vote whereby the direct lenders only voted 36% beneficial interest to approve the sale, not achieving the statutory 51% beneficial interest vote required to approve such a sale or joint venture.

Cross was able to locate a group that was interested in acquiring this asset for an amount greater than the taxes owed. On August 20, 2011, Cross held a conference call, submitted the offer and held a vote whereby the direct lenders rejected the offer. Cross then renegotiated with the proposed buyer and structured a joint venture whereby the incoming buyer would partner with the direct lenders, pay off taxes, and add value to the property for future development and/or sale. Cross also alerted the Trustee of the punitive property tax situation and encouraged the Trustee to contact the tax office to inform the county of the Trustee's Bankruptcy Automatic Stay. The Trustee confirmed that the tax office does recognize the Bankruptcy Automatic Stay.


IX.    **Castaic Partners II LLC**
       **Castaic Partners III LLC**
       **Tapia Ranch**

Current Status: Joint Venture between Direct Lenders and DACA.

Prior to Cross receiving the loan administration duties on these three loans, the ARC Estate submitted to the court a collateral valuation on these assets in the amount of $2,000,000; $1,000,000 and $9,151,065 respectively.

Cross held various conference calls and sent numerous vote ballots allowing the direct lenders the ability to approve or reject a sale and/or joint venture. Beginning in October 2010, Cross began extensive communications and negotiations on behalf of a joint venture proposal to include all three assets. In April 2011 the direct lenders concluded a vote which represented a beneficial interest amount equal to 54% for Castaic II, 64% for Castaic III and 52% for Tapia Ranch in favor of entering a joint venture agreement with Howard Justice of Debt Acquisition of American ("DACA") and to form a joint venture partnership between newly formed entities Castaic Investors LLC and DACA/Castaic LLC.

A final vote tally declaration was made by Carol Kesler on April 19, 2011 certifying the direct lender vote approving the joint venture. Direct Lender Daniel Newman became the manager for the direct lenders and created operating agreements and a direct lender operating board of advisors so that the direct lenders could begin managing their own joint venture. This timely joint venture also included DACA setting aside an amount not to exceed $3,000,000 to appeal, reduce and pay off delinquent taxes which were about to go to tax auction sale. The Trustee on behalf of the bankruptcy estate is currently assisting with a tax mediation session involving the County of Los Angeles to resolve a property tax dispute. All closing documents have been posted on the Cross Assets secure password protected website for the direct lenders accessibility.

## X. Comvest Capital

Current Status:  Under Contract, Loan/Note Sale.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $700,000.

During the time Cross managed this loan, Cross brought the direct lenders numerous proposals from loan/note buyers.  In December 2010, Cross held a conference call with the direct lenders and presented numerous offers to acquire the loan/note. The direct lenders directed Cross to move forward with negotiations on the highest offer from ESO Equity Group ("ESO") for approximately $518,500. This transaction was also dependent upon pending resolution of ongoing litigation between borrower and guarantor of the loan. In February 2011 the direct lenders concluded a vote which represented a beneficial interest amount equal to 52% approving the sale of the loan/note to ESO. A final vote tally declaration was made by Carol Kesler on February 1, 2011 certifying the direct lender vote approving the sale.

Since that time, Cross has spent a substantial amount of time with ESO, the Trustee and the borrower finalizing the transaction and entering into the necessary closing documents.  On May 3, 2012, United States Bankruptcy Court, District of Nevada, approved the Ex Parte Application for Authorization to Facilitate Sale of Loan Documents, Including Sale of Estate's Interest (Comvest).  At this time, Cross is moving forward with closing this transaction as directed by the direct lenders.

## XI.  Del Valle – Livingston

Current Status: Sold as REO.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $1,620,000.

Beginning in January 2011 Cross held a conference call and conducted a vote approving Cross to enter into negotiations with the borrower, who now resides in Germany, in effort to receive consent to lease the property to two tenant farmers and to invoke the Assignment of Rents and Lease Proceeds clause in the loan agreement thereby allowing the direct lenders to receive all lease proceeds. The vote was approved in March 2011. Cross was able to collect a total of $67,820 in farm lease revenue for the second half of 2010 and 2011. The farm lease funds are held in escrow by Bridge Title Company for benefit of the direct lenders.

During this time Cross also obtained a vote from the direct lenders approving the hiring and paying of a California real estate attorney and Trustee services firm to initiate a foreclosure to wipe out a $60,423 judgment that Cross discovered on title.  The vote also approved the creation of Del Valle Livingston SPE LLC entity to foreclose into and create an Operating Agreement to govern the SPE. The direct lenders voted to appoint direct lender Daniel Newman to serve as the SPE manager via the Operating Agreement.

Cross held conference calls in October 2011 updating the direct lenders as to the foreclosure process and related costs as well as to present two offers to acquire the REO property.  In October 2011 the direct lenders concluded a vote which represented a beneficial interest amount

equal to 67% approving the sale of the property to Stan Silva and Grissom Family Land & Cattle for a price of $2,887,200.

A final vote tally declaration was made by Carol Kesler on October 24, 2011 certifying the direct lender vote approving the sale. The Trustee filed an Ex Parte Application for sale approval from the Court which was approved by the Court and subsequently sent to the Title Company. Cross informed all direct lenders that upon the close of escrow all proceeds were to be held by and between the Title Company and the Trustee. All closing documents were sent to the Trustee, Daniel Newman, Manager of the SPE and to Cross by the Title Company. Cross also had them posted onto the Cross Assets secure password protected website for the direct lenders accessibility.

In addition to the closing, on January 24, 2012, Trustee's counsel, Mr. Jonathan Dabierri sent Cross an email on behalf of the Trustee requesting that Cross instruct Bridge Title to transfer the farm lease revenue being held in escrow to the SPE Manager Daniel Newman for the benefit of the direct lenders. Cross forwarded Mr. Dabierri's email to Bridge Title and Bridge wired said funds to Daniel Newman. Daniel Newman confirmed the receipt of funds from Bridge Title on January 26, 2012.

## XII. Eagle Meadows

Current Status: Loan Outstanding, Under Contract to Sell Water Rights.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $2,500,000.

Upon receiving the servicing files for Eagle Meadows, Cross initially spent months of investigation coordinating and organizing a complete overview of the loan and how all collateral related to each other. The assets included land and water rights located in Merced County California. The first step was to assess the value of both the land and the water entitlement rights.

Upon further investigation Cross uncovered that the San Luis Water Agency had sold Certificates of Sale to all water entitlements for the previous five year delinquent water district assessments owed to the water district. The amount owed to San Luis Water District to fully redeem the Certificates of Sale totaled approximately $134,000 divided between Fox and Eagle. As it stood, 100% of the Merced water rights were to be forfeited to the water district on May 30, 2011. Upon that event happening, the direct lenders would be wiped out of any water positions with no right of redemption. The water entitlements were the bulk of asset value. In addition to this, Cross alerted all the direct lenders and the Trustee and his counsel as to the punitive property taxes owed on the property that were now reaching $2,500,000 and had been in arrears for five years. Cross informed the Trustee that a Bankruptcy Automatic Stay was needed to prevent a tax sale.

During late 2010 and early 2011 Cross began marketing the property and water assets and negotiated numerous purchase offers for the benefit of the direct lenders. None of the offers placed a value on the land. It appeared that the marketplace was not interested in this area for a future development. The project sits in a tertiary farming community – an area hit so badly by the economic downturn that in 2010 Lowe's Home Improvement Center (the only Home

Improvement Center within thirty square miles) vacated the market. Adding to this, both Fox and Eagle land parcels were Phase II of the overall Fox Hills Specific Plan that included a non-related Phase I plan to be developed before Phase II. Phase I is owned and controlled by Point Center Financial, another hard money lender similar to USACM who was also in bankruptcy. Without all phases being combined in a marketing effort, the market place was viewing the area land as dry-crop farm land. Cross contacted Point Center numerous times and they officially turned down marketing the properties together.

In February 2011, Cross held a conference call with the direct lenders and sent a communication containing a vote to sell the Merced water rights for not less than $1,100 per acre foot, which was the highest offer price per acre foot Cross had received to date. Within these communications, Cross also included a cash call request to pay off the delinquent San Luis Water District bills and redeem the Certificates of Sale as well as to pay for and reserve a portion of 2011 water for the ability to lease it on an annual term. Not enough direct lenders responded to the capital call to advance the necessary funds to preserve their water assets or to reserve 2011 water.

In February 2011, Cross held conference calls and sent communications and a vote to all direct lenders that covered numerous action items needed to preserve asset value and to also monetize asset value. On February 15, 2011 Cross received a declaration from Carol Kessler stating that the direct lenders had voted a 57.71% beneficial interest approving the sale of water rights located in Merced County along with giving Cross the ability to hire a real estate and water attorney to represent the direct lenders interest.

Knowing that the Eagle Meadows loan had not been foreclosed on in 2008 when Compass foreclosed on the associated Fox Hills loan collateral, it appeared that the foreclosure may have been halted due to title problems. In addition, the Eagle collateral has approx. $2,500,000 owed in property tax arrears. Angiola's proposal was only to acquire the water entitlements. Through the advice of the direct lenders real estate and water attorneys, Cross was advised to contact the borrower of the loan, Kent Hoggan, and to structure the water sale through a short term Loan Forbearance and use of the Assignments of Rents and Lease Proceeds clause in the loan agreement. This structure would allow a sale to commence whereby all sale proceeds would be escrowed for the benefit of the direct lenders. Kent Hoggan executed the water sale agreement between himself, acting as borrower, and Angiola Water District.

In late April 2011, Cross was able to place the water rights under contract with Angiola Water District for a price of $1,285 per acre foot. This price represented a 17% increase in price from the price the direct lenders approved. The total consideration of the Angiola Water Sale Agreement would give the direct lenders a total of $2,785,880 at closing on an asset that the ARC Estate previously targeted with a $2,500,000 valuation. In addition to this, Cross was able to lease a small portion of the land in 2011 to a local sheep farmer for a total consideration of $2,712. The sheep lease money is being held in escrow by Bridge Title.

Upon execution of the Angiola Water District Agreements, Angiola released to the Title Company non-refundable earnest money deposit in the amount of $135,000 to be used to fully pay off and redeem the San Luis Water District Certificates of Sale and to preserve the water assets. Through the structuring of the contract with this buyer, Cross was able orchestrate a full redemption of the water assets ONE WEEK before they were to be forfeited with no right of redemption.

In August 2011, Cross was contacted by the Attorney of San Luis Water District and told that the water district was not approving the permanent transfer of the Merced water rights to Angiola. Their reason to block the transaction is based on the current and trailing liability they perceive to exist on transferring a valuable asset (the water entitlements) off of land parcels within their water district when the land parcels are so far in property tax arrears owed to the County. This was a position they have stuck to and have even gone so far as to request Cross post a $10,000 deposit to continue dealing with them on the water transfer. Cross sent a fully briefed communication to the direct lenders alerting them to this action by San Luis Water District and Cross has since requested over a dozen times, by phone communication and email communication, cooperation from the Trustee and his counsel in effort to help negotiate a position to effectuate the sale. Cross has had no response from the Trustee. Cross has continuously worked alongside the buyer, Angiola Water District, in an effort to effectuate the sale of the Merced water entitlements. Cross was successful in working with the Trustee to make sure the County of Merced recognized the Bankruptcy Automatic Stay in effort to hold off any pending property tax sale, of which the property parcels are at risk of in 2012. In an email dated March 16, 2012, Jonathan Dabierri (Trustee's counsel), forwarded Cross an email stating that the County of Merced was on record as acknowledging the Bankruptcy Automatic Stay.

In March 2012, Cross was sent information regarding a lawsuit brought by Kaweah Construction v. Fox Hills Landowners Association, et al. that includes the Fox and Eagle Merced County land. Cross believes this could impact the assets on a title basis and is not sure the outcome of this lawsuit and/or its impact on any recovery on the assets.

Cross requests the assistance of the Trustee to cooperate with Cross and to assist Cross in every manner it can in effort to appeal and reduce the taxes owed on the Merced County land assets which will allow the San Luis Water District the ability to approve the water sale to Angiola Water District. Cross has been able to verbally negotiate an increase in contract value with Angiola to include the Merced land parcels should the property taxes be reduced.

## XIII. Fiesta Murrieta

Current Status: Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $189,000.

In October 2010, Todd Hansen of Platinum Properties acquired the personal guarantee of one of the two guarantors, Lawrence Redmond. A vote was taken by the direct lenders and they overwhelmingly approved the guarantee sale to Todd Hansen for an amount of $80,000. Those funds were sent directly to Bridge Title Company to be held in escrow for the benefit of the direct lenders. In May 2011 a vote was taken and approved by the direct lenders allowing $8,400 to be applied to Cross for Cycle 3 administrative fees due for the six month period of May 1, 2011 thru October 31, 2011. To date, $71,600 remains in escrow with Bridge Title for the benefit of the direct lenders.

In August 2011, Cross presented the direct lenders four separate proposals; three were from loan/note buyers and one was a joint venture proposal. Cross held conference calls and the direct lenders decided to move forward with a joint venture offer from DACA. In October 2011, Cross

sent communications and voting ballots to the direct lenders whereby the direct lenders never voted the required 51% beneficial interest to approve such a sale and/or joint venture.

Most recently, Cross negotiated a $625,000 proposal from a group called NEVCO/Tierra Ray Corporation to a final proposal amount of $834,000 to acquire the loan/note. Cross was also successful in negotiating this buyer out of assuming the remaining personal guarantee of Richard Ashby whereby the direct lenders would retain the guarantee. A conference call was held in March 2012 to discuss the offer whereby the direct lenders requested for Cross to initiate a vote. Cross has repeatedly requested for the direct lender communication team (led by Donna Cangelosi) to send a ballot to all direct lenders but to the knowledge of Cross, nothing has been sent at this time.

## XIV. Fox Hills SPE LLC (Merced County & Fresno County)

Current Status: REO, Under Contract to Sell Water Rights.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $1,500,000.

Upon deliver of the servicing files for Fox Hills, Cross initially spent months of investigation coordinating and organizing a complete overview of the REO, the previous foreclosure actions of Compass and how all collateral tracts related to each other. The assets included land and water rights located in two California counties – Merced and Fresno. The first step was to assess the value of both the land and the water entitlement rights.

Upon further investigation Cross uncovered that the San Luis Water Agency sold Certificates of Sale to all water entitlements for the previous five year delinquent water district assessments owed to the water district. The amount owed to San Luis Water District to fully redeem the Certificates of Sale totaled approximately $134,000 divided between Fox and Eagle. As it stood, 100% of the Merced water rights were to be forfeited to the water district on May 30, 2011. Upon that event happening, the direct lenders would be wiped out of any water positions with no right of redemption. The water entitlements were the bulk of the asset value. Cross also learned that similar water district assessments were severely delinquent in Fresno County. In addition to this, Cross alerted all the direct lenders and the Trustee and his counsel as to the punitive property taxes owed on the property that were now reaching $1,000,000 and had been in arrears for five years. Cross informed the Trustee that a Bankruptcy Automatic Stay was needed to prevent a tax sale.

During late 2010 and early 2011 Cross began marketing the property and water assets and negotiated numerous purchase offers for the benefit of the direct lenders. None of the offers placed a value on the land. It appeared that the marketplace was not interested in this area for a future development. The project sits in a tertiary farming community – an area hit so badly by the economic downturn that in 2010 Lowe's Home Improvement Center (the only Home Improvement Center within thirty square miles) vacated the market. Adding to this, both Fox and Eagle land parcels were Phase II of the overall Fox Hills Specific Plan that included a non-related Phase I plan to be developed before Phase II. Phase I is owned and controlled by Point Center Financial, another hard money lender similar to USACM who was also in bankruptcy. Without all phases being combined in a marketing effort, the market place viewed the land as

dry-crop farm land. Cross contacted Point Center numerous times and they officially turned down marketing the properties together.

In February 2011, Cross held a conference call with the direct lenders and sent a communication containing a vote to sell the Merced and Fresno water rights for not less than $1,100 per acre foot, which was the highest offer price per acre foot Cross had received to date. Cross also included a vote to approve selling the 790 acres of land plus water rights located in Fresno County as well as the ability to negotiate with Sheppard Mullin on the release of approximately $217,000 that was being held by Sheppard Mullin for benefit of the direct lenders. Cross was able to have $90,000 of those funds released and placed into an escrow account being held with Bridge Title for benefit of the direct lenders. Within these communications, Cross also included in the communication a cash call request to pay off the delinquent San Luis Water District bills and redeem the Certificates of Sale, to pay for and reserve the 2011 water thereby hopefully being able to lease it on an annual term. Not enough direct lenders responded to the capital call to advance the necessary funds to preserve their water assets or to pay in advance any 2011 water. Cross also alerted the direct lenders of the servicing claim made by Silar in the amount of $3,300,000.

In February 2011, Cross held conference calls and sent communications and a vote to all direct lenders that covered numerous action items needed to preserve asset value and to also monetize asset value. On February 15, 2011, Cross received a declaration from Carol Kessler stating that the direct lenders had voted their 63.38% beneficial interest approving the sale of water rights located in Merced County along with giving Cross the ability to hire a real estate and water attorney to represent the direct lenders interest. On February 26, 2011, Cross received another declaration from Carol Kessler stating that the direct lenders had voted their 53.15% beneficial interest approving the sale of water rights and land located in Fresno County along with giving Cross the ability to hire a real estate and water attorney to represent the direct lenders interest.

In late April 2011, Cross was able to place the water rights under contract with Angiola Water District for a price of $1,285 per acre foot. This price represented a 17% increase in price from the price the direct lenders approved. Cross was also able to sell the Fresno land for $790 per acre. The total consideration of the Angiola Water & Land Sale Agreements would give the direct lenders a total of $6,935,050 at closing on an asset that the ARC Estate previously targeted as having a $1,500,000 valuation.

The $6,935,050 is comprised of $1,195,050 for the Merced water rights and $5,740,000 for the Fresno water rights and land. In addition to this, Cross was able to lease a small portion of the land in 2011 to a local Sheep farmer for a total consideration of $2,236. That money is held in escrow by Bridge Title.

In June 2011, Cross held another vote with the direct lenders requesting that they allow Cross to pay Cycle 3 administrative fees owed to Cross through the use of the escrowed funds. The direct lenders approved the request and Cross instructed Bridge Title to release those funds to Cross.

Upon execution of the Angiola Water District Agreements, Angiola released to the Title Company non-refundable earnest money deposit in the amounts of $50,000 for Fresno County and $100,000 for Merced County to be used to fully pay off and redeem the water district Certificates of Sale and to preserve the water assets. Through the structuring of the contract with

this buyer, Cross was able orchestrate a full redemption of the water assets ONE WEEK before they were to be forfeited with no right of redemption.

In August 2011, Cross was contacted by the Attorney of San Luis Water District and told that the water district was not approving the permanent transfer of the Merced water rights to Angiola. Their reason to block the transaction is based on the current and trailing liability they perceive to exist on transferring a valuable asset (the water entitlements) off of land parcels within their water district when the land parcels are so far in property tax arrears owed to the County. This was a position they have stuck to and have even gone so far as to request Cross post a $10,000 deposit to continue dealing with them on the water transfer. Cross sent a fully briefed communication to the direct lenders alerting them to this action by San Luis Water District and Cross has since requested over a dozen times, by phone communication and email communication, cooperation from the Trustee and his counsel in effort to help negotiate a position to effectuate the sale. Cross has had no response from the Trustee. Cross has continuously worked alongside the buyer, Angiola Water District in an effort to effectuate the sale of the Merced water entitlements. Cross was successful in working with the Trustee to make sure the County of Merced recognized the Bankruptcy Automatic Stay in effort to hold off any pending property tax sale, of which the property parcels are at risk of 2012. In an email dated March 16, 2012, Jonathan Dabierri Trustee's counsel), forwarded Cross an email stating that the County of Merced was on record as acknowledging the Bankruptcy Automatic Stay.

Also during this time, Cross was also able to uncover that upon Compass' previous foreclosure of the Fox Hills loan collateral back in early 2008, Compass overlooked two parcels that the direct lenders had a claim to by virtue of their loan documents. It appeared that two parcels, located in Fresno County, were held by Fox Hills Fresno Slough, LLC -- an entity that was a borrowing entity listed on the loan documents but had not been perfected by a lien or secured by a deed of trust. Cross worked alongside the [direct lenders] real estate attorney and water attorney and made a claim on the two disputed parcels owned by Fox Hills Fresno Slough, LLC.

On behalf of the direct lenders, Cross and the disputed parcel parties entered into a Loan Forbearance, Mediation and Escrow Agreement whereby the two disputed Fresno parcels would close simultaneously with the other Angiola transaction and the approximately $1,013,000 consideration from those two parcels would be held by the Title Company per an escrow agreement and to be mediated as to who has claim to the proceeds. Cross worked with the Trustee to provide information for his Ex Parte Order to obtain Court approval of the Fox Hills Fresno closing.

On February 15, 2012, the Trustee obtained a Court approved order approving the sale of the Fresno portion. The closing occurred on February 29, 2012 for an amount of $5,740,000. The Title Company sent all closing documents to the Trustee and to Cross. Cross had all documents posted to the Cross Assets website and alerted the direct lenders of the closing.

Cross is currently scheduling mediation with the two disputed Fresno parcels in effort to have the $1,013,000 released to the direct lenders. Again, this was value derived from two land parcels that Compass overlooked in their 2009 foreclosure of the Fox Hills loan.

In March 2012, Cross was sent information regarding a lawsuit brought by Kaweah Construction v. Fox hills Landowners Association, et al. that includes the Fox and Eagle Merced County land.

Cross believes this may impact the assets on a title basis and is not sure the outcome of this lawsuit and/or its impact on any recovery on the assets.

Cross requests the assistance of the Trustee to cooperate with Cross and to assist Cross in every manner it can in effort to appeal and reduce the taxes owed on the Merced County land assets which will allow the San Luis Water District the ability to approve the water sale to Angiola Water District. Cross has been able to verbally negotiate an increase in contract value with Angiola to include the Merced land parcels should the property taxes be reduced.

## XV. **Harbor Georgetown**

Current Status: Sold Loan/Note.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $1,520,000.

When Cross first received the vote from the direct lenders to manage this asset per the MAC Agreement, Cross learned this asset was subject to a Show Cause Hearing by the county for the property to be sold at the upcoming tax foreclosure sale. The direct lenders were days away from losing their investment in total because the period to redeem the taxes were days away. Cross immediately worked diligently with the Trustee to try extend the redemption period due to the automatic stay process. Although the county was reluctant to enter into a long-term stay, they did agree to give the direct lenders a temporary stay so they could pay the delinquent taxes.

In order to save this asset, Cross negotiated a tax payment plan and a $2,000,000 loan payoff with the borrower, Value Ann Arbor Management LLC. In early 2010, the direct lenders concluded a vote approving the transaction based on a two year delayed closing, with the interim consideration of Value Ann Arbor Management paying certain delinquent taxes to prevent a final tax foreclosure.

During this two year term, Cross actively worked with the borrower and the taxing authorities to have taxes paid as they became due. In total, Cross was successful at having the borrower pay multiple delinquent taxes in excess of $800,000 since 2010. In doing so, Cross was able to save the asset from the County of Washtenaw Tax Judicial Foreclosure scheduled in 2010, 2011 and 2012.

In March 2012, Value Ann Arbor Management LLC closed its $2,000,000 purchase through escrow. Cross informed all direct lenders that upon the close of escrow all proceeds were to be held by and between the Title Company and the Trustee. All closing documents were sent to the Trustee and to Cross by the Title Company. Cross also had them posted on the Cross Assets secure password protected website for the direct lenders accessibility. Although Cross spent substantial hours on this transaction for the past two years making sure taxes were paid and facilitating the sale with Value Ann Arbor Management LLC, Cross only billed the direct lenders for three months of administration fees.

## XVI. **HFA Clearlake**

Current Status: Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $3,500,000.

During the time Cross managed this loan, Cross had brought the direct lenders numerous proposals from loan/note buyers, some of which were turned down by the direct lenders and/or did not achieve the statutory 51% beneficial interest vote required to approve such a sale.

The property itself is a boarded up class C apartment complex. The Trustee owns a second lien on the property and therefore the direct lenders cannot foreclose due to the automatic stay. The city has issued the borrower numerous building violations for the current status of the property. The property has substantial delinquent property taxes in arrears and Cross has worked with the Trustee to make sure the County recognizes the Bankruptcy Automatic Stay. The value of the property is the location of the property and its possible redevelopment into a higher and better use.

In early 2011, Cross was successful in obtaining a joint venture proposal from a condo developer to pay the direct lenders $3,000,000 net of taxes, broker fees and closing costs and to also participate with the lenders on the future development of the project once the joint venture partner was successful in foreclosing on the property. During this time, Cross worked with the borrower to have the assessed value of the taxes reduced from $11 million to $2.9 million. Upon a follow up conference call, the lenders decided the better course of action was to request the current borrower to list the property for sale to determine if this was in fact the highest price possible.

Cross obtained the direct lenders consent to work with the borrower as the borrower hired Marcus & Millichap, a very reputable brokerage firm in the area, to list the property for sale. Numerous offers were obtained by Marcus & Millichap with an offer of $4,225,000 being the highest offer. Unfortunately, this price was much lower than the previous $3,000,000 brought by the joint venture once taxes, brokerage and other closing costs were considered. The borrower signed a purchase and sale agreement with this buyer but it was contingent on direct lender approval.

In early January 2012, Cross sent the direct lenders the purchase and sale agreement signed by their borrower. On January 9, 2012, Cross held a conference call to discuss the purchase and sale agreement. On the conference call, the direct lenders instructed Cross to counter the terms of the purchase and sale offer and to inquire if the buyer would be willing to entertain a joint venture structure.

Numerous discussions have happened over the past few months. In March of 2012, the borrower informed Cross that the buyer would not entertain a joint venture structure. The proposed buyer has been in the process of completing its due diligence with the city of West Palm Beach in order to increase its purchase price. At this time, Cross is still waiting on the buyer to respond to whether it can increase its purchase price as requested by the direct lenders.

## XVII.   Huntsville SPE LLC

Current Status: Sold as REO.

Prior to Cross receiving the loan administration duties on this asset, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $900,000.

Prior to Cross being involved with this asset, Cross and the Trustee learned that on October 6, 2009, the property had been foreclosed on by the County for the non payment of approximately $447,278 of property taxes. Cross was able to discover that the property was still within the Texas statutory 180 day redemption period. Cross worked with the county and buyers to fully redeem the property for benefit of the direct lenders. In March 2010 Cross presented the direct lenders with a loan facility to help pay off the taxes and obtain ownership of the property. At the same time, The Trustee filed a motion to sell the property to the Kehl-Huntsville, LLC for $1,050,000, less the amounts owed on the tax redemptions. In June 2010 the sale closed through escrow. All closing documents were sent to the Trustee by the Title Company and subsequently Cross obtained the closing statements and had them posted onto the Cross Assets secure password protected website for the direct lenders accessibility.

In addition to the closing, Cross was also able to discover that upon the October 2009 tax foreclosure, the property had been overbid at tax auction and there remained $163,258.97 in excess funds being held by the Court Registry. Cross, on behalf of the direct lenders, filed an Owners Petition for Excess Funds to be released into an escrow account Cross set up at Bridge Title Company for the benefit of the direct lenders. Cross filed the petition and appeared before the District Court of Walker County, Texas, 12th District and was successful at having the funds released directly to the escrow account currently being held for the benefit of the direct lenders. Upon the sale of the property, Cross subtracted its contractual 3.5% disposition fee of $36,750 from the escrow account. To date, $126,508.97 remains in escrow with Bridge Title for benefit of the direct lenders.

## XVIII.   Lake Helen Partners SPE LLC

Current Status: REO Outstanding.

Prior to Cross receiving the loan administration duties on this asset, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $500,000.

Upon Cross receiving the loan files from the Trustee Cross discovered that Citron, Compass/Silar's local servicing agent in Florida, sold the bulk of this property without consent of the lenders and kept the money without notifying the direct lenders of the sale. Upon discovering this situation, Cross worked with the Trustee to bring a complaint against Citron for conversion of the funds. The Trustee complaint was brought in early 2011 and provided for a constructive trust, for turnover and accounting of funds and breach of fiduciary duty. A copy of the complaint was provided to the direct lenders and posted on the Cross website for the benefit of the direct lenders. The complaint is still pending at this time.

The remaining collateral for this loan is a hodgepodge of vacant lots with no real contiguous development plan. Cross has listed its ownership in the property for sale but has not had any real offers.

## XIX. Margarita Annex

Current Status: Joint Venture approved with Loan from Silar.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $5,000,000.

In January 2011 Cross sent the direct lenders a proposal from Taylor Duncan Interests proposing to buy the note for $5,000,000. Cross held conference calls and sent the direct lenders voting ballots whereby in February 2011 they approved the sale by a 53% majority vote. Cross and Taylor Duncan Interests drafted and subsequently executed loan sale agreements and during their due diligence period, Taylor Duncan decided to pass on the opportunity. Cross informed the direct lenders of Taylor Duncan Interests decision not to move forward.

In May 2011 Cross brought the direct lenders a $5,100,000 offer from First Golf Inc. Cross held conference calls and sent vote ballots whereby the direct lenders vote was just under the 51% majority needed. Cross informed the direct lenders of the vote outcome.

In September 2011, Cross received a joint venture proposal from Dean Pearson. Cross held conference calls and sent the direct lenders voting ballots whereby they approved the joint venture by a 56% majority vote. At the end of October 2011, Dean Pearson had still not placed his required deposit money in escrow and informed Cross that he was terminating the negotiations and was no longer interested in the joint venture. Cross informed the direct lenders of his decision not to move forward.

In November 2011, Cross presented the direct lenders with another buy-out offer from Pacific West Ventures in the amount of $5,200,000. Cross held conference calls and sent the direct lenders voting ballots whereby the Trustee voted the estates approximate 24.42% interest against the sale and the direct lenders never reached the statutory majority to approve the sale. Cross informed the direct lenders of the vote outcome.

In February 2012, Cross presented a joint venture offer to the direct lenders from Donna Cangelosi, Dean Pearson and Silar to provide loan funding in the amount up to $1,132,150 to hold the property for future development. Funding of the Silar loan was approved by the Court on April 19, 2012.

## XX. Mountain House Business Park (Regents Gate)

Current Status: Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $3,825,000.

In December 2010, Cross was able to negotiate a $1,600,000 note repurchase with the borrower Michael Clevenger of Pegasus Ventures. Cross held conference calls and sent the direct lenders vote ballots whereby the direct lenders voted a 53.52% beneficial interest to move forward with the sale to Pegasus. Cross worked with Pegasus on loan sale agreements and both parties

executed the agreements in late December 2010. Pegasus then failed to perform under the terms of the agreement. Cross notified the direct lenders of this situation.

In August 2011, Cross held a conference call with the direct lenders to discuss foreclosure options and discussed a capital call with the lenders to pay off delinquent taxes owed. Cross sent communications but never received funds from the direct lenders sufficient to pursue either a foreclosure or tax pay off. Cross informed all the direct lenders of the vote outcome.

In April 2011, Cross sent the direct lenders communications regarding a $1,500,000 offer from Global Investment & Development, whereby they offered to purchase the property subject only to a foreclosure of the property and to receive clear title. Cross asked the direct lenders to provide funds to foreclosure and to move forward with the offer and received no response from the direct lenders.

In February 2012, Cross submitted the direct lenders another offer from Pegasus to purchase the note for $1,650,000. Cross held a conference call with the direct lenders and sent communications and a vote ballot whereby the direct lenders never reached the statutory 51% majority vote to move forward with Pegasus. The vote only reached 29.67% in favor of the offer. Cross notified the direct lenders of the situation.

In March 2012, Cross received yet another offer from Pegasus, offering to acquire the note for $2,500,000 with some additional stipulations. Cross held a conference call alerting the direct lenders of the offer.

In May 2012, Cross received another offer from Global Investment & Development to enter into an agreement with the direct lenders in order to pay $20,000 to foreclose on the property and once free and clear title is obtained, to then acquire the property for $1,600,000. Cross sent the letter of intent to the direct lender communication team led by Donna Cangelosi so the offer could be disseminated to all the direct lenders in this loan.

## XXI. Ocean Atlantic SPE LLC

Current Status: Sold REO.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $902,500.

During the time Cross managed this loan, Cross noticed that Compass previously foreclosed on the loan, title was taken in the name of Asset Resolution Corporation instead of the direct lenders. Cross worked with the Title Company as well as with the Trustee to correct the problem and the Trustee sought and received court authorization to transfer title to the direct lenders SPE LLC.

During this timeframe, Cross also took a vote from the direct lenders authorizing Cross to lease the land to tenant farmers. Cross was successful in doing so and had approximately $24,012.50 placed into escrow with Bridge Title for the benefit of the direct lenders.

In May 2011 a vote was taken and approved by the direct lenders allowing $12,600 to be applied to Cross for Cycle 3 administrative fees due for the six month period of May 1, 2011 thru

October 31, 2011. To date $11,412.50 remains in escrow with Bridge Title for the benefit of the direct lenders.

In April 2011 the direct lenders voted a beneficial interest amount equal to 57.38% in favor of selling the property to Mr. John Myers for $1,280,000. A final vote tally declaration was made by Carol Kesler on April 28, 2011 certifying the direct lender vote approving the sale. The sale closed through escrow in December 2011. The Trustee filed an Ex Parte Application for sale approval from the Court which was approved by the Court and subsequently sent to the Title Company. Cross informed all direct lenders that upon the close of escrow all proceeds were to be held by and between the Title Company and the Trustee. All closing documents were sent to the Trustee and to Cross by the Title Company. Cross had them posted onto the Cross Assets secure password protected website for the direct lenders accessibility.

## XXII.   Oak Shores II

Current Status:  Loan Outstanding.

Prior to Cross receiving the loan administration duties on this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $3,000,000.

During the time Cross has managed this loan, Cross has sent the direct lenders many communications describing the tax situation on the individual lot parcels as well as overviews of the property and existing problems with the physical collateral of the loan.  This asset is located on a lake property and is a secondary home market.  Cross has received very little interest in this property and has marketed the note heavily.

In October 2011, Cross presented the direct lenders with a $600,000 offer for the note from Richardson Properties. During the conference call, the majority of the lenders rejected the offer. Cross went back to Richardson properties and tried to increase the offer several times.  Through additional due diligence conducted by Richardson Properties, they determined to withdrawal the offer and elected to present a joint venture proposal to the direct lenders.

In April 2012, Cross received a joint venture proposal from Charlie Richardson on behalf of his development partner, Bolero Development.  The joint venture allowed the direct lenders to contribute the land into the venture for a capital basis of $1,200,000 plus foreclose on the loan, pay off all property taxes, repair all outstanding issues related to the property, prepare the property for development and use their market expertise to develop the property and allow the direct lenders to participate with a back-end equity position.  Upon Donna Cangelosi and Terry Helms reading the joint venture offer, they believed the joint venture terms needed to be better defined and the direct lenders needed a larger back-end equity stake.  To date, Cross has asked Bolero to provide more detailed information on the joint venture, provide more information on their scope of services, sources of funding and to provide a development budget.  Cross has yet to receive any of this information.  Cross sent all correspondence to the direct lender communication team led by Donna Cangelosi, and has also put the buyer in direct contact with both Donna Cangelosi and Terry Helms.

As set forth in the Asset Summary Report, the asset collateral will be placed on the County's Power of Sale list, to be sold in May 2013 should a Payment Plan or a Plan of Redemption not be initiated beforehand. Upon learning this, Cross immediately emailed the Trustee a detailed

property tax overview itemizing each of the 59 tax parcels by APN number and tax amounts owed in arrears. Cross encouraged the Trustee and Trustee's counsel to call the County of San Luis Obispo tax office and to obtain notice that the County recognizes the Bankruptcy Automatic Stay which will put on hold and prevent any adversarial tax power of sale process from being initiated. Cross provided all contact information to the Trustee and his counsel.

## XXIII.   The Gardens LLC $2,425,000

Current Status:  Loan Outstanding.

Prior to Cross receiving the loan administration duties on these this loan, the ARC Estate submitted to the court a collateral valuation on this asset in the amount of $270,000.

The overall Gardens project involves three related loans – The Gardens 2.425, The Gardens Phase II and The Gardens Timeshare.  The direct lenders own the Gardens 2.425 loan while the ARC Estate owns an interest in each loan and a 100% interest in the Gardens Phase II.  At the time Cross received the managerial duties on this loan, no lender or anyone involved with this loan (that Cross spoke to), had any idea as to what the loan collateral actually was. Cross ran title, worked with area brokers and the people involved in the project and to date, there seems to be a title issue and what may seem to be non recorded lien releases by USA capital before they declared bankruptcy.

Each of the three loans are intertwined and dependent on the Parliament House – a 116 room hotel and nightclub for the alternative lifestyle community. We have read numerous newspaper articles discussing the default and near term foreclosure on the Parliament House. To date Cross has not been able to bring a qualified buyer to the table in an amount that exceeds the property taxes owed. The few potential buyers Cross has spoken to have all backed out upon their formalizing of proper due diligence.  The asset is located within a high crime area that continues to diminish as to property value.

In April 2010 Cross reached out numerous times to the Trustee in effort to work together. Cross sent numerous detailed emails describing the situation, alerting the Trustee to property taxes in arrears and the dire need to combine efforts on a work-out and to clean up title.  To date Cross has had no assistance.

In October 2011 Cross held conference calls with the direct lenders updating them to the issues faced on this asset and their connection to the other loans. Cross believes the loan will best be managed by the Trustee whereby they can combine both assets for higher marketing purposes.

**Exhibit "C"**
**Bridge Title & Republic Title Escrow Accounts for Benefit of the Direct Lenders**

| Escrow Account Name & Title Co. | Escrow Account No. | Current Balance | |
|---|---|---|---|
| 60th Street - Bridge Title Escrow | 430015xxxx | $ 364,645.00 | |
| Del Valle Livingston - Bridge Title Escrow | 430015xxxx | $ - | Closed out. |
| Eagle Meadows - Bridge Title Escrow | 430015xxxx | $ 2,712.00 | |
| Eagle Meadows - Republic Title Escrow | 4503xxxx | $ 23,330.64 | |
| Fox Hills - Republic Title Escrow (Merced) | 4503xxxx | $ 7,539.88 | |
| Fox Hills - Republic Title Escrow (Fresno) | 4503xxxx | $ 73,469.46 | |
| Fox Hills - Bridge Title Escrow | 430015xxxx | $ 43,074.25 | |
| Fiesta Marietta - Bridge Title Escrow | 430015xxxx | $ 71,600.00 | |
| Huntsville - Bridge Title Escrow | 430015xxxx | $ 126,508.97 | |
| Ocean Atlantic - Bridge Title Escrow | 430015xxxx | $ 11,412.50 | |

Note: These balances reflect the amounts given to Cross by the respective Title Company.
       Balances may vary by less than $20 due to Title Company wire fees.

**Exhibit "D"**
**Outstanding Administrative Management Fees Owed to Cross**

| Asset / Loan Name | Open Invoice Total: Cycles 1, 2 & 3 | Open Invoice Total: Cycle 4 11/1/11 thru 5/31/12 | Open Invoice Total: Cycles 1, 2, 3 & 4 |
|---|---|---|---|
| Binford | $ 22,980.00 | $ 12,600.00 | $ 35,580.00 |
| Bundy 2.5 | $ 10,170.00 | $ 4,760.00 | $ 14,930.00 |
| Bundy 5.0 | $ 12,930.00 | $ 6,020.00 | $ 18,950.00 |
| Bundy 5.725 | $ 15,750.00 | $ 7,280.00 | $ 23,030.00 |
| Bundy 7.5 | $ 19,890.00 | $ 11,340.00 | $ 31,230.00 |
| Clear Lake | $ 58,580.00 | $ 28,840.00 | $ 87,420.00 |
| Comvest | $ 15,330.00 | $ 7,700.00 | $ 23,030.00 |
| Eagle Meadows | $ 66,625.00 | $ 41,300.00 | $ 107,925.00 |
| Fiesta Murrieta | $ 15,540.00 | $ 9,800.00 | $ 25,340.00 |
| Fox Hills | $ - | $ 17,940.00 | $ 17,940.00 |
| Gardens | $ 8,250.00 | $ 4,620.00 | $ 12,870.00 |
| Lake Helen | $ 9,150.00 | $ 4,620.00 | $ 13,770.00 |
| Margarita Annex | $ 26,100.00 | $ 13,720.00 | $ 39,820.00 |
| Mountain House | $ 55,020.00 | $ 28,000.00 | $ 83,020.00 |
| Oak Shores | $ 50,400.00 | $ 23,940.00 | $ 74,340.00 |
| Totals | $ 386,715.00 | $ 222,480.00 | $ 609,195.00 |

Note: The Fox Hills admin accrual fee reflects the months of March, April and May 2012, payable at $20 per month per lender. Fox Fresno portion closed February 29, 2012. All admin accrual as of that date were paid through the Title Co at closing.

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Cotton, Driggs, Walch, Holley, Woloson & Thompson, and that on the 21st day of June, 2012, I caused to be served a true and correct copy of CROSS FLS, LLC'S STATUS in the following manner:

☒ (ELECTRONIC SERVICE) Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

An employee of Cotton, Driggs, Walch, Holley, Woloson & Thompson

- 6 -

09558-01/901630.doc

**<u>EXHIBIT G</u>**
**DECLARATION**

5985230-1

1   SULLIVAN, HILL, LEWIN, REZ & ENGEL          **Electronically Filed:  May 15, 2013**
    A Professional Law Corporation
2     James P. Hill, CA SBN 90478 (Pro Hac Vice)
      Jonathan S. Dabbieri, SBN 91963 (Pro Hac Vice)
3     Elizabeth E. Stephens, NV SBN 5788
    228 South Fourth Street, First Floor
4   Las Vegas, NV 89101
    Telephone:  (702) 382-6440
5   Fax Number: (702) 384-9102

6   Attorneys for Chapter 7 Trustee,
    William A. Leonard, Jr.

7

8                       UNITED STATES BANKRUPTCY COURT

9                             DISTRICT OF NEVADA

10  In re                              )   CASE NO. BK-S-09-32824-RCJ (Lead Case)
                                       )
11  ASSET RESOLUTION, LLC,             )   Jointly Administered with Case Nos.:
                                       )   BK-S-09-32831-RCJ;  BK-S-09-32839-RCJ;
12              Debtor.                )   BK-S-09-32843-RCJ;  BK-S-09-32844-RCJ;
                                       )   BK-S-09-32846-RCJ;  BK-S-09-32849-RCJ;
13                                     )   BK-S-09-32851-RCJ;  BK-S-09-32853-RCJ;
                                       )   BK-S-09-32868-RCJ;  BK-S-09-32873-RCJ;
14                                     )   BK-S-09-32875-RCJ;  BK-S-09-32878-RCJ;
                                       )   BK-S-09-32880-RCJ;  BK-S-09-32882-RCJ
15                                     )
    _____)   Chapter 7
16  Affects:                           )
    ☒ All Debtors                      )
17    ☐ Asset Resolution, LLC, 09-32824 )   **DECLARATION OF DONNA**
      ☐ Bundy 2.5 Million SPE, LLC, 09-32831 )   **CANGELOSI IN OPPOSITION TO**
18    ☐ Bundy Five Million SPE, LLC, 09-32839 )   **HFAH CLEAR LAKE LLC'S MOTION**
      ☐ CFP Anchor B SPE, LLC, 09-32843 )   **FOR RELIEF FROM THE**
19    ☐ CFP Cornman Toltec SPE, LLC, 09-32844 )   **AUTOMATIC STAY PURSUANT TO**
      ☐ CFP Gess SPE LLC, 09-32846     )   **11 U.S.C. § 362(d)(1)**
20    ☐ CFP Gramercy SPE, LLC, 09-32849 )
      ☐ Fiesta Stoneridge, LLC, 09-32851 )
21    ☐ Fox Hills SPE, LLC, 09-32853   )
      ☐ HFAH Monaco SPE, LLC, 09-32868 )
22    ☐ Huntsville SPE LLC, 09-32873   )
      ☐ Lake Helen Partners SPE LLC, 09-32875 )   Ctrm:  RCJ - Courtroom 6
23    ☐ Ocean Atlantic SPE LLC, 09-32878 )          Bruce R. Thompson Federal Building
      ☐ Shamrock SPE LLC, 09-32880     )          400 S. Virginia Street
24    ☐ 10-90 SPE, LLC, 09-32882       )          Reno, NV 89501
25    _____)   Judge: Hon. Robert C. Jones

26  / / /

27  / / /

28  / / /

    352815-v1                     - 1 -

I, Donna Cangelosi, declare:

1. I am over the age of majority and competent to testify as to all matters hereinafter set forth, all of which are true and correct and of my own personal knowledge. If called as a witness I could testify competently as set forth herein.

2. In 2011, Cross FLS, as servicer of the first mortgage, together with HFAH, entered into negotiations with Revenue Properties (US), Inc. to sell the property which is the subject of this motion for $4,225,000. I participated in those negotiations. During those negotiations, the law firm of Stutsman, Thames & Markey represented Revenue Properties (US), Inc., the potential buyer. Those discussions culminated in a proposed sale of the property to Revenue Properties (US), Inc. for $4,225,000. That offer was presented to the direct lenders associated with these loans for a vote and they rejected it.

3. The previous sale negotiations included a requirement by the borrower that its parent company be released from its guaranty.

4. The prior negotiations resulted in a signed Buy/Sale Agreement, including at least one amendment to that document. There were discussions about other proposed amendments as well.

5. In or near July, 2012, together with Arthur Kriss and Dean Pearson, I visited West Palm Beach, Florida and inspected the subject property. While we were there, we met with taxing authorities and municipal leaders, multi-family developers, construction company representatives, and brokers. As a result of these meetings, it has been concluded that the highest and best use of the property would be its development as a three-story walkup garden apartment structure consisting of between 275 and 396 units. This is more fully set forth in the report prepared by Edward Mitnick at our request.

6. In the meetings with developers and other real estate professionals, they all spoke of the strengthening of the market, that it was continuing to improve, and that it was a hot market.

7. During these meetings I confirmed with city authorities that they would waive the code enforcement penalties and fines (in the approximate amount of $1,000,000) if the structures which were on the property are demolished. The demolition of those properties is a part of the expected development of the property by the direct lenders. During my meetings with the county tax

collector's office, they indicated a willingness to accept a reduced amount in satisfaction of the delinquent taxes, penalties, and interest, although no specific figure has been agreed upon. During these meetings I also confirmed with the county tax collector's office that they acknowledge they are stayed from foreclosing upon the property. The property is therefore in no danger of foreclosure.

8.      The direct lenders are moving diligently to be in a position to develop the property. It is intended to set up a TDI representative organization with Arthur Kriss and me as the TDI reps. The organization will then borrow money to foreclose upon the property, demolish the existing structures, negotiate tax and penalty concessions, and obtain entitlements to develop the property. It will then be sold to a buyer as a non-distressed asset versus the current proposed sale.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and of my own personal knowledge.

Executed this 15th day of May, 2013, at _____5:04PM_____.

Donna Cangelosi